1  SEAN K. KENNEDY (No. 145632)
   Federal Public Defender
2  sean_kennedy@fd.org
   JOHN LITTRELL (No. 221601)
3  Deputy Federal Public Defender
   john_littrell@fd.org
4  Office of the Federal Public Defender
   321 East Second Street
5  Los Angeles, California  90012
   Telephone (213) 894-5310
6  Facsimile (213) 894-0081

7  Attorneys for Defendant
   RICHARD MICHAEL WELTON

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                WESTERN DIVISION

12

13  UNITED STATES OF AMERICA,        )   NO. CR 09-153-MMM
                                     )
14            Plaintiff,             )   NOTICE OF MOTION; MOTION
                                     )   TO SUPPRESS STATEMENTS;
15       v.                          )   MEMORANDUM OF POINTS
                                     )   AND AUTHORITIES
16  RICHARD MICHAEL WELTON,          )
                                     )   DATE:    July 13, 2009
17            Defendant.             )   TIME:    1:15 p.m.
                                     )   JUDGE:   Hon. Margaret M.
18  _____ )            Morrow
                                         ROOM:    7
19
    TO:   UNITED STATES ATTORNEY THOMAS O'BRIEN, AND ASSISTANT
20
    UNITED STATES ATTORNEY LANA MORTON-OWENS:
21

22
          PLEASE TAKE NOTICE that on July 13, 2009, at 1:15 p.m., or as soon
23
    thereafter as counsel may be heard, in the courtroom of the Honorable Margaret M.
24
    Morrow, United States District Judge, defendant Richard Welton will bring on for
25
    hearing the following motion:
26
    ///
27
    ///
28
    ///

1

**MOTION**

2          Defendant Richard Welton, by and through his attorney of record, Deputy Federal

3   Public Defender John Littrell, hereby moves this Honorable Court for an order

4   suppressing Welton's statements made on September 18, 2008 to FBI Special Agent

5   Stephanie Benitez.  This motion is made pursuant to the Fifth and Sixth Amendments to

6   the United States Constitution and is based upon the attached Memorandum of Points and

7   Authorities, Declarations, Exhibits, all files and records in the case, and any other such

8   evidence and argument as may be presented at the hearing.

9

10                                              Respectfully submitted,

11

12                                              SEAN K. KENNEDY
                                                Federal Public Defender
13

14   DATED: June 29, 2009                  By _____/s/_____
                                                JOHN LITTRELL
15                                              Deputy Federal Public Defender

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Richard Welton is charged with receipt of child pornography, 18 U.S.C. 2252A(a)(2)(A), (b)(1) and possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B), (b)(2).  Trial is scheduled to commence on July 21, 2009.

In support of the charges in the indictment, the Government will attempt to introduce statements made by Mr. Welton during an interrogation that was conducted by FBI Special Agent Stephanie Benitez on September 18, 2008.

This motion seeks to suppress statements made by Mr. Welton during that interview because Mr. Welton was subjected to custodial interrogation without a valid Miranda waiver, and because his statements were involuntary, being the product of improper psychological coercion and deliberate lies by Special Agent Benitez.

## II.   STATEMENT OF FACTS

Mr. Welton has an extensive history of being the victim of sexual abuse.

When he was about four years old, Mr. Welton was walking by a church by his home.  He was lured into the church by a man who offered him candy.  The man then performed oral sex on him and tried to force Mr. Welton to do the same to him.  Mr. Welton said no and the man hit him in the genitals.  Mr. Welton ran away and cried.  He never told anyone about it.  Although Mr. Welton knew that something about the experience was wrong, he didn't know how to approach an adult and explain what had happened.  See Exhibit A (Declaration of Dr. Nathan Lavid) at ¶ 10.

When Mr. Welton was about seven or eight years old, he was sexually abused a second time by a man who took him to a car and performed oral sex on him.  The man was interrupted when people approached the car.  Id. at ¶ 11.

The third time Mr. Welton was sexually abused as a child was when he was about nine or ten years old.  Mr. Welton was raped by a stranger who took him to a car

1   in a remote parking lot.  There was nobody there to stop the abuse.  Id. at ¶ 12.

2          On August 23, 2007, a church custodian found approximately 95 pages of

3   computer printouts which contained images of child pornography in the nursery area

4   of the First Presbyterian Church in Covina, CA.  Although most of the images were

5   adult pornography or other lawful material, about 10-20 pages appear to consist of

6   child pornography.

7          On September 18, 2008, Mr. Welton's parole officer, Eric Carreon, came to

8   Sornoso Auto Repair in Covina, California.  Mr. Welton worked as an auto mechanic

9   there and lived on the premises. With Mr. Carreon was at least one other parole agent

10  as well as Covina Police.   Exhibit B (FBI 302 Re: September 18, 2008 Interview).

11  The parole officers and Covina police were there to conduct a parole search.  Also

12  with Mr. Carreon was Federal Bureau of Investigation ("FBI") Special Agent

13  Stephanie Benitez and her partner, Task Force Officer Bernell Trapp.  Id.  They were

14  there to interrogate Mr. Welton regarding the print images found in the church.  Id.

15         Mr. Welton was carrying a water bottle to the cooler near the garage where he

16  worked when the officers approached.  Exhibit C (Declaration of Richard Welton) at ¶

17  3.  When Officer Carreon saw Mr. Welton, he said "Turn around.  Put [the water

18  bottle] down.  Come with us.  They need to talk to you."  Id. at ¶ 3.  Mr. Welton

19  assumed, correctly, that Mr. Carreon was there to conduct a parole compliance search.

20  Officer Carreon mentioned to Mr. Welton that he "didn't want to run" after him, and

21  told Mr. Welton that he had already had to run after a person that day.  Previously,

22  when parole compliance searches have been conducted, Mr. Welton was told that he

23  was not free to leave during the course of the search.  On several occasions, Mr.

24  Welton was handcuffed during parole compliance searches.  When Officer Carreon,

25  his parole officer, told Mr. Welton to "turn around" and informed him that "they

26  "need to talk to [him,]" Mr. Welton did not feel free to leave.  Id. at ¶ 5.

27         Shortly thereafter, Special Agent Benitez escorted Mr. Welton to an office in

28  order to interrogate him regarding the images that had been found in the church.

1  At the outset of the interview, Special Agent Benitez made it clear to Mr. Welton that

2  she knew of Mr. Welton's extensive history as a victim of child sexual abuse: <u>See</u>

3  Exhibit D (Transcript of September 18, 2009 Interview of Richard Welton) at 2 ("I've

4  actually, um, been learning a lot about you, so, Richard.  And, um, this isn't any,

5  anything that we just kind of stumbled upon.").  After a long discussion regarding Mr.

6  Welton's history and personal life, but before asking any questions regarding the

7  circumstances of this case, Special Agent Benitez again turned the conversation

8  toward  Mr. Welton's past experience as a victim of child sexual abuse.

9        Um, we know where you're coming from.  Um, we, uh, I've looked at

10        a lot of your reports from the past regarding churches and, and some

11        of, some of your records from that.  I also know, um, I believe your,

12        your mom was interviewed about maybe something that happened to

13        you when you were younger.  And we understand that; we understand

14        there's reasons for, for what you do, okay?  And I, um, I'm sorry, I'm

15        sorry those things happened to you . . . .

16  Exhibit D at 15.  Immediately after making those statements, Special Agent Benitez

17  attempted to administer <u>Miranda</u> warnings to Mr. Welton.  <u>Id.</u> at 16.  Even as she did

18  so, she expressed to Mr. Welton that she "felt for him."  <u>Id.</u> at 16 ("Um, but again, um,

19  Richard I, I, I feel for you and I, I understand, okay?").  Special Agent Benitez read

20  the rights so quickly and ran the words together that  Mr. Welton did not understand

21  what she said.  <u>See</u> Declaration of Richard Welton at ¶ 6; <u>see also</u> Exhibit D at 21

22  ("let me read this to ya real quick and then we'll, we'll continue.")

23        Mr. Welton proceeded to describe his childhood sexual abuse to Special Agent

24  Benitez in detail.  <u>See</u> Exhibit D at 25-32.  At one point, Special Agent Benitez

25  offered to use her "pull" to help figure out who had hurt him.  <u>Id.</u> at 27.

26        When Mr. Welton expressed any reluctance to speak, Special Agent Benitez

27  took a more confrontational tone.  In order to coerce him into confessing, Special

28  Agent Benitez told two deliberate lies to Mr. Welton about the evidence against him:

5

1    First, Special Agent Benitez told Mr. Welton that his fingerprints were found

2   on the images that had been recovered from the church, when she knew that they had

3   not.  Exhibit D at 39 ("Well, we, we know you were in there, Richard, I mean, we

4   know, we know you were in there because your, your prints were on them.  So it's not

5   a question if you were or [i]f you weren't.  Again, it's a question of why?").

6    Second, Special Agent Benitez told Mr. Welton that phone records from the

7   church established that Mr. Welton had been there multiple times, when she had not

8   checked the phone records and did not know what they would establish.  Exhibit D at

9   53-54 ("The only thing that concerns me is when we checked the phone records before

10   from the church on Second . . . the records indicate that you were there more than

11   twice.").[1]  Ultimately, following the discussion of his childhood sexual abuse and

12   based on a false understanding of the evidence against him, Mr. Welton  made

13   incriminating statements that linked him to the images found in the church.

14

15    **III.    ARGUMENT**

16   **A.    Mr. Welton's Confession Was Taken In Violation of his Miranda Rights**

17    A suspect's statements made during custodial interrogation cannot be used

18   against him at trial unless the defendant is first advised of his right to remain silent,

19   the fact that his statements may be used against him, and his right to the presence of

20   counsel prior to questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).

21    A defendant is in "custody" for the purposes of the Miranda analysis if, taking

22   into account the totality of the circumstances, a reasonable person would not have felt

23   free to leave.  See United States v. Hernandez, 476 F.3d 791, 796 (9th Cir. 2007)

24   (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  A person is in custody if

25   he is "effectively deprived of his freedom of movement." United States v. Bekowies,

26   432 F.2d 8, 12 (9th Cir. 1970); see also Orozco v. Texas, 394 U.S. 324, 325(1969)

27   _____

28    [1] The First Presbytarian Church, where the images containing child
pornography were found, is located at 310 N. Second Avenue in Covina, CA.

6

1  (holding that criminal defendant was "in custody" for the purpose of evaluating his

2  Miranda claim when four police officers had entered his bedroom to question him and

3  he was not "free to leave."). A suspect is "interrogated" if he is questioned or there is

4  any other activity by law enforcement that would be "reasonably likely to elicit an

5  incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

6          Mr. Welton was in custody at the time he was ordered by his parole officer to

7  "turn around" and "put down" the water bottle he was carrying. At that point, Mr.

8  Welton was effectively detained, because he did not feel "free to leave, nor would a

9  reasonable person subject to parole supervision have felt "free to leave." Moreover,

10  Officer Carreon's statement to Mr. Welton that the FBI "needed to talk" to him, taking

11  into account the circumstances, left him feeling that he had no choice but to comply.

12  See Kaupp v. Texas, 538 U.S. 626, 630 (2003) (finding that suspect was seized when

13  three police officers roused him out of bed at 3:00 a.m. and told him "we need to go

14  and talk"). Although Special Agent Benitez told Mr. Welton that he was "not in

15  custody," and that "it has nothing to do with that," see Exhibit D at 3, this was not

16  entirely true given the fact that Mr. Welton was required to follow the orders of his

17  parole officer. Because Mr. Welton's parole officer was conducting a compliance

18  search, Mr. Welton believed that he was not, in fact, "free to leave" at the time he was

19  interrogated by Special Agent Benitez. And based on Mr. Welton's previous

20  experiences during parole compliance searches, his belief was reasonable.

21          Mr. Welton was clearly interrogated when Special Agent Benitez asked him

22  direct questions that cut to the heart of the Government's suspicions about him -

23  whether he possessed images of child pornography in the First Presbytarian Church in

24  Covina. Therefore, the Government has the burden of establishing that Mr. Welton

25  was properly Mirandized prior to making any statements in response to the agents'

26  interrogation, and that he knowingly and voluntarily waived his Miranda rights, or

27  that one of the exceptions to the Miranda rule applies. See Miranda, 384 U.S. at 479.

28  ///

1  **B.**      **Special Agent Stephanie Benitez Violated Mr. Welton's Fifth Amendment**

2             **Right to Due Process of Law When She (1) Repeatedly Referred To His**

3             **History of Being a Victim of Sexual Abuse And Implied That She Was**

4             **There to Help Find His Abuser, and (2) Told Deliberate and Calculated**

5             **Lies About The Evidence Against Him In Order to Elicit A Confession**

6             The Due Process Clause of the Fifth Amendment to the United States

7  Constitution guarantees that "(n)o person. . . shall be compelled in any criminal case

8  to be a witness against himself." U.S. Const. amend. V.  It follows from the Fifth

9  Amendment's guarantee that a defendant's involuntary confession cannot be

10 admitted at trial without violating constitutionally-protected due process rights.

11 Jackson v. Denno, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964).  Accordingly, a

12 defendant who objects to the admission of a confession on the grounds that it was not

13 made voluntarily has a constitutional right to an evidentiary hearing to determine the

14 voluntariness of the confession before it is heard by a jury.  Id. at 376-77.  An

15 evidentiary hearing is also compelled by Title 18, Section 3501, which provides that

16 "(b )efore . . . a confession is received in evidence, the trial judge shall, out of the

17 presence of the jury, determine any issue as to voluntariness." At the hearing, "both

18 the underlying factual issues and the voluntariness of (the) confession (must be)

19 actually and reliably determined."   Jackson, 378 U.S. at 380.

20            The government bears the burden of proving, by a preponderance of the

21 evidence, that the defendant's statements were voluntary.  Lego v. Twomey, 404 U.S.

22 477,489 (1972). A statement is involuntary if it is "extracted by any sort of threats or

23 violence (or) obtained by any direct or implied promises, however slight, (or) by the

24 exertion of any improper influence." United States v. Guerrero, 847 F.2d 1363, 1366

25 (9th Cir. 1988) (citation and internal quotation omitted); see also United States v.

26 Turner, 926 F.2d 883, 888 (9th Cir.1991).  If the court determines that the defendant's

27 statement to law enforcement was involuntary due to the improper application of

28 psychological pressure, the confession is inadmissible at trial. See Lynumn v. Ilinois,

8

372 U.S. 528 (1963) (threats to a mother that state financial aid to her infant children would cease if she failed to cooperate rendered her confession involuntary); United States v. Tingle, 658 F.2d 1332, 1337 (9th Cir. 1981).  To determine whether a defendant's confession was involuntary as a result of psychological coercion, courts look to all the surrounding circumstances to determine "whether . . . the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).  The government has the burden of proving by a preponderance of the evidence that Mr. Welton's statements in response to Special Agent Benitez' questioning were voluntary.  Lego, 404 U.S. at 489.

In this case, Special Agent Benitez used improper influence to coerce Mr. Welton to confess by manipulating the grief and confusion caused by his childhood sexual abuse.  Special Agent Benitez knew that Mr. Welton was the victim of sexual abuse on multiple occasions, knew that the experience was painful, and knew that Mr. Welton's conduct of viewing child pornography was directly related to his traumatic experience as a child.  She used that knowledge to improperly coerce him into confessing by offering him the empathy and validation that a mental health professional would have provided.  Because of Mr. Welton's fragile emotional state, he was unable to think clearly or weigh the consequences of confessing his conduct to a federal agent.  See Leyra v. Denno, 347 U.S. 556, 559-60 (confession involuntary where it was the product of psychological pressure applied by state psychiatrist, who "by subtle and suggestive questions . . . induce[d] petitioner to admit his guilt.")

In addition, Special Agent Benitez repeatedly lied to Mr. Welton regarding the evidence against him.  She claimed that his fingerprints were found on the material recovered from the church, when she knew that was not true.  Exhibit D at 39.  She falsely claimed that phone records from the church proved that Mr. Welton was there multiple times, and accused Mr. Welton of lying to her when he said otherwise.  See Exhibit D at 53-54.  These deliberate lies were targeted to make Mr. Welton feel

9

1 hopeless and convince him that confessing to Special Agent Benitez was his only way

2 out.  Although mere deception by an interrogating officer has been found insufficient

3 to overbear a suspect's will in some cases, see United States v. Miller, 984 F.2d 1028,

4 1031 (9th Cir. 1993), false claims regarding the evidence against the accused has been

5 found to be sufficient to render a confession involuntary when it is used in

6 combination with other coercive techniques.  See United States v. Tingle, 658 F.2d

7 1332 (9th Cir. 1981) (confession found involuntary where interrogator falsely claimed

8 that accomplice had implicated defendant in a robbery).

9

10 **IV.  CONCLUSION**

11 The government violated Mr. Welton's Miranda rights when it subjected him

12 to custodial interrogation without a valid Miranda waiver.  The Government violated

13 Mr. Welton's right to due process of law when Special Agent Stephanie Benitez

14 manipulated Mr. Welton's by expressing empathy for his history as a victim of sexual

15 abuse in order to coerce him to answer her questions and then deliberately lied to him

16 regarding the existence of evidence against him.  The combination of these two

17 improper tactics overbore Mr. Welton's will to resist and coerced him into confessing.

18 His confession was involuntary and should be suppressed.

19

20 Respectfully submitted,

21 SEAN K. KENNEDY
Federal Public Defender

22

23 DATED:      June 29, 2009              By_____/s/_____

24 JOHN LITTRELL
Deputy Federal Public Defender

10