THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
J. LANA MORTON-OWENS
Assistant United States Attorney
California State Bar No. 233831
General Crimes Section
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:    (213) 894-3547
        Facsimile:    (213) 894-0141
        Email: lana.morton-owens@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                    UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        ) No. CR 09-0153-MMM
                                 )
              Plaintiff,         ) GOVERNMENT'S RESPONSE TO
                                 ) DEFENDANT'S EX PARTE
              v.                 ) APPLICATION FOR EVIDENTIARY
                                 ) HEARING RE OUTRAGEOUS
RICHARD MICHAEL WELTON           ) GOVERNMENT MISCONDUCT;
                                 ) DECLARATIONS OF J. LANA MORTON-
              Defendant.         ) OWENS, ANTHONY SCARPELLI, AND
                                 ) STEPHANIE BENITEZ
                                 )
                                 ) **Current Trial Date:**
                                 ) **8-4-2009 at 8:30 a.m.**
                                 )
_____)

        Plaintiff United States of America, by and through its

attorney of record, Assistant United States Attorney J. Lana

Morton-Owens, hereby submits the following response to defendant

Richard Michael Welton's ("defendant") Ex Parte Application for

Evidentiary Hearing.  The government's response is based on the

attached memorandum of points and authorities, the declarations

of J. Lana Morton-Owens, Anthony Scarpelli, and Stephanie

1    Benitez, the files and records in this case, and such further

2    evidence and argument as the Court may permit at any hearing on

3    this motion.

4

5    Dated: July 28, 2009

6                                    Respectfully submitted,

7                                    THOMAS P. O'BRIEN
                                     United States Attorney
8
                                     CHRISTINE C. EWELL
9                                    Assistant United States Attorney
                                     Chief, Criminal Division
10

11                                   _____/s/_____
12                                   J. LANA MORTON-OWENS
                                     Assistant United States Attorney
13
                                     Attorneys for Plaintiff
14                                   UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      2

1                    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3         On June 29, 2009, defendant Richard Michael Welton

4    ("defendant") filed a Motion to Suppress that was heard on July

5    13, 2009.  Defendant moved to suppress his post-<u>Miranda</u>

6    confession based on his assertion that his statements were

7    "involuntary, being a product of improper psychological coercion

8    and deliberate lies by Special Agent Benitez." (Hereafter "SA

9    Benitez".)  On July 6, 2009, the government filed its opposition

10   to defendant's motion to suppress, including a supporting

11   declaration of SA Benitez.  On July 13, 2009, the Court held an

12   evidentiary hearing at which SA Benitez testified.  On July 20,

13   2009, the Court denied defendant's motion to suppress.  The Court

14   specifically found that defendant's statements to SA Benitez at

15   the September 18, 2009 interview were made voluntarily.

16        Defendant now seeks an evidentiary hearing regarding whether

17   SA Benitez's testimony at the July 13, 2009 hearing was subject

18   to tampering by an out-of-district Assistant United States

19   Attorney not associated with the prosecution of this case.  Based

20   on the defendant's allegations of outrageous misconduct, he seeks

21   a dismissal of the indictment or, in the alternative, some

22   unspecified evidentiary sanction.

23        The government does not oppose a hearing on the matter.

24   However, the government maintains that there was no prosecutorial

25   misconduct, SA Benitez's testimony was not tainted, and the

26   remedies defendant seeks are unwarranted.

27

28                                 1

## II.  STATEMENT OF FACTS

On September 18, 2008, SA Benitez interviewed defendant about images of child pornography found in the First Presbyterian Church in Covina, California.  After defendant confessed in that interview to both downloading and possessing the images, defendant was indicted on February 20, 2009 for receipt and possession of child pornography.  Assistant United States Attorney Lana Morton-Owens has been in charge of the prosecution since February 2009 and responsible for all aspects of the case preparation, including all motion preparation.  (See Declaration of J. Lana Morton-Owens ("Morton-Owens Decl." at ¶ 2.)

In early June of 2009, AUSA Morton-Owens informed SA Benitez that defendant intended to file a motion to suppress.  (Morton-Owens Decl. at ¶ 3.)  AUSA Morton-Owens told SA Benitez that it was AUSA Morton-Owens' understanding that the motion would claim that SA Benitez had misused defendant's prior sexual abuse as an interview tactic to coerce defendant's confession.  (Morton-Owens Decl. at ¶ 3.)

On June 11, 2009, SA Benitez, without the knowledge of AUSA Morton-Owens, sent an email to an Assistant United States Attorney in the District of Columbia seeking legal advice regarding the concept of "softening up" a defendant prior to Mirandizing the defendant.  (Morton-Owens Decl. at ¶ 4; Exhibit 1.)  SA Benitez was seeking this legal guidance because both in a prior unrelated case and at a Los Angeles Police Department training, the concept of "softening up" a defendant was used in the context of suppressing pre-Miranda statements.  (Benitez

2

Decl. at ¶ 3.)  SA Benitez had never encountered the concept of
"softening" before and was interested in discussing the legal
ramifications with the out of district AUSA.  (Benitez Decl. at
¶ 3.)  SA Benitez previously believed that "softening" and
"rapport building" were similar concepts, but after the training
was unclear.  (Benitez Decl. at ¶ 3.)  When the out-of-district
AUSA saw SA Benitez use the term "soften-up" in relationship to
interviewing suspects, he thought of old gangster movies and
beating witnesses into confessing, so he informed SA Benitez that
she may not want to use the term because the rapport-building SA
Benitez engages in would not constitute "softening" as he
understood the term.  (Scarpelli Decl. at ¶ 4.)  AUSA Morton-
Owens was unaware of the relationship between SA Benitez and the
out-of-district AUSA, or SA Benitez's request for guidance from
the out-of-district AUSA.  (Morton-Owens Decl. at ¶¶ 4, 5.)

On June 29, 2009, defendant filed a motion to suppress
evidence alleging psychological coercion.  (Morton-Owens Decl. at
¶ 6.)  On July 1, 2009, SA Benitez, without the knowledge of AUSA
Morton-Owens, forwarded defendant's motion to suppress to the
out-of-district AUSA in an attempt to seek advice about the
merits of the motion.  (Benitez Decl. at ¶ 6.)  From June 30,
2009 to July 6, 2009, AUSA Morton-Owens and SA Benitez drafted SA
Benitez's declaration in opposition to defendant's motion to
suppress.  (Morton-Owens Decl. at ¶ 8.)  During this period, SA
Benitez had no communication with the out-of-district AUSA and
the out-of-district AUSA had no role in the drafting or substance
of SA Benitez's declaration.   (Benitez Decl. at ¶¶ 7, 8;
Scarpelli Dec. at ¶ 8.)  At that time, AUSA Morton-Owens had no

1  knowledge of any previous or current communications between SA
2  Benitez and the out-of-district AUSA.  (Morton-Owens Decl. at ¶
3  8.)

4      On July 9, 2009, the out-of-district AUSA drafted an email
5  communication to SA Benitez in which he discussed his review of
6  defendant's motion to suppress and SA Benitez's September 18,
7  2009 interview with defendant.  (Scarpelli Dec. at ¶ 9)  His
8  email focused on his opinion as to whether SA Benitez acted
9  improperly.  (Scarpelli Dec. at ¶ 9.)  The out-of-district AUSA
10 believed that his advice was being sought because the assigned
11 AUSA on the case was new and SA Benitez wanted to ensure that the
12 assigned AUSA did not miss any legal arguments.  (Scarpelli Decl.
13 at ¶ 5.)  The out-of-district AUSA indicates that his email was
14 not written in any way to instruct SA Benitez on how to testify.
15 (Scarpelli Decl. at ¶ 5.)  The out-of-district AUSA indicates
16 that he stated "DON'T SAY IT WAS TO SOFTEN HIM UP," because it
17 was another opportunity to joke with SA Benitez about their prior
18 conversations.  (Scarpelli Decl. at ¶ 10.)  When SA Benitez
19 reviewed the July 9, 2009 email communication, she understood the
20 statement "DON'T SAY IT WAS TO SOFTEN HIM UP" as a joke and not
21 as an attempt to influence what she would say at the July 13,
22 2009 hearing.  (Benitez Decl. at ¶ 11.)

23     On July 13, 2009, SA Benitez testified consistently with her
24 declaration.  (Morton-Owens Decl. ¶ 9.)  Indeed, when asked if
25 she used sympathy "to build a rapport with [defendant]," SA
26 Benitez responded "yes".  (Morton-Owens Decl. at ¶ 10.)  At no
27 time was SA Benitez's testimony influenced in any manner by her
28 communications with the out-of-district AUSA, and she testified

                                4

1  truthfully at the hearing.  (Benitez Decl. at ¶ 12.)

2      On July 20, 2009, the government produced several email

3  communications between SA Benitez and disclosed fingerprint

4  expert Kathryn Suchma.  (Morton-Owens Decl. at ¶ 11.)  After

5  reviewing these emails, on July 21, 2009, defense counsel asked

6  government counsel if there were any other email communications

7  from, or to, any of the agents assigned to the case.  (Morton-

8  Owens Decl. at ¶ 12.)  The government made immediate inquiry from

9  each agent and provided the defense with a copy of the

10 communications on July 22, 2009.  (Morton-Owens Decl. at ¶ 13.)

11 Government counsel redacted limited irrelevant information from

12 these communications.  (Morton-Owens Decl. at ¶ 14.)  On July 23,

13 2009, defense counsel asked for completely un-redacted versions

14 of the relevant email communications.  (Morton-Owens Decl. at ¶

15 15.)  Government counsel complied with this request as soon as

16 possible.  (Morton-Owens Decl. at ¶ 16.)  On July 26, 2009,

17 government counsel learned of additional emails related to the

18 communications between the out-of-district AUSA and SA Benitez

19 and, on July 27, 2009, immediately provided defense counsel with

20 a copy of those communications.  (Morton-Owens Decl. at ¶ 17.)

21

22 **III. ARGUMENT**

23      A.   The Out-of-district AUSA Did Not Tamper With SA

24           Benitez's Testimony

25      Defendant claims that "a hearing should be held to determine

26 the nature of the witness tampering."  As an initial matter,

27 defendant fails to make a viable claim that the out-of-district

28 AUSA engaged in witness tampering.  The witness tampering statute

5

prohibits "physical force or the threat of physical force against any person, or attempts to do so, with intent to influence . . . the testimony of any person in an official proceeding. . ."  18 U.S.C. § 1512.  Defendant does not and indeed cannot claim that the out-of-district AUSA engaged in this type of witness tampering.  Instead it appears that the true nature of defendant's claim is that the out-of-district AUSA "coached" SA Benitez regarding how to testify during the July 13, 2009 suppression hearing.  Mere coaching, however, does not rise to the level of witness tampering.  <u>Skains v. Lockler</u>, 2009 U.S. Dist. LEXIS 11187 (E.D. Cal. Jan. 16, 2009)(recognizing that there is no Ninth Circuit or Supreme Court authority to support the claim that "coaching" a witness is a violation of federal law, assuming such testimony is not perjured.)  Moreover, even assuming such "coaching" occurred, it had no effect on SA Benitez's testimony or any other aspect of the government's opposition to defendant's motion to suppress.

The issue underlying defendant's motion to suppress was whether SA Benitez's September 18, 2008 interview with defendant resulted in defendant's voluntary confession.  The out-of-district AUSA and SA Benitez were not acquainted when SA Benitez interviewed the defendant.  (Benitez Decl. at ¶ 13; Scarpelli Decl. at ¶ 12.)  Therefore, the out-of-district AUSA had no influence on SA Benitez's conduct during that interview.

Additionally, SA Benitez's declaration was written without any influence or assistance from the out-of-district AUSA since the two did not have any contact when the declaration was drafted.  (Benitez Decl. at ¶ 7; Scarpelli Decl. at ¶ 8.)

1    Finally, all relevant factual issues regarding SA Benitez's
2    interaction with defendant were fully explored at the July 13,
3    2009 hearing.  When faced with questions about SA Benitez's pre-
4    Miranda statements to defendant, SA Benitez fully admitted that
5    she spoke with defendant pre-Miranda and informed defendant that
6    she sympathized with defendant to "build a rapport."  (Morton-
7    Owens Decl. at ¶ 10.)  Whether or not "coaching" occurred, it is
8    clear that SA Benitez did nothing to hide the nature of her
9    interactions with defendant, in fact, she fully admitted that she
10   did try and build a rapport with defendant at the beginning of
11   the interview.

12       B.   The Remedies Defendant Seeks Are Unwarranted

13       Defendant argues that he may be entitled to dismissal of the
14   indictment or another unspecified evidentiary sanction based on
15   the actions of the out-of-district AUSA.  Citing United States v.
16   Ross, 372 F.3d 1097, 1111-1112 (9th Cir. 2004), defendant alleges
17   that "sanctions may be necessary to punish prosecutors who fail
18   to fulfill their duty to win fairly, staying well within the
19   rules."  Defendant's proposed remedies are unwarranted in light
20   of the circumstances in this case.  This is especially true where
21   the alleged misconduct was not committed by the prosecutor
22   involved in the prosecution of the case nor when the alleged
23   misconduct pertains to matters outside the prosecution of the
24   case.

25       1.   No Due Process Violation Occurred

26       A defendant's ability to move for dismissal based on
27   government misconduct arises from dictum in United States v.
28   Russell, 411 U.S. 423 (1973), in which the Supreme Court left

                                    7

open the possibility that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." Id. at 431. Although the Supreme Court and the Ninth Circuit have recognized the possibility of dismissal due to outrageous government conduct, "the due process channel which Russell kept open is a most narrow one." United States v. Ryan, 548 F.2d 782, 789 (9th Cir. 1976); see United States v. Jacobs, 855 F.2d 652, 655 (9th Cir. 1988) (describing dismissal of indictment as a "disfavored" and "drastic" remedy). To succeed on such a claim, a defendant must meet "an extremely high standard." United States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991).

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir. 1995) (citing Hampton v. United States, 425 U.S. 484 (1976)). An indictment will be dismissed for outrageous government conduct based on a due process violation only where the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. McClelland, 72 F.3d 717, 721 (9th Cir. 1995); United States v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991). "In general, that standard is met only when the police completely fabricate the crime solely to secure the defendant's conviction." United States v. Franco, 136 F.3d 622, 629 (9th Cir. 1998).

8

1  Defendants bear the burden of proving that the government's
2  conduct was "so excessive, flagrant, scandalous, intolerable, and
3  offensive as to violate due process." United States v. Edmonds,
4  103 F.3d 822, 825 (9th Cir. 1996) (internal quotations omitted).

5      Defendant cannot satisfy his burden of demonstrating that
6  the out-of-district AUSA's conduct violated defendant's due
7  process rights. Therefore, dismissal of the indictment would be
8  improper.

9               2.  Supervisory Powers

10      A court may exercise its supervisory powers to dismiss an
11  indictment in response to outrageous government conduct that
12  falls short of a due process violation. United States v.
13  Fernandez, 388 F.3d 1199, 1239 (9th Cir. 2004). Specifically,
14  the court may dismiss an indictment under its supervisory powers
15  for three reasons: "to remedy a constitutional or statutory
16  violation; to protect judicial integrity by ensuring that a
17  conviction rests on appropriate considerations validly before a
18  jury; or to deter future illegal conduct." Barrera-Moreno, 951
19  F.2d at 1091. "This is a high standard, limiting the
20  availability of the defense to extreme cases, and even in some of
21  the most egregious situations it has not been met." United
22  States v. Doe, 125 F.3d 1249, 1257 (9th Cir. 1997) (internal
23  citations omitted); see United States v. Tucker, 8 F.3d 673, 674
24  (9th Cir. 1993) (circumstances under which courts can exercise
25  supervisory power are "substantially limited"); United States v.
26  Owen, 580 F.2d 365, 367 (9th Cir. 1978) (noting that supervisory
27  powers "remain a harsh, ultimate sanction which are more often
28  referred to than invoked" (internal quotations and citation

9

omitted)).

To justify dismissal in the exercise of the court's supervisory powers, the misconduct must (1) be flagrant and (2) cause substantial prejudice to defendant. <u>Fernandez</u>, 388 F.3d at 1239. Absent such flagrant and prejudicial prosecutorial misconduct, dismissal of the indictment is an abuse of the Court's discretion. <u>Jacobs</u>, 855 F.2d at 655. Dismissal of an indictment under supervisory powers is also inappropriate where lesser remedial action is available. <u>Doe</u>, 125 F.3d at 1257; <u>Barrera-Moreno</u>, 951 F.2d at 1092; <u>see</u> <u>Tucker</u>, 8 F.3d at 674-75 (deterrence is inappropriate basis for reversal under supervisory power where means more narrowly tailored to deter objectionable prosecutorial conduct are available).

These cases establish that the extraordinary remedy of dismissal is available only in truly extraordinary cases, and only where defendant has been prejudiced. Here, defendant cannot and, indeed, does not claim that he was prejudiced by any statements made by the out-of-district AUSA. SA Benitez's testimony was not influenced or altered in any way as a result of the information provided by the out-of-district AUSA. Even if the Court were to determine that the out-of-district AUSA instructed SA Benitez on her testimony, such instruction would not constitute government misconduct. Moreover, even if SA Benitez tailored her testimony based on the AUSA's advice, which she did not, defendant does not cite, and the government could not locate, any authority holding that assisting or otherwise coaching - as opposed to threatening - a witness on how to phrase an answer is improper, provided the answer remains truthful.

1      Moreover, even assuming that the out-of-district AUSA acted

2  improperly, any remedy should be addressed outside the context of

3  this case as the AUSA had no involvement in the prosecution of

4  the matter and his actions had no substantive effect on the

5  evidence presented in this case. <u>United States v. Morrison</u>, 449

6  U.S. 361, 366 (1981) (holding "the remedy [for government

7  misconduct] is limited to denying the prosecution the fruits of

8  its transgression.").  In other words, because there were no

9  fruits of any alleged transgression, any sanction should be

10  unrelated to the prosecution of this case.

**IV.  CONCLUSION**

12      For the forgoing reasons, there was no witness tampering and

13  defendant's proposed remedies are not warranted.

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

July 28, 2009          /s/
DATE               J. LANA MORTON-OWENS
                 Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## DECLARATION OF J. LANA MORTON-OWENS

I, J. Lana Morton-Owens, declare and state:

1.   I am an Assistant United States Attorney at the United States Attorney's Office for the Central District of California. I am responsible for the prosecution of <u>United States v. Richard Michael Welton</u>, CR09-153-MMM ("<u>U.S. v. Welton</u>").   I make this declaration in support of Government's Response to Defendant's Ex Parte Application for Evidentiary Hearing Re: Outrageous Government Conduct.

2.   I have been in charge of the prosecution in <u>U.S. v. Welton</u> since February 2009.   I alone have been responsible for all aspects of case preparation for this case, including all motion preparation.

3.   In early June of 2009, I informed Federal Bureau of Investigation Special Agent Stephanie Benitez ("SA Benitez"), the case agent in <u>U.S. v. Welton</u>, that defendant intended to file a motion to suppress.   I informed SA Benitez that I anticipated defendant's motion would claim that SA Benitez had misused defendant's prior sexual abuse as an interview tactic to coerce defendant's confession.

4.   On June 11, 2009, unbeknownst to me, SA Benitez sent an email to an out-of-district Assistant United States Attorney in the District of Columbia (the "out-of-district AUSA") seeking legal advice regarding the concept of "softening up" a defendant prior to Mirandizing the defendant.

5.   I was not aware of the personal relationship between SA Benitez and the out-of-district AUSA.

6.   On June 29, 2009, defendant filed a motion to suppress

1  evidence alleging psychological coercion.

2      7.  On July 1, 2009, SA Benitez, without my knowledge,

3  forwarded defendant's motion to suppress to the out-of-district

4  AUSA in an attempt to seek advice about the merits of the motion.

5      8.  From June 30 to July 6, 2009, while I assisted SA

6  Benitez in drafting her declaration to support the government's

7  opposition to defendant's motion to suppress, I had no knowledge

8  of any previous or current communications between SA Benitez and

9  the out-of-district AUSA.

10      9.  On July 13, 2009, at the hearing on defendant's motion

11  to suppress, SA Benitez testified consistently with her

12  declaration.

13      10.  During the hearing, when asked if she used sympathy

14  "to build a rapport with [defendant]," SA Benitez responded,

15  "Yes."

16      11.  On July 20, 2009, I produced several email

17  communications between SA Benitez and disclosed fingerprint

18  expert Kathryn Suchma.

19      12.  After reviewing these emails, on July 21, 2009, defense

20  counsel asked me if there were any other email communications

21  from, or to, any of the agents assigned to the case.

22      13.  I made immediate inquiry from each agent and provided

23  the defense with a copy of the communications on July 22, 2009.

24      14.  I redacted limited irrelevant information from these

25  communications.

26      15.  On July 23, 2009, defense counsel asked me for

27

28                                  2

1 | completely un-redacted versions of the relevant email
2 | communications.
3 |      16.   I complied with this request as soon as possible.
4 |      17.   On July 26, 2009, I learned of additional emails
5 | related to the communications between the out-of-district AUSA
6 | and SA Benitez and, on July 27, 2009, immediately provided
7 | defense counsel with a copy of those communications.
8 |      18.   On July 28, 2009, I again learned of additional emails
9 | relating to this issue and produced them to defense counsel.
10 |      I declare under penalty of perjury under the laws of the
11 | United States that the foregoing is true and correct to the best
12 | of my knowledge and belief.   Executed this 28th day of July,
13 | 2009, at Los Angeles California.

J. LANA MORTON-OWENS

3

<u>DECLARATION OF STEPHANIE BENITEZ</u>

I, STEPHANIE BENITEZ, declare as follows:

    1.    This declaration is made supplemental to my July 6, 2009 declaration.

    2.    On or about June 19, 2009, Assistant United States Attorney J. Lana Morton-Owens, contacted me via telephone and informed me that defendant Welton intended to file a motion to suppress evidence based on alleged psychological coercion. According to AUSA Morton-Owens, defendant was claiming that I was too nice and too sympathetic while building rapport with the defendant when discussing defendant's history.

    2.    I found the timing of defendant Welton's allegation ironic because a defendant in <u>United States v. Giraldo</u>, CR08-14 (Dist. Columbia), had made a similar argument just a couple of months prior to defendant Welton's motion. However, before that time, I had never heard of such an allegation. Moreover, in June of 2009, I attended a training seminar in which I first heard the term "soften up". The instructor cautioned against the use of "softening up" a suspect during rapport building. I had never employed the use of "softening" or used any of the tactics the instructor had discussed. However, this presentation gained my attention as I had previously believed the term "to soften up" as meaning to act kind or nice during an interview, something which is a standard procedure for interviewing sex offenders. After the completion of the <u>Giraldo</u> case and after this seminar, in an attempt to better understand the legal definition of "softening up", I had a discussion with my friend, Assistant United States Attorney Anthony Scarpelli about the term and the case law which

might better define it.  AUSA Scarpelli and I had briefly dated in the past, and I had known him to be knowledgeable in legal definitions.  He stated the term which the instructor made reference to, did not apply to my definition of "softening".  Thus AUSA Scarpelli agreed with my belief that the phrase was an inappropriate term that did not apply to my definition of using kindness during rapport building.

3.   After that conversation with AUSA Scarpelli, on at least one occasion, if not more, the term "to soften up" or "softening up" was used between us in a joking manner.

4.   On June 29, 2009, when defendant filed his motion to suppress evidence, I asked AUSA Scarpelli for his advice on the motion because I was concerned that the assigned AUSA Lana Morton-Owens may not be aware of all the legal arguments based on her inexperience.  Because AUSA Scarpelli and I are friends and because he has responded to motions before, I wanted him to give me his thoughts on the motion.  I therefore, forwarded the motion to him on July 1, 2009.

5.   Between July 1, 2009 and July 9, 2009, I did not communicate with AUSA Scarpelli on this matter, or any matter at all.

6.   Between July 1, 2009 and July 6, 2009, AUSA Morton-Owens and I drafted my declaration in support for the government's opposition to defendant's motion to suppress.  I never discussed my declaration with AUSA Scarpelli.

7.   On July 6, 2009, I finalized and signed my declaration.  The declaration contained true and accurate statements.

8.   On July 9, 2009, AUSA Scarpelli responded to my initial

request to review the motion to suppress by sending me an email communication.  I reviewed the communication and believed that AUSA Scarpelli was offering his legal opinion on my interview with defendant Welton as well as offering his suggestions regarding legal arguments that could be made in response to defendant's motion to suppress.  I did not interpret the email communication as an instruction as to what I should say, or should not say, when I testify.

9.   I understood the phrase "DON'T SAY IT WAS TO SOFTEN HIM UP" to be a reference from our past conversations and a humorous remark by AUSA Scarpelli, similar to our use of the term "to soften up" or "softening up" as a joke in the past. I did not interpret the statement to be an instruction on what I should say, or should not say, when I testify.  Furthermore, had it been an instruction, it would not have influenced my testimony.

10.  On July 13, 2009, I testified at the hearing regarding defendant's motion to suppress.  I testified honestly to each of the questions posed.  At no time was my testimony influenced by AUSA Scarpelli.

I swear under penalty of perjury that the aforementioned is true and accurate.

Executed in Los Angeles, CA,  this 28 day of July, 2009.

___
STEPHANIE D. BENITEZ

1                     DECLARATION OF ANTHONY SCARPELLI

2      I, ANTHONY SCARPELLI, declare as follows:

3          1.   I am an Assistant United States Attorney for the

4      District of Columbia.  I have been so employed since August of

5      2000.  Prior to my employment with the Department of Justice, I

6      practiced as District Attorney in New Jersey for eight years.

7          2.   I am not involved in the criminal prosecution of

8      Richard Michael Welton.

9          3.   I have known FBI Special Agent Stephanie D. Benitez

10     since approximately January, 2009.  I had a brief romantic

11     relationship with her between January, 2009 and March, 2009.

12     Since that time, we have been friends and colleagues.  As part of

13     that relationship, we discuss both legal and non-legal issues.

14         4.   On June 11, 2009, SA Benitez contacted me regarding an

15     issue which arose in both an unrelated case's suppression motion

16     and a training seminar regarding "softening" a defendant pre-

17     Miranda.  I understood she was seeking an understanding of the

18     term and how it applied in the legal context.  As soon as I heard

19     the term, I thought of the television and movie gangsters beating

20     someone into talking.  I thought the term "softening" was an

21     incorrect description of SA Benitez's pre-Miranda rapport

22     building technique, I told her that I didn't think judges would

23     approve of such a concept.  From that time, the term "softening"

24     became a joke between the two of us.

25         5.   At that same time, SA Benitez also informed me that she

26     was working on a case with a new AUSA and would like me to look

27     at a Motion to Suppress to give her my thoughts on the Motion.

28                                    1

1   Prior to that time, I was unaware of the case.  It was my

2   understanding that SA Benitez wanted to ensure that the AUSA on

3   the case did not miss any of the legal arguments and sought my

4   advice based on our friendship and my experience.  I did not

5   interpret the request from SA Benitez as a request regarding how

6   SA Benitez should testify. I do not believe that SA Benitez would

7   tailor her testimony based on my statements.

8          6.    After that initial conversation with SA Benitez, I did

9   brief research on the issue of pre-Miranda statements.  In doing

10  so, I located case law discussing the taking of pre-Miranda

11  statements and then legitimizing those statements with a post-

12  Miranda interview, was held to be unconstitutional.  I then

13  contacted SA Benitez and discussed the issue.

14         7.    On July 1, 2009, I received a Motion to Suppress

15  Evidence filed by defendant Richard Michael Welton.  Based on my

16  schedule, I was unable to review the materials immediately.

17         8.    Between July 1, 2009, and July 9, 2009, I did not have

18  any communications with SA Benitez about the Welton case.  At no

19  time did I discuss with her the contents of her declaration or

20  assist in drafting the declaration.

21         9.    On July 9, 2009, I responded by email to SA Benitez's

22  July 1, 2009 email, with my thoughts on the contents of her

23  transcribed September 18, 2008 interview which was attached as an

24  exhibit to defendant Welton's motion.  Specifically, after

25  reviewing the transcript and concluding that SA Benitez did not

26  coerce the defendant, I wanted to alleviate her concerns and give

27  her ideas with which to share with the assigned AUSA.  My

28                                   2

comments were directed at my review of the September 18, 2008 interview and not directed at any testimony she may offer in the case.

10.   While I understand that the phrase, "DO NOT SAY IT WAS TO SOFTEN HIM UP" in the July 9 email could be misinterpreted to appear as if I am instructing SA Benitez on how to testify, that was not my intent and I am as certain as I can be that it was not interpreted that way by SA Benitez.

11.   At no time, have I ever instructed SA Benitez how to testify or attempted in any way to influence her testimony.

Executed in Washington D.C., this 28 day of July, 2009.

_____
ANTHONY SCARPELLI

3

## DECLARATION OF J. LANA MORTON-OWENS

I, J. Lana Morton-Owens, declare and state:

1.   I am an Assistant United States Attorney at the United States Attorney's Office for the Central District of California. I am responsible for the prosecution of <u>United States v. Richard Michael Welton</u>, CR09-153-MMM ("<u>U.S. v. Welton</u>").   I make this declaration in support of Government's Response to Defendant's Ex Parte Application for Evidentiary Hearing Re: Outrageous Government Conduct.

2.   I have been in charge of the prosecution in <u>U.S. v. Welton</u> since February 2009.   I alone have been responsible for all aspects of case preparation for this case, including all motion preparation.

3.   In early June of 2009, I informed Federal Bureau of Investigation Special Agent Stephanie Benitez ("SA Benitez"), the case agent in <u>U.S. v. Welton</u>, that defendant intended to file a motion to suppress.   I informed SA Benitez that I anticipated defendant's motion would claim that SA Benitez had misused defendant's prior sexual abuse as an interview tactic to coerce defendant's confession.

4.   On June 11, 2009, unbeknownst to me, SA Benitez sent an email to an out-of-district Assistant United States Attorney in the District of Columbia (the "out-of-district AUSA") seeking legal advice regarding the concept of "softening up" a defendant prior to Mirandizing the defendant.

5.   I was not aware of the personal relationship between SA Benitez and the out-of-district AUSA.

6.   On June 29, 2009, defendant filed a motion to suppress

1   evidence alleging psychological coercion.

2       7.  On July 1, 2009, SA Benitez, without my knowledge,

3   forwarded defendant's motion to suppress to the out-of-district

4   AUSA in an attempt to seek advice about the merits of the motion.

5       8.  From June 30 to July 6, 2009, while I assisted SA

6   Benitez in drafting her declaration to support the government's

7   opposition to defendant's motion to suppress, I had no knowledge

8   of any previous or current communications between SA Benitez and

9   the out-of-district AUSA.

10      9.  On July 13, 2009, at the hearing on defendant's motion

11   to suppress, SA Benitez testified consistently with her

12   declaration.

13      10.  During the hearing, when asked if she used sympathy

14   "to build a rapport with [defendant]," SA Benitez responded,

15   "Yes."

16      11.  On July 20, 2009, I produced several email

17   communications between SA Benitez and disclosed fingerprint

18   expert Kathryn Suchma.

19      12.  After reviewing these emails, on July 21, 2009, defense

20   counsel asked me if there were any other email communications

21   from, or to, any of the agents assigned to the case.

22      13.  I made immediate inquiry from each agent and provided

23   the defense with a copy of the communications on July 22, 2009.

24      14.  I redacted limited irrelevant information from these

25   communications.

26      15.  On July 23, 2009, defense counsel asked me for

27

28                           2

1  completely un-redacted versions of the relevant email

2  communications.

3       16.  I complied with this request as soon as possible.

4       17.  On July 26, 2009, I learned of additional emails

5  related to the communications between the out-of-district AUSA

6  and SA Benitez and, on July 27, 2009, immediately provided

7  defense counsel with a copy of those communications.

8       18.  On July 28, 2009, I again learned of additional emails

9  relating to this issue and produced them to defense counsel.

10       I declare under penalty of perjury under the laws of the

11  United States that the foregoing is true and correct to the best

12  of my knowledge and belief.  Executed this 28th day of July,

13  2009, at Los Angeles California.

14

15                              J. LANA MORTON-OWENS

16

17

18

19

20

21

22

23

24

25

26

27

28                                  3

# EXHIBIT 1

**Morton-Owens, Lana (USACAC)**

| | |
|---|---|
| **From:** | Benitez, Stephanie D. (FBI) |
| **Sent:** | Sunday, July 26, 2009 10:03 PM |
| **To:** | Morton-Owens, Lana (USACAC) |
| **Subject:** | FW: |

```
SSA Stephanie D. Benitez
Federal Bureau of Investigation
Violent Crimes/Crimes Against Children Unit, Rm. 3999
Tel:    202-324-6364
Cell:   626-523-4272
```

---

```
From: Benitez, Stephanie D.
Sent: Thursday, June 11, 2009 4:47 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:
```

Enough surface area that will fit your ass.

```
-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 4:50 PM
To: Benitez, Stephanie D.
Subject: RE:
```

Don't get carried away, I only own 13% of the white elephant.

```
From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 4:38 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:
```

One man's softening up is another man's repore building.

Kate's case – defendant was Rafael Gilberto Giraldo.



```
-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 4:25 PM
To: Benitez, Stephanie D.
Subject: RE:
```

I will look up the Miranda issue.  My first thought is that most judges would frown upon "softening up" defendants.  I will read over Honeycutt and see what else I can come up with. In the case you did with Kate, do you recall the defendant's name and possibly the criminal case number?  I could look and see if Judge Urbina prepared a written opinion.  If I don't get back to you next week please remind me.  At my age and with all the chemicals in my hair, the brain is slowing.

USA000391



From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 2:14 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:

Helloooo - Clydes - Yeah - the last time I went there my credit card was stolen.

I am not sure.  I just returned from homicide school so am pretty busy myself.  I also told a colleague I would take him out to celebrate his passing of his ASAC exam which I will be taking in the next few weeks.  Maybe we will swing by.

Charlie is good. He was pretending like he was afraid of the storm last night and barked until I let him in my room.  Faker.

When you have a chance, give me your thoughts regarding a Miranda question.  In this last case, Katzoff questioned my "softening" of the defendant pre-Miranda and the judge through out the defendant's pre-Miranda statement.  (But Kate never told me why).  I did not think this was a problem.  However, last week at school I was told "softening" could get your confession thrown out (Case law – Honeycutt). So… LA USAO called me yesterday to inform they were not going to offer another one of my sex offenders any type of plea because he is so dangerous, thus he will go to trial July 21.  The Defense attorney is saying I compelled the defendant to confess because I "softened him" pre-Miranda.

This keeps coming up!  While I don't think this is going to be an issue in this case (the defendant was out of custody during the interview and prior to interviewing him I told him he was not in-custody and he was free to leave) I Mirandized him bc his parole Agent was onsite and I told him, I did not want him to feel like he had to talk to me because he was here so, out of an abundance of caution, I was going to Mirandize him.  To which he waived.

Give me your thoughts when free…




-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 1:40 PM
To: Benitez, Stephanie D.
Subject: RE:

Hi Ms. Benitez,

Thank you for the documents.  I will look them over.

Are you going to meet at Clyde's later?  I was going to try but have too much to do.  I am traveling to Florida for work Saturday morning and won't be back until Wednesday.  So, I have a bunch of things I need to get done.

Anyway, thanks again, hope you are well

Anthony

2

USA000392

P.S. How is Charlie?

From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 12:13 PM
To: Scarpelli, Anthony (USADC)
Subject:

Hi Anthony,

I hope you are well.  The attached word document is a doc. I created a few years ago for the
local police regarding what they should do when seizing computer evidence and subsequently
asking for a review.  It might answer some of the questions you had asked about last week.
The attached word perfect document is a basic guide CART gives Agents who ask for a computer
review.  While some of it may be over your head, you may be able to glean some pointers from
it as well.

Good Luck,


SSA Stephanie D. Benitez

Violent Crimes/Crimes Against Children Unit,3999

Washington D.C.

Tel: 202-324-6364

Cell: 626-523-4272

3

USA000393

<u>DECLARATION OF STEPHANIE BENITEZ</u>

I, STEPHANIE BENITEZ, declare as follows:

    1.    This declaration is made supplemental to my July 6, 2009 declaration.

    2.    On or about June 19, 2009, Assistant United States Attorney J. Lana Morton-Owens, contacted me via telephone and informed me that defendant Welton intended to file a motion to suppress evidence based on alleged psychological coercion. According to AUSA Morton-Owens, defendant was claiming that I was too nice and too sympathetic while building rapport with the defendant when discussing defendant's history.

    2.    I found the timing of defendant Welton's allegation ironic because a defendant in <u>United States v. Giraldo</u>, CR08-14 (Dist. Columbia), had made a similar argument just a couple of months prior to defendant Welton's motion.  However, before that time, I had never heard of such an allegation.  Moreover, in June of 2009, I attended a training seminar in which I first heard the term "soften up".  The instructor cautioned against the use of "softening up" a suspect during rapport building.  I had never employed the use of "softening" or used any of the tactics the instructor had discussed.  However, this presentation gained my attention as I had previously believed the term "to soften up" as meaning to act kind or nice during an interview, something which is a standard procedure for interviewing sex offenders.  After the completion of the <u>Giraldo</u> case and after this seminar, in an attempt to better understand the legal definition of "softening up", I had a discussion with my friend, Assistant United States Attorney Anthony Scarpelli about the term and the case law which

might better define it.  AUSA Scarpelli and I had briefly dated
in the past, and I had known him to be knowledgeable in legal
definitions.  He stated the term which the instructor made
reference to, did not apply to my definition of "softening".
Thus AUSA Scarpelli agreed with my belief that the phrase was an
inappropriate term that did not apply to my definition of using
kindness during rapport building.

3.    After that conversation with AUSA Scarpelli, on at
least one occasion, if not more, the term "to soften up" or
"softening up" was used between us in a joking manner.

4.    On June 29, 2009, when defendant filed his motion to
suppress evidence, I asked AUSA Scarpelli for his advice on the
motion because I was concerned that the assigned AUSA Lana
Morton-Owens may not be aware of all the legal arguments based on
her inexperience.  Because AUSA Scarpelli and I are friends and
because he has responded to motions before, I wanted him to give
me his thoughts on the motion.  I therefore, forwarded the motion
to him on July 1, 2009.

5.    Between July 1, 2009 and July 9, 2009, I did not
communicate with AUSA Scarpelli on this matter, or any matter at
all.

6.    Between July 1, 2009 and July 6, 2009, AUSA Morton-
Owens and I drafted my declaration in support for the
government's opposition to defendant's motion to suppress.  I
never discussed my declaration with AUSA Scarpelli.

7.    On July 6, 2009, I finalized and signed my declaration.
The declaration contained true and accurate statements.

8.    On July 9, 2009, AUSA Scarpelli responded to my initial

request to review the motion to suppress by sending me an email communication.  I reviewed the communication and believed that AUSA Scarpelli was offering his legal opinion on my interview with defendant Welton as well as offering his suggestions regarding legal arguments that could be made in response to defendant's motion to suppress.  I did not interpret the email communication as an instruction as to what I should say, or should not say, when I testify.

9.   I understood the phrase "DON'T SAY IT WAS TO SOFTEN HIM UP" to be a reference from our past conversations and a humorous remark by AUSA Scarpelli, similar to our use of the term "to soften up" or "softening up" as a joke in the past. I did not interpret the statement to be an instruction on what I should say, or should not say, when I testify.  Furthermore, had it been an instruction, it would not have influenced my testimony.

10.  On July 13, 2009, I testified at the hearing regarding defendant's motion to suppress.  I testified honestly to each of the questions posed.  At no time was my testimony influenced by AUSA Scarpelli.

I swear under penalty of perjury that the aforementioned is true and accurate.


Executed in Los Angeles, CA,  this 28 day of July, 2009.


___
STEPHANIE D. BENITEZ

<u>DECLARATION OF ANTHONY SCARPELLI</u>

I, ANTHONY SCARPELLI, declare as follows:

    1.   I am an Assistant United States Attorney for the District of Columbia.  I have been so employed since August of 2000.  Prior to my employment with the Department of Justice, I practiced as District Attorney in New Jersey for eight years.

    2.   I am not involved in the criminal prosecution of Richard Michael Welton.

    3.   I have known FBI Special Agent Stephanie D. Benitez since approximately January, 2009.  I had a brief romantic relationship with her between January, 2009 and March, 2009.  Since that time, we have been friends and colleagues.  As part of that relationship, we discuss both legal and non-legal issues.

    4.   On June 11, 2009, SA Benitez contacted me regarding an issue which arose in both an unrelated case's suppression motion and a training seminar regarding "softening" a defendant pre-Miranda.  I understood she was seeking an understanding of the term and how it applied in the legal context.  As soon as I heard the term, I thought of the television and movie gangsters beating someone into talking.  I thought the term "softening" was an incorrect description of SA Benitez's pre-Miranda rapport building technique, I told her that I didn't think judges would approve of such a concept.  From that time, the term "softening" became a joke between the two of us.

    5.   SA Benitez also informed me that she was working on a case with a new AUSA and would like me to look at a Motion to Suppress to give her my thoughts on the Motion.  Prior to that

1

time, I was unaware of the case.  It was my understanding that SA
Benitez wanted to ensure that the AUSA on the case did not miss
any of the legal arguments and sought my advice based on our
friendship and my experience.  I did not interpret the request
from SA Benitez as a request regarding how SA Benitez should
testify. I do not believe that SA Benitez would tailor her
testimony based on my statements.

6.    After that initial conversation with SA Benitez, I did
brief research on the issue of pre-Miranda statements.  In doing
so, I located case law discussing the taking of pre-Miranda
statements and then legitimizing those statements with a post-
Miranda interview, was held to be unconstitutional.  I then
contacted SA Benitez and discussed the issue.

7.    On July 1, 2009, I received a Motion to Suppress
Evidence filed by defendant Richard Michael Welton.  Based on my
schedule, I was unable to review the materials immediately.

8.    Between July 1, 2009, and July 9, 2009, I did not have
any communications with SA Benitez about the Welton case.  At no
time did I discuss with her the contents of her declaration or
assist in drafting the declaration.

9.    On July 9, 2009, I responded by email to SA Benitez's
July 1, 2009 email, with my thoughts on the contents of her
transcribed September 18, 2008 interview which was attached as an
exhibit to defendant Welton's motion.  Specifically, after
reviewing the transcript and concluding that SA Benitez did not
coerce the defendant, I wanted to alleviate her concerns and give
her ideas with which to share with the assigned AUSA.  My

2

comments were directed at my review of the September 18, 2008 interview and not directed at any testimony she may offer in the case.

10.    While I understand that the phrase, "DO NOT SAY IT WAS TO SOFTEN HIM UP" in the July 9 email could be misinterpreted to appear as if I am instructing SA Benitez on how to testify, that was not my intent and I am as certain as I can be that it was not interpreted that way by SA Benitez.

11.    At no time, have I ever instructed SA Benitez how to testify or attempted in any way to influence her testimony.

Executed in Washington D.C., this 28 day of July, 2009.

_____
ANTHONY SCARPELLI

3