1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>    vs.<br><br>RICHARD MICHAEL WELTON,<br><br>      Defendant. | CASE NO. CR 09-00153 MMM<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT AND GRANTING MOTION FOR OTHER REMEDY |

On February 20, 2009, defendant Richard Michael Welton was charged in a two-count indictment with receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2).  Trial is set to commence on August 4, 2009.  On June 29, 2009, Welton filed a motion to suppress oral statements he made to FBI agents on September 18, 2008, when the agents interviewed him at his workplace and residence, Sornoso Auto Repair in Covina, California.[1] Welton asserted that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  He also argued that the statements were not voluntarily made and thus violated his

---

[1]Defendant's Motion to Suppress Evidence ("Defendant's Suppression Motion"), Docket No. 21 (June 29, 2009).

Fifth Amendment rights.[2]  The government filed opposition,[3] and the court denied the motion on July 20, 2009, concluding that the evidence showed the government did not use unconstitutionally coercive tactics to obtain statements from Welton.[4]

On July 22, 2009, the government produced redacted copies of email communications between AUSA Anthony Scarpelli and FBI Special Agent Stephanie Benitez to defense counsel. Benitez was the agent who had obtained the statements from Welton and who testified at the hearing on the motion to suppress.  Scarpelli is an attorney in the United States Attorney's Office for the District of Columbia.  Scarpelli and Benitez were involved romantically between January and March 2009.  On July 23 and 24, at defense counsel's request, the government produced unredacted copies of the email communications.[5]  On July 27, 2009, defendant requested that the court conduct an evidentiary hearing to determine the nature and scope of Scarpelli's communications with Benitez regarding her testimony in this case.[6]  The government did not object, and the court held a hearing on July 29, 2009, at 3:30 p.m.[7]

## I.  FACTUAL BACKGROUND

The facts surrounding Welton's statements to Benitez are set forth fully in the court's order denying defendant's motion to suppress and are incorporated herein by reference.  In the motion,

---

[2]*Id.* at 8-10.

[3]Government's Motion to Strike and Opposition to Defendant's Motion to Suppress Statement and Evidence; Memorandum of Points and Authorities; Declarations of Eric Carreon and Special Agent Stephanie Benitez ("Government's Suppression Opposition"), Docket No. 28 (July 6, 2009).

[4]Order Denying Defendant's Motion to Suppress ("Order"), Docket No. 50 (July 20, 2009) at 13.

[5]*Ex Parte* Application for Order Setting Evidentiary Hearing re: Outrageous Government Misconduct ("*Ex Parte* Application"), Docket No. 58 (July 27, 2009) at 4.

[6]*Id.*

[7]Order Granting Defendant's *Ex Parte* Application; Setting Evidentiary Hearing, Docket No. 60 (July 27, 2009).

defendant challenged the voluntariness of the statements he had made on the basis that psychological coercion by Benitez – i.e., manipulation of his feelings regarding sexual abuse he had suffered as a child – induced him to speak. Benitez testified, in a declaration and at the evidentiary hearing, that she felt sorry for Welton if he had been abused as a child, and that she did not mention possible prior abuse as an interview tactic. She stated that expressing sympathy for any past abuse he may have suffered was a way of relating to Welton, and putting him at ease.[8]

The evidentiary hearing on Welton's motion to suppress took place on July 13, 2009. Prior to the hearing, on June 11, 2009, Benitez had emailed Scarpelli with a question about *Miranda* rights; in the email, she referenced a case in which she had recently testified, and in which a district judge had suppressed a statement made by a suspect before he was given *Miranda* warnings. Benitez said that she had recently learned that "softening up" a suspect before giving him *Miranda* warnings could result in suppression of the suspect's confession, and expressed concern because Welton's attorney had alleged that she compelled Welton's confession through "softening." Benitez requested Scarpelli's thoughts on the matter.[9]

Later the same day, Scarpelli sent Benitez an email promising to look into the *Miranda* issue, and stating that "most judges would frown upon 'softening up' defendants."[10] Benitez

---

[8]Reporter's Transcript of Proceedings, July 13, 2009 ("July 13 RT") at 43:3-12.

[9]Benitez's email stated:
"In this last case, [public defender] Katzoff questioned my 'softening' of the defendant pre-Miranda and [U.S. District Judge Urbina] thr[ew] out the defendant's pre-Miranda statement. (But Kate never told me why.) I did not think this was a problem. However, last week at school I was told 'softening' could get your confession thrown out (Case law - Honeycutt). So. . . [Los Angeles U.S. Attorney's Office] called me yesterday to inform they were not going to offer another one of my sex offenders any type of plea because he is so dangerous, thus he will go to trial July 21. The Defense attorney is saying I compelled the defendant to confess because I 'softened him' pre-Miranda. . . . Give me your thoughts when free."
(Supplemental Exhibits in Support of *Ex Parte* Application for Evidentiary Hearing re: Outrageous Government Misconduct, Docket No. 63 (July 29, 2009), Ex. E.)

[10]*Id.*

3

responded: "One man's softening up is another man's [rapport] building."[11]  Several hours later, Scarpelli sent Benitez an email.  He stated that while her interview technique was "efficient and productive," a majority of the United States Supreme Court "didn't like it."  Scarpelli referenced the Court's decision in *Missouri v. Siebert*, 542 U.S. 600 (2004), and noted that "[b]ased on what a defendant says, it [might] make the entire confession inadmissible."[12]

Welton filed his motion to suppress eighteen days after this email exchange, on June 29, 2009.  That same day, AUSA Lana Morton-Owens forwarded a copy of the motion and the transcript of Welton's interrogation to Benitez.  On July 1, 2009, Benitez emailed Scarpelli, and told him that she would be testifying soon at the suppression hearing in this case, and that she was shocked by the allegations defense counsel had made about her in the motion papers.  She said she would forward a copy of the motion and the interview transcript to Scarpelli for his review.[13]  She forwarded the documents to Scarpelli in a separate email that read: "Here it is . . . ridiculous."[14]

On Thursday, July 9, 2009, Scarpelli sent Benitez an email regarding his review of the interview transcript.  He said that Benitez had done a "[g]ood job" making clear to Welton that he was not in custody.  Scarpelli observed that if the court determined that Welton was in custody, however, Benitez's pre-*Miranda* conversation with him was "not incriminating" and constituted "background information to see if [Welton] wanted to talk and to make him feel comfortable with [Benitez].  He then stated: "DON'T SAY IT WAS TO SOFTEN HIM UP."  Scarpelli opined that Welton's argument that Benitez had "prey[ed] on his victimization" was "a loser," and counseled that "[t]he prosecutor should keep in terms of just trying to develop a rapport with [defendant]."[15]

---

[11]*Id.*

[12]*Id.*, Ex. F.

[13]*Id.*

[14]*Ex Parte* Application, Ex. B.

[15]*Id.*  Scarpelli also observed:
" The argument that you lied to him, and you preyed on his prior victimization will not fly.  Lying to [defendants] is permissible, as long as it does not go so far [as] to violate the Due Process rights.  Case law establishes that much worse things have

4

Benitez thanked Scarpelli for his analysis, and noted that she would testify the following Monday.  She noted that AUSA Morton-Owens was "awesome" but had only been an AUSA for four months.  Benitez requested permission to forward Scarpelli's analysis to Morton-Owens.[16]  Scarpelli agreed, and later offered further analysis as to whether Welton had been in custody.[17]  After Benitez told Scarpelli that the interview took place at Welton's place of work and that Welton had received *Miranda* warnings fifteen times in the past, Scarpelli replied that Welton was "screwed."[18]

Both Benitez and Scarpelli testified at the evidentiary hearing held on July 29.  Benitez stated that she consulted Scarpelli because she was offended by defense counsel's allegations regarding her conduct, and because Morton-Owens was an inexperienced prosecutor, and she wanted the advice of a more seasoned attorney.[19]  Benitez testified that she had not spoken in person or by telephone with Scarpelli regarding the case, and that their only communications were the emails that had been produced to defense counsel.[20]

Benitez defined "softening up" a suspect as being excessively nice and gentle, and contrasted this with the manner in which "softening up" has been used in the court decisions cited

---

been told to [defendants] and [have] not invalidate[d] the statement. . . . Bottom line, he will take a plea because he is cooked."  *Id.*

[16]*Id.* ("Thank You.  Yes, makes lots of sense.  Thanks for looking this over.  I testify on Monday so we will see what happens.  The AUSA is awesome on this case, but she has about four months on only so I wrote most of my declaration for her (scary).  I hope you don't mind if I forward your email to her???").

[17]*Id.* ("In the end for in custody purposes, the test is would a reasonable person in his position feel free to leave and not answer questions.  You told him he could leave, and left, he know the criminal system, was smart enough, did not appear to be under the influence of drugs, alcohol, etc., the statement wasn't long, it was at his place, not police station (right?), you were not aggressive with him").

[18]*Id.*, Ex. C.

[19]Reporter's Transcript of Proceedings, July 29, 2009 ("July 29 RT") at 19:14-24.

[20]*Id.*, 23:22-24:23.

5

by Scarpelli.[21]   She acknowledged that past sexual abuse was a topic that she often discussed with suspects, but stated that usually it was a subject raised by the suspect rather than by her.   She conceded that in this case, she alluded to abuse before Welton discussed the particulars of it.[22]\

Scarpelli testified that he defined "softening up" a suspect as "gangsters beating someone into talking," or "some [other] sort of gangster scenario."[23]   He also stated that his advice that Benitez not "SAY IT WAS TO SOFTEN HIM UP" was intended as a joke.[24]   Scarpelli said that he assumed Benitez would forward his email messages to Morton-Owens, and that Morton-Owens would comply with any disclosure obligations that arose.[25]   He acknowledged that he had shown bad judgment, but disclaimed any wrongdoing:

"Q:   Do you think you did anything wrong in this case?

A:   I do.  I think that I used poor judgment in putting a joke in an e-mail which ultimately has us all here.

Q:   But you don't see any problem in terms of discussing the issues that might come up with the hearing with Special Agent Benitez prior to the hearing?

A:   Well, I think what I was doing was I was giving her the legal parameters of what occurred.  And again, I was looking back from her statement, which was already memorialized.  And again, that was being –  my understanding was it was going to be turned over to the assistant handling the case.

---

[21]*Id.*, 26:12-23.

[22]*Id.*, 15:23-16:16.

[23]*Id.*, 50:1-2; see also Declaration of Anthony Scarpelli ("Scarpelli Decl."), ¶ 4.

[24]*Id.*, 47:13-15 ("I think that I used poor judgment in putting a joke in an e-mail which ultimately has us all here"); *id.*, 50:19-24 ("[I]t was a joke.  And it was referring back to our, you know, sort of kidding around about the term softening up.  And again, I would refer you back to where there was the time where she and I –  I'm not a hundred percent sure, but we were going to meet, and I sort of kidded around, hey, what are you trying to do?  Soften me up?  So it became a joke").

[25]*Id.*, 47:4-12.

Q:      But wasn't it obvious to you at that time that your legal advice might affect

        the way she testified?

A:      I don't believe so."[26]

Based on this evidence, defendant seeks dismissal of the indictment for outrageous government misconduct under the Due Process Clause or dismissal under the court's inherent supervisory powers.  At the hearing, he argued that the government's failure to turn over copies of the email communications violated the Jencks Act or its disclosure obligations under *Brady/Giglio*.  On this basis, he asked that the court strike Benitez's testimony at the suppression hearing, and conclude that, without that testimony, the government had not met its burden of showing that the statements he made on September 18, 2008.  Based on that conclusion, defendant argued, the confession should be suppressed.[27]

## II.  DISCUSSION

**A.      Whether the Government Engaged in Witness Coaching That Violated Due Process**

To violate due process, governmental conduct must be "so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction."  *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quoting *United States v. Russell*, 411 U.S. 423 (1973)); see also *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991) ("[G]overnmental conduct must be 'so grossly shocking and so outrageous as to violate the universal sense of justice,'" quoting *Restrepo*, 930 F.2d at 712).

Defendant contends that "coaching" Benitez in the manner Scarpelli did was outrageous and violated due process.  "Significant 'difficulties (attend) the notion that due process of law can be embodied in fixed rules.'"  *Hampton v. United States*, 425 U.S. 484, 491 (Powell, J., concurring) (quoting *Russell*, 411 U.S. at 431).  Neither party has cited, and the court has not

---

[26]*Id.*, 47:13-48:1.

[27]*Ex Parte* Motion at 5-7; July 29 RT at 64:6-65:7.

7

found, case authority delineating the "constitutional boundaries of witness preparation." *Skains v. Lockler*, No. CIV S-06-127, 2009 WL 230037, *8 (E.D. Cal. Jan. 20, 2009) ("It is, of course, proper for an attorney to meet with a witness in preparation for trial. A thorough search reveals no Supreme Court or Ninth Circuit precedent on the constitutional boundaries of witness preparation. There appear to be no clearly established standards for evaluating a prosecutor's 'coaching' of witness testimony, assuming of course that the testimony is not perjured"). While directing a witness to use (or avoid using) particular words when phrasing an answer is unacceptable conduct, particularly for a prosecutor,[28] cf. *United States v. Apperson*, 441 F.3d 1162, 1208 (10th Cir. 2006) (affirming trial court's denial of a motion for mistrial where prosecutors denied "programming" witnesses by ascertaining which exhibits would be the subject of defense questions and suggesting how the witnesses might respond and there was no contrary evidence); *United States v. Copple*, 827 F.2d 1182, 1190 (8th Cir. 1987) (rejecting an argument that the government engaged in misconduct by, *inter alia*, "coaching [witnesses] on the way in which their testimony should be presented" because that the witnesses testified untruthfully);

---

[28]"While lawyers representing private parties may – indeed, must – do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first." *United States v. Kojayan*, 8 F.3d 1315, 1323 (1993). In communicating with Benitez as he did, AUSA Scarpelli appears to have forgotten the admonition of Justice Douglas: "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting); see also *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one"). Scarpelli's testimony at the evidentiary hearing that his admonition to Benitez was simply a joke was incredible. So too was his testimony that he thought "softening up" was akin to gangsters beating someone until they talked. The court finds AUSA Scarpelli's dissembling particularly troubling. See *Kojayan*, 8 F.3d at 1323 ("Acceptance of responsibility this is not").

*United States v. Cincotta*, 689 F.2d 238, 244-45 (1st Cir. 1982) (affirming a district judge's decision to instruct witnesses on their proper role in the trial and on the impropriety of prosecutors' conduct after the government sent a letter to prospective government witnesses that, *inter alia*, "coached the witnesses on how to present their testimony"), there is no evidence that Benitez testified falsely at the suppression hearing as a result of the advice she received from Scarpelli. Benitez's hearing testimony was consistent not only with the tape of the September 18, 2009 interview she conducted of Welton, but with the declaration she signed three days before Scarpelli advised her to avoid saying that her pre-*Miranda* conversation with Welton was designed to soften him up. In light of this fact, the court cannot conclude that Scarpelli's efforts to "coach" Benitez violated due process or constituted the type of outrageous government misconduct that warrants dismissal of the indictment.

**B.      Whether the Government Violated the Jencks Act or Rule 26.2 of the Federal Rules of Criminal Procedure**

The Jencks Act requires that the government produce a witness's statements to a defendant after the witness has testified. As respects pretrial discovery, it states that "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination *in the trial of the case.*" 18 U.S.C. § 3500(a) (emphasis added); see *United States v. Taylor*, 802 F.2d 1108, 1118 (9th Cir. 1986) (the Jencks Act "limits compulsory pretrial discovery of statements made by prospective government witnesses and makes them unavailable until such witnesses have testified at trial"); see also *United States v. Hanna*, 55 F.3d 1456, 1459 (9th Cir. 1995) ("Hanna's only request for the production of Jencks Act materials was made in a pretrial motion for discovery. Hanna did not move for the production of grand jury testimony or other witness statements after any of the government witnesses testified. Because Hanna failed to 'tender to the Court the question of [Sargeant Crenshaw's statements or prior testimony] at a time when it [was] possible for the Court to order it produced,' he may not claim, on appeal, that the failure to produce any such material violated the Jencks

1  Act"); *United States v. Barker*, 988 F.2d 77, 79 (9th Cir. 1993) ("[T]he Jencks Act requires only

2  that a witness' statement be 'subject to . . . discovery following the witness' testimony on direct

3  examination'").  At the hearing, defendant argued that the government's failure to disclose the

4  Benitez-Scarpelli emails prior to the suppression hearing violated the Jencks Act.  Because there

5  is no pretrial right to statements  under the Jencks Act, this argument fails.  See *Hanna*, 55 F.3d

6  at 1459.

7       Rule 12(h) of the Federal Rules of Criminal Procedure, however, effectively extends the

8  disclosure obligations of the Jencks Act to suppression and other pretrial hearings.  FED. R. CRIM.

9  P. 12(h) ("Rule 26.2 applies at a suppression hearing under Rule 12(b)(3)(C). At a suppression

10 hearing, a law enforcement officer is considered a government witness); FED. R. CRIM. PROC.

11 26.2(a) ("After a witness other than the defendant has testified on direct examination, the court,

12 on motion of a party who did not call the witness, must order an attorney for the government or

13 the defendant and the defendant's attorney to produce, for the examination and use of the moving

14 party, any statement of the witness that is in their possession and that relates to the subject matter

15 of the witness's testimony"); *United States v. Conners*, 825 F.2d 1384, 1388 (9th Cir. 1987)

16 ("Rule 26.2(a) places in the criminal rules the substance of the Jencks Act 18 U.S.C. § 3500");

17 see also *United States v. Webster*, 914 F.2d 259, 1990 WL 136117, *3 (6th Cir. Sept. 20, 1990)

18 (Unpub. Disp.) ("Thus it stands to reason that any law interpreting a provision of the Jencks Act

19 should be applicable to a similar provision of Rule 26.2").

20      The disclosure requirement of the Jencks Act, and thus of Rule 26.2(a), does not attach

21 until after the witness has testified on direct examination *and* defendant or his counsel has made

22 a request to the court for the witness's prior statements.  Unlike the requirements of *Brady v.*

23 *Maryland*, 373 U.S. 83 (1963), "the defendant must plainly tender to the Court the question of

24 the producibility of the document *at a time when it is possible for the Court to order it to*

25 *produced*, or to make an appropriate inquiry.  If he does not do so he may not assert . . . that

26 failure to order production or to undertake further inquiry was error."  *Hanna*, 55 F.3d at 1459

27 ("The responsibility for fairly directing the attention of the Court to the precise demand submitted

28 for the Court's determination is appropriately placed upon the Defendant, who seeks the statute's

benefits," quoting *United States v. Burke*, 506 F.2d 1165, 1168 (9th Cir.1974), cert. denied, 421 U.S. 915 (1975) (emphasis original)); see FED. R. CRIM. PROC. 26.2(a) ("[T]he court, *on motion of a party who did not call the witness*, must order [the witness' statements produced]" (emphasis added)); see also *United States v. Bagley*, 473 U.S. 667, 670 n. 2 (1985) ("The Jencks Act, 18 U.S.C. § 3500, requires the prosecutor to disclose, after direct examination of a Government witness and on the defendant's motion, any statement of the witness in the Government's possession that relates to the subject matter of the witness' testimony").[29]  Because defendant did not request that the court order production of statements by Benitez under Rule 26.2(a) at the hearing on the motion to suppress,[30] it appears that, strictly interpreted, Rule 26.2(a) does not apply.[31]

Moreover, the portions of the email exchange that are most troubling – i.e., those in which Scarpelli advises Benitez how to testify at the suppression hearing – would not be subject to disclosure under Rule 26.2(a).  Under the Jencks Act and Rule 26.2(a), only a witness's own statements need be disclosed.  "The Congressional policy behind the Jencks Act was to protect witnesses from being impeached with words that are not their own, or are an incomplete version of their testimony."  *United States v. Griffin*, 659 F.2d 932, 937 (9th Cir. 1981) (quoting *United*

---

[29]"The purpose of the Jencks Act is to restrict judicial power to order discovery against the government in criminal cases.  This purpose would be frustrated if district courts could compel disclosure, contrary to the Jencks Act, in the exercise of their discretion over cross-examination.  Although district courts have wide latitude in ordering discovery in criminal cases, we cannot tamper with statutory restrictions upon their power.  While we may encourage the government to disclose Jencks Act statements prior to the time when it is statutorily required to do so, we cannot compel such a course."  *United States v. Spagnuolo*, 515 F.2d 818, 820-21 (9th Cir. 1975) (internal citations omitted).

[30]Because Benitez's declaration was considered her "direct" testimony, defendant could have requested production of any statements by her at the beginning of the hearing.

[31]In a supplemental filing after the evidentiary hearing, the government conceded that a Rule 26.2(a) violation had occurred and that Benitez's testimony at the suppression hearing should be stricken.  (Government's Supplemental Response to Defendant's Government Misconduct Motion ("Govt.'s Supp. Response"), Docket No. 64 (July 29, 2009) at 3.)  The court addresses this filing *infra*.

*States v. Spencer*, 618 F.2d 605, 606 (9th Cir. 1980)); see also *United States v. Pardee*, 224 Fed. Appx. 650, 650 (9th Cir. Mar. 6, 2007) (Unpub. Disp.) ("Under the Jencks Act, 'production is limited to statements which can properly be called the witness' own words,'" quoting *United States v. Howard*, 450 F.2d 792, 793 (9th Cir. 1971) (per curiam)).

For all of these reasons, the court concludes that Rule 26.2(a) provides no basis for the relief that defendant seeks – i.e., the striking of Benitez's testimony at the suppression hearing and the suppression of defendant's statements in the September 18, 2008 interview.

## C.   Constitutional Requirements Regarding Pretrial Disclosure of Exculpatory or Impeachment Material

### 1.   Standards Governing Pretrial Disclosure of Evidence in Criminal Cases

The government has a constitutional duty to disclose, upon request, all evidence favorable to a defendant that is material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); see also *United States v. Ruiz*, 536 U.S. 622, 627-28 (2002) ("[A] federal criminal defendant's . . . right to receive from prosecutors exculpatory impeachment material [is] a right that the Constitution provides as part of its basic 'fair trial' guarantee," citing *Brady* and U.S. CONST. AMENDS. V and VI); *United States v. Agurs*, 427 U.S. 97, 106-07 (1976) ("In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel.  In such a situation he may make no request at all, or possibly ask for 'all Brady material' or for 'anything exculpatory.'  Such a request really gives the prosecutor no better notice than if no request is made. . . .  But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request [or a general 'all Brady material' request] is made");

Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); see also *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*).  The government's obligations under *Brady* are "not confined[,] [however,] to

evidence that affirmatively proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) (citing *Brady* and *Strickler*).

The government's disclosure obligations under *Brady* include impeachment as well as exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule" (citation omitted)); *Bagley*, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. . . .  Such evidence is 'evidence favorable to an accused,' . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal").

The *Brady* obligation, moreover, extends to all government actors, not just the government attorney and investigative team prosecuting the case. See *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004) ("A prosecutor's duty under *Brady* necessarily requires the cooperation of other government agents who might possess *Brady* material").  The government's good or bad faith, moreover, is irrelevant. *Brady*, 373 U.S. at 87; see also *Agurs*, 427 U.S. at 110 (stating that the prosecution's constitutional obligation to disclose material evidence is not "measured by the moral culpability, or the willfulness, of the prosecutor. . . .  If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor" (footnote omitted)); *Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor").

Before the court can find that a *Brady* violation has occurred, it must conclude that "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence [was] suppressed by the State, either willfully or inadvertently; and [that] prejudice . . . ensued." *Strickler*, 527 U.S. at 281-82.

## 2.     Whether The Government Violated *Brady* or *Giglio*

The timing of required *Brady* and *Giglio* disclosures differs. *Brady* disclosures need "'be

13

made at a time when disclosure would be of value to the accused.'" *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir.1985)); see also *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (stating that a *Brady* violation "may be cured . . . by belated disclosure of evidence, so long as the disclosure occurs 'at a time when disclosure would be of value to the accused,' " quoting *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992)).  By contrast, because *Giglio* material "merely goes to the credibility of the witness, it need not be disclosed prior to the witness testifying." *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978); *United States v. Hopkins*, Cr. No. S-05-0538 EJG (GGH), 2008 WL 4453583, *2 (E.D. Cal. Oct. 3, 2008); *United States v. Marquez*, 686 F. Supp. 1354, 1358 (N.D. Ill. 1988) ("Because evidence which is potentially impeaching merely goes to a witness' credibility, courts generally hold that disclosure in advance of trial is not required"); *United States v. Laurins*, 660 F. Supp. 1579, 1584 (N.D. Cal. 1987).

The court has not located any authority in this circuit that squarely hold that *Giglio* applies in the context of a pretrial suppression hearing.[32]  The Ninth Circuit has held, however, that *Brady* applies to at least one category of suppression hearing.  See *United States v. Barton*, 995 F.2d 931, 935 (9th Cir.) ("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant"), cert. denied, 510 U.S. 957 (1993); see also *United States v. Fernandez*, 231 F.3d 1240, 1248 n. 5 (9th Cir. 2000) ("Nonetheless, 'the due process principles announced in *Brady* and its progeny must be applied to' certain pretrial proceedings, such as suppression hearings," quoting *Barton*).[33]  The continuing validity of these

_____

[32]Although *Hopkins* arose in the context of a dispute between the parties regarding production of *Brady* and *Giglio* material prior to a pretrial suppression hearing, the issue was clouded by a pretrial discovery order entered by the district judge hearing the case.  Ultimately, the magistrate judge who heard the *Brady/Giglio* motion ordered production of *Giglio* material only if the government intended to call the witness to testify at trial.  See *Hopkins*, 2008 WL 4453583 at *1, 3.

[33]See also *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990) (applying *Brady* to a motion to suppress items seized without warrant from defendant's home and vehicle), vacated on

1   cases may be questionable given the Supreme Court's decision in *United States v. Ruiz*, 536 U.S.
2   622, 623 (2002).   There, the court reversed a decision of the Ninth Circuit that required
3   prosecutors to make impeachment material available to defendants before entering into a plea
4   agreement.   They nonetheless remain the law of the circuit and are instructive here.

5       Assuming, without deciding, that the government was required to disclose *Giglio* material
6   to defendant in connection with the suppression hearing, the court concludes that no *Giglio*
7   violation occurred, as defendant cannot show prejudice. See *Strickler*, 527 U.S. at 281-82.  As
8   noted, delayed disclosure of exculpatory or impeachment evidence does not violate the constitution
9   so long as the defendant receives the material in sufficient time to make use of it.  See, e.g.,
10  *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985) ("Davenport further claims that
11  the prosecution's failure at the pretrial hearing to disclose the fact that a witness to a lineup
12  identification had previously been asked to identify the robber amounted to a suppression of
13  exculpatory evidence under [*Brady*].  Disclosure, to escape the *Brady* sanction, must be made at
14  a time when the disclosure would be of value to the accused. . . .  Here, Davenport had access
15  to the exculpatory information from the beginning of trial and made use of it in cross-examining
16  a witness.  The delay in providing the information does not, therefore, constitute a due process

17  _____

18  other grounds, 503 U.S. 930 (1992).  Other circuits have assumed, without deciding, that *Brady*
19  and *Giglio* apply to suppression hearings. See, e.g., *United States v. Williams*, 10 F.3d 1070,
    1077 (4th Cir. 1993) ("Even if *Brady* were applicable in the context of a pretrial suppression
20  hearing, application of the law to the facts of the instant case would not require a different result.
    . . .  In light of the inconsequential nature of the *Brady* case to these proceedings, we assume
21  *arguendo* but decline to address definitively on the merits the issue of whether *Brady* should call
22  for disclosure of material evidence at pre-trial suppression hearings"); *United States v. Stott*, 245
    F.3d 890, 902 (7th Cir. 2001) (noting that the court had "assum[ed] without deciding" that *Brady*
23  applied to suppression hearings in *United States v. Veras*, 51 F.3d 1365(7th Cir. 1995)); *Veras*,
    51 F.3d at , 1375 (finding "no fault" with the district court's denial of a motion for new trial on
24  the basis that "'[b]ecause the suppressed evidence would not have affected the outcome of the
25  suppression hearing or the trial, defendant's due process rights were not violated and his motion
    for a new trial pursuant to *Brady* and  *Giglio* [*v. United States*, 405 U.S. 150 . . . (1972)] is
26  denied'"); but see *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) ("[I]t is hardly
27  clear that the *Brady* line of Supreme Court cases applies to suppression hearings.  Suppression
    hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due
28  process is violated when the withheld evidence is 'material either to guilt or to punishment'").

1   violation" (citations omitted)); see also *Gamez-Orduno*, 235 F.3d at 461; *Span*, 970 F.2d at 583.

2   Moreover, to establish a *Brady* violation, the defendant must show that there is a reasonable

3   probability that the outcome of the trial or proceeding would have been different had the evidence

4   been disclosed. *Gantt*, 389 F.3d at 913; see also *Strickler*, 527 U.S. at 263.

5        Defendant cannot make this showing here. First, although the evidence in question was

6   disclosed after the suppression hearing, the government produced the material at a time when

7   defendant was able to seek a pretrial hearing and renew his request that his statements to Benitez

8   be suppressed. He thus obtained the information in sufficient time to make use of it.[34]

9   Furthermore, the court concludes the impeachment evidence is not material, in the sense that it

10  does not alter the court's view regarding the voluntariness of defendant's statements on September

11  18, 2008.

12       Viewed in the context of Benitez's exchange with Scarpelli regarding "softening up"

13  suspects, the issue presented by Welton's suppression motion is whether Benitez "softened"

14  Welton up before he waived his *Miranda* rights such that his waiver was invalid and his

15  subsequent statements were coerced. There are two requirements for a voluntary, knowing, and

16  intelligent waiver of rights. "First, the relinquishment of the right must have been voluntary in

17  the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

18  or deception. Second, the waiver must have been made with a full awareness of both the nature

19  of the right being abandoned and the consequences of the decision to abandon it." *Moran v.*

20  *Burbine*, 475 U.S. 412, 421 (1986). The court has already concluded that Benitez's empathic

21  statements did not coerce Welton to waive his *Miranda* rights or confess his involvement in the

22  underlying crime.[35] It has similarly concluded that Welton was keenly aware of the fact that he

23  possessed rights under *Miranda* and chose nonetheless to give them up. The fact that Benitez

24  engaged in conversations, after the fact, with Scarpelli regarding the advisability of "softening up"

25

26       [34]Indeed, counsel will potentially be able to make further use of the impeachment material

27  at trial.

28       [35]Order at 14 n. 45.

suspects before reading them their *Miranda* rights does not change the court's view of what occurred on September 18, 2008, or the effect on Welton of the statements Benitez made that day.

The Ninth Circuit, in fact, considered the effect of "softening up" a suspect in *Elliott v. Rocha*, 108 F.3d 337 (Table), 1996 WL 733179 (9th Cir. Dec. 16, 1996) (Unpub. Disp.). There, the defendant and a police officer conversed for several minutes before the officer read the defendant his *Miranda* rights. They discussed the defendant's girlfriend, the defendant "being treated like a human being," the fact that the defendant would be handcuffed during transport to San Diego, the amount of bail, and the fact that other suspects in the case had implicated the defendant. *Id.* at *2. Considering the totality of the circumstances, including the fact that the police officer had known the defendant for eighteen years, and the fact that there was no evidence that the officer "plied [the defendant] with friendship to deceive him and obtain statements from him," the court concluded that such tactics did not amount to coercion. *Id.*

Similarly here, there is no evidence that Benitez crossed the line between empathy designed to develop rapport and deception designed to coerce a defendant into waiving rights he did not wish to give up, or making incriminating statements involuntarily. Benitez told defendant multiple times that he was free to leave and that he did not have to talk with her. She advised him at the outset of the conversation that she was a federal agent, that she had "come across something," and that defendant had "been on the radar" for some time. They then discussed his time in the Marine Corps, an ex-fiancee, why he was living at his place of employment, and his sex offender status. At this point, Benitez alluded to, but did not directly mention, the fact that Welton may have been abused as a child. She said: "I'm sorry those things happened to you, and I'm sorry it's following you."[36] Immediately, however, she said: "I'm here to talk with you about something we found," and stated that she was going to read Welton his *Miranda* rights.[37] She once again said that Welton did not have to speak with her. As in *Rocha*, the record is devoid of evidence that Benitez

---

[36]Interview Transcript at 15-16.

[37]Although Welton state, before Benitez read him his rights, that he had "never done anything to anyone," and suggested that he used pornography as an outlet, neither statement is incriminating.

used coercion to induce Welton to waive his *Miranda* rights or make involuntary statements.  See also *United States v. Miranda*, No. 08-CR-76, 2009 WL 159163, *3-4 (W.D. Wis. Jan. 22, 2009) (holding that playing a tape on which the suspect made potentially incriminating statements before giving *Miranda* warnings did not constitute unconstitutional "softening up" or the deliberate withholding of *Miranda* warnings until they had an inculpatory statement in hand, as is prohibited by *Missouri v. Seibert*, 542 U.S. 600 (2004)); *Hernandez v. Scribner*, No. 1:04-CV-05234, 2008 WL 2025146, *11 (E.D. Cal. May 9, 2008) (finding that a half hour of pre-*Miranda* questioning about unrelated past events and former acquaintances, and then about the victim of the homicide, did not constitute impermissible "softening up"); *Velasco v. Campbell*, No. 1:04-CV-06540, 2008 WL 928308, *10 (E.D. Cal. Apr. 4, 2008) (in analyzing whether improper "softening up" rendered a later post-*Miranda* confession invalid, the appropriate question is whether the suspect's "will has been overborne and his capacity for self-determination critically impaired," quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *Thompson v. Rummel*, No. C 05-1264, 2008 WL 906158, *11 (N.D. Cal. Mar. 31, 2008) (where inspectors expressed sympathy for the suspect and suggested that he may have committed homicide in self-defense, the comments did not overbear the suspect's will or render his *Miranda* waiver involuntary).

Because the court would have reached the same conclusion regarding the voluntariness of Welton's *Miranda* waiver and his subsequent statements had it known of Benitez's email communications with Scarpelli at the time of the suppression hearing, defendant has not been prejudiced and there has been no *Giglio* violation.

### D.   Exercise of The Court's Supervisory Power

"If the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss [an indictment] under its supervisory powers.  These powers may be exercised for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct."  *Barrera-Moreno*, 951 F.2d at 1091 (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991) (*Simpson II*)).

"Dismissal is appropriate when the investigatory or prosecutorial process has violated a

federal constitutional or statutory right and no lesser remedial action is available." *Id*. at 1092. Here, the court has found that the email communications and the government's failure to produce them before the suppression hearing did not violate a federal constitutional or statutory right. The need to provide a remedy for a statutory or constitutional violation therefore does not warrant dismissal of the indictment.

The second reason to dismiss under a court's supervisory powers is to protect judicial integrity, in particular by "ensuring that a conviction rests on appropriate considerations validly before a jury." *Barrera-Moreno*, 951 F.2d at 1091. This reason too is inapplicable here, both because the parties have waived jury trial and the court will act as the trier of fact, and because any possible prejudice to a fair trial has been and will be remedied by pretrial disclosure of the evidence, the evidentiary hearing held on July 29, 2009, and the opportunity defendant will have to impeach Benitez at trial. *United States v. Arista-Barragon*, 9 Fed. Appx. 590, 591 (9th Cir. Apr. 17, 2001) (Unpub. Disp.) ("Because this case was tried to a judge, the second reason for dismissing an indictment under the court's supervisory powers does not apply").

The third reason to exercise the court's supervisory powers is to "to deter future illegal conduct." *Barrera-Moreno*, 951 F.2d at 1091. In this regard, the court must consider whether "any lesser sanction [would be] like endorsing [the AUSA's conduct]." *United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008) (alterations original). Here, declining to impose some type of litigation sanction would endorse the notion that suggesting to government witnesses how they should testify at pretrial hearings is permissible, particularly since disclosure of the fact of such communications might not be compelled under *Brady*, *Giglio*, or Rule 26.2(a), and consequently there might not be another form of constitutional or statutory relief.

For a court to dismiss an indictment for prosecutorial misconduct under its supervisory powers, however, defendants must show both flagrant misbehavior and substantial prejudice. *United States v. Kearns*, 5 F.3d 1251, 1254 (9th Cir.1993) (citing *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir.1988) (per curiam)). The record reflects neither here. Under such circumstances, "the sanction chosen must be proportionate to the misconduct." *Jacobs*, 855 F.2d at 655; see also *United States v. Ross*, 372 F.3d 1097, 1111 (9th Cir. 2004) (sanctions to deter

prosecutorial misconduct are appropriate "even if the[ ] misconduct does not prejudice the defendant"). Where no prejudice has been suffered, remedies short of dismissal are salutary because they "allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced defendant." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988); see also *Ross*, 372 F.3d at 1111-12 (stating that in such circumstances, sanctions are "necessary to punish prosecutors who fail to fulfill their duty 'to win fairly, staying well within the rules,'" quoting *Kojayan*, 8 F.3d at 1323); see generally *Blanco*, 392 F.3d at 394-95 (noting that "[a] range of options will be available to the court, including, at one extreme, dismissal of the indictment for governmental misconduct. . . [and] [a]t the other extreme, . . . simply leav[ing] the judgment . . . in place").

A court exercising its inherent supervisory powers has a variety of tools available to ensure that a prosecutor remembers that "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). In this regard, the court previously granted defendant's *ex parte* application for an evidentiary hearing, ordered Benitez and Scarpelli to appear for cross-examination, and afforded defendant an opportunity to investigate whether more egregious violations had occurred. Ensuring that prejudice to the defendant is minimized or eliminated is the court's first and most important duty when faced with this type of situation. Cf. *Cincotta*, 689 F.2d at 244-45 (after the government suggested to its witnesses how they should testify, the district court correctly admonished the witnesses that its conduct had been inappropriate and that, contrary to the government's advice, their obligation was to testify truthfully and candidly for the benefit of the jury).

There are other remedies available, however, that warrant consideration in this case. In *United States v. Hasting*, 461 U.S. 499, 506 & n. 5 (1983), the Supreme Court suggested that where prosecutorial misconduct is harmless error as respects the defendant, a court exercising its inherent supervisory powers could "order the prosecutor to show cause why he should not be disciplined;" "ask[ ] the Department of Justice to initiate a disciplinary proceeding against him;" and "publically chastise[ ] the prosecutor by identifying him in its opinion." *Id*. The court can

also request that the state bar association of which the prosecution is a member initiate disciplinary proceedings. *Bank of Nova Scotia*, 487 U.S. at 263. Finally, it is within the power of the court to formally reprimand a prosecutor.[38] *United States v. Sigma International, Inc.*, 300 F.3d 1278, 1279 (11th Cir. 2002) (per curiam).[39]

As noted, the most troubling aspect of these proceedings is that AUSA Scarpelli not only advised Benitez how to present her testimony at the suppression hearing, but also took no responsibility for his actions, describing the comment as merely a joke. As an initial remedy, therefore, the court refers this matter to the United States Attorney for the District of Columbia and the Department of Justice's Office of Professional Responsibility, so that they may determine whether any ethical or legal violations were committed by Scarpelli that warrant further discipline.

Just as it finds not credible Scarpelli's assertion that his advice to Benitez was simply a joke, the court finds not credible Benitez's testimony that Scarpelli's advice did not influence her in any way when she testified at the suppression hearing. Even if she attempted to put it from her mind, Scarpelli's comments undoubtedly affected Benitez's testimony regarding her state of mind during the pre-*Miranda* portion of her interview with Welton, whether consciously or subconsciously. The sanction that is "proportionate to the misconduct," *Jacobs*, 855 F.2d at 655, therefore, is one that eliminates that taint. The court therefore makes a specific finding that those portions of Benitez's testimony that were influenced by Scarpelli's advice – i.e., those relating to, her motivation for making certain statements during the pre-*Miranda* portion of her interview with Welton – are not credible. The court's finding that Welton's *Miranda* waiver and subsequent statements were voluntary did not rely on Benitez's testimony about developing rapport with or

---

[38]A formal reprimand is something more than merely chastising the attorney in a written opinion. "[A] jurist's derogatory comments about a lawyer's conduct, without more, do not constitute a sanction." *In re Williams*, 156 F.3d 86, 92 (1st Cir. 1998).

[39]"Trial courts . . . must play an important role in policing overzealous prosecutors, as both state and federal trial courts generally have greater ability immediately to correct or minimize prosecutorial error and also have more leeway to impose sanctions on prosecutors than an appellate court, which generally may only undertake the severe action of overturning a conviction." *Le v. Mullin*, 311 F.3d 1002, 1030 (10th Cir. 2002).

expressing empathy for a suspect, but on the court's independent evaluation of the recording and transcription of the September 18, 2008 interview.[40]   Consequently, the court concludes that suppressing Welton's confession would be too severe a sanction to impose for purposes of remedying the misconduct.

At the hearing, defendant argued that with Benitez's testimony stricken, the court could not consider the recording and transcription of interview, as those items are hearsay.[41]   The court disagrees.   First, the statements of Welton that are reflected on the tape are not hearsay, as they are party admissions.   FED. R. EVID. 801(d)(2)(A).   Second, the statements of Benitez reflected on the tape are not being considered for the truth of the matter asserted, but rather for what they show regarding coercion or lack of coercion during the interview.   They are also not hearsay because they provide context for defendant's admissions.   See *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2007) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth"); *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) (the district court properly admitted evidence of an informant's recorded statements during a conversation with the defendant where they were presented not for the truth of the matter asserted, but to establish a context to assist the jury in understanding the recorded statements of the defendant, i.e., his admissions); see also *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989) (when a defendant has an out-of-court recorded conversation with a third party, and the defendant's statements are admissible as party admissions, the third party's statements to the defendant during the recorded conversation are admissible "as reciprocal and integrated utterances between two parties for the limited purpose of putting the response of the defendant in context of

[40]As noted, Benitez's written declaration was executed on July 6, 2009, before Scarpelli offered advice on how Benitez should testify.   (Government's Motion to Strike and Opposition to Defendant's Motion to Suppress Statement and Evidence; Memorandum of Points and Authorities; Declarations of Eric Carreon and Special Agent Stephanie Benitez, Docket No. 28 (July 6, 2009).) That declaration contains much of the same information as Benitez's testimony at the hearing. Because defendant did not have an effective opportunity to cross-examine Benitez regarding the statements she made in the declaration concerning her interview of Welton, the court strikes that those statements as well.

[41]See July 29 RT at 64:13-20.

making them intelligible to the jury and recognizable as admissions").

Defendant also argued that the tape could not be admitted unless he had an opportunity to cross-examine Benitez. To the extent this is a Confrontation Clause argument, it fails for the same reason that defendant's hearsay argument fails. See *Tennessee v. Street,* 471 U.S. 409, 413-414 (1985) (holding that the Confrontation Clause was not implicated when the confession of a non-testifying accomplice was admitted at defendant's trial for a non-hearsay purpose; the out-of-court statement was not offered to prove what happened at the murder scene but rather to rebut defendant's testimony that he was coerced to copy his own confession from the accomplice's); see also *United States v. Inadi*, 475 U.S. 387, 398 n. 11 (1986) (recognizing that the admission of non-hearsay statements raises no Confrontation Clause concerns, and noting that certain taped conversations could be admitted without violating the Confrontation Clause if not offered to prove the truth of the matters asserted, but rather as background for the conspiracy or to explain the significance of certain events); *Tolliver*, 454 F.3d at (holding that the statements of a government informant to defendant on a tape recording were offered for the non-hearsay purpose of providing context for defendant's admissions on the tape, presented no Confrontation Clause issue despite the fact that the informant did not testify at trial).[42]

Finally, the court declines to strike so much of Benitez's declaration and hearing testimony as authenticated the tape of the interview. Rule 901 sets a low threshold for the authentication of

---

[42]Nor was it necessary for Benitez to be available for cross-examination to prove the voluntariness of Welton's *Miranda* waiver or subsequent statements. Cf. *United States v. Bevans*, 728 F.Supp. 340, 348-49 (E.D. Pa. 1990) ("Defendant also challenges the introduction of a tape-recorded conversation . . . between Patterson and [defendant] following the former's arrest. The crux of [defendant's] argument is that because the Government did not produce Patterson at the in limine suppression hearing convened to determine the tape recording's admissibility, it failed as a matter of law to sustain its burden of proving that Patterson's consent was bestowed voluntarily. . . . Defendant cites no authority in support of this proposition, and the Court concludes it is unwarranted under existing law. Whether a person's consent to the recording of a telephone conversation is voluntarily conferred or instead the product of a will overborne by duress or coercion is a question of fact to be ascertained from all the circumstances. . . . This test in no way entails an unyielding requirement that the person who allegedly consented to police intrusion testify. . . . Evidence introduced at the suppression hearing clearly showed Patterson 'consciously, freely, and independently' agreed to the recording, . . . and the Court so found").

evidence.  FED. R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims").  Defendant at no time during these proceedings has challenged those portions of Benitez's declaration and testimony that authenticate the recording of her interview with Welton.  Benitez adequately authenticated the recording in her declaration, which was executed before she received the July 9, 2009 email from Scarpelli.[43]  In addition, unlike Benitez's testimony regarding her state of mind in conversing with Welton before she read him his *Miranda* rights, her testimony regarding the fact that she recorded the conversation and that the tape recording she has presented accurately reflects the words that were spoken is corroborated by the recording itself and by the lack of any challenge to the authenticity of the evidence by the defendant.  Consequently, striking this aspect of Benitez's declaration and suppression hearing testimony would be "a windfall to [an] unprejudiced defendant."  *Bank of Nova Scotia*, 487 U.S. at 263.

In addition to striking so much as Benitez's suppression hearing testimony and declaration as concerns her motivations in engaging Welton in general discussion that touched indirectly on his alleged history of prior sexual abuse before administering *Miranda* warnings, the court exercises its discretion to make a specific finding that Benitez testified in a manner the court finds not credible at the evidentiary hearing on defendant's motion to dismiss the indictment.  Specifically, the court finds not credible Benitez's testimony that Scarpelli's advice had no effect whatsoever on the manner in which she testified at the suppression hearing.  The court will take this finding into account in assessing Benitez's credibility as a trial witness, should she be called to testify.

### III.  CONCLUSION

For the foregoing reasons, Welton's motion to dismiss the indictment or alternatively to suppress the statements he made to FBI agents on September 18, 2008 as a sanction for outrageous

---

[43]Benitez Decl. ¶¶ 14-15.

24

government misconduct is denied.  Welton's motion for other remedies or sanctions is granted as detailed in this order.

DATED: August 1, 2009

_Margaret M. Morrow_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE