SEAN K. KENNEDY (No. 145632)
Federal Public Defender
Sean_Kennedy@fd.org
JOHN LITTRELL (No. 221601)
Deputy Federal Public Defender
John_Littrell@fd.org
Office of the Federal Public Defender
321 East Second Street
Los Angeles, California  90012
Telephone (213) 894-5310
Facsimile (213) 894-0081

Attorneys for Defendant
RICHARD MICHAEL WELTON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 09-153-MMM |
| Plaintiff, | ) | |
| v. | ) | MR. WELTON'S POST-TRIAL BRIEFING |
| RICHARD MICHAEL WELTON, | ) | |
| Defendant. | ) | |

**I.**

**Introduction**

Count One of the Indictment charges Mr. Welton of violating 18 U.S.C. § 2252A(a)(2) by receiving images of child pornography, in Los Angeles, within the Central District of California, between approximately August 30, 2005 and March 3, 2006.  Dkt. No. 9.  Count Two of the Indictment charges Mr. Welton of violating 18 U.S.C. § 2252A(a)(5) by possessing images of child pornography, in Los Angeles, within the Central District of California, between approximately August 30, 2005 and March 16, 2006.  The government's theory of the case was that Mr. Welton

downloaded images of child pornography from a computer somewhere, printed it, and brought it to the First Presbyterian Church in Covina, California.  Although the government offered evidence, in the form of fingerprint analysis and Mr. Welton's own statements, that supported its theory that Mr. Welton was the person who printed the images and brought them to the church, it did not introduce evidence that proved *when* Mr. Welton received or possessed those images, or *where* he received them.  Nor did it establish, beyond a reasonable doubt, that any of the images that Mr. Welton received or possessed were mailed, shipped, or transported in interstate commerce at the time the crime occurred.  Accordingly, the government failed to establish that this Court has jurisdiction over any of the conduct alleged in Count One, that venue is proper for Count one, or that any of the conduct alleged in the indictment occurred within the five-year statute of limitations.  Accordingly, the Court must find Mr. Welton not guilty of both Counts One and Two.

## II.

### Evidence Presented At Trial

The government presented the testimony of six witnesses at trial:

A.    David Robertson

David Robertson testified that he has been a volunteer grounds manager for the First Presbyterian church for approximately seven years.  August 4, 2009 Reporter's Transcript of Trial ("TX") at 11, 12.  His responsibilities include maintenance, painting, and gardening. Id.

In August, 2007, Mr. Robertson found stacks of pages, consisting of images of nudity, some of which involved children, behind a changing table in the nursery area of the church.  Id. at 17.  He then brought the images to the church receptionist, Linda Breatore, and said "we have a problem" or something like that.  Id. at 18:9.  Shortly thereafter, he shredded the images.  Id. at 18:17-19.

About one and a half to two weeks later, Mr. Robertson found a "large stack of pictures" behind another changing table.  Id. at 19:2.  Although he flipped through the

pictures briefly, he did not study any of them.  Mr. Robertson did not describe the pictures that he recovered.  When Mr. Robertson was shown Government's Exhibit 125, he testified that he could not recognize the exhibit.  Id. at 19:24.  Again, Mr. Robertson turned over what he found to Linda Breatore.  Id. at 20:9.

B.      Linda Breatore

Linda Breatore testified that she has been a church receptionist at the First Presbyterian Church for about seven years.  She testified that in August 2007, David Robertson brought her a "stack" and said "we have a problem" or something like that. Id. at 25:10-12.  Ms. Breatore flipped through the pages and recognized some of them as pornography, including pornography involving children.  She did not count the number of pages or commit all of the images to memory.  Id. at 33:14.

When shown Government's Exhibit 125, Ms. Breatore recognized some of the images in the stack, but not all of them.  Id. at 32:19.  Some of the images were definitely not in Ms. Breatore's memory.  Id. at 32:25.  She acknowledged that the stack of images that constituted Government's Exhibit 125 might not be the same as the stack of images that were given to her by Mr. Robertson.  Ms. Breatore acknowledged that some images could have been added to the stack since the time she looked at it in August 2007.  Id. at 33:18.  Some of the images that she received in August 2007 could have been removed from the stack.  Id. at 33:21.

When asked to mark the images that she remembered seeing in August 2007, within Government's Exhibit 125, Ms. Breatore placed her initials on 27 of the 95 pages.  See Exhibit 125.  She initialed the pages that correspond with Government's Exhibits 1; 2; 4; 8; 9; 20; 22; 23; 29; 37; 40; 41; 54; 57; 58; 66; 71; 72; 74; 80; 85; 87; 88; 89; 90; 91; and 93.  See id.; Dkt. No. 75 (Stipulation re: Exhibits 125, 125A).

Ms. Breatore testified on direct examination that she was "always with" the images.  She said that to her knowledge, she had control of the images "from the time

3

[she] received the images from Mr. Robertson to the time that they were given to the police . . . ." Id. at 31:17.  However, on cross examination, she acknowledged that the police didn't arrive until the day after she received the images from Mr. Robertson. Id. at 33:24.  The night after Ms. Breatore received the images, she left the images at the church overnight, unattended.  Id. at 33:4.  She didn't exactly remember what she did with the images that night; her memory was fuzzy.  Id. at 36:8.  She believed that she may have put them in the safe in her office, see id. at 38:13-14, but did not actually remember having done so.  Id. at 40:8.  She did not know whether or not she locked her office when she left for the night.  She did not actually have a memory of shutting her office door.  Id. at 40:24-41:2.  She didn't have a clear memory of whether she gave the images to the pastor of the church, or whether she handed them over to the police.  Id. at 30:13-15.

C.      Officer Robert Bobkiewicz

Officer Bobkiewicz responded to the First Presbyterian Church on August 23, 2007, the day after the images were found.  He testified that the pastor of the church, Andrea Messinger, handed him images.  Id. at 50:4-5.  Detective Bobkiewicz testified that he believed that Government's Exhibit 125 was the images that he received from the pastor.  Id. at 50:14-15.  But he acknowledged that he did not recognize all of the images in Exhibit 125.  He didn't count the number of pages that he received on August 23, 2007, and he didn't count the number of pages he reviewed in court, two years later.  Id. at 53:18-23.  He didn't know whether the stack of images represented in 125 was exactly the same as the stack of images he received in August 2007.

When asked to mark the images that he believed that he saw on August 23, 2007 within Government's Exhibit 125, Detective Bobkiewicz placed his initials on 27 of the 95 pages.  See Exhibit 125A (Duplicate of Exhibit 125, with Detective Bobkiewicz' initials).  He initialed the pages that correspond with Government's

Exhibits 1; 2; 3; 4; 8; 9; 10; 12; 13; 19; 20; 22; 23; 24; 27; 28; 29; 32; 33; 34; 35; 37; 38; 39; 40; 41; 50; 51; 54; 55; 57; 58; 66; 67; 68; 69; 70; 71; 72; 74; 80; 83; 86; 87; 88; 89; 90; 91; and 95 See id.; Dkt. No. 75 (Stipulation re: Exhibits 125, 125A).  He acknowledged, however, that it was possible that he had seen some of the images before as part of other investigations.  8/4/09 TX at 59:11-15.

Officer Bobkiewicz had the images in his possession for about a week, from August 23, 2007 to August 30, 2007.  He gave the images to Federal Bureau of Investigation Special Agent Stephanie Benitez on August 30, 2007.  Id. at 51:10.

D.    Kathryn Suchma

Kathryn Suchma is a fingerprint examiner for the FBI.  She received the stack of images labeled as Government's Exhibit 125 in February, 2008, from FBI Special Agent Stephanie Benitez.[1]  Relying on her notes, Ms. Suchma testified that latent fingerprints were found on nine of the images that she was able to identify as being Mr. Welton's.  Id. at 98:9-16.  The fingerprints were found on the images that correspond to Government's Exhibits 2, 13, 31, 41, 60, 61, 66, 78, and 81.  Id.

_____

[1] FBI Special Agent Stephanie Benitez did not testify.  According to Officer Bobkiewicz, he gave Ms. Benitez the images on August 30, 2009.  There is no evidence in the record of what happened to the images for the nearly five months between August 30, 2009, and February 20, 2008.  There is no information in the record related to where the images were stored, who had access to them, whether pages were added or subtracted from the stack during that time, and whether they were in substantially the same condition at that point as they had been in when they were found.  Similarly, there is no information in the record regarding what was done with the images after Ms. Suchma was finished examining them, where they were kept, and who had access to them before they were presented as evidence in this case.  Task Force Officer Bernell Trapp testified that on September 18, 2008, he saw Ms. Benitez with images which he believed were from the church.  Id. at 73:12.  However, the images that Ms. Benitez brought to the interview were copies, not the originals.  See Exhibit 106; 108C (Benitez:  "[T]hese are copies, these aren't the originals.")

E.      Task Force Officer Bernell Trapp

Task Force Officer ("TFO") Bernell Trapp testified  he accompanied FBI Special Agent Stephanie Benitez to an interview of Mr. Welton on September 18, 2008.  Mr. Trapp was not assigned to investigate Mr. Welton, id. at 66:20-21, and he had not been associated with the investigation of the case either before or after the September 18, 2008 interview.  Id. at 82:15-18.  His only involvement was to "assist in the interview."  Id. at 66:24.  TFO Trapp was present during the interview with Mr. Welton, and he saw that Special Agent Benitez brought what he believed to be copies of the images that were found in the church to the interview.  Id. at 73:12.

TFO Trapp testified that at some points during the interview, Special Agent Benitez showed Mr. Welton certain images from the stack, id. at 77:3-6, but he did not recall which of the images were shown to Mr. Welton.  Id. at 79.

TFO Trapp did not bring the images to the interview.  Id. at 82:22-23.  He did not recall ever handling the images himself, id. at 83:9, nor did he have any reason to view any of the images.  Id. at 79:20.  He didn't look at all of the pages in the stack. Id. at 10-11.  He never showed any images to Mr. Welton himself.  Id. at 83:16.


F.      Special Agent Chris Christopherson

Special Agent Chris Christopherson offered opinions about the nature of the images contained in Government's Exhibit 125 and 1-95, whether those images were printed from a computer, and whether they were downloaded from the internet.

Mr. Christopherson did not review the original images.  He reviewed copies of the images that had been loaded onto a CD.  Id. at 151:14-16.  He testified that he received the CD from Special Agent Minh Tran.[2]  Mr. Christopherson did not utilize a

_____

[2] There is no evidence in the record regarding where Special Agent Minh Tran got the images that she sent to Special Agent Christopherson, or whether they were the same images that were recovered by David Robertson on August 22, 2009.

computer to analyze the images, and he did not have access to the computer he believed was used to download and print the images. Id. at 152:6-24. His opinions were based solely on the numbers and characters he saw on the pages. Id. He acknowledged that the images could have been color copied on to the page, and that the headers and footers that he assumed were generated by a web browser could also have been manually typed the data into using a typewriter. Id. at 154:4-6.

Mr. Christopherson testified that his opinion was based on four pieces of meta-information which he saw in the headers and footers, id. at 117:19-23, and his understanding of how popular web browsers Internet Explorer and Firefox typically organize that information and arrange it on web pages. Id. at 118:10-17; see also id. at 127:2-9 (describing reliance on "meta-information," which indicated that a web browser was used and that the worldwide web was used.").

First, he relied on what he believed to be the Uniform Resource Locator ("URL,") which he also referred to as a "web address" appearing on the pages. Id. at 117:21. He testified that the URL is "determined on the client's side." Id. at 118:20.

Second, he relied on the page numbers. Id. at 117:22. He testified that the page numbers are determined by the web browser. Id. at 118:20.

Third, he relied on the dates and times. Id. at 117:22. He testified that the dates and times are also "determined on the client's side." Id. at 118:20.

Fourth, he relied on the title that appeared on the page. Id. at 117:22. He testified that the title on the pages was supplied by the web server. Id. at 118:22.[3]

_____

[3] Mr. Christopherson's opinion was also based on the presence of what he believed to be "banners" and "hyperlinks" on the printed pages. Id. at 119:18-22. He testified that it was "common" in website design to include an image at the top portion of the web page that is common throughout the site. Id. at 119:21-22. But he acknowledged that the presence of a "banner," without more, would not be sufficient to form an opinion that a page came from a computer. Id. at 156:21-25. He also acknowledged that he could not offer an opinion as to whether any of the exhibits he reviewed as part of this case actually contained "hyperlinks." Id. at 158:7-10.

Notwithstanding the fact that the government did not offer the information in the headers and footers into evidence for the truth of the matters asserted, see id. at 7:23-8:11, Mr. Christopherson assumed the information in the headers and footers to be true and relied on that in his analysis. Id. at 155:8-14.  Although he was able to verify some of the information using the "who-is" and "geotrace" services, he was not able to verify the accuracy of all of the information on the pages. Id. at 159:25-160:5.

Based on the information in the headers and footers, Mr. Christopherson offered opinions related to the following exhibits offered by the government:

### 1.   Government's Exhibit 66

Special Agent Christopherson testified that he believed that Exhibit 66 was printed using a computer.  His opinion was based on information he read from the page, including the address.  The Court struck his testimony related to what various things in the address meant, however, for lack of foundation. Id. at 128:21-23.

### 2.   Government's Exhibit 71

Special Agent Christopherson testified that the same web address was accessed in order to access both Exhibit 66 and 71. Id. at 129:14-21.  His opinion was based on his observation of the markings on the pages, including the addresses and the numbers in the address bar, from which he opined that the images must be related because they were "closely related in number." Id. at 129:18-19.  The Court struck his testimony related to the relationship between the images and whether they were a series from same website for lack of foundation. Id. at 129:24-130:7.

### 3.   Government's Exhibit 31 and 70

Special Agent Christopherson testified that Exhibits 31 and 70 were related, and that they were probably part of one printout. Id. at 131:12-13.  He also believed

that the internet was used to access both exhibits.  Id. at 132:11.

### 4.   Government's Exhibit 86

Special Agent Christopherson opined that Exhibit 86 was printed using a different web browser than Exhibit 70.  Id. at 134:23-135:2.

### 5.   Government's Exhibits 86-91

Special Agent Christopherson opined, based on the dates appearing the pages, the "layout of the information" on the pages, the presence of Asian characters, and the page numbers and web addresses at the bottom left portion of the pages, that the exhibits 86-91 were printed together.  Id. at 136:11-19.  Defense counsel objected and moved to strike the answer because Special Agent Christopherson was merely reading the data from the pages and the subject was not appropriate for expert testimony.  Id. at 136:20-23.  The government acknowledged that Mr. Christopherson's conclusion was on that "a layperson could reach as well."  Id. at 137:10-12.  The Court noted that Mr. Christopherson's testimony consisted of a mere recitation of information appearing on the printed pages and questioned whether Mr. Christopherson's was doing anything that any other witness could not do.  Id. at 138:1-2.  The Court did not rule on the motion to strike.  The government elected to move on.  Id. at 138:7.

### 6.   Government's Exhibit 89

Special Agent Christopherson testified Government's Exhibit 89 did not contain a "banner."  Id. at 139:2-6. Mr. Christopherson had testified, earlier, that a "banner" is an object that is typically included in web pages.  Id. at 119:21-22.

### 7.   The IP Address 213.130.210

Mr. Christopherson noted that some of the pages shown to him had IP addresses listed in the "web address" portion of the page.  Id. at 120:18-19.

Based on the IP addresses listed on some of the pages, Special Agent Christopherson testified that he attempted to determine where the IP Address 213.130.210 was located and who it was registered to.  Id. 142:9.  Mr. Christopherson used the following methods to attempt to locate the IP address:

a.    "Who-is"

Mr. Christopherson testified that "Who-is" is a name for a web service used by people who want to report offensive on the internet.  Id. at 144:1-8.  It does not refer to a particular organization, but to a type of service, offered on the internet to help users look up the location of URLs.  Id. at 169:23.  He opined that the "who-is" services get their data from the Regional Internet Registrars ("RIRs").  Id. at 170:14.[4] But he acknowledged that the RIRs, in turn, rely on the self-reporting of the Internet Service Providers ("ISPs") as to where they are.  Id. at 171:9.  Mr. Christopherson did not know whether the RIRs validate the information they received from ISPs..

b.    "Geotrace"

Mr. Christopherson testified that "Geotrace" is a method used mostly by law enforcement to determine the physical location of an IP address.  Id. at 144:9-11.  In this case, he used a service called "Geobytes."  Id. at 166:18-24.  He testified that he had found "Geobytes" to be "very reliable in the past."  Id. at 168:1.  But he did not know where it got its information about the location of an IP address.  He did not know whether the information he got from Geobytes was physically confirmed or based solely on the self-reporting of an Internet Service Provider regarding its location.  He was willing to assume the latter was correct.  Id. at 168:9-10.

Mr. Christopherson acknowledged that the "Who-is" and "Geotrace" searches

---

[4]  Mr. Christopherson testified that "ARIN" is the "RIR" for North America.  Id. at 142:24-143:3.  "RIPE" is the RIR for Europe, Central Asia, and the Middle East. Id. at 143:4-8.

upon which he based his opinions with respect to IP address 213.130.210 were "unofficial" ways to verify an IP address.  Id. at 172:20-21.  He could have verified the physical location of the IP address more reliably by serving a subpoena on the RIR.  Id. at 172:25.  He explained that he believed he could have invoked his authority under the United States' Mutual Legal Assistance Treaty ("MLAT") to serve a subpoena on the RIPE organization in Amsterdam.  Id. at 173:22-23.  With a subpoena, he probably could have determined whether the images were hosted on the computer that used the IP address 213.130.210.  Id. at 174:22-23.

Finally, Mr. Christopherson admitted that even assuming the results of his investigation were accurate, all he was able to determine using the "Who-is" service and the "Geotrace" services was that IP address 213.130.210 was currently "in Madrid, Spain."  Id. at 142:22, 144:25.  He testified that it was "highly likely" that the IP address was delegated to RIPE, and that it was used in Madrid.  Id. at 147:2-5.  He acknowledged, however, that IP addresses are not static in one location, and that they can move.  Id. at 161:6-9.  Therefore, at best,"Who-is" and "Geobytes" services can predict where an IP address is at the time the inquiry is made.  Id. at 177:11-20.  They cannot determine where the IP address was previously.  Id.


### 8.   Government's Exhibits 1-95

Without any additional foundation for his opinion, at the close of his direct examination, Special Agent Christopherson opined that Government's Exhibits 1-95 were all accessed using a computer and the internet.  Id. at 147:12-21.


### 9.   Government's Exhibit 88

Special Agent Christopherson testified that he recognized the visual depiction in Exhibit 88 as an image he had seen during an unrelated investigation he conducted in Louisiana in "approximately 2005."  Id. at 150:4-15.  He did not offer an opinion with respect to whether the image constituted child pornography or was produced

1   using a real minor engaged in sexually explicit conduct.  Nor did he give any more
2   specific information regarding the time when he first saw the image.

3

4                                              **III.**

5                            **Key Exhibits Presented At Trial**

6

7          A.    Exhibits 1-95 and 125

8          The government introduced into evidence 95 pages of images which it

9   contended were the images found in the First Presbyterian Church in Covina,

10  California, on August 22, 2007.   Some of the images included depictions of child

11  pornography – that is, they contained visual images of real minors engaged in sexually

12  explicit conduct.  Other images in the stack consisted of adult pornography, cartoons

13  or drawings, or other material that was not proven to have been produced using real

14  minor children.  The images were individually numbered in Exhibits 1-95.  A

15  compendium of Exhibits 1-96 was introduce into evidence as Exhibit 125.

16

17         B.    Dkt. No. 72:  Stipulation Re: Government Exhibits 89 and 91

18         Mr. Welton stipulated that one of the images in Exhibit 89 was produced using

19  a real minor.[5]  He also agreed that the same image was taken in Illinois.

20         Mr. Welton stipulated that one of the images in Exhibit 91 was produced using

21  a real minor.  He agreed that the image was taken in Florida.

22         He did not stipulate that any of the other images in any of the other exhibits

23  offered into evidence were produced using a real minor, and there is no other evidence

24  in the record establishing that they were produced using real minors.

25  _____

26         [5]  The government had the burden of proving that Mr. Welton received and
    possessed images that were produced using a real minor engaged in sexually explicit
27  conduct.  See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 256 (2002) (holding
    that Congress's ban on possession of virtual child pornography violated the First
28  Amendment because  its creation does not involve actual children)

C.    Dkt. No 73:  Fingerprint Evidence

The government presented evidence that Mr. Welton's fingerprints were left on nine of the images of child pornography recovered from the First Presbyterian Church in Covina, California.  See Exhibits 2, 13, 31, 41, 60, 61, 66, 78, and 81.

D.    Exhibit 106:  Recorded Statements By Richard Welton

The government introduced evidence that Mr. Welton admitted to having brought images, including some of the images that were shown to him by Special Agent Benitez, into the First Presbyterian Church.  See Exhibit 106.  A partial transcript of the interview was submitted, as Exhibit 108, as an aid to the Court in reading Exhibit 106.  During his interview with Special Agent Benitez, Mr. Welton admitted that he went in the church "a couple times," Exhibit 108E, and that he always went to the church when no one was there.  See Exhibit 108I.

Mr. Welton did not say where he had obtained the images.  When Special Agent Benitez asked Mr. Welton where he printed the images from, Mr. Welton stated that he had "no idea."  See Exhibit 108G.  He repeatedly told her that he had no idea, or that he didn't know.  See id.  When Special Agent Benitez suggested that the images "came from a computer somewhere," Mr. Welton again responded that he had "no idea" where the images came from.  See Exhibit 108M.  When pressed, Mr. Welton said that it "had to of been a church somewhere."  See Exhibit 108N.

Nor did Mr. Welton say when he had obtained the images or when he put them in the church.  When Special Agent Benitez told Mr. Welton during the interview that a page "look[ed] like it was printed in oh five and oh six, so it would have been a couple years ago, Mr. Welton simply replied "Yeah."  See Exhibit 108C.  When Special Agent Benitez again told Mr. Welton that the images were "dated oh six" Mr. Welton again replied "Yeah."  See Exhibit 108G.

**IV.**

**Legal Analysis**

**A.      COUNT ONE:  RECEIPT OF CHILD PORNOGRAPHY**

In order to prevail on Count One, the government had to prove, beyond a reasonable doubt, that Mr. Welton knowingly received at least one image depicting a minor engaged in sexually explicit conduct that had been mailed, shipped, or transported in interstate commerce.  18 U.S.C. § 2252A(a)(2); 2256(8); <u>see also</u> <u>Free Speech Coalition</u>, 535 U.S. 256 (noting requirement of actual minor).

The government failed to meet its burden of proof, as set forth below:

First, the government failed to establish, beyond a reasonable doubt, that any child pornography received by Mr. Welton had been mailed, shipped, or transported in interstate or foreign commerce at the time Mr. Welton allegedly received it.

Second, the government has not established that this Court has jurisdiction over the conduct alleged in Count One, as it has not established that Mr. Welton's receipt of child pornography occurred in the United States.

Third, the government has not proven that the offense occurred within the Central District of California, and thus venue is not proper with respect to Count One.

Finally, the government has not proven that Mr. Welton's receipt of child pornography occurred within the five-year statute of limitations that applies in this case pursuant to 18 U.S.C. § 3282.

> 1.      <u>The Government Failed To Prove That Child Pornography That Was Received By Mr. Welton Had Been Mailed, Shipped, or Transported In Interstate Or Foreign Commerce at the time it was Received</u>

The statute charged in Count One, 18 U.S.C. § 2252A(a)(2), was enacted in 1996.  Pub.L. 104-208, Div. A, Title I, § 101(a), (Sept. 30, 1996).  At that time, subsection (a)(2) provided, in relevant part, as follows:

> Any person who . . . knowingly receives or distributes . . . any child pornography that has been mailed, or shipped or transported in interstate

commerce by any means, including by computer . . . shall be punished as provided in subsection (b).

18 U.S.C. § 2252A(a)(2) (1996).

On September 7, 2007, in <u>United States v. Schaefer</u>, 501 F.3d 1197 (10th Cir. 2007), the Tenth Circuit reversed a conviction under a nearly identical statute, 18 U.S.C. § 2252(a)(2).[6]  That statute, like 18 U.S.C. § 2252A(a)(2), required that the government prove that the defendant received child pornography that had been "mailed, shipped, or transported in interstate commerce by any means, including by computer."  18 U.S.C. § 2252(a)(2)(1996).  The government attempted to prove the facts upon which the Court's jurisdiction depended by establishing that the defendant had downloaded images of child pornography over the internet.  The Court held that a mere showing that a defendant accessed the internet in order to download the image of child pornography was insufficient evidence from which a jury could conclude that the image had been actually mailed, shipped, or transported in interstate commerce.  <u>Id.</u> at 1201.  Although unlikely, the Court held, it was possible that the child pornography could have been downloaded from the internet from a source within Kansas, in which case the defendant would have used the internet to obtain the image, but the image would not have been transported in interstate commerce.  <u>Id.</u>

The Court's ruling was based on the plain language of the statute, which

---

[6]  Prior to the amendment to the statute in 2008, 18 U.S.C. § 2252(a)(2) provided as follows:

> Any person who . . . knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer . . . if . . . the producing of such material involves the use of a minor engaged in sexually explicit conduct, and such visual depiction is of such conduct . . . shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2252(a)(2).

limited its reach to receipt of child pornography that actually moved from one state to another.  Although Congress *could* have invoked the full reach of its Commerce Clause jurisdiction when promulgating 18 U.S.C. § 2252, the Court held, it made a "purposeful decision" not to do so by choosing words which limited its jurisdiction to receipt of child pornography that had actually traveled in interstate commerce.  Id. at 1202.  By using the terms "in commerce," rather than "affecting commerce" or a "facility of interstate commerce,"  Congress deliberately limited the reach of the statute to receipt of child pornography that had actually moved across state lines.  Id.[7]

On October 8, 2008, Congress amended 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2252(a)(2)  to address the limitations that the Schaefer Court had pointed out. With respect to 18 U.S.C. § 2252A(a)(2), the statute charged in Count One in this case, Congress struck the terms "in interstate" and inserting the terms, "in *or affecting* interstate" at every place in the statute where those terms appeared.  See 120 Stat. 614, 647, Pub.L. 110-358, Title I, § 103(a)(4), (b), (d), Title II, § 203(b) (Oct. 8, 2008) (emphasis added).  In the same amendment, Congress inserted "using *any means or facility of interstate or foreign commerce*" after "mailed, or" in each place in subsection (a)(2) where those terms appeared.  Id. at § 103(a)(4)(b) (emphasis added). Prior to the 2008 amendment, the language of the statute explicitly limited its reach to material that had actually crossed state lines.  See Schaefer, 501 F.3d at 1201.  After the amendment, Congress made clear its intent to regulate not merely the receipt of child pornography that had actually traveled in the *channels* of interstate commerce, but also the receipt of child pornography that affects the *instrumentalities* of interstate commerce or had a *substantial effect* on interstate commerce -- that is, receipt of child

---

[7]  The Third Circuit disagreed with Shaefer's ruling with respect to whether a mere showing that the internet was used was sufficient to establish the interstate transportation of child pornography as required by the statute.  See United States v. MacEwan, 445 F.3d 237, 244 (3d. Cir. 2006).  But MacEwan did not consider the question that was addressed by Schaefer:  whether the plain language of the statute represented a limited invocation of Commerce Clause jurisdiction by Congress.

pornography that "affected" interstate commerce or "was produced using materials that had been shipped or transported in interstate commerce.  See United States v. Lopez, 514 U.S. 549, 558 (1995) (noting three areas of permissible Commerce Clause jurisdiction:  the channels of interstate commerce, the instrumentalities or interstate commerce, and activity which "substantially affects" interstate commerce).  With the amendments, Congress vastly expanded its jurisdiction to regulate child pornography offenses.  See PEDOPHILES, POLITICS, AND THE BALANCE OF POWER: THE FALLOUT FROM UNITED STATES V. SHAEFER AND THE EROSION OF STATE AUTHORITY, 86 Denv. U. L. Rev. 1115, 1167 (2009).

The *Ex Post Facto* Clause of the United States Constitution states that "[n]o State shall . . . pass any . . . ex post facto Law."  The *Ex Post Facto* Clause forbids the passage and application of laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."  Calif. Dep't of Corr. v. Morales, 514 U.S. 499, 504 (1995) (quoting Collins v. Youngblood, 497 U.S. 37, 41 (1990)); see also Calder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (defining prohibited *ex post facto* law as "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.")

In this case, the 2008 amendment to 18 U.S.C. § 2252A(a)(2), which expanded the reach of the statute to the transportation of child pornography that merely "affected" interstate commerce, or that was produced using material that had been shipped in interstate commerce, altered the definition of the crime.  See Morales, 514 U.S. at 504.  After the amendment, the statute reached conduct that was not criminal prior to the passage of the statute, such as the interstate receipt of child pornography which might only "affect" interstate commerce, or the interstate receipt of child pornography that was produced using materials that were manufactured in another state.   Congress, of course, had the authority to prospectively change and broaden the definition of the crime.  But that broader definition of the crime cannot be applied to "an action done before the passing of the law."  Calder, 3 Dall. at 390.

The conduct alleged in Count One of the indictment against Mr. Welton occurred in 2005 and 2006, prior to the 2008 amendment to the statute.  Thus, the 2008 amendments to the statute cannot be applied retroactively to Mr. Welton.  As the government acknowledged at the outset of trial, it has the burden of proving that Mr. Welton received images of child pornography that were actually mailed, shipped, or transported in interstate or foreign commerce.  See TX at pp. 6-7,

a.      The Government Failed to Prove, Beyond a Reasonable Doubt, that Any of the Images Were Hosted At a Server in Madrid, Spain

In order to establish the interstate or foreign transportation of the images, the government  presented the testimony of Special Agent Chris Christopherson.  Mr. Christopherson testified that based on the headers and footers he saw on some of the printed pages of child pornography, including an IP address, he believed that the images on those pages were, at one point, hosted by a server in Madrid, Spain.

Mr. Christopherson's testimony with respect to the location of the web server that hosted the images  that bear the IP address 213.4.130.210 was questionable.  First, it relied on information he obtained from various websites, known as "who-is" services or "geotrace" websites, which purport to keep track of the locus and other identifying information about IP addresses.  Mr. Christopherson acknowledged that he did not know the source of the information that the "who-is" and "geotrace" websites used when determining the location of the server.  Thus, Mr. Christopherson's testimony regarding the location of the server which hosted the images is no more reliable than the testimony of an ordinary computer user, who opines, based on visiting an internet website, that there are currently tickets available to the Dodger game scheduled that evening,[8] or that there is currently a lot of traffic on Interstate

---

[8]  See www.dodgers.com

Five.[9]  Websites that report facts that are observable in the world can be generally reliable and, for the most part, pretty precise.  But they are not competent proof of the underlying facts about which they report.  Nor are they a proper foundation for expert testimony about those facts.  See Fed. R. Evid. 703.

Mr. Christopherson acknowledged that his methods to verify the physical location of the server were "unofficial."  There was an official way to verify the location of the IP address.  Mr. Christopherson acknowledged that he could have probably served a subpoena on RIPE Regional Internet Registrar in Amsterdam, using the authority of the United States' Mutual Legal Assistance Treaty.  With a subpoena, he could have determined, more reliably, where the physical IP address 213.4.130.210 was, located that computer, and searched the computer manually.

But even assuming Mr. Christopherson's "unofficial" method of determining the physical location of the IP address by consulting the "who-is" and "geotrace" websites was accurate at the time he was employed in this case, those websites tell the Court nothing about the location of the IP address 213.4.130.210 in 2005 and 2006, the time that the government contends the images were hosted there.  Even if the images were traced back to that IP address on the date when Mr. Christopherson looked for them, that fact does not prove that the same images were hosted by that server in 2005 and 2006, the dates that the government alleges that Mr. Welton received the images.  Nor does it prove that the IP address 213.4.130.210 was located in Madrid at that time. Mr. Christopherson acknowledged that IP addresses can move.

      b.    The Fact That Exhibits 89 and 91 Were Taken In Illinois And Florida Does Not Prove That They Had Been Mailed, Shipped, or Transported In Interstate Commerce When They Were Received

In order to meet its burden of establishing that the images in this case were actually transported in interstate or foreign commerce, the government also introduced a stipulation between the parties that two of the photographs that are depicted in

---

[9]  See www.sigalert.com

Government's Exhibit 89 and 91, were taken in Florida and Illinois.  See Dkt. No. 72.  But it presented no evidence to establish where the images were *received*, and how.  In order to establish that the images had been mailed, shipped, or transported in interstate commerce at the time Mr. Welton received them, it is not sufficient to establish that images depicted in Exhibits 89 and 91 were taken in Florida and Illinois.  Nor is it enough to establish that the images were, at some later point, *possessed* in California.  The government must also establish that Mr. Welton initially *received* the images depicted in Exhibit 89 and 91 in some place other than Florida (with respect to Exhibit 91) and Illinois (with respect to Exhibit 89).  Because it did not introduced any evidence whatsoever as to where the images were received, the government cannot prove, beyond a reasonable doubt, that the images were actually received in any state other than the state where they were created.

> c.   Special Agent Christopherson's Recollection of Seeing Exhibit 88 In An Unrelated Investigation In Louisiana Does Not Establish The Interstate Transportation Of Child Pornography

Finally, Special Agent Christopherson's comment that he recognized Government's Exhibit 88 from an unrelated investigation he conducted in Louisiana in "approximately 2005" does not prove that Mr. Welton received any image of child pornography that had been mailed, shipped, or transported in interstate commerce.

First, the government has not introduced evidence that any of the images contained in Exhibit 88 were produced using an actual minor.  Therefore, there is insufficient proof that any of the images depicted in Exhibit 88 actually constitute unlawful child pornography.  See Free Speech Coalition, 535 U.S. at 256.

Second, the government has not established that Mr. Christopherson observed the image in Exhibit 88 in Louisiana *prior* to the time Mr. Welton received it.  Mr. Christopherson testified only that he believed he saw the image in Louisiana in "approximately" 2005.  As noted herein, the government has not established the date on which Mr. Welton received the images.  Mr. Welton's acquiescence in Special

Agent Benitez' statement that there were dates from "oh five" and "oh six" on the pages is not necessarily an admission of his conduct in receiving the images, but an acknowledgement of what was written on the pages that he was shown.  But even if Mr. Welton's statements were admissions related to his own conduct in receiving images, there is no evidence that he was shown Exhibit 88 at the time he made his statements and no evidence that it was the image to which he referred.  Moreover, there is no evidence where the image in Exhibit 88 originated.  Therefore, it could have been created in California, received by Mr. Welton there prior to 2005, and subsequently transported to Louisiana at the time Mr. Christopherson saw it.

Third, because the government failed to introduce any evidence of where Mr. Welton received the image, it cannot establish that the image was transported in interstate commerce – in this case, to California – at the time Mr. Welton received it. Mr. Welton could have received the image in Louisiana and thereafter transported it to California himself.  In such a case, the act of receiving would have been completed in Louisiana, and could not have been punished in California.

2.    This Court Lacks Jurisdiction With Respect to Count One Because There Is No Evidence That the Images Were Received In the United States

Regardless of whether the government can establish that the images that Mr. Welton allegedly received were at some point transported in interstate or foreign commerce, it cannot invoke this Court's jurisdiction to punish Mr. Welton unless it also proves that Mr. Welton's receipt of those images took place in the United States. See United States v. Martinelli, (NO. 02-0623, CRIM.APP. 20000311) 62 M.J. 52, 64 (U.S. Armed Forces, September 28, 20052005) (no extraterritorial jurisdiction for receipt of child pornography pursuant to 18 U.S.C. § 2252A(a)(2)).

The government had the burden of proving that the acts which constitute receipt of child pornography all occurred in the United States.  See id.; compare United States v. Moncini, 882 F.2d 401 (9th Cir. 1989) (finding that jurisdiction lied in

the United States for transportation of child pornography pursuant to 18 U.S.C. § 2252(a)(1) where defendant had mailed a letter containing child pornography from Italy to the United States because transportation of child pornography was a continuing offense that was not complete until the letter reached the United States).

The government did not present any evidence related to the place where the images were received in this case.  Special Agent Christopherson did not offer an opinion as to what computer actually received the images he examined, or where it was located.  Id. at 182:2-11.  He did not know whether the images were received in the United States.  Id. at 182:17-19.  He agreed that they could have been received in Canada.  Id. at 182:24-25. The only evidence that is even vaguely probative on the issue of where the  images were received is Mr. Welton's equivocal statements that he may have printed the images from a "church computer somewhere."

> BENITEZ:          "Okay.  I think what you're telling me is, that you printed
>                          that from a church computer somewhere."
>
> WELTON:          "Yeah."

Exhibit 106, 108N.  There is reason to doubt Mr. Welton's implicit assent to SA Benitez' statement.  He had previously told SA Benitez, on two occasions during the conversation, that he had "no idea" where he printed the images.  See id.  But even assuming Mr. Welton's statement that he *printed* the images from a "church computer somewhere" is accurate, there is no evidence that the church computer to which Mr. Welton refers is the same computer that was used to *download* the images.  And there is no evidence that the computer to which he referred was in the United States.

The government's argument, in closing, that Mr. Welton's mere reference to the existence of other churches nearby, see August 5, 2009 Reporter's Transcript of Trial at 10:13-17, is evidence that Mr. Welton actually downloaded the images from one of those churches, is utterly unsupported.  Id.   The government also argued that it would be "unreasonable" to infer that Mr. Welton "did that downloading anywhere else but the area where he did the stashing."  Id. at 11:20-22.  But it offered no

evidence to support its theory that the downloading occurred in the area either.  The question is not whether it would be "reasonable" for Mr. Welton to have been out of the district, and even the United States of America, at the time the images were received.  The question is whether the government has introduced any evidence to the contrary.  It has not.[10]  Because the government has introduced no evidence at trial of where Mr. Welton received the images, or that Mr. Welton received the images in the United States, it cannot establish that this Court has jurisdiction for Count One.

>    3.    The Government Introduced No Evidence That Mr. Welton Received
>           Images of Child Pornography Within This Judicial District

For similar reasons, the government failed to establish that venue for Count One is proper in this district.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law[.]" U.S. Const., Amend VI.  Similarly, Article III of the Constitution provides:  "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const., Art. III, §2, cl. 3.  Finally, Rule 18 of the Federal Rules of Criminal Procedure provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.  "Questions of venue in criminal cases . . . are not merely matters of formal legal procedure." United States v. Johnson, 323 U.S.

---

[10] The government's argument that Mr. Welton would have had to leave the district 13 times in order to access the images outside the district in this case is wholly unsupported. Id. at 11:12-19.  Moreover, there is no evidence that "four different computers" were used. Id. at 11:23-24.  Special Agent Christopherson opined only that *two* different *browsers* were used. See id. at 134:24-135:2.

273, 276 (1944).  "They raise deep issues of public policy" and implicate "the fair administration of criminal justice and the public confidence in it[.]"  Id.

Venue in a criminal case is proper in the place where the essential elements of the offense took place.  United States v. Pace, 314 F.3d 344, 349-50 (9th Cir. 2002). Where a crime consists of a single, discrete act, venue is proper only in the place where that discrete act occurred.  Id. at 350.  The government has the burden of proving venue by a preponderance of the evidence.  Id. at 349.  Because the indictment was facially adequate with respect to alleging proper venue in this District, an objection on venue was properly made at the close of the government's case.  See United States v. Ruelas-Arreguin, 219 F.3d 1056, 1060 (9th Cir. 2000).

The government alleged in the indictment that Mr. Welton received images of child pornography "in Los Angeles County, within the Central District of California, and elsewhere."  Dkt. No. 9.  Thus, it alleged facts which, if proven, would establish venue in the Central District.  But as set forth herein, the government failed to introduce any evidence whatsoever in support of its allegations as to the place of the offense.  Thus, the government has failed to establish, by a preponderance of the evidence, that venue is proper in the Central District of California as to Count One.

4.    The Government Failed to Prove That the Images Were Received Within the Five-Year Statute of Limitations That Applies In This Case

The government also had the burden of establishing that all of the acts alleged in each count of the indictment occurred within the applicable statute of limitations. See Az Din v. United States, 232 F.3d 283, 287 (9th Cir. 1956) (court dismissed charge where government failed to establish that charged conduct alleged occurred within statutory period); United States v. Fuchs, 218 F.3d 957, 961 (9th Cir. 2000).

Receipt of child pornography pursuant to 18 U.S.C. § 2252A(a)(2) was, at the time the crime is alleged to have been committed in this case, governed by the general five-year statute of limitations set forth in 18 U.S.C. § 3282 for non-capital offenses.

24

On July 27, 2006, after the conduct alleged in the indictment, Congress promulgated 18 U.S.C. § 3299, which provided that "[n]otwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any . . . felony under chapter 109A, 110." That statute eliminated the statute of limitations for the offenses in this case, receipt and possession of child pornography. However, that statute was not in effect between August 30, 2005 and March 16, 2006, the dates alleged in Count One of the indictment.

Congress can extend a statute of limitations period after an offense is committed, without violating the *Ex Post Facto* Clause, but only it does so before the original limitations period has expired. See Clements v. United States, 266 F.2d 397, 399 (9th Cir.1959) United States v. De La Mata, 266 F.3d 1275, 1286 (11th Cir. 2001); United States v. Brechtel, 997 F.2d 1108, 1113 (5th Cir.1993). However, amending the statute of limitations for certain conduct after the original statute of limitations has already lapsed violates the *ex post* facto clause because it has the effect of criminalizing conduct that had already become immune from prosecution. See Stogner v. California, 539 U.S. 607, 613 (2003); Calder, 3 Dall. at 390.

In order to invoke 18 U.S.C. § 3299, the government must, at minimum, prove that Mr. Welton committed the conduct of receiving child pornography after July 28, 2001 -- five years prior to the promulgation of 18 U.S.C. § 3299. This is because if Mr. Welton's conduct occurred earlier, then the statute of limitations that was then in existence would have already expired at the time the new statute of limitations -- or in this case, abrogation of the statute of limitations -- was enacted. See De La Mata, 266 F.3d at 1286 (explaining that offenses committed five years or more before five-year statute of limitations was extended are governed by five-year limitation). Because the government introduced no evidence that competently establishes when Mr. Welton actually received the images in this case, it cannot establish that Mr. Welton committed the act of receiving the images more recently than July 28, 2001.

          a.     The Court Cannot Consider the Dates and Times That Appear on

the Printed Pages Offered into Evidence as Evidence of the Actual Dates on Which Those Pages Were Received or Possessed

At the outset of trial, the government specified that it was offering the information in the headers and footers of the printed pages for a limited purpose.  See TX at 7:23-8:11 ("Your honor, as the government stated in its brief consistently, the government has no intention of admitting the header and footer information [of the printed pages] for the truth of the matter asserted.").  Therefore, the Court cannot consider the data on those pages in determining whether the pages were received or possessed on the dates that appear on those pages.

          b.      Special Agent Chris Christopherson's Testimony Does Not Establish That the Dates and Times Contained in the Headers and Footers of the Government's Exhibits Accurately Reflect the Dates and Times Those Documents Were Received

Special Agent Christopherson did not offer an opinion in his direct examination as to whether the time and date information listed on any of the Government's Exhibits were accurate.  On cross-examination, he opined that in his experience, the "date and time may not be precise, but at least its fairly accurate."  Id. at 177:25-178:1.  He acknowledged, however, that the date and time information, which emanates from the user's local computer, not a remote web server or web browser, can be easily changed by the user.  Id. at 178:7-11.  He also acknowledged that computer clocks can be inaccurate if, for example, the battery on the computer motherboard runs out.  Id. at 178:23-179:5.  He testified that without looking at the computer that generated the date and time information on the pages, he would not be able to verify the accuracy of that information.  Id. at 180:9.

Mr. Christopherson's testimony that in his "experience" the time and date information contained on computer clocks is "fairly accurate" is not proof that all computer clocks on all computers are similarly precise.  Less still is it evidence that tends to establish that the dates and times that appear on the government's exhibits accurately represents the dates and times that those documents were received.

Because Mr. Christopherson did not examine the computer, he admitted, he did not know if the times and dates on the pages he examined were correct.  Id. at 181:7-8.

        c.      Defense Counsel's Questioning of Special Agent Christopherson Regarding the Accuracy of the Date and Time Headers Did Not "Open The Door" to the Consideration of the Header and Footer Information on the Government's Exhibits For Their Truth

      The government argued, in closing, that defense counsel's questioning of Special Agent Christopherson about the accuracy of the dates on the pages he reviewed "opened the door" to their admissibility for the truth of the matter asserted. But "a party cannot appeal to the truth of the matter asserted by hearsay evidence even when its opponent has opened the door to the use of otherwise inadmissable hearsay." United States v. Sine, 493 F.3d 1021, 1038 (9th Cir. 2007) (citing United States v. Collicott, 92 F.3d 973, 981 n.8, 982 & n. 11 (9th Cir.1996)).

      In Sine, the defendant was prosecuted for a complex mail fraud scheme.  The government presented evidence that the defendant defrauded investors in an elaborate Ponzi scheme by taking their money and not investing it as promised.  The defendant claimed in his defense that he acted in good faith, and argued that the evidence showed that he had attempted to file civil suits in other jurisdictions to recover the money entrusted to him by investors.  As part of its case in chief, the government questioned witnesses in detail regarding the contents of an order from a federal district judge in one of the civil suits in which the judge found, among other things, that the defendant acted in bad faith in filing those suits, and that he was not in fact attempting to recover the funds.  Although ostensibly the contents of the order were not introduced for the truth of the matter, but only for the purpose of establishing the witness' knowledge of the order, The Court of Appeals held that the contents of the judge's order were in practice used by the prosecutor for the truth of the matter asserted.  Id. at 1027.  The Court held that he order was hearsay, and that no exception to the hearsay doctrine applied.  Id. at 1036.  The government argued that the defense

had "opened the door" to the use of the contents of the order to establish the truth of the matters asserted when the defendant claimed that he was acting in good faith to recover investors' money.  Id. at 1037.  The Court disagreed, holding that even to the extent that the defendant had "opened the door" to the prosecution's use of otherwise inadmissible evidence of his motives, the prosecution's remedy was "limited to using the hearsay evidence for matters not concerning the truth of the statement, such as explaining or minimizing a witness's testimony represented to be inconsistent with a prior statement."  Id. at 1038 (citing Collicott, 92 F.3d at 980-81).

Similarly in this case, after defense counsel cross-examined Special Agent Christopherson regarding the accuracy of the dates and times on the government's exhibits, the government was free to question Mr. Christopherson on re-direct examination on that topic.  It was not, however, permitted to rely on the date and time information in the headers and footers of the pages to establish the date and time on which those documents were received – the truth of the dates and times – when it had expressly disavowed any intention to offer the information in the headers and footers for the truth of the matter asserted at the outset of trial.  See Collicot, 92 F.3d at 980-81 n.8 (declining to extend "open door" doctrine to permit the introduction of otherwise inadmissible hearsay to prove the truth of the matter asserted).

d.      Mr. Welton's Statements Do Not Prove That the Images Were Received Within the Statute of Limitations

Contrary to the government's claim, Mr. Welton did not admit that he received the images at any particular time or within the statute of limitations.  At most, what Mr. Welton did was acknowledge that some of the pages that he was shown by Special Agent Benitez had dates printed on them from 2005 and 2006.

Special Agent Benitez told Mr. Welton during the interview that a page "look[ed] like it was printed in oh five and oh six, so it would have been a couple years ago."  In response, Mr. Welton simply replied "Yeah."  See Exhibit 108C.

It is not clear whether Mr. Welton was agreeing with Special Agent Benitez' statements about what dates were listed on the pages, her general proposition that the pages were left in the church "a long time ago," or whether he was simply saying "Yeah" in order to acknowledge that he was being addressed. After all, Special Agent Benitez did not *ask* Mr. Welton when he received the images. Rather, she merely *told* him that the *dates on the pages* were from 2005 and 2006.

The only other time that Special Agent Benitez mentioned dates during the interview was also a mere reference to the dates on the pages, not Mr. Welton's conduct in receiving them. Again, Special Agent Benitez did not ask Mr. Welton when he received the images. She merely told Mr. Welton that the copies of the images were "dated oh six" Mr. Welton again replied "Yeah." <u>See</u> Exhibit 108G.

Even assuming that Mr. Welton had been admitting to his own conduct, and even assuming he was admitting to the dates on which he received certain images, it is impossible to discern which images he referred to. There is no evidence in the record related to what images Mr. Welton was shown at the time he spoke about the dates, or whether those images depict minors engaged in sexually explicit conduct. Many of the images found in the church are not child pornography and do not depict images of minor children. <u>See</u> Exhibit 125. The only images in this case that there is sufficient evidence to conclude constitute child pornography, as defined by law, are the images contained in Exhibits 89 and 91.[11] And there is no evidence that Mr. Welton's statements to Special Agent Benitez at any point referred to Exhibits 89 or 91 as opposed to lawful adult pornography, which was also in the stack.

//

//

//

## B.    COUNT TWO:  POSSESSION OF CHILD PORNOGRAPHY

---

[11] <u>See</u> <u>Free Speech Coalition</u>, 535 U.S. at 256.

1.   The Government Failed to Prove That the Images Were Possessed Within
the Five-Year Statute of Limitations That Applies In This Case

Just as the government failed to establish that the act of receiving the images occurred within the five-year statute of limitations, it failed to establish that the images were possessed within the five-year statute of limitations.

The government had the burden of establishing Mr. Welton possessed the images in this case at some point after July 28, 2001, the first date that the statute of limitations could have been abrogated, consistent with the *Ex Post Facto* clause.  See 18 U.S.C. § 3299; Stogner, 539 U.S. at 613; Fuchs, 218 F.3d at 961 (government was required to show that a criminal conspiracy, subject to five-year statute of limitations, continued into the relevant statutory period pursuant to 18 U.S.C. § 3582); United States v. Montgomery, 384 F.3d 1050, 1063 (9th Cir. 2004).  Because the government introduced no evidence of when Mr. Welton possessed the images in this case, it cannot establish that his possession of the images continued until after July 28, 2001.

It is not unreasonable to suspect that the images could have been stashed in the First Presbyterian Church prior to July 28, 2001.  They were well concealed in a hollow spot underneath and behind a changing table.  See TX 17:3-6.  They were only discovered when the changing table had to be moved away from the wall because the church was being repainted and re-carpeted.  See id. at 18:22-19:1-2.  There was no evidence presented that the changing table had been moved in the past eight years such that the images would have been discovered prior to then.

But more importantly, the government has not offered any evidence that tends to establish that the images were placed there on a date after July 28. 2001.  As noted herein, the dates and times on the pages themselves cannot be relied on for the purpose of determining the dates and times on which those pages were received or possessed.  Special Agent Christopherson's testimony did not establish the dates and times that those pages were first received or possessed.  And Mr. Welton's statements,

at most, established that 2005 and 2006 dates appeared on some of the pages – it did not prove anything about Mr. Welton's conduct, and there is no evidence that the pages to which Mr. Welton referred contained child pornography.

## III.

## CONCLUSION

For the foregoing reasons, Mr. Welton respectfully requests that the Court find him not guilty of both of the charges in the indictment.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:   August 10, 2009          By_____/s/_____
JOHN LITTRELL
Deputy Federal Public Defender

# **TABLE OF CONTENTS**

PAGE

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     Evidence Presented At Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

        A.   David Robertson  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
        B.   Linda Breatore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
        C.   Officer Robert Bobkiewicz . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
        D.   Kathryn Suchma  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
        E.   Task Force Officer Bernell Trapp  . . . . . . . . . . . . . . . . . . . . . .   6
        F.   Special Agent Chris Christopherson . . . . . . . . . . . . . . . . . . . . .   6

             1.   Government's Exhibit 66  . . . . . . . . . . . . . . . . . . . . . . . . . .   8
             2.   Government's Exhibit 71  . . . . . . . . . . . . . . . . . . . . . . . . . .   8
             3.   Government's Exhibit 31 and 70 . . . . . . . . . . . . . . . . . . . .   8
             4.   Government's Exhibit 86  . . . . . . . . . . . . . . . . . . . . . . . . . .   9
             5.   Government's Exhibits 86-91 . . . . . . . . . . . . . . . . . . . . . .   9
             6.   Government's Exhibit 89  . . . . . . . . . . . . . . . . . . . . . . . . . .   9
             7.   The IP Address 213.130.210  . . . . . . . . . . . . . . . . . . . . . .   9
                  a.    "Who-is" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
                  b.    "Geotrace"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
             8.   Government's Exhibits 1-95 . . . . . . . . . . . . . . . . . . . . . . .  11
             9.   Government's Exhibit 88  . . . . . . . . . . . . . . . . . . . . . . . . .  11

III.    Key Exhibits Presented At Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

        A.   Exhibits 1-95 and 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
        B.   Dkt. No. 72:  Stipulation Re: Government Exhibits 89 and 91  . . . . .  12
        C.   Dkt. No 73:  Fingerprint Evidence  . . . . . . . . . . . . . . . . . . . . . .  13
        D.   Exhibit 106:  Recorded Statements By Richard Welton  . . . . . . . . . .  13

IV.     Legal Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        A.   COUNT ONE:  RECEIPT OF CHILD PORNOGRAPHY  . . . . . . . . .  14

             1.   The Government Failed To Prove That Child Pornography
                  That Was Received By Mr. Welton Had Been Mailed,
                  Shipped, or Transported In Interstate Or Foreign Commerce
                  at the time it was Received . . . . . . . . . . . . . . . . . . . . . . . . . .  14

                  a.    The Government Failed to Prove, Beyond a Reasonable
                        Doubt, that Any of the Images Were Hosted At a Server
                        in Madrid, Spain . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

                  b.    The Fact That Exhibits 89 and 91 Were Taken In Illinois
                        And Florida Does Not Prove That They Had Been
                        Mailed, Shipped, or Transported In Interstate
                        Commerce When They Were Received . . . . . . . . . . . . . .  19

i

1

# **<u>TABLE OF CONTENTS</u>**

2

PAGE

3

4

5

c.  Special Agent Christopherson's Recollection of Seeing
Exhibit 88 In An Unrelated Investigation In Louisiana
Does Not Establish The Interstate Transportation Of
Child Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6

7

2.  This Court Lacks Jurisdiction With Respect to Count One
Because There Is No Evidence That the Images Were
Received In the United States . . . . . . . . . . . . . . . . . . . . . . . . . 21

8

9

10

3.  The Government Introduced No Evidence That Mr. Welton
Received Images of Child Pornography Within This Judicial
District  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

11

12

4.  The Government Failed to Prove That the Images Were
Received Within the Five-Year Statute of Limitations That Applies
In This Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

13

14

a.  The Court Cannot Consider the Dates and Times That
Appear on the Printed Pages Offered into Evidence as
Evidence of the Actual Dates on Which Those Pages Were
Received or Possessed . . . . . . . . . . . . . . . . . . . . . . . . . 26

15

16

17

18

b.  Special Agent Chris Christopherson's Testimony
Does Not Establish That the Dates and Times Contained
in the Headers and Footers of the Government's Exhibits
Accurately Reflect the Dates and Times Those
Documents Were Received  . . . . . . . . . . . . . . . . . . . . . . 26

19

20

c.  Defense Counsel's Questioning of Special Agent
Christopherson Regarding the Accuracy of the Date and
Time Headers Did Not "Open The Door" to the
Consideration of the Header and . . . . . . . . . . . . . . . . . . 27

21

22

d.  Mr. Welton's Statements Do Not Prove That the Images
Were Received Within the Statute of Limitations . . . . . . 28

23

B.  COUNT TWO:  POSSESSION OF CHILD PORNOGRAPHY . . . . . 30

24

1.  The Government Failed to Prove That the Images
Were Possessed  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

26

27

28

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>PAGE</u>

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Az Din v. United States,*
    232 F.3d 283 (9th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Calif. Department of Correction v. Morales,*
    514 U.S. 499 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Clements v. United States,*
    266 F.2d 397 (9th Cir.1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Collins v. Youngblood,*
    497 U.S. 37 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Free Speech Coalition,*
    535 U.S. 256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 29

*Stogner v. California,*
    539 U.S. 607 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30

*United States v. Brechtel,*
    997 F.2d 1108 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Collicott,*
    92 F.3d 973 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. De La Mata,*
    266 F.3d 1275 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*United States v. Fuchs,*
    218 F.3d 957 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 30

*United States v. Johnson,*
    323 U.S. 273 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Lopez,*
    514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. MacEwan,*
    445 F.3d 237 (3d. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Martinelli,* (NO. 02-0623, CRIM.APP. 20000311) 62 M.J. 52, 64
(U.S. Armed Forces, September 28, 20052005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iii

# TABLE OF AUTHORITIES

## FEDERAL CASES

PAGE

*United States v. Moncini*,
    882 F.2d 401 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*United States v. Montgomery*,
    384 F.3d 1050 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*United States v. Pace*,
    314 F.3d 344 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*United States v. Ruelas-Arreguin*,
    219 F.3d 1056 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*United States v. Schaefer*,
    501 F.3d 1197 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 16

*United States v. Sine*,
    493 F.3d 1021 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

## STATE CASES

*Calder v. Bull*,
    3 Dall. 386, 1 L. Ed. 648 (1798) . . . . . . . . . . . . . . . . . . . . . . . . . . .   17, 18, 25

## FEDERAL STATUTES

18 U.S.C. §2252A(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

18 U.S.C. § 3282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 25

18 U.S.C. § 3299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25, 30

18 U.S.C. § 3582þ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

120 Stat. 614, 647, Pub. L. 110-358, Title I, § 103(a)(4),þ(b) . . . . . . . . . . . . . . . .   16

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

## MISCELLANEOUS

*Pedophiles, Politics, and the Balance of Power: The Fallout From*
*United States v. Shaefer and the Erosion of State Authority,*
86 Denv. U. L. Rev. 1115, 1167 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17