SEAN K. KENNEDY (No. 145632)
Federal Public Defender
sean_kennedy@fd.org
JOHN LITTRELL (No. 221601)
Deputy Federal Public Defender
john_littrell@fd.org
Office of the Federal Public Defender
321 East Second Street
Los Angeles, California  90012
Telephone (213) 894-5310
Facsimile (213) 894-0081

Attorneys for Defendant
RICHARD MICHAEL WELTON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | NO. CR 09-153-MMM |
|---|---|
| Plaintiff, | |
| v. | [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| RICHARD MICHAEL WELTON, | |
| Defendant. | |

Defendant Richard Michael Welton, through his counsel, Deputy Federal Public Defender John Littrell, hereby submits the following proposed findings of fact and conclusions of law pursuant to this Court's August 5, 2009 order.

## I.
## Proposed Findings of Fact

1. On February 20, 2009, Defendant Richard Michael Welton was charged in a two count indictment. Count One of the Indictment charged Mr. Welton with violating 18 U.S.C. § 2252A(a)(2) by receiving images of child pornography, in Los Angeles, within the Central District of California, between August 30,

|   |   |   |
|---|---|---|
| 1 |    | 2005 and March 3, 2006.  Count Two of the Indictment charged Mr. Welton |
| 2 |    | with violating 18 U.S.C. § 2252A(a)(5) by possessing images of child |
| 3 |    | pornography, in Los Angeles, within the Central District of California, |
| 4 |    | between August 30, 2005 and March 16, 2006. |
| 5 | 2. | On July 31, 2009, Mr. Welton waived his right to have his case tried by a jury |
| 6 |    | pursuant to Fed. R. Crim. P. 23.  After a colloquy with Mr. Welton, the Court |
| 7 |    | determined that Mr. Welton's waiver was voluntary and accepted his waiver. |
| 8 | 3. | On August 4, 2009, trial was held before this Court. |
| 9 | 4. | The government presented the testimony of six witnesses at trial: David |
| 10 |    | Robertson, Linda Breatore, Detective Robert Bobkiewicz, Kathryn Suchma, |
| 11 |    | and Christopher Christopherson.  It also presented a number of exhibits. |
| 12 |    | Having heard the testimony of the government's witnesses, and reviewed the |
| 13 |    | exhibits accepted into evidence, the Court hereby finds as follows: |

### David Robertson

|   |   |   |
|---|---|---|
| 16 | 5. | David Robertson has been a volunteer grounds manager for the First |
| 17 |    | Presbytarian church in Covina, California, for approximately seven years.  His |
| 18 |    | responsibilities include maintenance, painting, and gardening. |
| 19 | 6. | In August, 2007, Mr. Robertson found a stack of pages, behind a changing |
| 20 |    | table in the nursery area of the church.  Although he flipped through the |
| 21 |    | pictures briefly, he did not  study any of them.  Mr. Robertson did not |
| 22 |    | describe the pictures that he recovered from the changing table, and he was |
| 23 |    | unable to recognize the images contained in Government's Exhibit 125. |
| 24 | 7. | Mr. Robertson turned over what he found to Linda Breatore. |

### Linda Breatore

|   |   |   |
|---|---|---|
| 27 | 8. | Linda Breatore has been a church receptionist at the First Presbytarian Church |
| 28 |    | for about seven years.  In August 2007, David Robertson brought her a |

|   |   |   |
|---|---|---|
| 1 | | "stack" of pages and said "we have a problem" or something like that. Ms. |
| 2 | | Breatore flipped through the pages and recognized some of them as |
| 3 | | pornography, including pornography involving children. She did not count |
| 4 | | the number of pages or commit all of the images to memory. |
| 5 | 9. | Ms. Breatore recognized some of the images contained in Government's |
| 6 | | Exhibit 125, but not all of them. She did not know if the images contained in |
| 7 | | Government's Exhibit 125 were the same as the images that she received from |
| 8 | | Mr. Robertson. Some images could have been added, and some of the images |
| 9 | | could have been removed from the stack. Ms. Breatore was able to recognize |
| 10 | | the pages that correspond to Exhibits 1; 2; 4; 8; 9; 20; 22; 23; 29; 37; 40; 41; |
| 11 | | 54; 57; 58; 66; 71; 72; 74; 80; 85; 87; 88; 89; 90; 91; and 93. |

### Robert Bobkiewicz

|   |   |   |
|---|---|---|
| 14 | 10. | Robert Bobkiewicz is a detective from the Covina Police Department. He |
| 15 | | responded to the First Presbyterian Church on August 23, 2007, the day after |
| 16 | | they were found. When he arrived, the pastor of the church, Andrea |
| 17 | | Messinger, handed him images. Detective Bobkiewicz believed that |
| 18 | | Government's Exhibit 125 represented the images that he received. But he |
| 19 | | acknowledged that he did not recognize all of the images and he did not know |
| 20 | | whether the stack of images represented in 125 was exactly the same as the |
| 21 | | stack of images he received in August 2007. He recognized only the images |
| 22 | | that correspond to Exhibits 1; 2; 3; 4; 8; 9; 10; 12; 13; 19; 20; 22; 23; 24; 27; |
| 23 | | 28; 29; 32; 33; 34; 35; 37; 38; 39; 40; 41; 50; 51; 54; 55; 57; 58; 66; 67; 68; |
| 24 | | 69; 70; 71; 72; 74; 80; 83; 86; 87; 88; 89; 90; 91; and 95. |

### Kathryn Suchma

|   |   |   |
|---|---|---|
| 27 | 11. | Kathryn Suchma is a fingerprint examiner for the FBI. She received the stack |
| 28 | | of images labeled as Government's Exhibit 125 in February, 2008, from FBI |

1  Special Agent Stephanie Benitez. Relying on her notes, Ms. Suchma testified
2  that latent fingerprints were found on nine of the images that she was able to
3  identify as being Mr. Welton's. The fingerprints were found on the images
4  that correspond to Exhibits 2; 13; 31; 41; 60; 61; 66; 78; and 81.

<u>Bernell Trapp</u>

7  12.  Task Force Officer ("TFO") Bernell Trapp accompanied FBI Special Agent
8      Stephanie Benitez to an interview of Mr. Welton on September 18, 2008.
9      TFO Trapp was not assigned to investigate Mr. Welton, and he had not been
10     associated with the investigation either before or after the September 18, 2008
11     interview. His only involvement was to assist in the interview.
12 13.  During the interview, Special Agent Benitez showed Mr. Welton certain
13     images from the stack, but he did not recall which of the images were shown
14     to Mr. Welton. TFO Trapp did not bring the images to the interview. He did
15     not recall ever handling the images , nor did he have any reason to view any
16     of the images. He never showed any images to Mr. Welton himself.

<u>Chris Christopherson</u>

19 14.  Chris Christopherson, a Special Agent with the Federal Bureau of
20     Investigation, offered opinions about the nature of the images contained in
21     Exhibits 125 and 1-95, whether those images were printed from a computer,
22     and whether they were downloaded from the internet.
23 15.  Special Agent Christopherson did not review the original images. He
24     reviewed copies of the images that had been loaded onto a CD. His opinions
25     were based solely on the numbers and characters he saw on the pages. He
26     acknowledged that the images could have been color copied on to the page,
27     and it was possible that the headers and footers could have been manually
28     typed the data into using a typewriter, without using a computer.

16. In many cases, Special Agent Christopherson assumed the information contained in the headers and footers on the pages he reviewed to be true. To the extent that information was not true, he acknowledged, his opinions were wrong. In other cases, Special Agent Christopherson attempted to verify the information listed in the headers and footers by visiting various websites.

17. Special Agent Christopher attempted to verify the Uniform Resource Locators ("URLs") indicated in the headers and footers of some of the pages he reviewed by entering that information into a website that offered a service called a "Who-is" service. "Who-is" is a generic name for a publicly available service used by people who want to report offensive content on the internet. It does not refer to a particular organization, but to a type of service, offered on the internet to help users look up the location of URLs. "Who-is" services get their data from the Regional Internet Registrars ("RIRs"). RIRs, in turn, may rely on the Internet Service Providers ("ISPs") to determine who URLs are assigned to. Special Agent Christopherson did not know whether the RIRs validate the information they received from ISPs..

18. Special Agent Christopherson attempted to determine the physical location of the IP addresses he observed in the headers and footers of the images he reviewed. Specifically, Special Agent Christopherson attempted to locate the IP Address 213.4.130.210 by using a web-based service called "Geotrace." Based on his efforts, he opined that the IP address 213.4.130.210 was located in Madrid, Spain. But Special Agent Christopherson did not know from where the "Geotrace" service got its information. He also did not know whether the information he got from Geobytes was confirmed or based solely on the self-reporting of an Internet Service Provider regarding its location.

19. The "Who-is" and "Geobytes" services can only predict where an IP address may be located at the time the inquiry is made. They cannot determine where the IP address was previously. IP addresses are not static in one location;

1  they can be moved from one location to another.  The "Who-is" and
2  "Geobytes" services could not have determined where a particular IP address
3  was physically located at the time of the conduct charged in this case.
4  20. Special Agent Christopherson could have employed a more reliable, official
5  method of verifying the physical location of the IP address 213.4.130.210.
6  Using the United States' authority under a Mutual Legal Assistance Treaty
7  ("MLAT"), Special Agent Christopherson could have served a subpoena on
8  RIPE, the agency that delegates IP addresses in Europe.  With a subpoena, he
9  may have been able to determine, more reliably, whether the images were
10 hosted on the computer that used the IP address 213.4.130.210.

## Exhibits

13 21. The government introduced into evidence 95 pages of images.  Some of the
14 images included depictions of child pornography – that is, they contained
15 visual images of real minors engaged in sexually explicit conduct.  Other
16 images in the stack consisted of adult pornography, cartoons or drawings, or
17 other material that was not proven to have been produced using real minor
18 children.  The images were individually numbered in Exhibits 1-95.  A
19 compendium of Exhibits 1-96 was introduced into evidence as Exhibit 125.
20 22. Mr. Welton stipulated that one of the images in Exhibit 89 was produced
21 using a real minor.[1]  He also agreed that the same image was taken in Illinois.
22 23. Mr. Welton stipulated that one of the images in Exhibit 91 was produced
23 using a real minor.  He agreed that the image was taken in Florida.
24 24. Mr. Welton's fingerprints were recovered from nine of the images recovered

---

[1] The government had the burden of proving that Mr. Welton received and possessed images that were produced using a real minor engaged in sexually explicit conduct.  See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 256 (2002) (holding that Congress' ban on possession of virtual child pornography violated the First Amendment because its creation does not involve actual children)

        from the First Presbyterian Church in Covina, California.

25. On September 18, 2008, when he was interviewed by FBI Special Agent Stephanie Benitez, Mr. Welton admitted that he went in the First Presbyterian Church a couple times, when no one was there. He also admitted that he brought images, some of which depicted young children, into the church..

26. Mr. Welton did not tell Special Agent Benitez where he got the images. Mr. Welton stated that he had "no idea" where they came from. When Special Agent Benitez suggested that the images "came from a computer somewhere," Mr. Welton replied that he had "no idea." Mr. Welton did acknowledge at some point, however, that it "had to of been a church somewhere."

27. Mr. Welton did not say when he had obtained the images or put them in the church. When Special Agent Benitez told Mr. Welton that a page "look[ed] like it was printed in oh five and oh six, so it would have been a couple years ago, Mr. Welton replied "Yeah." When Special Agent Benitez told Mr. Welton that an image was "dated oh six," Mr. Welton again replied "Yeah."

## II.
## Proposed Conclusions of Law
<u>Interstate Nexus (Count One)</u>

28. At the time of the conduct charged in Count One, 18 U.S.C. § 2252A(a)(2) ) provided, in relevant part, as follows:
    Any person who . . . knowingly receives or distributes . . . any child pornography that has been mailed, or shipped or transported in interstate commerce by any means, including by computer . . . shall be punished as provided in subsection (b).

29. In order to prevail on Count One, the government had to prove, beyond a reasonable doubt, that Mr. Welton knowingly received an image depicting a real minor engaged in sexually explicit conduct that had been mailed, shipped,

or transported in interstate commerce. 18 U.S.C. §§ 2252A(a)(2); 2256(8); See <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 256 (2002).

30. Although the statute was subsequently amended to provide that jurisdiction could be proven in an alternative manner, the parties agree that in order to avoid a problem under the *Ex Post Facto* clause of the United States Constitution, this case is governed by the version of 18 U.S.C. § 2252A(a)(2) that was in effect at the time of the charged conduct, not the version of the statute that currently exists. Therefore, the government has the burden of proving that Mr. Welton received images of child pornography that were actually mailed, shipped, or transported in interstate or foreign commerce.

31. The government failed to meet its burden of proving, beyond a reasonable doubt, that any child pornography received by Mr. Welton had been mailed, shipped, or transported in interstate or foreign commerce.

32. The evidence in the record does not establish, beyond a reasonable doubt, that any of the images contained in the exhibits in this case originated from outside of the United States. Special Agent Christopherson's testimony that some of the images may have originated from Madrid, Spain, was unconvincing, because his testimony was based solely on his entry of data from the face of the pages, which he did not know to be accurate.

33. Moreover, the government failed to establish that the "Who-is" and "Geotrace" websites that supplied the data upon which Special Agent Christopherson relied to "verify" the information in the headers and footers supplied accurate information. Special Agent Christopherson did not know where those websites obtained the information they reported.

34. Even assuming that the data reported by the "Who-is" and "Geotrace" services was accurate, Special Agent Christopherson acknowledged, those web services are capable only of determining the *current* locus of a particular URL or IP address; they could not determine where the URLs and IP

addresses listed on the government's exhibits were hosted in 2005 and 2006, the dates on which Mr. Welton is alleged to have received the images.

35. The government also failed to establish, beyond a reasonable doubt, that the images in Government's Exhibits 89 and 91 had been mailed, shipped, or transported in interstate commerce. Although the government proved that some of the images depicted in Government's Exhibit 89 and 91 were produced in Florida and Illinois, the government presented no evidence to establish that Mr. Welton received the images in some place other than Florida (with respect to Exhibit 91) and Illinois (with respect to Exhibit 89). Thus, the government introduced no evidence that any images which constituted child pornography, see 18 U.S.C. §2256(8), were actually received in any state other than the states where they were created.

## Jurisdiction (Count One)

36. In order to prevail in Count One, the government also had the burden of establishing that this Court had jurisdiction. There is no extraterritorial jurisdiction in cases charging 18 U.S.C. § 2252A(a)(2). United States v. Martinelli, (NO. 02-0623, CRIM.APP. 20000311) 62 M.J. 52, 64 (U.S. Armed Forces, September 28, 20052005). Therefore, the government had the burden of proving, beyond a reasonable doubt, that Mr. Welton committed all of the conduct of receiving images of child pornography in the United States.

37. The government did not present any evidence in order to establish the place where the images were received in this case. Because the government has introduced no evidence that established where Mr. Welton received the images, or that Mr. Welton received the images in the United States, it cannot establish that this Court has jurisdiction for Count One.

## Venue (Count One)

38. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law[.]" U.S. Const., Amend VI.

39. "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const., Art. III, §2, cl. 3.

40. Rule 18 of the Federal Rules of Criminal Procedure provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

41. "Questions of venue in criminal cases . . . are not merely matters of formal legal procedure." United States v. Johnson, 323 U.S. 273, 276 (1944). "They raise deep issues of public policy" and implicate "the fair administration of criminal justice and the public confidence in it[.]" Id.

42. Venue in a criminal case is proper in the place where the essential elements of the offense took place. United States v. Pace, 314 F.3d 344, 349-50 (9th Cir. 2002). Where a crime consists of a single, discrete act, venue is proper only in the place where that discrete act occurred. Id. at 350. The government has the burden of proving venue by a preponderance of the evidence. Id. at 349.

43. The government alleged in the indictment that Mr. Welton received images of child pornography "in Los Angeles County, within the Central District of California, and elsewhere." But the government failed to introduce any evidence whatsoever in support of its allegations with respect to where the images were received, or whether they were received in this District. Thus, the government has failed to establish, by a preponderance of the evidence,

1       that venue is proper in the Central District of California as to Count One.

### Statute of Limitations (Counts One and Two)

44. The government had the burden of establishing that all of the acts alleged in each count of the indictment occurred within the applicable statute of limitations. See United States v. Fuchs, 218 F.3d 957, 961 (9th Cir. 2000).

45. At the time of the conduct charged in the indictment, both of the charges in this case – receipt of child pornography, 18 U.S.C. § 2252A(a)(2), and possession of child pornography, 18 U.S.C. § 2252A(a)(5) – were governed by the general five-year statute of limitations set forth in 18 U.S.C. § 3282.

46. On July 27, 2006, after the conduct alleged in the indictment, Congress promulgated 18 U.S.C. § 3299, which provided that "[n]otwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any . . . felony under chapter 109A, 110." That statute eliminated the statute of limitations for receipt and possession of child pornography. However, that statute was not in effect between August 30, 2005 and March 16, 2006, the dates alleged in the indictment.

47. Congress can extend a statute of limitations period, and apply that new statute of limitations to conduct that was already committed, without violating the *Ex Post Facto* Clause, but only it does so before the original limitations period has expired. Clements v. United States, 266 F.2d 397, 399 (9th Cir.1959) United States v. De La Mata, 266 F.3d 1275, 1286 (11th Cir. 2001).

48. Congress may not, however, amend the statute of limitations for certain conduct and apply it to that conduct after the original statute of limitations has already lapsed. Stogner v. California, 539 U.S. 607, 613 (2003).

49. Therefore, in order to invoke 18 U.S.C. § 3299, the government would have to, at a minimum, prove that Mr. Welton committed the conduct of receiving and possessing child pornography after July 28, 2001 -- five years prior to the

promulgation of 18 U.S.C. § 3299. <u>See</u> <u>De La Mata</u>, 266 F.3d at 1286 (explaining that offenses committed five years or more before five-year statute of limitations was extended are governed by five-year limitation).

50. The government did not introduce sufficient evidence to establish when Mr. Welton actually received or possessed the images of child pornography in this case. Accordingly, the government failed to establish that Mr. Welton committed any of the acts charged in the indictment after July 28, 2001.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 10, 2009      By_____/s/_____
JOHN LITTRELL
Deputy Federal Public Defender