UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 09-00153 MMM |
| Plaintiff, | ) |
| | ) |
| vs. | ) FINDINGS OF FACT AND CONCLUSIONS |
| | ) OF LAW |
| RICHARD MICHAEL WELTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Defendant was indicted on one count of receiving images of child pornography in violation of 18 U.S.C. § 2252A(a)(2), and one count of possessing images of child pornography in violation of 18 U.S.C. § 2252A(a)(5).[1]  Defendant waived trial by jury with the consent of the government and the approval of the court pursuant to Rule 23(a) of the Federal Rules of Criminal Procedure.  On August 4, 2009, both parties requested that the court make findings of fact pursuant to Rule 23(c).[2]  Having carefully considered the testimony and exhibits in evidence, the briefs submitted by the parties, and the relevant law, the court makes the following findings of fact and conclusions of law:

---

[1]Indictment, Docket No. 9 (Feb. 20, 2009).

[2]Government's Request for Specific Findings of Fact Under Federal Rule of Criminal Procedure 23(c), Docket No. 70 (Aug. 3, 2009); Richard Welton's Request for Specific Findings of Fact, Docket No. 71 (Aug. 3, 2009).

# I. FINDINGS OF FACT

## Covina First Presbyterian Church

1. The Covina First Presbyterian Church ("Church") has five buildings, connected by a courtyard.[3]

2. Exhibit 97 accurately depicts the front of the Church between 2005 and 2007.[4]

3. Exhibit 98 accurately depicts the side entrance of the Church between 2005 and 2007.[5]

4. During the last seven years, there have been transients on Church property. None of the transients, however, has entered the buildings on the property.[6]

5. The Church has a nursery, used on Sundays, so that those attending church can leave their infants with babysitters during services; otherwise, the nursery is rarely used.[7]

6. From 2005 to 2007, the nursery had a lock on its door.[8]

7. The entrance to the nursery is located directly to the left of the side entrance to the Church depicted in Exhibit 98.[9]

8. One can access the nursery without entering any other Church building.[10]

---

[3]Reporter's Transcript of Proceedings ("RT Day 1"), Docket No. 76 (Aug. 4, 2009) at 12:22-25; 13:1-18; 23:15-23.

[4]*Id.* at 12:8-17; Exh. 97.

[5]RT Day 1 at 12:18-24; Exh. 98.

[6]RT Day 1 at 21:18-24 ("Q. Mr. Robertson, there has been a problem at the church with transients sleeping in the office; right? A. We have had transients on the grounds. We've never had any, that we're aware of, in any of the buildings at all. Q. And that problem goes back to when you first started volunteering there. Is that true? A. Yes").

[7]*Id.* at 12:25; 13:1; 24:9-15 ("Pretty much on Sundays, when people go to church and they don't want to bring their infants, they take them into the nursery and leave them with baby-sitters there. To my knowledge, it's very rarely used other than on Sunday mornings during the services").

[8]*Id.* at 24:16-21.

[9]*Id.* at 13:12-13.

[10]*Id.* at 13:15-18.

9.     Exhibit 100 accurately depicts the entrance to the nursery between 2005 and 2007.[11]

10.    From 2005 to 2007, parts of the church, including the office, the sanctuary, and the greeting hall, had an alarm system.[12]  The building that houses the nursery, a chapel, and a storage room did not have an alarm, however.[13]

11.    In 2005 and 2006, there were at least two changing tables in the nursery.[14]  Exhibits 101 and 102 accurately depict the two changing tables.[15]  Exhibit 104 accurately depicts one of the two changing tables as it appeared in 2005 to 2007.[16]

12.    The changing tables are white cabinets whose top is surrounded on three sides by a small railing.[17]  The changing tables are not affixed to the wall.[18]

13.    The bottom of each changing table has a small, hollow, concave area that is inaccessible when the changing table is sitting on the ground.[19]  The sides of each changing table extend all the way to the ground such that the area under the changing table is accessible only by lifting the table.

14.    In August 2007, the Church was engaged in repainting the nursery and replacing the nursery carpet.[20]

---

[11]*Id.* at 14:6-17.

[12]*Id.* at 23:8-14.

[13]*Id.* at 23:24-25; 24:1-4.

[14]*Id.* at 19:3-6.

[15]*Id.* at 14:18-25; 15:1-3, 12-15; Exhs. 101, 102.

[16]RT Day 1 at 16:5-14.

[17]*Id.* at 15:5-6; Exhs. 102, 103.

[18]RT Day 1 at 15:4-6.

[19]*Id.* at 16:25; 17:1-6 ("There's a small concave area, like a foundation is built up. It's a leg system that goes all the way around so kids can't get their fingers into it, but there is a hollow area underneath the bottom of the changing table").

[20]*Id.* at 15:20-25; 16:1.

**David Robertson**

15.    At all times relevant to the indictment, David Robertson was a retiree who volunteered at the Church doing such things as painting, weeding, gardening, emptying waste baskets, moving tables, and organizing things.[21]  Robertson has volunteered at the Church for seven years.[22]

16.    Robertson is familiar with the buildings and grounds at the Church, including the nursery.[23]

17.    In August 2007, while pulling a changing table away from the wall to paint behind it, Robertson found a stack of 10-15 printouts in the hollow area under the changing table.  The printouts contained images of nude children.[24]

18.    After finding the printouts, Robertson gave them to the church's pastor, Andrea Messinger.[25]

19.    Messinger instructed Robertson to dispose of or destroy the printouts; Robertson destroyed the stack of images by shredding them.[26]

20.    A week and a half to two weeks later, on August 22, 2007, in the course of preparing the Church nursery for recarpeting, Robertson lifted the second changing table off the ground, and found another stack of printouts.[27]

21.    Exhibit 102 accurately depicts the two changing tables underneath which Robertson found the printouts in August 2007.[28]

---

[21]*Id.* at 11:12-25; 12:1-4.

[22]*Id.* at 11:22-23.

[23]*Id.* at 12:5-7; 14:20-22; 23:18-19.

[24]*Id.* at 15:20-25; 16:1-8; 16:22-25; 17:1-25; 18:1-4 ("Q. Can you tell the Court what was depicted on those pictures? A. Nudity, and I did see some children involved. Q. In those pictures, if you remember, what were the children doing? A. As near as I can remember, the children were on the floor wearing no clothes.  There was no sexual contact with the children from the top picture that I saw").

[25]*Id.* at 18:5-11.

[26]*Id.* at 18:12-19.

[27]*Id.* at 18:20-25; 19:1-2.

[28]*Id.* at 19:3-6; Exh. 102.

22.     The changing table in the foreground of Exhibit 102 is the one underneath which Robertson found the first set of printouts. The changing table in the background is that under which he found the second group of printouts.[29]

23.     Robertson flipped through the second group of printouts, but did not stop to study any of the images.[30]

24.     Based on his review of the images on the printouts, Robertson knew that they depicted nude bodies and sexual contact; he saw at least one child on the floor involved in oral copulation of a man.[31]

25.     Robertson touched the printouts with his bare hands.[32] He subsequently handed the stack of images to Linda Breatore.[33]

**Linda Breatore**

26.     For the last seven years, Breatore has worked as a secretary and receptionist at the Church.[34] Breatore greets people, prints bulletins, addresses maintenance issues, looks up Bible passages, and otherwise contributes to the everyday running of the Church.[35]

27.     When Robertson gave Breatore the stack of printouts, she held them on her lap, flipped open to the middle of the stack, and realized they were pornography involving teenagers and children

---

[29]*Id.* at 19:10-18.

[30]*Id.* at 19:25; 20:1-3 ("Q. Have you looked through the – flipped through? A. I flipped through the pictures just as I'm doing right now, where I fanned them out, but I did not stop and study any of the pictures").

[31]*Id.* at 21:3-13 ("Q. When you say realize what you were looking at, what do you mean? A. There were nude bodies, sexual contact, from just flipping through. I did not want to dwell on it, and I just flipped through, stopped, and went into the office. Q. When you flipped through that second stack of images, did you see any children? A. Yes, I did. Q. Then if you recall, what were those children doing? A. Again, I saw some on the floor and one involved in oral copulation of a man").

[32]*Id.* at 20:13-15.

[33]*Id.* at 20:4-9; 25:8-15.

[34]*Id.* at 22:21-25; 23:1-7.

[35]*Id.* at 23:3-7.

1    who were, in her estimation, three and four years old.[36]

2    28.   After looking at the images, Breatore went out to the courtyard to call Messinger and advise her

3          of the situation.  Breatore took the printouts with her.[37]

4    29.   Breatore then called individuals who had access to the nursery to ascertain whether anyone was

5          aware of a break-in, and whether Church policy that at least two people be in the nursery at all

6          times had been violated.[38]

7    30.   After making these calls, Breatore spoke with Messinger a second time.  Messinger suggested

8          that Breatore contact John King, a local politician and leader in the Church.[39]

9    31.   Breatore spoke with King, who said he would alert the police.[40]

10   32.   While Breatore made these telephone calls, she kept the stack of printouts on her lap.[41]

11   33.   On the day Robertson discovered the second stack of printouts and delivered them to her,

12         Breatore looked at each photograph individually to make sure that no children who were

13         members of the church congregation had been photographed.[42]  Breatore spent approximately

14

15

---

16   [36]*Id.* at 26:3-17 ("Q. What was in the middle of [the stack of printouts]?  A. Pornography.  Q.
17   What type of pornography, if you know?  A. Well, child pornography.  What I saw was teenagers and
18   some that were very little ones.  Q. When you say little ones, what do you mean?  A. Three, four years
     old").

19   [37]*Id.* at 28:10-17.

20   [38]*Id.* at 28:25; 29:1-8 ("Oh, I called people who had access to the nursery to try to find out if they
21   had any idea, had there been a break-in that they knew of, were there always two people there, two at
     a time, that's our policy.  So I spent the day calling people and trying to get information about what had
22   been going on in the nursery").

23   [39]*Id.* at 29:9-15.

24   [40]*Id.* at 30:2-6.

25   [41]*Id.* at 29:20-25; 30:1 ("Q. [ ] Where were the images when you were making all these phone
26   calls?  A. In my lap.  Q. At any time did you set the images aside and leave them alone?
     A. No.  I set them sometimes on my desk, but I was always with them").

27   [42]*Id.* at 32:11-13 ("I was looking basically to make sure there were no members of our
28   congregation in there.  So I -- 10 minutes").

1    ten minutes looking at the printouts the day she received them.[43]

2    34.    Breatore handled the printouts with her bare hands.[44]

3    35.    Breatore kept the stack of printouts with her while she was at the church, even taking the, to the

4    restroom when she went.[45]  When she left that night, Breatore stored the printouts either in the

5    receptionists' office, which has a lock, or in a safe.  She distinctly remembers that she left them

6    in the administration building, which has a lock and an alarm.[46]  The next day, Breatore gave the

7

8    _____

9    [43]*Id.* at 32:11-13.

10    [44]*Id.* at 35:18-20.

11    [45]*Id.* at 29:20-25; 30:1; 30:12-16 ("Q. Did the police take the pictures from you?  A. I don't have
12    a clear memory of that.  I remember having the pictures.  I remember them [in] the conference room.
13    I may have handed them to the pastor to hand to him.  I'm not sure.  I don't remember"); *id.* at 33:25;
34:1-23 ("Q. You took the images into the bathroom every time you went?  A. Well, it wasn't that often,
but I do remember that because I didn't want them laying out.  It's a church").

14    [46]*Id.* at 36:20-25; 37:1-12 ("Q.[ ] Do you have an office at the church?  A. Yes, I do.  Q. And
15    does your office door lock?  A. Yes, it does.  Q. When you were looking at the images and when you
16    say the images were on your desk, is that in your office?  A. Yes.  Q. Does the door to the administration
building lock?  A. Yes.  Q. And in 2005 to 2007, is that one of the buildings you said had an alarm?  A.
17    Yes.  Q. When you left for the -- or when the staff left for the evening, would your office door have been
locked?  A. Yes.  Q. Would the administration door have been locked?  A. Yes"); *id.* at 37:18-25; 38:1-
18    25; 39:1-5 ("Q. [ ] Are you familiar with the people that work at the church?  A. Yes.  Q. And how many
19    people work in the administration building?  A. In August?  Because it makes a difference.  In August
there's only five of us.  Q. And how many people had access to your office?  A. Three of us.  Q. And
20    who were those three?  A. Pastor Andrea; Kathy Karlson, who is the other secretary; and myself.  Q.
Besides those three people, besides yourself, no one has access to your office?  A. I don't believe their
21    key fits.  I don't believe so.  Q. And as far as you know, the door was locked when you left in August
of 2007 and the images were inside your office?  A. Yes.  Well, yes, as far as I know, the office was
22    locked when I left.  Q. And to the best of your recollection, were the images inside the office or in the
23    safe?  A. To the best that I can remember, I would have put them in the safe.  Q. What leads you to
believe that you put them in the safe besides the rolling up memory?  Is there anything that leads you to
24    believe that you put them in the safe?  A. Well, I was trying to refresh my memory about events.  I tore
apart my office – I save old calendars.  I save old pieces of paper to help my memory if something else
25    comes up.  I have a folder, and it has the alarm combination on it.  It's just a little piece of paper.  I don't
usually look at it.  I just reach in and pull out the combination.  I was going through my office looking
26    for, like I said, for old calendars to help me refresh my memory.  In that folder, I found some notes, not
27    very detailed, but some little notes I had written about the day that we discovered the pictures.  They
were right next to the safe combination.  So that in conjunction with me remembering the rolling up, I
28    figured I put them in the safe").

7

1   printouts to Messinger.[47]

2   36.   At some point, Breatore placed the printouts in a bag.[48]

3   37.   Breatore never removed or disposed of any of the printouts in the stack.[49]

4   38.   When the police arrived the following day, Breatore joined Detective Robert Bobkowitcz,

5         Messinger, and King in the conference room.[50]  During the meeting, the printouts were given to

6         Bobkowitcz.[51]

7   39.   At trial, Breatore looked at each page of the stack of printouts comprising Exhibit 125, and

8         placed her initials in the corner of pages 1, 2, 4, 8, 9, 20, 22, 23, 29, 37, 40, 41, 54, 57, 58, 66,

9         71, 72, 74, 80, 85, 87, 88, 89, 90, 91, and 93 of the exhibit,[52] to indicate that she distinctly

10        remembered viewing those pages on the day Robertson gave her the images.[53]

11  40.   Breatore specifically remembered the poses and some of the faces of the minors depicted in the

12        printouts.[54]

13

14  ─────────────────────

15  [47]The police officer who took custody of the photographs confirmed that Messinger gave them
    to him.  *Id.* at 50:22-23 ("Q. What did you do with Government's Exhibit 125 after you were given it
16  by the pastor?  A. I assumed custody of the pictures and went back to the police station").

17  [48]*Id.* at 31:9-12 ("Q. How did the images get in a bag, if you know?  A. I was a bit paranoid that
    they would fall and we'd have people walking in and out of the church or that somebody would see
18  them.  I'm the one who put them in the bag").

19  [49]*Id.* at 35:21-25; 32:1.

20  [50]*Id.* at 30:7-16.

21  [51]*Id.* at 30:12-19 ("Q. Did the police take the pictures from you?  A. I don't have a clear memory
    of that.  I remember having the pictures.  I remember them on the conference room.  I may have handed
22  them to the pastor to hand to him.  I'm not sure.  I don't remember.  Q. As you recall, did the police
23  leave with Government's Exhibit 125 or the images?  A. Oh, yes"); *id.* at 31:2-12 ("Q. [ ] Did you see
    the police officer that came actually take the images?  A. Yes, I saw him walk out of the conference
24  room with the bag of pictures").

25  [52]These page numbers correspond to individual exhibits bearing the same numbers.

26  [53]*Id.* at 41:13-25; 42:1; Stipulation Re Government's Exhibits 125 and 125A ("Stip. Re:
27  125/125A"), Docket No. 75 (Aug. 5, 2009), at 2.

28  [54]RT Day 1 at 27:23-25; 28:1.

8

41.   Breatore confirmed that Exhibit 125 was approximately the same size as the stack of images she received from Robertson.[55]

**Detective Robert Bobkowitcz**

42.   Bobkowitcz is a Covina Police Department detective, specializing in adult and juvenile sex crimes.[56]  Bobkowitcz has been an detective in the Covina Police Department for four years.  He has been a police officer for 19 years.[57]

43.   Bobkowitcz has viewed child pornography approximately five or six times.[58]  He has seen hundreds, but not thousands, of images of child pornography.[59]  He has also received training regarding child pornography, its origin, and how it is traded.[60]

44.   Bobkowitcz is familiar with the manner in which the Covina Police Department obtains fingerprints from suspects and applicants.[61]

45.   On August 23, 2007, King called Bobkowitcz to advise him that images possibly constituting child pornography had been found in the Church nursery.   King asked Bobkowitcz to investigate.[62]

46.   That same day, Bobkowitcz went to the Church and met with Messinger, Breatore, and  King in the conference room.[63]  At the conclusion of the meeting, Bobkowitcz assumed custody of the

---

[55]*Id.* at 33:7-10 "Q. So as you sit here today, you don't know exactly how many pages Mr. Robertson gave you; right?  A. I know the stack is about the same size, but no, I don't know the exact number").

[56]*Id.* at 49:1, 6-12.

[57]*Id.* at 49:2-5.

[58]*Id.* at 58:18-19.

[59]*Id.* at 59:14-18.

[60]*Id.* at 58:20-25; 59:1-5.

[61]*Id.* at 193:2-12.

[62]*Id.* at 49:17-22.

[63]*Id.* at 49:23-25; 50:1-5.

1    images and took them to the police station.[64]

2  47.  Bobkowitcz was the officer in the Covina Police Department in charge of the case related to the

3       printouts.[65]  He looked at every image in the stack of printouts on August 23, 2007, the day he

4       brought them to the police station.[66]  When he was finished, Bobkowitcz locked the images in

5       a drawer in his desk.[67]

6  48.  Bobkowitcz had previously worked on cases with FBI Special Agent Stephanie Benitez.[68]  On

7       August 30, 2007, Bobkowitcz gave the printouts to Benitez.[69]  The printouts remained locked

8       in Bobkowitcz's desk until he gave them to Benitez.[70]

9  49.  Bobkowitcz neither purposefully removed any pages from nor added any pages to from the stack

10      of printouts.[71]

11 50.  At trial, Bobkowitcz reviewed each page of Exhibit 125, and placed his initials in the corner of

12      pages 1, 2, 3, 4, 8, 9, 10, 12, 13, 19, 20, 22, 23, 24, 27, 28, 29, 32, 33, 34, 35, 37, 38, 39, 40, 41,

13      50, 51, 54, 55, 57, 58, 66, 67, 68, 69, 70, 71, 72, 74, 80, 83, 86, 87, 88, 89, 90, 91, and 95 of

14      Exhibit 125-A, indicating that he recalled seeing those pages at the time he took custody of the

15      stack.[72]

16

17  [64]Id. at 50:22-23 ("Q. What did you do with Government's Exhibit 125 after you were given it
18  by the pastor?  A. I assumed custody of the pictures and went back to the police station").

19  [65]Id. at 60:15-17.

20  [66]Id. at 53:24-25; 54:1.

21  [67]Id. at 57:18-19.

22  [68]Id. at 50:20-25; 51:1 ("I had a rapport with an FBI agent from West Covina that I had worked
23  some other cases on, Stephanie Benitez, and I knew that she specialized in these types of cases.  So I
    called her and told her what I had").

24  [69]Id. at 51:8-12; 53:16-17.

25  [70]Id. at 57:20-22.

26  [71]Id. at 54:12-17.

27  [72]Id. at 54:18-20; 56:16-24; Stip. Re: 125/125A at 2.  Exhibit 125-A is an exact copy of Exhibit
28  125.  (RT Day 1 at 56:10-14.)  Exhibit 125 is an exact copy of Exhibits 1-95.  (Id. at 89:12-16.)  The

51.   Benitez asked Bobkowitcz to have Robertson and Breatore complete fingerprint cards; she also asked that Bobkowitcz himself complete one.[73]

52.   On September 12, 2007, Bobkowitcz was fingerprinted by Jailer Russell Amio, and gave his fingerprint card to Benitez.[74]

53.   When nonsuspects are fingerprinted they are asked to show identification.[75]

54.   Bobkowitcz requested that Breatore and Robertson complete fingerprint cards for Amio.  He gave their cards to Benitez.[76]

55.   Bobkowitcz knows the Covina Police Department's policy as to whether the officer who takes a person's fingerprints must sign the fingerprint card.[77]  Bobkowitcz recognized Amio's

---

page numbers of Exhibits 125 and 125-A correspond to individual exhibits bearing the same numbers. At trial, defendant objected to having the witnesses review the stack of images and indicate those they recalled seeing.  He asserted that pretrial meetings with government counsel or other pretrial viewing of the images tainted any identification offered on the witness stand.  (*Id.* at 54:23-55:2.)  Addressing the analogous issue of eyewitness identifications of criminal defendants, courts have held that in-court identifications are admissible, if they are reliable, notwithstanding the fact that there may have been a suggestive pretrial exposure of the witness to the defendant. See, e.g., *United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992).  See also *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) ("It is the reliability of identification evidence that primarily determines its admissibility").  "While identification testimony is significant evidence, such testimony is still only evidence, and . . . is not a factor that goes to the very heart the 'integrity' of the adversary process. [ ]Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to both any suggestibility in the identification procedure and any countervailing testimony. . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114 n. 14 (1977) (quoting *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C. Cir. 1968) (Leventhal, J., concurring)).  Defense counsel did not assert that government counsel engaged in any misconduct nor did he demonstrate that the witnesses' in-court identifications were the product of impermissibly suggestive out-of-court identification procedures.  Both lawyers had a full opportunity to "examine the witnesses to see if they had an adequate independent recollection." *United States v. Dixon*, 201 F.3d 1223, 1229 (9th Cir. 2000). The court concluded that the witnesses had sufficient independent recollection and that their identifications of the photographs were reliable.

[73]RT Day 1 at 193:13-25; 194:1-7.

[74]*Id.* at 194:3-10; Exh. 112.

[75]*Id.* at 194:21-24.

[76]*Id.* at 194:11-3, 25; 195:1; 196: 10-25; 197:1-8, 20-25; 198:1.

[77]*Id.* at 198:23-25; 199:1.

signature on his fingerprint card and on the fingerprint cards of Breatore and Robertson.  In each case, Amio signed the card as the person who had taken the fingerprints.  Bobkowticz asked Amio to take Breatore's and Robertson's fingerprints, and received their fingerprint cards from Amio.[78]

**Bernell Trapp**

56.   Bernell Trapp is a detective with the Los Angeles County Sheriff's Department, assigned to the safe team task force headed by the FBI.[79]  Trapp has worked at the Los Angeles County Sheriff's Department since June 1985.[80]

57.   Benitez asked Trapp to assist in interviewing defendant Richard Michael Welton.[81]   The interview, which was recorded, took place on September 18, 2008.[82]  Trapp, Benitez, and Welton were present at the interview.[83]  Trapp was able to hear the entire interview,[84] and listened to and authenticated the recording.[85]

58.   Benitez brought paperwork and copies of the images found at the Church to the September 18, 2008 interview.[86]  Trapp recognized Exhibit 125 as the images Benitez brought to the interview, and in particular recalled the splotchiness of the images, the fact that some had Asian writing

---

[78]*Id.* at 199:2-25; 200:1-8; 204:1-19.

[79]*Id.* at 65:22-25; 66:1-9.

[80]*Id.* at 65:25; 66:1-2.

[81]*Id.* at 66:10-13.

[82]*Id.* at 66:25; 67:1; 71:15-17.

[83]*Id.* at 70:3-5.

[84]*Id.* at 70:23-25.

[85]*Id.* at 67:2-25; 68:1-25.

[86]*Id.* at 73:7-25 ("Q. [ ] Do you recognize Government's Exhibit 125. A. Yes, I do. Q. What is it? A. It's the photocopies of the images that were found at the church.  Q. When you say the photocopies of the images, are you – excuse me.  Are you referring to the images that Agent Benitez brought to the interview with the defendant? A. Correct").

1    on them, and the fact that some were cartoon images.[87]

2    59.   Trapp stated that, when Welton was presented with copies of the images found at the Church and

3          asked if he remembered them, he did not seem surprised.[88]

4    **Government Expert Witness Kathryn Suchma**

5    60.   Kathryn Suchma is a latent print examiner for the FBI.[89]

6    61.   The palm or surface of the hand has a specialized skin known as friction ridge skin.  When that

7          skin is coated in oils or sweat, an impression of the skin can be left on an object that the person

8          handles.[90]  Fingerprints can be used as a means of identification because fingerprints are unique

9          to each individual and they persist throughout life, with the exception of scarring or injury.[91]

10   62.   Suchma has completed 32 credit hours of scientific course work and a four-year degree, as well

11         as 18 month of training at the FBI laboratory in the field of latent prints and fingerprint

12         comparisons.[92]  She has worked for the FBI laboratory since 2005,[93] handling hundreds of cases

13         involving latent print examinations.[94]

14   63.   Suchma received 95 pages, a black plastic bag, and four fingerprint cards, in February 2008, for

15

16

17

-----

18   [87]*Id.* at 74:1-9 ("Q. How are you sure that those are the same images that Agent Benitez brought

19   with her to the interview? [ ] [A.] I remember the splotchiness, some of the cartoons, and some of the
     printed out pages had some type of Asian writing on them. I don't know if it was Chinese or whatever,

20   but some type of Asian writing which, you know, is uncommon. So I remember that from this case").

21   [88]*Id.* at 74:18-25 ("Q. What was the defendant's reaction when the copies of the images were put
     in front of him? [ ] [A.] Again, he didn't appear to be surprised").

22

23   [89]*Id.* at 85:17-21.

24   [90]*Id.* at 85:24-25; 86:1-4.

25   [91]*Id.* at 86:17-22.

26   [92]*Id.* at 86:5-10.

27   [93]*Id.* at 86:11-13.

28   [94]*Id.* at 86:14-16.

analysis.[95]  Exhibits 1-95 are the original images sent to and analyzed by Suchma.[96]  Exhibit 125 is an exact duplicate of Exhibits 1-95.[97]

64.     Exhibits 109-112 were sent to Suchma in February 2008.[98]  Exhibit 109 represents a true sample of Welton's fingerprints.[99]  Exhibit 110 represents a true sample of Breatore's fingerprints.[100]  Exhibit 111 represents a true sample of Robertson's fingerprints.[101]  Exhibit 112 represents a true sample of Bobkowitcz's fingerprints.[102]

65.     Twelve of Breatore's fingerprints are on the black plastic bag Benitez sent Suchma in February 2008, identified as Exhibit 96.[103]  Breatore's fingerprints are also on Exhibits 22, 38, 45, 54, 74, 76, and 95.[104]

66.     Bobkowitcz's fingerprints are on Exhibit 74.[105]

67.     Welton's fingerprints are on Exhibits 2, 13, 31, 41, 60, 61, 66, 78, and 81,[106] indicating that he touched these exhibits.[107]

---

[95]Id. at 86:23-25; 87:6-10; 89:20-25; 90:1-9.

[96]Id. at 88:2-19.

[97]Id. at 89:12-16.

[98]Id. at 91:6-15; 91:24-25; 92:1-21.

[99]Id. at 96:25; 97:1-12; Trial Stipulations re Fingerprints, Docket No. 73 (Aug. 4, 2009).

[100]RT Day 1 at 91:10-15; Reporter's Transcript of Proceedings, Aug. 5, 2009 ("RT Day 2") at 43:5-22.

[101]RT Day 1 at 91:22-25; 92:1-9; RT Day 2 at 43:5-22.

[102]RT Day 1 at 92:10-19; 207:24-25.

[103]Id. at 94:19-24.

[104]Id. at 95:10-14.

[105]Id. at 95:16-21.

[106]Id. at 98:9-16; Exhs. 113-21.

[107]Id. at 107:9-14 ("Q. [ ] Is it possible to leave a fingerprint on a page without actually touching it?  A. No.  Q. What about is it possible to touch a page without leaving a fingerprint?  A. Yes").

68.   Joshua Hoffman was a suspect in a sexual battery case investigated by Bobkowitcz.[108]  Suchma compared the fingerprints found on the images to Joshua Hoffman's and found none of his fingerprints on the images.[109]

**Government Expert Witness Christopher Christopherson**

69.   Christopher Christopherson is an FBI Special Agent specializing in cyber investigations, including investigations involving child pornography and computer intrusions.[110]

70.   Prior to working for the FBI, Christopherson was a computer science professor, with a speciality in web programming and web design.  Prior to that, he was a web programmer, designing and programming websites and web applications.[111]

71.   Christopherson has received training from the FBI on the processing of digital evidence, i.e., evidence involving use of the Internet or a computer.[112]

72.   Christopherson has taken courses at the FBI concerning network traffic analysis, incident response, and other aspects of cyber crime.  He has also received training regarding popular internet protocols, including HTTP and email.[113]  Christopherson is familiar with the manner in which a computer processes information and puts that information on a printout.[114]

73.   Christopherson has worked on approximately 20 cases involving child pornography,[115] and

---

[108]*Id.* at 51:19-23.

[109]*Id.* at 106:21-107:3.

[110]*Id.* at 114:1-10.

[111]*Id.* at 114:23-25; 115:1-4.

[112]*Id.* at 114:16-22; 115:8-12.

[113]*Id.* at 115:14-21.

[114]*Id.* at 121:20-25; 122:1-2 ("Q. And are you familiar with how computers use information in order to put that information on a printed piece of paper?  A. Yes, very familiar.  Q. How are you familiar with that information?  A. As a web developer, I dealt with that in a professional basis and also in preparation for this trial, I examined the ways in which some of this information might appear on a printout").

[115]*Id.* at 140:3-6.

received Exhibits 1 through 95 in this case for analysis.[116]  As part of his analysis, he reviewed HTTP protocol, which controls how information is sent between a web browser or an individual using the web browser and a web server, and how the server responds.  From 2005 to 2007, Firefox and Internet Explorer together had a 95% share of the web browser market.[117]  Christopherson examined these web browsers to determine how their software identifies the website source of information on the printout they prepare.[118]  The Internet Explorer and Firefox programs typically include the Universal Resource Locator (URL) on printouts they prepare.[119]

74.  Exhibit 67 contains, in the upper right corner, a URL, whose text begins with "http://" and ends with ".html."[120]  In addition to Exhibit 67, each of Exhibits 1-44, 46-60, 62-63, 65-66, 68-72, 74-80, 82, 84-95, contains a URL beginning with "http://."[121]

75.  The Internet Explorer and Firefox programs typically include a date and time stamp on printouts they prepare.[122]  Exhibit 67 contains, in the lower right corner, a date and time stamp.[123]  The date and time on such a stamp are based on communications between the user and the client or

---

[116]*Id.* at 116:9-25; 117:1-4; 125:9-15.

[117]*Id.* at 122:21-23; 184:24-25; 185:1.

[118]*Id.* at 122:13-25.

[119]*Id.* at 118:1-15 ("So if you looked at Government's Exhibit 67, starting from the top of the page, there's two pieces of information at the top.  Starting with the text my and ending with the three dots, that text represents the title of the web page.  Looking to the right of that, the text that starts with the HTTP colon slash slash and ends with HTML represents the web address. Bottom left portion of this, and again, by saying web address, I'm also referring to the HTTP portion of that.  Moving to the bottom portion, looking at the left side, the one of two indicates the page number of the series that this printout represents, and the bottom right and the date and time stamp.  All of these four pieces of meta-information represent typical pieces of information that both FireFox and Internet Explorer would include in printouts").

[120]*Id.*; Exh. 67.

[121]Exhs. 1-44, 46-60, 62-63, 65-66, 68-72, 74-80, 82, 84-95.

[122]RT Day 1 at 118:1-15.

[123]*Id.*; Exh. 67.

1      the web browser; it is determined on the client's side.[124]

2   76.   Exhibits 1, 33, 47, 52, 53, 60, 63, 69, 70, 75-80, and 82-94 bear only a date stamp.  Exhibits 2-

3      32, 34-44, 48-51, 54-59, 61, 65, 68, 72-73, and 95 bear stamps with both the date and time.[125]

4   77.   Exhibit 67 contains, in the lower left corner, "1 of 2," indicating that it is the first in a series of

5      pages comprising a printout.[126]  The page number in the series is supplied by the web browser.[127]

6      Numbers and words reflecting the page number are typical information that both Internet

7      Explorer and Firefox include on printouts.[128]

8   78.   In addition to Exhibit 67, Exhibits 1-44, 46-61, 63-66, 68-74, and 95 contain notations indicating

9      which page in a series the printout represents.[129]

10   79.   Exhibit 67 contains, in the upper left corner, text indicating the title of the web page.[130]  The

11      webpage title is supplied by the web server that provides access to the webpage.[131]

12   80.   In addition to Exhibit 67, Exhibits 2-32, 34-44, 46, 48-51, 55-59, 61-62, 65, 67-68, 70, 72-73,

13      81, and 86-91 contain title information as metadata in the upper left corner of the Exhibits.[132]

14   81.   It is typical of website design to include an image at the top of the webpage known as a

---

16     [124]RT Day 1 at 118:16-22 ("Q. How does this information get on the page when one is
17 using a computer?  A. There's two ways.  Based on the communication between the user and the client
or the web browser and the web server, the URL is determined on the client's side, as is the date and
18 time, and the title is supplied by the web server, where the page number is generated by the web browser
itself").  The court understands that, as used by Christopherson, the term "client" refers to the machine,
19 browser, or other software employed by an individual user to access the Internet.

20     [125]Exhs. 1-44, 47-61, 63, 65, 68-70, 72-73, 75-80, 82-95.

21     [126]RT Day 1 at 118:1-18.

22     [127]Id. at 118:18-22.

23     [128]Id. at 118:1-18.

24     [129]Exhs. 1-44, 46-61, 63-66, 68-74, 95.

25     [130]Id. at 118:1-5; Exh. 67 ("My Little Sister Hot lolita photos 13yo rompl baby nymphets lolita
26 b..."

27     [131]RT Day 1 at 118:16-22.

28     [132]Exhs. 2-32, 34-44, 46, 48-51, 55-59, 61-62, 65, 67-68, 70, 72-73, 81, 86-91.

1         "banner." The presence of a banner indicates that a printout came from the Internet.[133]

2   82.     An IP address is the computer address of a web server and may be included in the URL in lieu

3         of a domain name.[134]

4   83.     The URLs on Exhibits 66, 71, and 86-91 include the IP address 213.4.130.210.[135] The

5         information following the IP address 213.4.130.210 provides information regarding the directory

6         within the web server where the page is found and the file name of the images on the page.[136]

7   84.     ARIN is a non-profit company based in North America, which delegates IP address space in

8         North America.[137] RIPE is a non-profit company based in Europe, which delegates IP address

9         space in Europe.[138] Consultation with ARIN and RIPE is generally accepted in the cyber

10       industry as a method of determining the physical location of an IP address.[139]

11   85.     The service "Who-Is" enables one to determine to whom an IP address is registered.[140] Who-Is

12

---

13      [133]RT Day 1 at 119:1-22 ("There's also the banner at the top of the page, which is the image that
14 says My Little Sisters and contains the teddy bear. . . . The banner itself tells me it came from the
Internet because it's typical of a website design to include an image at the top portion of the web page.
15 Actually, I should say all pages on the website. To generate a design that's common across the
website"); *id.* at 139:2-6 ("The banner would typically be at the top portion of the page. So I would
16 examine Government's Exhibit 87 if I were going to look at the – or make that determination on the
banner. So I would say that 89 does not contain a banner"); *id.* at 139:11-15 ("[M]y understanding of
17 having done my own layouts is the banner would be at the top portion and/or the bottom").

18      [134]*Id.* at 120:4-15 ("Q. What other types of address information did you find in reviewing
19 Government's Exhibits 1 through 95? A. In Government's Exhibit 71, in the address, the computer or
the web server is referred to by IP address, which simply is the computer address of the web server. In
20 another of – in a number of other images, the computer was referred to by its domain name. Where a
domain name is a more human, readable form of a computer address that's easier for humans to
21 remember and then type in. Q. So if someone has a domain name, that takes the place of an IP address;
is that right? A. In effect, yes").

22
23      [135]Exhs. 66, 71, 86-91; RT Day 1 at 120:16-25; 121:1-6

24      [136]RT Day 1 at 128:15; 129:1-3.

25      [137]*Id.* at 143:18-25.

26      [138]*Id.*

27      [139]*Id.* at 143:12-16.

28      [140]*Id.* at 141:15-22.

gets its information from Regional Internet Registrars ("RIRs") like ARIN and RIPE.[141]  The service "Geotrace" conducts geographic tracing to determine the physical location of an IP address.[142]  Consultation with the "Who-Is" and "Geotrace" services is generally accepted in the cyber industry as a means of determining the physical location of an IP address.[143]

86.   RIPE was the first RIR formed in approximately 1992.  Other RIRs were formed later.  When it came into being, each RIR was given a block of IP addresses to delegate to subscribers such as Internet service providers and corporations.[144]

87.   The current physical location of the IP address 213.4.130.210 is Madrid, Spain.  It is registered to a company named Terra Networks.[145]  An IP address can move from one physical location to another.[146]  Given that RIRs have generally been assigned blocks of IP addresses to delegate within a particular territory, it is highly likely that the IP address 213.4.130.210 was initially delegated to RIPE for use in Europe, and that at all times relevant to this case, it was used in Europe.[147]

88.   JPEG is a method of organizing the data of an image into a computer file.[148]  One indication that

---

[141]*Id.* at 170:13-14.

[142]*Id.* at 141:23-25.

[143]*Id.* at 143:12-16.

[144]*Id.* at 146:8-13.

[145]*Id.* at 142:16-18; 144:21-25.

[146]*Id.* at 161:3-11 ("Q. An IP address, you testified, is like a physical address; right?  A. Yes.  Q. But it actually can move; isn't that right?  A. Yes.  Q. An IP address is not static in one location.  A. That's correct.  Q. And in that sense it's more like a telephone number, wouldn't you say?  A. You could use that analogy").

[147]*Id.* at 147:1-5 ("That IP address actually starts with 213.  Based on my training and experience, it's highly likely that it was first of all delegated to RIPE, and second of all, it is also highly likely that it was used by that Terra network in Madrid at the time").

[148]*Id.* at 130:8-12.

1      an image is a JPEG is that the file name may contain ".JPG" at the end.[149]

2      89.    Exhibits 1-6, 8-9, 11, 14-23, 25-30, 32-41, 46-48, 50-52, 54-60, 63, 65-66, 69, 71, 74-79, 82, 84-

3             85, and 92-95 all contain ".JPG" at the end of the URL.[150]

4      90.    In or about 2005, Christopherson saw the image in Exhibit 88-A on a computer while he was in

5             the state of Louisiana.[151]

6      91.    Christopherson entered the URL from Exhibits 3, 5, and 25 into a browser and found the images

7             located at that URL to be the same as those in the exhibits.[152]

8      92.    When an individual conducts an Internet search, it is impossible for that individual to

9             communicate only with computers in a certain region.  This is because the structure of the

10            Internet causes the route between a web browser and web server to vary between

11            communications and sometimes even within the same communication.  As a consequence, the

12            data will travel through different regions.[153]

13    _____

14      [149]Id. at 129:14-17 (identifying photographs as JPEGs Exhs. 66, 71 (URLs ending in ".jpg").

15      [150]Exhs. 1-6, 8-9, 11, 14-23, 25-30, 32-41, 46-48, 50-52, 54-60, 63, 65-66, 69, 71, 74-79, 82, 84-
16    85, 92-95.

17      [151]RT Day 1 at 150:8-24 ("Q. [ ] Turning your attention to Government's Exhibit 88, are these
       the images that you have seen before?  A. Yes, I've seen one or more of these images before.  Q.
18     Specifically, is there any particular image that you recall seeing before?  A. I've seen a number of
       images of the series involving this female.  But in particular, I recognize Exhibit 88-A as an image that
19     I've seen before.  Q. Where were you when you saw this image prior to this case?  A. I was in Louisiana.
       Q. And where was the – was this image last seen on a computer by you?  A. Yes.  Q. Where was the
20     computer when you last saw this image in New Orleans?  A. The computer was also in Louisiana.  Q.
       How long ago was it that you saw – first saw this image in Louisiana?  A. Approximately 2005.  So
21     maybe four, five years").

22      [152]Id. at 186:4-25; 187:1-10 ("Q. [ ] How many of the images were you able to verify using the
       URL information? . . . THE COURT: And which were they?  THE WITNESS: Government's Exhibit
23     3, Government's Exhibit 5, Government's Exhibit 25, and Government's
24     Exhibit – I believe it's 4.  That particular image was not available, but another image which was of
       similar sexual nature was available.  So I assume that that web address was correct, because a similar
25     image was found. There were two other images that I found which – so at least those, and I believe there
26     were two more").

27      [153]Id. at 191:4-16 ("Q. [ ] When an individual goes on the Internet and they are searching for
       something, is it possible for that individual to communicate only with computers in a certain region?
28     A. I don't believe that's possible.  Q. Why?  A. Based on the structure of the Internet, the fact that it's

**September 18, 2008 Interview with Defendant**

93.     Welton was born on May 16, 1961.[154]  On September 18, 2008, Trapp and Benitez interviewed Welton at his home/place of work.[155]  During the interview, Welton identified the approximate location of Covina First Presbyterian Church.[156]  He knew that the Church had a courtyard,[157] and acknowledged that he had been inside the Church when no one else was present.[158]  Welton also admitted that he had been inside the Church nursery late at night.[159]

94.     Welton recognized the stack of printouts,[160] and said he had placed them under a changing table

---

a packet switched network, your route between web browser and a web server, for instance, could vary between instances.  And sometimes even within the same communication.  You may send multiple what are called packet orbits of data to the server, and the server may send it to you, and it's almost within certainty that it will take a different route").

[154]Exh. 106 (Track marked 108A).

[155]*Id.* at 70:3-7; Exh. 106.

[156]Exh. 106 (Track marked 108B) ("Benitez: Are you familiar with First Presbyterian Church . . . um . . . right here in Covina?  Welton: I don't know . . . exactly which one that is.  Benitez: Okay.  Welton: I mean, which one is it?  Benitez: It's um...  Welton: Is it like, is it the one on Second Street?  There's one, two . . . two or three churches there I think").

[157]Exh. 106 (Track Marked 108F) ("Benitez: So, uh, the First Presbyterian was . . . Welton: That one was, you can walk in the courtyard right there and, you know . . .").

[158]Exh. 106 (Track Marked 108I) ("Benitez: So all this time that you went into the church on – we're talking about the First Presbyterian Church – nobody was there.  Welton: I wouldn't go in when there was someone there anyway.  Benitez: Okay, yeah.  Welton: No way").

[159]Exh. 106 (Track Marked 108C) ("Welton: Usually the door's open anyway.  It isn't even locked, it's just open"); Exh. 106 (Track Marked 108E) ("Benitez: Okay, why, why, why the nursery?  Why not like the main . . . Welton: 'Cause it was open"); Exh. 106 (Track Marked 108E) ("Trapp: How many times did you go into the church?  Welton: Only a couple times, you know"); Exh. 106 (Track Marked 108E) ("Benitez: Do you remember, was it early in the morning, was it late night?  Welton: Late at night").

[160]Exh. 106 (Track Marked 108C) ("Benitez:  Do you . . . I–I'm just going to let you look at this.  This, this is basically what was found over there, okay?  And these are copies, these aren't the originals.  Um, do you remember these?  Welton: I do.  That's old stuff.  Benitez: Well it looks like it was printed in '05 and '06, so it would have been a couple years ago.  Welton: Hm . . . not that old").  See also RT Day 1 at 75:18-22 ("He initially started talking about how old they were.  And then he later said that they weren't that old"); *id.*, 74:13-17 (stating that when asked this question, copies of the images were placed in front of the defendant).

21

1   in the nursery at the Church.[161]   Welton returned to the nursery at least one time after he first

2   placed printouts there.[162]

3   95.   He retrieved at least some of the images using a computer in a church.[163]

4   96.   Welton found at least some of the printouts on preview pages of pay for view websites.[164]

5   97.   Welton knew that the printouts included photographs of minor children.[165]

6   98.   At no time during the interview did Welton deny that the stack of printouts in Exhibit 125 was

7

8   _____

9   [161]Exh. 106 (Track Marked 108D) ("<u>Benitez</u>: Okay, do you, do you remember exactly where you

10   put it?  If it was under something, on top of something?  <u>Welton</u>: Yeah it was under the . . . the thing.
   <u>Benitez</u>: Under what thing?  <u>Welton</u>: The cabinet.  <u>Benitez</u>: Cabinet?  <u>Welton</u>: It was just some cabinet

11   that was there"); Exh. 106 (Track Marked 108I) ("<u>Benitez</u>: Did you push it, push it beneath the cabinet,
   or was it under the cabinet or was it pushed back?  <u>Welton</u>: The cabinet, and underneath it is a hollow

12   spot . . .  <u>Benitez</u>: Okay.  <u>Welton</u>: . . . or whatever, and you can lift it up and just put it right under there
   and that's it").  See also RT Day 1 at 76:10-14 ("Q. Where did he say he put them?  A. Um, in like a

13   hollow portion of a cabinet"); RT Day 1 at 77:3-6 (noting that the stack of images was still in front of

14   defendant when this question was asked).

15   [162]Exh. 106 (Track Marked 108E) ("<u>Trapp</u>: So you stashed them there so you could use them
   when you came back?  <u>Welton</u>: Once or twice, yeah, but I only went there a couple times"); Exh. 106

16   (Track Marked 108I) ("<u>Benitez</u>: Did you, did you keep adding to it, or did you have a stash in, in . . .
   <u>Welton</u>: I might've, um, put some with it once or twice or somethin'.  I'm not sure").

17

18   [163]Exh. 106 (Track Marked 108M) ("<u>Benitez</u>: Those images that I showed you came from
   somewhere, came from a computer somewhere. * * * <u>Welton</u>: Where that computer is, I have no idea.

19   <u>Benitez</u>: It's what?  <u>Welton</u>: Where this computer is, where I got the images?"); Exh. 106 (Track
   Marked 108N) ("It would have to have been from a long time ago from a computer that I went on");

20   Exh. 106 (Track Marked 108N) ("<u>Welton</u>: It had to have been a church somewhere, but I don't know
   exactly which one, you know, where I was at"); Exh. 106 (Track Marked 108N) ("<u>Benitez</u>: I think what

21   you're telling me is that you printed that from a church computer somewhere.  <u>Welton</u>: Yeah").

22   [164]Exh. 106 (Track Marked 108H) ("<u>Benitez</u>: Okay.  Well, how did you, how did you find, um

23   . . . <u>Welton</u>: There's a link thing, when you go on the Internet.  There's a link banner page to something.
   <u>Benitez</u>: Right.  <u>Welton</u>: And if you keep going to these links, it links to others and you just keep going

24   to this stuff and it goes, automatically goes to a thing and you can say preview and you preview it and

25   then the previews come up.  <u>Benitez</u>: Okay").

26   [165]Exh. 106 (Track Marked 108K) ("<u>Benitez</u>: Many of these girls I'm looking at they're, you
   know, from, anywhere from two to six.  <u>Welton</u>: Mm-hmm.  <u>Benitez</u>: So that, that's why  I'm asking

27   that.  You know, there's some teens, but, you know that, those are easier sites to find.  But you know,
   what, why the two, three, four year olds.  <u>Welton</u>: I don't know, actually, I try to figure that out myself,

28   you know, and stuff.  And I just said, I'm just not gonna look at it anymore").

1    his,[166] or that some of the images depicted children.[167]

2    **Trial Stipulations**

3    99.    The girl depicted in Exhibit 89-C is a real minor.  She was between 7-10 years old at the time

4            the image in Exhibit 89-C was taken.  The image depicted in Exhibit 89-C was taken in

5            Illinois.[168]

6    100.   The girl depicted in both Exhibit 89-E and 91-B is the same girl.  She is a real minor.  The girl

7            was seven years old when the images in Exhibits 89-E and 91-B were taken.  The images in

8            Exhibits 89-E and 91-B were taken in Florida.[169]

9

10                              **II.  CONCLUSIONS OF LAW**

11   A.      **Count Two (18 U.S.C. § 2252A(a)(5)(B))**

12   1.      In order to obtain a conviction for possession of child pornography under 18 U.S.C.

13           § 2252(a)(5)(B), the government must prove beyond a reasonable doubt (1) that the defendant

14           knowingly possessed one or more visual depictions of an actual minor engaging in sexually

15           explicit conduct; and (2) that the images of child pornography defendant knowingly possessed

16           had been mailed, shipped or transported in interstate or foreign commerce by any means,

17           including by computer.  18 U.S.C. § 2252(a)(5)(B).

18   2.      To establish that a defendant possessed child pornography, "there must be a 'sufficient nexus

19           between the defendant and the contraband to support the inference that the defendant exercised

20           dominion and control over it.'"  *United States v. Romm*, 455 F.3d 990, 999 (9th Cir. 2006)

21           (quoting *United States v. Carrasco*, 257 F.3d 1045, 1049 (9th Cir. 2001) (alteration original)).

22           To establish knowing possession of child pornography, there must be evidence that defendant

23           knew the pornography he possessed involved a minor engaging in sexually explicit conduct.

24   _____

25    [166]RT Day 1 at 79:17-20.

26    [167]*Id.* at 79:21-24.

27    [168]Trial Stipulations, Docket No. 72 (Aug. 4, 2009).

28    [169]*Id.*

1    *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994).  See also *Romm*, 455 F.3d at

2    1003 n. 16 (" In *X-Citement Video*, the Supreme Court held 18 U.S.C. § 2252 requires the

3    government to prove the defendant's knowledge that the performer depicted is a minor because

4    this is 'the crucial element separating legal innocence from wrongful conduct'").

5    3.    Interstate nexus may be proved in a number of ways.  Given the statutory language, the clearest

6          is to show that the image was "mailed, shipped or transported in interstate or foreign commerce,

7          including by computer."  18 U.S.C. § 2252(a)(5)(B).  In addition, interstate nexus may be proved

8          by showing use of the Internet to download the image.  *United States v. MacEwan*, 445 F.3d

9          237, 244 (3d Cir.) ("[B]ecause of the very interstate nature of Internet, once a user submits a

10         connection request to a website server or an image is transmitted from the website server back

11         to the user, the data has traveled in interstate commerce.  Here, once the images of child

12         pornography left the website server and entered the complex global data transmission system

13         that is the Internet, the images were being transmitted in interstate commerce"), cert. denied, 127

14         S.Ct. 208 (2006); see also *United States v. Mellies*, 329 Fed. Appx. 592, 606-07 (6th Cir. May

15         15, 2009) (Unpub. Disp.) ("[T]he district court did not err in instructing the jury that 'any image

16         of child pornography that was transmitted or received over the Internet moved in interstate

17         commerce'"); ("Transmission of photographs by means of the Internet is tantamount to moving

18         photographs across state lines and thus constitutes transportation in interstate commerce");

19         *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002) ("We join the First Circuit in holding

20         that '[t]ransmission of photographs by means of the Internet is tantamount to moving

21         photographs across state lines and thus constitutes transportation in interstate commerce' for the

22         purposes of 18 U.S.C. § 2251," quoting *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir.

23         1997)); *United States v. White*, 2 Fed. Appx. 295, 298 (4th Cir. Jan. 22, 2001) (Unpub. Disp.)

24         (same); *United States v. Patton*, Cr. No. 09-43 (PAM/JSM), 2009 WL 1514502, *2 (D. Minn.

25         June 1, 2009) ("'[T]he government may satisfy the interstate commerce element by proving that

26         child pornography images were transmitted over the Internet,'" quoting *United States v. Lewis*,

27         554 F.3d 208, 205 (1st Cir. 2009)); *United States v. Gouin*, No. CR05-433RSL, 2008 WL

28         1886158, *2 (W.D. Wash. Apr. 24, 2008) ("[T]his court believes the Ninth Circuit will follow

24

the Third Circuit's reasoning in *MacEwan*"); *United States v. Pomerico*, No. 06 CR 113(RJD), 2008 WL 4469465, *6 (E.D.N.Y. Oct. 3, 2008) ("[T]his Court finds that 'use of the Internet satisfies the interstate commerce element of . . . 18 U.S.C. § 2252A(a)(2)(B),'" quoting *MacEwan*, 445 F.3d at 239)).

        **1.**        **The Government Proved Beyond a Reasonable Doubt That Defendant Knowingly Possessed the Images**

        **a.**        **Possession**

4.    As noted, to prove possession, the government must adduce evidence of "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over it."  *Romm*, 455 F.3d at 999 (quoting *Carrasco*, 257 at 1049). Possession can be proved even if the contraband is not found on defendant's person or in his home.  The Ninth Circuit has held, for example, that marijuana hidden under a bush was in the constructive possession of a defendant because he knew of its presence and had the power to exercise dominion and control over it.  *United States v. Cepelis*, 426 F.2d 134, 135-36 (9th Cir. 1970) ("Here the trial judge could have found sole or joint possession in the appellant from his demonstrated ability to arrange for the delivery of the hashish").  See also *Brothers v. United States*, 328 F.2d 151, 156 (9th Cir.) (possession found of drugs hidden in a Lucky Strike package on a curb), cert. denied, 377 U.S. 1001 (1964); (*White v. United States*, 315 F.2d 113, 114-15 (9th Cir.) (possession found of drugs hidden at a service station), cert. denied, 375 U.S. 821 (1963).

2.    Although in this case the images were not found on defendant's person or in his home, the government proved beyond a reasonable doubt that defendant possessed the images.  As in *Cepelis*, defendant was able to pinpoint the location of the images.  When Benitez asked defendant where the images were stored, and whether they were stored on top of something or underneath something, defendant said that they were stored under a cabinet, specifically in a hollow part of the cabinet in the nursery of the church.[170]  *Cepelis*, 426 F.2d at 135-36.  He also

---

[170]Exh. 106 (Track Marked 108D); Exh. 106 (Track Marked 108I).

1   exercised dominion and control over the images, to the extent that he returned to the nursery and

2   used the images until Robertson discovered them in August 2007.[171]   This conclusion is

3   corroborated by the fact that defendant's fingerprints were found on many of the images in the

4   stack.  Thus, the possession element of the § 2252A(a)(5)(B) offense is satisfied.

5   3.   At trial, defendant objected to the introduction of Exhibits 1-96 and 125 on the basis that there

6   was a defect in the chain of custody.[172]  The court held that any defect in the chain of custody

7   went to the weight, rather than the admissibility, of the evidence.[173]  See *United States v.*

8   *Robinson*, 967 F.2d 287, 292 (9th Cir. 1992) (citing *United States v. Candoli*, 870 F.2d 496, 509

9   (9th Cir. 1989)).  See also *United States v. Matta-Ballesteros*, 71 F.3d 754, 768 (9th Cir. 1995)

10  ("The prosecution must introduce sufficient proof so that a reasonable juror could find that tapes

11  are in substantially the same condition as when they were seized, and may admit the tapes if

12  there is a reasonable probability the tapes have not been changed in important respects").  The

13  government presented evidence establishing a clear chain of custody from Robertson to

14  Breatore[174] to Detective Bobkowitcz[175] to Agent Benitez[176] in August 2007.  Benitez

15  subsequently sent the images to an FBI latent print examiner in February 2008.[177]  Although

16

17  [171]Exh. 106 (Track Marked 108E) ("<u>Trapp</u>: So you stashed them there so you could use them

18  when you came back?  <u>Welton</u>: Once or twice, yeah, but I only went there a couple times").

19  [172]RT Day 1 at 28:4-5; 56:1-5; 88:23-25; 89:1; 90:15-16; RT Day 2 at 18:29-25; 19:1-25; 20:1-

20  25; 21:1-25; 22:1-25.

21  [173]RT Day 2 at 41:24-25; 42:1-20.

22  [174]RT Day 1 at 20:4-9, 22:21-15, 23:1-7, 25:8-15, 29:20-25, 30:1, 30:12-16, 33:15, 34:1-12,

23  37:18-25, 39:1-5.  Breatore either personally handed the photographs to Detective Bobkowitcz, or
    handed them to Messenger and was present when Messenger gave them to Bobkowitcz.  Breatore had

24  a specific memory of Bobkowitcz leaving the church conference room with the bag of photographs; both
    she and Bobkowitcz, moreover, were able to remember and identify many of individual photographs

25  in Exhibit 125 and 125A.

26  [175]*Id.* at 30:12-19, 31:2-12, 50:3-5.

27  [176]*Id.* at 57:20-22.

28  [177]RT Day 1 at 87:20-23, 88:8-10.

26

Benitez did not testify, there was testimony that Bobkowitcz sent the photographs to Benitez and that Suchma received the photographs from Benitez. This indicates that Benitez maintained control of the photographs during the intervening period. As respects a majority of the printouts that the fingerprint examiner received, the government provided direct evidence that they were found in the nursery in August 2007. Either Breatore or Bobkowitcz specifically recalled that Exhibits 1, 2, 3, 4, 8, 9, 10, 12, 13, 19, 20, 22, 23, 24, 27, 28, 29, 32, 33, 34, 35, 37, 38, 39, 40, 41, 50, 51, 54, 55, 57, 58, 66, 67, 68, 69, 70, 71, 72, 74, 80, 83, 86, 87, 88, 89, 90, 91, 93, and 95 were in the original stack. In addition, there was evidence that either Breatore's or Bobkowitcz's fingerprints were found on Exhibits 22, 38, 45, 54, 74, 76, and 95. This constitutes direct evidence that two additional images were in the original stack. Finally, Exhibits 2, 13, 31, 41, 60, 61, 66, 78, and 81 bore defendant's fingerprints, providing direct evidence that he had handled those images; coupled with his admission that he had placed the stack under the changing table and returned to view it once or twice, this fingerprint evidence supports an inference that these exhibits too were part of the original stack. In toto, therefore, there was direct evidence that 59 of 95 exhibits were in the original stack. Combined with the fact that the only testimonial gap in the chain of custody[178] identified by defendant was during a period when the exhibits were in the possession of FBI Special Agent Benitez, that no evidence was adduced that the images had been in the possession of intermeddlers or had been tampered with or changed, the court finds, beyond a reasonable doubt, that Exhibits 1-95 were in the original stack of printouts, and were in substantially the same condition as when found.[179] See

---

[178]As noted, Breatore could not recall whether she handed the photographs directly to Bobkowitcz or gave them to Messenger and watched Messenger give them to Bobkowitcz. Breatore's lack of recollection on this point is not an impediment to finding that the government satisfactorily proved the chain of custody of the photographs.

[179]Without evidence regarding the manner in which Benitez stored the printouts, the court cannot conclude that none of the printouts was lost. Breatore testified, however, that the stack of printouts introduced at trial was approximately the same size as that she received on the day the images were found by Robertson. (See RT Day 1 at 33:9-10 ("I know the stack is about the same size").) As a consequence, the fact that some printouts may inadvertently have been lost does not alter the court's conclusion regarding the chain of custody.

*United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) ("[I]n the absence of any evidence of tampering, a presumption exists that public officers 'properly discharge [ ] their official duties,'" quoting *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)); *United States v. Dickerson*, 873 F.2d 1181, 1185 (9th Cir. 1988) ("An important factors to be considered is the likelihood of intermeddlers tampering with evidence").

**b.      Images of Actual Minors**

5.      In *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), the Supreme Court held that criminalizing the possession of "virtual" child pornography, i.e., images that do not depict a "real" child, would violate the freedom of speech protections of the First Amendment. *Id.* at 239-40, 258. As a result, the government has the burden of proving beyond a reasonable doubt that the visual depictions defendant possessed were images of actual minors.[180] *United States v. Salcido*, 506 F.3d 729, 733 (9th Cir. 2007). The Ninth Circuit has clearly stated that neither expert nor lay testimony is required to prove that images depict actual minors. *Salcido*, 506 F.3d at 733 ("With respect to the quantum of evidence necessary to support a conviction, there seems to be general agreement among the circuits that [the] pornographic images themselves are sufficient to prove the depiction of actual minors"). The trier of fact may conclude beyond a reasonable doubt that the visual depictions are of actual children where "it is obvious from the pictures themselves that they are of children." *United States v. Rearden*, 349 F.3d 608, 613, (9th Cir. 2003). In *Salcido*, the court held that the factual determination that real minors were depicted was further supported by the fact that the defendant had admitted his interest in child pornography. *Salcido*, 506 F.3d at 735.

6.      Here, based on the images themselves, the court finds that Exhibits 3, 21, 65, 66, 67, 68, 70, 71, 72, 78, 87, 88A, 88D, 88E, 89A, 89B, 89C, 89D, 89E, 89F,89G, 89H, 89I, 90 (all pictures), 91A, 91B, 91C, and 91D depict actual minors.[181]   The court's determination is supported by

---

[180]For purposes of the statute, a "minor" is "any person under the age of eighteen years."  18 U.S.C. § 2256(a).

[181]The government's expert, Christopherson, testified that Exhibit 2 appeared to have "morphed"; the court understood this to mean that the image had been electronically altered. (RT Day 1 at 183:8-

1  defendant's tacit admission at the September 18, 2008 interview that the pictures were images

2  of young children.[182]  In addition, the parties stipulated that the girl depicted in both Exhibit

3  89(e) and 91(b) is an actual minor, and that the girl depicted in Exhibit 89(c) is also an actual

4  minor.[183]

5  **c.    Engaged in Sexually Explicit Conduct**

6  7.    The government also has the burden of proving that the actual minors depicted are engaged in

7  sexually explicit conduct.  Section 2256 provides a definition of sexually explicit conduct, which

8  includes:

9          (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or

10          oral-anal, whether between persons of the same or opposite sex;

11          (ii) bestiality;

12          (iii) masturbation;

13          (iv) sadistic or masochistic abuse; or

14

15  125; 183:1-5 ("Government's Exhibit 2, it appears in the neck area of the female, there appears to be
16  a separation.  The color is a little different.  And some of the morphed images I create on my own, I
17  know it's difficult to maintain the color.  And also there's some sort of jagged – there's some jagged
    lines that don't appear to be continuous there in that area, and the shadows to the right side of her head
18  make it seem to me like this image is morphed")).  The expert stated that he saw no evidence that the
    images of child pornography had morphed or been "photo shopped." He did not identify which images
19  he considered child pornography, however.  (*Id.* at 18:6-9 ("Q. Calling your attention to the images of
20  child pornography in this case, did you see any evidence that those images had been morphed or photo
    shopped? A. I saw no evidence of that")).  The court notes from its own examination that many exhibits
21  from the URLs "www.fakestarstv.net," "www.wowceleb.com," "celebrity-porno.net," and
    "pf.poiv.com" appear to contain images of the head of a celebrity (whose name appears in the title) on
22  the nude body of another woman.  (Exhs. 2, 10, 11, 12, 13, 14, 15, 16, 17, 23, 24, 33, 52, 57, 63, 69).
    Because this creates doubt as to whether the images displayed on these pages depict actual as opposed
23  to simulated minors, the court does not rely on them in reaching its verdict.

24          [182]Exh. 106 (Track Marked 108K) ("<u>Benitez</u>: Many of these girls I'm looking at they're, you
25  know, from, anywhere from two to six.  <u>Welton</u>: Mm-hmm.  <u>Benitez</u>: So that, that's why  I'm asking
    that.  You know, there's some teens, but, you know that, those are easier sites to find.  But you know,
26  what, why the two, three, four year olds.  <u>Welton</u>: I don't know, actually, I try to figure that out myself,
    you know, and stuff.  And I just said, I'm just not gonna look at it anymore").  At no time during the
27  interview did defendant deny that the images depicted actual minors.  (RT Day 1 at 79:20-23.)

28          [183]Trial Stipulations, Docket No. 72 (Aug. 4, 2009).

1    (v) lascivious exhibition of the genitals or pubic area of any person.[184]

2    18 U.S.C. § 2256(2)(A).

3    8.    In evaluating whether an image involves a lascivious exhibition of genitals or pubic area under

4    § 2256(a)(A)(v), courts in the Ninth Circuit frequently cite the six factor test first articulated in

5    *United States v. Dost*, 636 F.Supp. 828 (S.D. Cal. 1986), aff'd sub nom. *United States v.*

6    *Wiegand*, 812 F.2d 1239 (9th Cir. 1987).  The factors are:

7    "1) whether the focal point of the visual depiction is on the child's genitalia

8    or pubic area;

9    2) whether the setting of the visual depiction is sexually suggestive, i.e., in

10   a place or pose generally associated with sexual activity;

11   3) whether the child is depicted in an unnatural pose, or in inappropriate

12   attire, considering the age of the child;

13   4) whether the child is fully or partially clothed, or nude;

14   5) whether the visual depiction suggests sexual coyness or a willingness to

15   engage in sexual activity;

16   6) whether the visual depiction is intended or designed to elicit a sexual

17   response in the viewer."  *Id.* at 832.

18   The Ninth Circuit has held that the *Dost* factors are a "starting point" in determining whether a

19   particular image is likely "so presented by the photographer as to arouse or satisfy the sexual

20   cravings of the voyeur."  *United States v. Hill*, 459 F.3d 966, 971 (9th Cir. 2006) (quoting

21   *Wiegand*, 812 F.2d at 1244.  The factors are "neither exclusive nor conclusive"; rather, a

22   finding of lasciviousness must based on "'the overall content of the visual depiction.'" *Hill*, 459

23   F.3d at 971 (quoting *Dost*, 636 F.Supp. at 832).  The trier of fact need not "rely on the *Dost*

24   factors with precision to reach a mathematical result, or . . . weigh or count them, or . . . rely on

25   them exclusively."  *United States v. Overton*, 573 F.3d 679, 686-87 (9th Cir. 2009) (quoting

26

27   [184]The court follows the indictment, which uses the statutory definition that applies to a visual
     depiction whose "production . . . involve[d] the use of a minor engaging in sexually explicit conduct."
28   18 U.S.C. § 2256(2)(A), (8)(A).

*United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008)).

9.  The following exhibits show actual minors engaged in sexually explicit conduct:

a.  Exhibit 65 depicts a completely nude child in a coy pose; the child's pubic area is a focal point of the image, which is clearly intended to elicit a sexual response;

b.  Exhibit 66, which contains five photographs, depicts both genital-genital and oral-genital sexual intercourse;

c.  Exhibit 67 depicts a nude child in an unnatural pose with an arched back that suggests sexual coyness.  The child's pubic area is a focal point of the image, which is clearly designed to elicit a sexual response;

d.  Exhibit 68 depicts a nude child, who is reclining in a manner typically associated with sexual activity, in a bedroom – a place associated with sexual activity.  The image appears designed to elicit a sexual response;

e.  Exhibit 71, which contains eight photographs, depicts a child engaged in genital-genital and oral-genital sexual intercourse;

f.  Exhibit 72 depicts a child wearing only an unbuttoned men's shirt and a tie – inappropriate attire given the age of the child.  The child's nude pubic area is a focal point of the image, and the child is positioned in a suggestive pose designed to elicit a sexual response;

g.  Exhibit 87, a series of images, depicts a child (1) engaged in oral-genital sexual intercourse; (2) engaged in masturbation of an adult man; (3) posed so that an adult's hand is inclined toward the child's pubic area, making that area the focal point of the image; and (4) in a bedroom, nude, with legs spread in a fashion suggesting a willingness to engage in sexual activity and designed to elicit a sexual response;

h.  Exhibit 88A, depicts a child engaged in oral-genital sexual intercourse;

i.  Exhibit 88D depicts a child engaged in genital-genital sexual intercourse;

j.  Exhibit 88E depicts a child engaged in genital-genital sexual intercourse;

k.  Exhibit 89A-F depict a child or children engaged in oral-genital sexual intercourse;

l.  Exhibit 89G depicts a nude child in a coy, suggestive pose.  The child's pubic area is a

31

focal point of the image, which is clearly designed to elicit a sexual response;

m.     Exhibit 89H depicts a child engaged in genital-genital sexual intercourse;

n.     Exhibit 89I depicts a child wearing only stockings – inappropriate attire considering the age of the child. The child's legs are spread in such a way that the pubic area is the focal point of the image. The manner in which the child is posed suggests a willingness to engage in sexual activity, and is clearly intended to elicit a sexual response;

o.     Exhibit 90 consists of two images. In the first, a child's public area is the focal point of the image. The child is nude, and the image is designed to elicit a sexual response. In the second, the child is engaged in masturbation of an adult male;

p.     Exhibits 91A, B, and D show a child engaged in genital-genital sexual intercourse; and

q.     Exhibit 91C depicts a child facing away from the camera, bent over with legs spread; this makes the child's public area the focal point of the image. Additionally, the child is nude, and the child's position suggests a willingness to engage in sexual activity. The image is designed to elicit a sexual response.

### d.     Knowing Possession

10.     In addition, to proving that defendant possessed sexually explicit images of actual minors, the government must prove beyond a reasonable doubt that defendant's possession of the images was knowing, i.e., that he knew the sexually explicit nature of the images and the age of those depicted. *X-Citement Video*, 513 U.S. at 78 (under § 2252 "the term 'knowingly' . . . extends both to the sexually explicit nature of the material and to the age of the performers"); *Romm*, 455 F.3d at 1003 & n. 16 (applying *X-Citement Video* to §2252A).[185] The government must therefore prove beyond a reasonable doubt not only that defendant knew he was in possession of the images, but also that he knew that they depicted child pornography. See Model Criminal Jury

---

[185]The Supreme Court has construed criminal statutes as including a scienter requirement, even when such a requirement is not explicitly set forth in the statutory language. This "presumption" in favor of scienter reads into a criminal statute only that "*mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct'" so that the statute does "not . . . apply to a person who engages in innocent, if aberrant, activity." *Carter v. United States*, 530 U.S. 255, 267, 269 (2000) (quoting *X-Citement Video*, 513 U.S. at 72).

1    Instruction 8.154 (2003) (to find guilt under § 2252(a)(4)(B), the jury must determine that the
2    government has proved beyond a reasonable doubt that defendant knew the visual depiction(s)
3    showed minor(s) engaged in sexually explicit conduct and that he knew the production of the
4    images involved the use of a minor in sexually explicit conduct); *Romm*, 455 F.3d at 1005
5    (noting that § 2252 and § 2252A are materially the same and applying Model Instruction 8.154
6    to possession under § 2252A).

7  11.   The court concludes that the government met its burden in this regard.  The evidence showed
8        that defendant knew the images identified in paragraph 9 depicted actual minors; he also knew
9        that the minors in the images were engaged in sexually explicit conduct.  First, defendant's
10       statements during the September 18 interview compel such a finding.  When Benitez asked why
11       defendant looked at two to four year old girls, he did not deny that the images depicted girls of
12       this age, but merely said that he had been trying "to figure that out."[186]  More fundamentally,
13       defendant could not have possessed the images without knowing that they depicted minor
14       children engaged in sexually explicit conduct.  This is not analogous to a case in which an
15       individual has a large cache of images on a computer hard drive and is not aware that some of
16       the images depict minors engaged in sexually explicit activity.  See *United States v. Kuchinski*,
17       469 F.3d 853, 861-63 (9th Cir. 2006) (reversing a conviction for knowing receipt of child
18       pornography based on images stored in the cache files of defendant's computer where defendant
19       lacked knowledge of or access to the files).

20 12.   When asked by Benitez whether he remembered the stack of pictures, defendant said he did, and
21       commented that they were "old stuff."  Clearly, defendant recognized the images on sight.[187]

22    _____

23    [186]Exh. 106 (Track Marked 108K) ("Benitez: Many of these girls I'm looking at they're, you
      know, from, anywhere from two to six.  Welton: Mm-hmm.  Benitez: So that, that's why  I'm asking
24    that.  You know, there's some teens, but, you know that, those are easier sites to find.  But you know,
      what, why the two, three, four year olds.  Welton: I don't know, actually, I try to figure that out myself,
25    you know, and stuff.  And I just said, I'm just not gonna look at it anymore").

26    [187]Exh. 106 (Track Marked 108C) ("Benitez:  Do you . . . I–I'm just going to let you look at this.
      This, this is basically what was found over there, okay?  And these are copies, these aren't the originals.
27    Um, do you remember these?  Welton: I do.  That's old stuff.  Benitez: Well it looks like it was printed
28    in '05 and '06, so it would have been a couple years ago.  Welton: Hm . . . not that old"); RT Day 1 at

The evidence thus does not support an inference that defendant received the stack of images but never looked through them. Indeed, defendant acknowledged that he added to the stack after he first placed the images in the church nursery.[188] He also provided detailed information as to how he found the images by clicking through preview links.[189] See *Romm*, 455 F.3d at 1002 ("[D]ownloading child pornography constitutes both the act of possession and receipt").

13. Additionally, the fact that the exhibits bear dates presented in different formats, as well as other meta-information in different formats, gives rise to an inference that different browsers were used to download the images.[190] Similarly, the fact that the documents bear different date and time metadata gives rise to an inference that they were printed at different times. Defendant elicited testimony from Christopherson, the government's expert, that a user printing multiple pages at one time would have had to manually adjust his computer's clock while printing to have different dates and/or times displayed.[191] It is highly unlikely that defendant physically altered the clock on the computer he was using multiple times while printing images on a single occasion. Thus, although the court does not consider the date and time metadata for the truth that the printouts were made at those exact dates and times, it does consider the metadata circumstantial evidence that the printouts were made at different times. See, e.g., *United States*

_____

75:18-22 ("Q. [ ] When Agent Benitez asked the defendant do you remember these, referring to Government's Exhibit 125, what did the defendant say? A. He initially started talking about how old they were. And then he later said that they weren't that old").

[188]Exh. 106 (Track Marked 108E) ("Trapp: So you stashed them there so you could use them when you came back? Welton: Once or twice, yeah, but I only went there a couple times"); Exh. 106 (Track Marked 108I) ("Benitez: Did you, did you keep adding to it, or did you have a stash in, in . . . Welton: I might've, um, put some with it once or twice or somethin'. I'm not sure").

[189]Exh. 106 (Track Marked 108H) ("Benitez: Okay. Well, how did you, how did you find, um . . . Welton: There's a link thing, when you go on the Internet. There's a link banner page to something. Benitez: Right. Welton: And if you keep going to these links, it links to others and you just keep going to this stuff and it goes, automatically goes to a thing and you can say preview and you preview it and then the previews come up. Benitez: Okay").

[190]RT Day 1 at 134:23-25; 125:1-2.

[191]RT Day 1 at 178:2-9.

34

1    *v. Mungia*, 273 Fed. Appx. 517, 521 (6th Cir. Apr. 16, 2008) (Unpub. Disp.) ("We have

2    previously held that '[p]ersonal telephone directories and notebooks are admissible as "drug

3    records" for non-hearsay purposes of showing that a conspiracy existed and that a defendant was

4    a member of the conspiracy.'  See *[United States v.] Gaitan-Acevedo*, 148 F.3d [577,] 591 [6th

5    Cir. 1998]; see also *United States v. Chavez*, 229 F.3d 946, 953-54 (10th Cir. 2000) (defendant

6    argued that phone number on scrap of paper was hearsay because it was offered to show that the

7    person who answered the call was a co-conspirator, but the court held that it was properly

8    admitted for the 'non-hearsay purpose of linking the coconspirators,' explaining that '[n]o,

9    "truth" can be gleaned from a mere phone number and thus, the number could not have been

10   submitted for the truth of the matter asserted.'   The defendant presents no rationale for

11   distinguishing the cell-phone contact lists and logs from paper-based personal telephone

12   directories or notes introduced for the purpose of establishing a conspiracy, and we see none.

13    We conclude, therefore, that the evidence was properly admissible for the non-hearsay purpose

14   of linking Munguia to his co-conspirators"); *United States v. Tin Yat Chin*, 371 F.3d 31, 39 (2d

15   Cir. 2004) ("When a category of writings does not trigger the traditional reliability concerns of

16   hearsay – defects in memory, perception, narration, or sincerity – we have sanctioned their

17   admissibility as 'non-hearsay.'  See *United States v. Saint Prix*, 672 F.2d 1077, 1083-84 (2d Cir.

18   1982) (affirming admissibility of sales receipts for vans 'to prove that someone using

19   [defendant's] name bought the vans, from which the jury could infer that the person using

20   [defendant's] name was [defendant] himself"); *United States v. Lieberman*, 637 F.2d 95, 101 (2d

21   Cir. 1980) (finding a hotel registration card signed by guests admissible 'to show that someone

22   calling himself Robert D'Ambra registered in the hotel laying a foundation for further evidence

23   that from his room a call was made to [defendant's] unpublished telephone number' (internal

24   citation omitted)); *United States v. Mejias*, 552 F.2d 435, 446 (2d Cir. 1977) (affirming

25   admissibility of motel receipt, luggage store invoice, and travel agency business card, all of

26   which were in the defendant's possession when he was arrested, as circumstantial evidence of

27   his presence at a motel")).  The fact that different computers were used to print the images, and

28   that the printing was done at different times also supports a finding of knowing possession.  See

35

1  *United States v. Miller*, 527 F.3d 54, 69 (3d Cir. 2008) (holding that the number of occasions on

2  which photographs were copied onto a Zip disc supported a finding of knowing possession).

3  14.    Moreover, many of the website addresses from which the images were copied contain language

4  that identifies the images as child pornography.[192] See *United States v. Payne*, 341 F.3d 393, 403

5  (5th Cir. 2003) (holding that the "number of images in [defendant's] possession, taken together

6  with the suggestive titles of the photographs" established knowing receipt). Finally, the fact that

7  Welton's fingerprints were found on the front or back of nine pages scattered throughout the

8  stack compels the conclusion that he went through the images in the stack and was able to

9  observe the nature of the images they contained.

10  15.    For all of these reasons, the court finds that the government proved beyond a reasonable doubt

11  that defendant possessed the eleven exhibits[193] that visually depict actual minors engaged in

12  sexually explicit conduct.[194]  These eleven exhibits contain 38 visual depictions of actual minors

13  engaged in sexually explicit conduct.

14

15  [192]Some of the website addresses make it obvious that the images were of sexually explicit
conduct.  See, e.g., Exh. 3 ("MySexyKittens.com"); Exhs. 4, 9, 20, 37, 38, 39, 40, 95
16  ("incestartwork.com"); Exhs. 5, 6 ("www.xxxzoosex.com"); Exh. 21 ("fetish.net"); Exh. 25
("teencreamers"); Exh. 31 ("first-sex.biz"); Exh. 36 ("just-a-porn.com"); Exhs. 41, 46 ("erotic-
17  place.org"); Exh. 48 ("monstersofcock.com"); Exh. 49 ("hairygirlspornsite.com"); Exh. 53
("Nude_Celebs"); Exh. 58 ("www.sex4it.com"); Exhs. 62, 70 ("WANNA MORE LITTLE GIRLS?");
18  Exh. 65 ("porn"); Exh. 81 ("CHILD LOLITAS PORNO PAYSITE"); Exh. 86 ("Tiny Babies Sucking
Big Cocks"); Exh. 87 ("Hot cute CHILD Loli[tas] are being fucked Hard"); Exh. 89 ("Are you ready??
19  For Amazing Child Porno!!!"); Exh. 90 ("Our KIDS Like to show Their nude Bodies for you").  Others
contain language that make it obvious or at least suggest that the images were of minors.  See, e.g.,
20  Exhs. 18, 19, 30, 77 ("petiteteenager.com"); Exh. 25 ("teencreamers"); Exh. 44 ("teensflowers.biz");
Exhs. 62, 70 ("WANNA MORE LITTLE GIRLS?"); Exh. 67 ("My little Sisters"; "lolitas site"; "baby-
21  pics.exstazy.biz"; "My Little Sister Hot lolita photos 13yo rompl baby nymphets lolita b..."); Exhs. 68,
72 ("My Lolita"); Exh. 74 ("teenage.girlstested.com"); Exh. 80 ("School Bus Chicks"); Exhs. 81, 86,
22  87, 88, 89, 90, 91 ("CHILD LOLITAS PORNO PAYSITE"); Exh. 85 ("www.teenspornus.net"); Exh.
86 ("Tiny Babies Sucking Big Cocks"); Exh. 87 ("Hot cute CHILD Loli[tas] are being fucked Hard");
23  Exh. 89 ("Are you ready?? For Amazing Child Porno!!!"); Exh. 90 ("Our KIDS Like to show Their
nude Bodies for you").
24

25

26  [193]Exhs. 65, 66, 67, 68, 71, 72, 87, 88, 89, 90, 91.

27  [194]The court's conclusion is supported further by the fact that one printout bears defendant's
fingerprint (Exhibit 66), eight bear Breatore's fingerprints (Exhibits 66, 71, 72, 87, 88, 89, 90, 91), and
28  ten bear Bobkowitcz's fingerprints (Exhibits 66, 67, 68, 71, 72, 87, 88, 89, 90, 91).

### 2. The Government Has Proved That Some of the Images Were Transported in Interstate Commerce

16.    The government also met its burden of proving beyond a reasonable doubt that images of child pornography knowingly possessed by defendant had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252(a)(5)(B). In this regard, the court has jurisdiction if even one image traveled in interstate commerce. *United States v. Lacy*, 119 F.3d 742, 748-49 (9th Cir. 1997) ("[J]urisdiction exists if the 'pictures or the materials used to produce them' traveled in interstate commerce").

17.    The government and defendant stipulated that three of the images were produced out of state; their presence in the state of California proves that they were transported in interstate commerce. See *United States v. Gouin*, No. CR950433RSL, 2008 WL 1886158, *2 (W.D. Wash. Apr. 24, 2008) (finding, in a case where the government presented evidence that images recorded the abuse of real children in other states, that the images must have traveled to defendant's state to become part of his collection of pornography), aff'd, *United States v. Gouin*, 323 Fed. Appx. 573 (9th Cir. Apr. 22, 2009) (Unpub. Disp.). So too, it is clear that the image Christopherson saw previously on a computer in Louisiana traveled to California in interstate commerce.[195] Christopherson also presented credible evidence that many of the images, namely, those bearing the 213 IP address, had been hosted on a website in Europe. *Gouin*, 2009 WL 1069297 at *1 ("The government presented testimony that . . . some of the images came from websites registered in foreign countries").

18.    Based on the authority cited earlier, the court additionally finds that "Internet transmission of the visual depictions at issue meets the statutory definition of 'transported in interstate commerce.'" *Gouin*, 2008 WL 1886158 at *2. "Regardless of the route taken, . . . we conclude that because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to the user, the data has traveled in interstate commerce. Here, once the images of child pornography left

---

[195]RT Day 1 at 150:8-21.

1  the website server and entered the complex global data transmission system that is the Internet,

2  the images were being transmitted in interstate commerce." *MacEwan*, 445 F.3d at 244.

3  19.  Defendant's post-trial brief relied heavily on *United States v. Schaefer*, 501 F.3d 1197 (10th Cir.

4  2007), for the proposition that mere use of the Internet does not demonstrate that the images

5  were transported in interstate commerce.[196]  This reliance is misplaced.  First, the Tenth Circuit

6  appears to be the only circuit that has so held.  By contrast, the First, Third, Fourth, Fifth, and

7  Sixth Circuits, as well as the District of Minnesota, the Eastern District of New York, and the

8  Western District of Washington all have held that the transmission of images via the Internet is

9  sufficient to establish that they traveled in interstate commerce.  See *Schaefer*, 501 F.3d at 1202

10  (recognizing the contrary rulings).  Indeed, based on the court's research, it appears no other

11  court has followed *Schaefer*'s reasoning.  *Schaefer* was a unique case in which the government

12  made no attempt to prove that images transmitted via the Internet had traveled in interstate

13  commerce.  Consequently, even the Tenth Circuit has limited the applicability of the holding.

14  See *United States v. Vigil*, 523 F.3d 1258, 1266 (10th Cir. 2008) ("*Schaefer* is limited to its facts

15  – the government's say so was not enough to prove that the Internet operates in interstate

16  commerce, no matter how obvious").

17  20.  In this case, the government's expert, Christopherson, offered undisputed testimony that it was

18  impossible for an individual who is surfing the Internet to communicate only with computers in

19  a certain geographical region.[197]  See *Gouin*, 2008 WL 1886158 at *3 ("Had the *Schaefer* court

20  been presented with the breadth and depth of the evidence of interstate transportation in this

21  case, the Tenth Circuit would have had no difficulty in affirming Schaefer's conviction").

22

23  _____

[196]Def.'s Post-Trial Brief at 15-17.

24

25  [197]RT Day 1 at 191:4-16 ("Q.  When an individual goes on the Internet and they are searching
for something, is it possible for that individual to communicate only with computers in a certain region.

26  A.  I don't believe that's possible.  Q.  Why?  A.  Based on the structure of the Internet, the fact that it's
a packet switched network, your route between web browser and a web server, for instance, could vary

27  between instances.  And sometimes even within the same communication.  You may send multiple what
are called packet orbits of data to the server, and the server may send it to you, and it's almost within

28  certainty that it will take a different route").

21.    In sum, the court concludes that the evidence the government presented in this case is sufficient to support a finding that images transmitted via the Internet traveled in interstate commerce. The question thus becomes whether the government proved beyond a reasonable doubt that the images of child pornography defendant possessed were transmitted over the Internet. The government's expert, Christopherson, testified that metadata on the printouts constituted circumstantial evidence that the images were printed from Internet websites.

22.    The government can prove the interstate commerce element of the crime through circumstantial rather than direct evidence. *Runyan*, 290 F.3d at 242 ("[C]ircumstantial evidence linking a particular image to the Internet (such as the presence of a website address embedded on the image) can be sufficient evidence of interstate transportation to support a conviction under § 2252A"). In *Runyan*, the Fifth Circuit held that the government must present "some evidence" linking specific images to the Internet; merely proving that defendant had Internet access and sometimes accessed pornography websites or newsgroups is not sufficient. *Id.* The *Runyan* court held that the government had presented sufficient evidence because one image on defendant's hard drive had a website address embedded on it and contained language advertising child pornography available at the website. In addition, the government presented expert testimony that the image had come from the Internet. *Id.* In *United States v. Henriques*, 234 F.3d 263 (5th Cir. 2000), the Fifth Circuit addressed a case in which some images in a group contained embedded web addresses, but the ones on which defendant's conviction rested did not. The court held that the evidence did not support conviction "since the government did not attempt to prove the nexus to the Internet for the three images [of child pornography on which the conviction was based] independently." *Id.* at 267-68.

23.    The First Circuit has adopted the holding in *Henriques*. In *United States v. Hilton*, 257 F.3d 50 (1st Cir. 2000), the court held that physical evidence and expert testimony was sufficient to prove beyond a reasonable doubt that images had been transported over the Internet. *Id.* at 54-55. The files in question were located on a "MIRC" subdirectory, which contained software used in connection with Internet chat rooms. Additionally, the time and date features of each of the image files were "indicative" of files that had been transmitted via modems. *Id.* Similarly

39

1   in *Miller*, one factor on which the Third Circuit relied in concluding that the evidence supported

2   an inference that images had traveled via the Internet was the fact that they "advertised the

3   names of websites suggesting that they were initially downloaded from the internet." *Miller*,

4   527 F.3d at 66 (citing *Henriques*, 234 F.3d at 267).

5   24.   Based on this precedent, the credible testimony of the government's expert, and the court's

6   independent review of the exhibits, the court finds beyond a reasonable doubt that Exhibits 65,

7   66, 67, 68, 71, 72, 87, 88, 89, 90, and 91, each of which depicts an actual minor engaged in

8   sexually explicit conduct, were retrieved using the Internet.[198]   The court relies not only on

9   Christopherson's testimony, but on circumstantial evidence found on the exhibits themselves,

10   including the presence of a URL in the header or footer, or embedded in the image itself,[199]

11   *Runyan*, 290 F.3d at 242, a time and date stamp, *Hilton*, 257 F.3d at 54-55, and the presence in

12   the headers of the names of the websites, *Miller*, 527 at 66.  Furthermore, defendant detailed in

13   the September 18, 2008 interview how he sought out images on the Internet,[200] and stated that

14   he had used a church computer to find the images.[201]

### 3.   Conclusion as to Possession Count

16   25.   For the reasons stated, the court finds beyond a reasonable doubt (1) that defendant possessed

17   all of Exhibits 1-95; (2) that fifteen of the exhibits visually depict actual minors; (3) that of those

---

[198]Although the court cannot find beyond a reasonable doubt that they depict an actual minor engaged in sexually explicit conduct, it concludes that the government proved beyond a reasonable doubt that Exhibits 1-44, 46-60, 62-63, 69-70, 74-80, 82, and 84-87, and 92-95 were also retrieved using the Internet.

[199]Each of the exhibits contains a URL.  In addition, Exhibits 65, 67, and 72 contain a URL embedded directly onto the photograph.

[200]Exh. 106 (Track Marked 108H) ("Benitez: Okay.  Well, how did you, how did you find, um . . . Welton: There's a link thing, when you go on the Internet.  There's a link banner page to something. Benitez: Right.  Welton: And if you keep going to these links, it links to others and you just keep going to this stuff and it goes, automatically goes to a thing and you can say preview and you preview it and then the previews come up.  Benitez: Okay").

[201]Exh. 106 (Track Marked 108N) ("Welton: It had to have been a church somewhere, but I don't know exactly which one, you know, where I was at"); *Id.* ("Benitez: I think what you're telling me is that you printed that from a church computer somewhere.  Welton: Yeah").

fifteen exhibits, eleven display actual minors engaged in sexually explicit conduct; (4) that defendant possessed these eleven exhibits knowing that they depicted an actual minor engaging in sexually explicit conduct; and (5) that each of the eleven exhibits traveled in interstate commerce.  The eleven exhibits in question are Exhibits 65, 66, 67, 68, 71, 72, 87, 88, 89, 90, and 91.

### 4.    Defendant's Knowing Possession of Child Pornography Occurred Within the Applicable Statute of Limitations

26.   The government must also prove that the conduct for which it seeks to convict defendant occurred within the applicable statute of limitations.  At the time of the conduct alleged in the indictment, possession of child pornography was governed by the general five-year statute of limitations set forth in 18 U.S.C. § 3282 for non-capital offenses.  On July 27, 2006, after the conduct alleged in the indictment occurred, Congress promulgated 18 U.S.C. § 3299,[202] which eliminated the statute of limitations for possession of child pornography. Pub. L. 109-248, Title II, § 211(a), July 27, 2006, 120 Stat. 616.  "[P]rosecution under a statute that purports to revive a limitations period after it has run would fall afoul of the Ex Post Facto Clause." *United States v. Bischel*, 61 F.3d 1429, 1434 (9th Cir 1995).  Congress can extend the statute of limitations after an offense is committed, however, without violating the Ex Post Facto Clause, so long as it enacts the extension before the original limitations period has expired.  *Clements v. United States*, 266 F.2d 397, 399 (9th Cir. 1959).  Defendant argues that to take advantage of the extended statute of limitations, the underlying conduct must have occurred on or after July 28, 2001.[203]  The court agrees.

27.   The government and defendant appear to agree that the government has the burden of proving

---

[202]"Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense under section 1201 involving a minor victim, and for any felony under chapter 109A, 110 (except for section 2257 and 2257A), or 117, or section 1591."  18 U.S.C. § 3299.

[203]Def.'s Post-Trial Brief at 11.

that the underlying conduct occurred within the limitations period.[204] *Az Din v. United States*, 232 F.2d 283, 287 (9th Cir. 1956). The government asserts that its burden of proof on this point is by a preponderance of the evidence.[205] Defendant does not dispute this.

28. Based on a survey of the relevant case law, the court concludes that the government must show that the conduct occurred within the applicable limitations period by a preponderance of the evidence. In *United States v. Gonsalves*, 675 F.2d 1050 (9th Cir. 1982), the Ninth Circuit considered the burden of proof under 18 U.S.C. § 3290, which provides that there is no statute of limitations for crimes committed by persons fleeing from justice. To take advantage of this statute, the government must prove that the accused concealed himself intending to avoid arrest or prosecution. *Id.* at 1052. The court held that the government had to prove the conduct tolling the otherwise applicable statute of limitations by a preponderance of the evidence. It noted that "[a] major reason for adhering to the 'reasonable doubt' standard is absent . . . when the evidence offered to prove a defense is unrelated to the issue of guilt." *Id.* at 1054.

29. The Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), does not necessitate reexamination of the Ninth Circuit's holding in *Gonsalves*. In *Apprendi*, the Court held that the U.S. Constitution requires that the government prove beyond a reasonable doubt any fact that increases the maximum possible punishment. *Id.* at 476. The Ninth Circuit has considered *Apprendi*'s effect on a state statute of limitations, and concluded that the state need not prove that the conduct alleged occurred within the limitations period beyond a reasonable doubt. *Renderos v. Ryan*, 469 F.3d 788, 796 (9th Cir. 2006). See also *Renderos v. Ryan*, No. C 04-05250, 2005 WL 1629816, *8 (N.D. Cal. July 7, 2005) ("The [California Supreme Court] also pointed out that no United States Supreme Court case has ever extended to statutes of limitations the rule of *Apprendi*").

30. Whether the burden is by a preponderance of the evidence or beyond a reasonable doubt,

---

[204]Def.'s Post-Trial Brief at 24; Government's Opposition to Defendant's Motion for Acquittal Pursuant to Federal Rule of Criminal Procedure 29 ("Gov't. Post-Trial Brief"), Docket No. 80 (Aug. 10, 2009) at 12-13 n. 7.

[205]Gov't. Post-Trial Brief at 12-13 n.7.

however, the court finds that the government met its burden of showing that defendant's knowing possession of child pornography occurred within the statute of limitations. Defendant knowingly possessed the stack of images from the time he left it in the nursery until the time it was discovered and removed. *United States v. Krstic*, 558 F.3d 1010, 1019 (9th Cir. 2009) ("[P]ossessory offenses have long been described as 'continuing offenses' that are not complete upon receipt of the prohibited item. Rather, the statute of limitations does not begin to run until the possessor parts with the item"). Because the court finds, by both a preponderance of the evidence and beyond a reasonable doubt that defendant's constructive possession continued until discovery of the photographs in August 2007, the government has met its burden of proving that the conduct occurred within the limitations period as extended by 18 U.S.C. § 3299, that is, that defendant possessed the images on or after July 28, 2001.[206]

### B.   Count One (18 U.S.C. § 2252A(a)(2)): Knowing Receipt of Child Pornography

31.   To convict a defendant of receipt of child pornography under 18 U.S.C. § 2252A(a)(2), the government must prove beyond a reasonable doubt: (1) that defendant knowingly received one or more visual depictions of child pornography using any means or facility; and (2) that the images of child pornography defendant knowingly possessed had been mailed, shipped or transported in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(2).

32.   To establish that a defendant knowingly received child pornography, the government must prove beyond a reasonable doubt that defendant a "knowing acceptance or taking of possession" of child pornography. *Romm*, 455 F.3d at 1001; *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) ("An individual who downloads material takes possession or accepts delivery of the visual image; he has therefore certainly received it"). The offenses of possession and

---

[206]The government and defendant dispute whether, in asking the government's expert his opinion regarding the reliability of the dates and times printed on the exhibits, defense counsel opened the door to admission of the date and time evidence for the truth of the matter asserted. (RT Day 2 at 36:8-12.) In concluding that the government proved beyond a reasonable doubt that defendant possessed child pornography within the statute of limitations, the court does not rely on Chirstopherson's testimony regarding the reliability of the date and time stamps.

receipt are related, but are not identical. Every element of the crime of knowing possession is subsumed within the crime of knowing receipt. *United States v. Davenport*, 519 F.3d 940, 947 (9th Cir. 2008). The added element of the receipt charge is that the government must prove the requisite *mens rea* at the moment defendant took possession of the child pornography. See *United States v. Kamen*, 491 F.Supp.2d 142, 150 (D. Mass. 2007) ("Receipt equals possession plus the additional element of acceptance. . ."). One can knowingly possess child pornography without knowingly receiving it, as for instance if a person's computer is infected with a virus or spyware that surreptitiously places images of child pornography on one's computer and one later comes to know that the child pornography is there. *Miller*, 527 F.3d at 62-63. When the computer owner discovers the images, he will knowingly possess them, even though he did not knowingly receive them. See *United States v. Larson*, 558 F.Supp.2d 1103, 1107 (D. Mont. 2008) ("A person acts knowingly if he is aware of the act and does not act through ignorance, mistake or accident").

33. This different mental state – i.e., defendant's state of mind at the time he came into possession of the child pornography – is the only additional element that the government must establish to prove knowing receipt of child pornography in addition to knowing possession of child pornography.

**1.    The Government Did Not Prove Beyond a Reasonable Doubt that Defendant Knowingly Received Child Pornography**

34. The government has the burden of proving beyond a reasonable doubt that when defendant took possession of the child pornography, he did so knowing that the images were visual depictions of actual minors engaged in sexually explicit conduct. In other words, the government has the burden of showing that defendant took possession of the images in the absence of ignorance, mistake, or accident. 12 U.S.C. § 2252A(a)(2); *Larson*, 558 F.Supp.2d at 1107.

35. The government's ability to prove this fact is complicated in this base because it cannot prove when defendant acquired the images. The primary evidence on which the government relies to prove receipt is defendant's September 18, 2008 interview. During the interview, Welton stated: "It had to have been a church somewhere, but I don't know exactly which one, you know, where

44

I was at."[207]  The recording is cut immediately before and immediately after this statement.  The government asserts that defendant's reference to "it" concerns the printing of child pornography. In another excerpt, Benitez states: "I think what you're telling me is that you printed that from a church computer somewhere."  Defendant replies: "Yeah."[208]  Here again, the government asserts that the "that" to which Benitez refers is child pornography.  The government, however, has introduced no evidence regarding the statements that preceded or followed this interaction, nor any other evidence that shows that defendant printed the eleven images that the court has found constitute child pornography.  At another point, defendant states:  "It would have to have been from a long time ago from a computer that I went on."  Here too, the government would have the court assume that the activity defendant references is the printing, downloading, or other acquisition of child pornography, as opposed to the printing, downloading or acquisition of the dozens of photographs in the stack of printouts found in the church that do not constitute child pornography.[209]

36.    At another point in the interview, Benitez states that the images must have come from a computer.  Defendant responds: "Where that computer is, I have no idea."  Benitez responds, "It's what?" and defendant states: "Where this computer; where I got the images?"[210]  This statement is susceptible of different interpretations.  Defendant may have meant to acknowledge that he used a computer, but that he did not remember which one.  Alternatively, he may have meant to suggest that he did not use a computer personally but that he received the images from

---

[207] Exh. 106 (Track Marked 108N).

[208] *Id.*

[209] This failure of proof makes the situation analogous to one in which a defendant received a stack of images from another person, some of which depicted child pornography, some of which depicted children in a non-pornographic manner, some of which depicted adult pornography, and some of which depicted neither children nor pornography.  Following receipt, the defendant may have culled from the stack images of child pornography that were later found by law enforcement.  Under these circumstances, the court would not be able to determine whether the defendant knowingly received child pornography unless it could ascertain that at the moment of receipt defendant knew the nature of the images he was receiving.

[210] Exh. 106 (Track Marked 108M).

45

another person who did. At another point during the interview, defendant repeatedly stated that he did not know the source of the images. He said: "I have no idea"; "Probably from. . . No I don't have any idea, I don't know, actually."[211] Whatever interpretation is placed on defendant's statements, they do not themselves identify, and the government adduced no other proof identifying, which images defendant's comments referenced. Thus, once again, the court is unable to find that the specific images among the printouts that constitute child pornography were knowingly received by defendant.

4.  The government's strongest evidence regarding receipt is defendant's description of how he located the pornography. He stated: "There's a link thing, when you go on the Internet. There's a link banner page to something. . . . And if you keep going to these links, it links to others and you just keep going to this stuff and it goes, automatically goes to a thing and you can say preview and you preview it and then the previews come up."[212]

5.  This evidence, however, lacks foundation in the sense that defendant does not specifically state that the images he downloaded were visual depictions of actual minors engaged in sexually explicit conduct. Detective Trapp confirmed that the item to which defendant referred during the interview was a copy of Exhibits 1-95 that had been placed in front of him. That stack contained not only child pornography, but also adult pornography, cartoons, morphed images, and pictures of children that were not pornographic. For defendant's statements during the interview to constitute evidence beyond a reasonable doubt that defendant knowingly received child pornography, the government would have had to prove that the specific subjects of defendant's statements were the images of child pornography in the stack. Trapp could not recall which image(s) were being discussed at the time defendant made these statements.[213] Consequently, it is not outside the realm of possibility that a third person gave defendant a stack

---

[211]Exh. 106 (Track Marked 108G).

[212]Exh. 106 (Track Marked 108H).

[213]RT Day 1 at 79:3-5 ("Q. Do you recall specifically which page of that stack might have been in -- was in front of the defendant?  A. Not specifically").

1  of images that contained adult pornography and/or non-pornographic images of children, as well
2  as child pornography.  From this larger stack, defendant could have culled the images he
3  preferred and stored them in the nursery.  If this were the case, he would knowingly have
4  possessed child pornography, but not knowingly have received it.  Because the government has
5  not rebutted the possibility that defendant obtained the images through accident, mistake, or
6  ignorance, it has not met its burden of proving beyond a reasonable doubt that defendant
7  knowingly received child pornography.

8  6.     Any findings of fact that are deemed to be conclusions of law are incorporated herein as
9         such.

10

11  DATED: November 30, 2009

12                                                    MARGARET M. MORROW
                                                      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28