ANDRÉ BIROTTE JR.
United States Attorney
Central District of California
CHRISTINE C. EWELL (Cal. State Bar No. 159622)
Assistant United States Attorney
Chief, Criminal Division
J. LANA MORTON-OWENS (Cal. State Bar No. 233831)
Assistant United States Attorney
    United States Courthouse, 12th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-4443/3547
    Facsimile:    (213) 894-0141
    Email:    christine.ewell@usdoj.gov
              lana.morton-owens@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

RONALD C. MACHEN JR.
United States Attorney
District of Columbia
JAMES H. DINAN
Assistant United States Attorney
Chief, Criminal Division
GREGORY G. MARSHALL
Assistant United States Attorney
Deputy Chief, Criminal Division
    Judiciary Center Building, Room 5842
    555 4th Street NW
    Washington, DC 20530
    Telephone:    (202) 514-6154
    Email:    james.h.dinan@usdoj.gov

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>RICHARD MICHAEL WELTON,<br><br>            Defendant. | ) CR No. 09-0153-MMM<br>)<br>) GOVERNMENT'S MOTION TO AMEND<br>) AUGUST 1, 2009 ORDER TO STRIKE<br>) CREDIBILITY FINDINGS AGAINST<br>) FBI SPECIAL AGENT STEPHANIE<br>) BENITEZ AND ASSISTANT UNITED<br>) STATES ATTORNEY ANTHONY<br>) SCARPELLI; MEMORANDUM OF POINTS<br>) AND AUTHORITIES; DECLARATIONS<br>) OF STEPHANIE BENITEZ, ANTHONY<br>) SCARPELLI, J. LANA MORTON-<br>) OWENS, JOHN V. GEISE, ANTHONY<br>) SANGLEY, AND KERRY P. SMITH;<br>) EXHIBITS<br>) |

1   The government files this motion to amend the court's August

2   1, 2009 Order to strike the court's adverse credibility findings

3   with respect to Federal Bureau of Investigation ("FBI") Special

4   Agent Stephanie Benitez and Assistant United States Attorney

5   ("AUSA") Anthony Scarpelli.  This motion is based upon the

6   attached memorandum of points and authorities; the attached

7   declarations of Benitez, Scarpelli, AUSA J. Lana Morton-Owens,

8   AUSA John V. Geise, Acting Chief, Organized Crime and Narcotics

9   Section, United States Attorney's Office for the District of

10  Columbia, FBI IT Specialist Anthony Sangley, and FBI Supervisory

11  Senior Resident Agent Kerry P. Smith; the records and files in

12  this case; and such further evidence and argument as may be

13  presented at any hearing on this matter.

14  Dated: July 7, 2010

15

16  Respectfully submitted,

17  ANDRÉ BIROTTE JR.                  RONALD C. MACHEN JR.
    United States Attorney             United States Attorney
18  Central District of California     District of Columbia

19
                                       _____/s/_____
20                                     JAMES H. DINAN
                                       Assistant U.S. Attorney
21  _____/s/_____          Chief, Criminal Division
    CHRISTINE C. EWELL
22  Assistant U.S. Attorney            GREGORY MARSHALL
    Chief, Criminal Division           Assistant U.S. Attorney
23                                     Dep. Chief, Criminal Division

24  _____/s/_____
    J. LANA MORTON OWENS
25  Assistant U.S. Attorney

26      Attorneys for Plaintiff
        UNITED STATES OF AMERICA
27

28                              2

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .  ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . .   6

      A.   Benitez's Questioning of Defendant . . . . . . .   7

      B.   Benitez's Declaration Prior to the
           Suppression Hearing . . . . . . . . . . . . . . .  7

      C.   Scarpelli's July 9 Email . . . . . . . . . . . .   8

      D.   Benitez's Suppression Hearing Testimony . . . . . 12

      E.   Benitez's July 29 Testimony That the Scarpelli
           Email Did Not Affect Her Suppression Hearing
           Testimony . . . . . . . . . . . . . . . . . . . . 14

      F.   The Court's August 1 Credibility Findings
           Regarding Benitez and Scarpelli . . . . . . . . . 17

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 19

      A.   Both Benitez and Scarpelli Understand the
           Seriousness of the Issues Posed by Scarpelli's
           Comment, Recognize That It Should Not Have Been
           Made, and Apologize . . . . . . . . . . . . . . . 19

      B.   A New Material Fact Warrants Removal of the
           Adverse Credibility Findings Against Both Benitez
           and Scarpelli . . . . . . . . . . . . . . . . . . 24

      C.   The Order's Recognition That Benitez May Have Been
           Influenced Only "Subconsciously" Justifies
           Striking the Adverse Credibility Finding Against
           Her . . . . . . . . . . . . . . . . . . . . . . . 29

           1.   Denial of a "subconscious" influence, even if
                incorrect, would not constitute intentional
                false testimony . . . . . . . . . . . . . . . 29

           2.   Benitez reasonably may have believed that her
                suppression hearing testimony was not
                influenced by Scarpelli's July 9 email . . . . 30

                a.   The Limited and Leading Questioning . . . 31

                b.   The Prior Declaration . . . . . . . . . . 33

        c.    <u>The FBI's Training</u> . . . . . . . . . . .  34

        d.    <u>The Provision of Scarpelli's Email
            to the Prosecutor</u> . . . . . . . . . . .  35

IV.  RELIEF REQUESTED . . . . . . . . . . . . . . . . .  36

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . .  37

ATTACHED DECLARATIONS:

    FBI SUPERVISORY SPECIAL AGENT STEPHANIE D. BENITEZ

    ASSISTANT UNITED STATES ATTORNEY ANTHONY SCARPELLI

    ASSISTANT UNITED STATES ATTORNEY J. LANA MORTON-OWENS

    ASSISTANT UNITED STATES ATTORNEY JOHN V. GEISE

    ANTHONY SANGLEY

    FBI SUPERVISORY SENIOR RESIDENT AGENT KERRY P. SMITH

ATTACHED EXHIBITS 1-11

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE

<u>United States v. Casanova</u>,
        642 F.2d 300 (9th Cir. 1981) . . . . . . . . . . . . .  27

<u>United States v. Davis</u>,
        548 F.2d 840 (9th Cir. 1977) . . . . . . . . . . . . .  27

<u>United States v. Lentz</u>,
        383 F.3d 191 (4th Cir. 2004) . . . . . . . . . . . . .  28

<u>United States v. Talao</u>,
        222 F.3d 1133 (9th Cir. 2000)  . . . . . . . . . . . . . 3

<u>United States v. Tucker</u>,
        716 F.2d 576 (9th Cir. 1983) . . . . . . . . . . . . .  26

iii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

On August 1, 2009, this court issued an order denying the motion of defendant Richard Michael Welton ("defendant") to dismiss the indictment, but granting his motion for other remedy. In that order, this court made specific adverse credibility findings against Federal Bureau of Investigation ("FBI") Special Agent ("SA") Stephanie Benitez and Assistant United States Attorney ("AUSA") Anthony Scarpelli.

In advance of a July 13, 2009 hearing on defendant's motion to suppress at which Benitez was to testify, Scarpelli and Benitez exchanged a series of emails, the culmination of which was a July 9, 2009 email in which Scarpelli stated, "DON'T SAY IT WAS TO SOFTEN HIM UP." At the July 29, 2009 hearing on defendant's motion to dismiss, Scarpelli and Benitez testified that this comment was intended and understood as a joke, and Benitez testified that it had not influenced her testimony at the suppression hearing.

This court found that "Scarpelli's testimony at the evidentiary hearing that his admonition to Benitez [concerning 'softening up'] was simply a joke was incredible. So too was his testimony that he thought 'softening up' was akin to gangsters beating someone until they talked. The court finds AUSA Scarpelli's dissembling particularly troubling." Order at 8, n.28 (internal citation omitted). This court also found "not credible Benitez's testimony that Scarpelli's advice did not influence her in any way when she testified at the suppression

hearing." Order at 21. This court reasoned that, even if Benitez attempted to put Scarpelli's email out of her mind, the email "undoubtedly affected Benitez's testimony regarding her state of mind during the pre-Miranda portion of her interview with [defendant,] whether consciously or subconsciously." Id. Accordingly, the court also found not credible "those portions of Benitez's testimony that were influenced by Scarpelli's advice – i.e., those relating to, her motivation for makng certain statements during the pre-Miranda portion of her interview with Welton." Id.

As a result of its findings, this court exercised its supervisory powers to impose two remedies. First, based on its conclusion that "AUSA Scarpelli not only advised Benitez how to present her testimony at the suppression hearing, but also took no responsiblity for his actions, describing the comment as merely a joke," the court referred "this matter to the United States Attorney for the District of Columbia and the Department of Justice's Office of Professional Responsibility, so that they may determine whether any ethical or legal violations were committed by Scarpelli that warrant further discipline." Order at 20-21. Second, based on its findings regarding the influence of Scarpelli's comment on Benitez's testimony, the court struck "so much [of] Benitez's suppression hearing testimony and declaration as concerns her motivations in engaging Welton in general discussion that touched indirectly on his alleged history of prior sexual abuse before administering Miranda warnings,"

found "not credible Benitez's testimony that Scarpelli's advice had no effect whatsoever on the manner in which she testified at the suppression hearing," and ruled that it would "take this finding into account in assessing Benitez's credibility as a trial witness, should she be called to testify." Order at 23-24.

By this motion, the government does not seek to alter the remedies imposed by the court as a means of avoiding prejudice to defendant in the underlying criminal case. In particular, the government is not asking the court to reconsider its decision to strike a portion of Benitez's testimony. And, though the government does seek withdrawal of the adverse credibilty finding against Benitez (for reasons discussed below), the government agrees not to call Benitez as a witness should this case return for retrial for any reason, so defendant would not be harmed by losing the opportunity to employ an adverse credibility finding in cross-examining Benitez at any such retrial.

What the government does request is that the court strike its adverse credibility findings against Scarpelli and Benitez.[1] This request is based on three grounds.

First, Scarpelli and Benitez both wish to assure this court that they understand and acknowledge the seriousness of the

---

[1] Because this motion addresses only the court's credibility findings, it should not be viewed as a motion for reconsideration, as a motion to reconsider the suppression ruling would be. The court's credibility findings imposed a collateral harm on Benitez and Scarpelli, cf. United States v. Talao, 222 F.3d 1133, 1138 (9th Cir. 2000) (formal reprimand of AUSA carries individual consequences rendering it appealable personally by AUSA), and the parties have not previously briefed whether such findings are warranted.

issues raised by the comment in Scarpelli's email.  They

understand that, given the pendency of Benitez's testimony, it

could have been interpreted as a suggestion as to how she should

testify, or perceived as potentially influencing her testimony,

even if not consciously.  Both Scarpelli and Benitez apologize to

the court for the communication that occasioned the court's need

to address the issues raised in a hearing and subsequent order,

and assure the court that they have learned from these events.

Scarpelli Decl. ¶¶ 2, 4; Benitez Decl. ¶¶ 3, 26.  In addition,

Scarpelli self-reported the court's finding to the United States

Attorney's Office for the District of Columbia ("DC-USAO") and to

the Department of Justice's Office of Professional Responsibility

("DOJ-OPR"), and DOJ-OPR is currently reviewing the matter.[2]

Scarpelli Decl. ¶ 3; Geise Decl. ¶ 13.  Similarly, though not

ordered by the court, Benitez is also the subject of a DOJ-OPR

investigation; the FBI's Office of Professional Responsibility

("FBI-OPR") is deferring its own investigation pending the

outcome of the DOJ-OPR investigation.  Smith Decl. ¶ 12.

Second, after issuance of the court's August 1 order, a new

material fact was discovered, namely, proof that Benitez had

voluntarily forwarded Scarpelli's July 9 email to Assistant

United States Attorney J. Lana Morton-Owens that same day.

Benitez had testified to this at the July 29 evidentiary hearing,

---

[2] The DC-USAO will conduct an internal review of the matter
after the DOJ-OPR review is completed.  Once DOJ-OPR has a matter
under review, it has jurisdiction exclusive of the USAO until the
matter has been resolved and discipline has or has not been
recommended.

but, at the time, neither she nor Morton-Owens was able to locate the email Benitez had sent forwarding Scarpelli's email to Morton-Owens, and Morton-Owens did not recall receiving the email.  After the hearing, both the United States Attorney's Office and the FBI, through retrieval searches of emails, were able to recover the email.  By establishing that Benitez's testimony on this point was correct, this new evidence corroborates Benitez's testimony on the subject matter of the July 9 email, which included her testimony that, as a result of her relationship with Scarpelli, including a specific prior incident in which a similar joke had been made, she understood Scarpelli's comment in the July 9 email as a joke.  This, in turn, corroborates Scarpelli's testimony that he intended this comment as a joke.  The government submits that the facts as a whole support the testimony of Benitez and Scarpelli that the commment was intended as a joke, and that the court's finding that Scarpelli's testimony on this point was not credible should be withdrawn.

Third, as to Benitez, the court's adverse credibility finding was based on its conclusion that, "even if she attempted to put it from her mind, Scarpelli's comments undoubtedly affected Benitez's testimony regarding her state of mind during the pre-Miranda portion of her interview with Welton, whether consciously or unconsciously."  Order at 21.  Benitez acknowledges the court's concern that, though she viewed Scarpelli's comments as a joke, his words nevertheless might

unconsciously have influenced her testimony.  The government

submits, however, that there is ample evidence to show Benitez

was not actually influenced by Scarpelli's email, and that an

unconscious influence should not be the basis for finding that

Benitez intentionally testified falsely in denying that

Scarpelli's comments influenced her, as one cannot intentionally

testify falsely about an influence that is only subconscious.  An

adverse credibility finding with respect to Benitez would have a

devastating impact on her career.  The government submits that on

the facts as a whole, neither such a finding nor the resulting

consequences are warranted, and the court's finding that

Benitez's testimony on this point was not credible should be

withdrawn.

     For these reasons, the government asks the court to amend

its August 1 Order to omit the adverse credibility findings

against Benitez and Scarpelli and to state that it is striking

Benitez's testimony based on its potentially having been

influenced by Scarpelli's email, rather than striking it based on

adverse credibility findings.[3]

## II.

### STATEMENT OF FACTS

     Most of the facts relevant to this motion have been set

forth in this court's July 20 order denying defendant's motion to

suppress and August 1 order denying defendant's motion to

---

[3] Defendant's counsel has indicated that defendant takes no
position with respect to the government's request.  Morton-Owens
Decl. ¶ 7.

dismiss.   The facts are summarized below with a focus on those
the government believes support removal of the adverse
credibility findings against Benitez and Scarpelli.

    A.   <u>Benitez's Questioning of Defendant</u>

    On September 18, 2008, after defendant's fingerprints were
discovered on printed pictures of child pornography, Benitez
interviewed him.   The entire interview was audio-recorded.

    B.   <u>Benitez's Declaration Prior to the Suppression Hearing</u>

    In his June 29, 2009 suppression motion, defendant contended
that Benitez used defendant's alleged past sexual abuse to
manipulate defendant's confession.

    On July 6, 2009, the government opposed the motion and
included a declaration from Benitez.   In her declaration, Benitez
recounted the facts leading up to her interview with defendant
and what occurred during the interview.   Benitez 7/6 Declaration
¶¶ 4-17, 21.   In three paragraphs of her declaration, Benitez
characterized her state of mind in making certain statements to
defendant during the interview, generally indicating that she was
being straightforward and truthful in her statements:

        18.   When I raised the possibility of Mr. Welton's
    alleged prior sexual abuse, I was unaware of the
    details, or even if such abuse had occurred.   I had
    read a police report in which Mr. Welton's mother
    states that Mr. Welton may have been sexually abused as
    a child.   I did not raise the issue with Mr. Welton in
    an attempt to confuse him about my purpose in wanting
    to speak with him.   Mr. Welton did not appear
    uncomfortable in speaking about the issue of his
    alleged sexual abuse, freely provided me with details,
    and brought the subject up several times without my
    prompting.

19.   When I stated "I've actually been learning a lot about you, so, Richard.  And this isn't anything that we just kinda stumbled upon" I was referring to Mr. Welton's extensive criminal history, including 18 separate arrests, and the investigation into the images located at the Presbyterian Church.  I wanted Mr. Welton to understand that I was not randomly interviewing sex offenders and that he was actually the target of our investigation.

20.   When I explained to Mr. Welton that I was sorry for the abuse he claimed to have suffered, that was a true statement; I was not using his alleged prior sexual abuse as an interview tactic.  When I said I did not think Mr. Welton had been treated "great" because he had a "title" on him, I was referring to his status as a registered sex offender.  When I asked for specific details related to the alleged abuse, such as a description of the individual, the name or location of the church, I asked those questions because if Mr. Welton had provided me with specific details, I would have investigated the claims and attempted to locate the individuals who abused him as they may still be active abusers.

Id. ¶¶ 18-20.

C.   Scarpelli's July 9 Email

Prior to her filing her declaration, and prior to the filing of defendant's motion, on June 11, 2009, Benitez had emailed Scarpelli, an AUSA in Washington, DC, with whom she had a prior romantic relationship between January and March 2009, about the defense's effort to suppress defendant's confession.[4]  In her email, Benitez said that she had recently learned that

---

[4] On June 4, 2009, Benitez had received a call from Scarpelli regarding a child pornography case in his district and asking for technical advice about what kinds of digital evidence should be requested when reviewing a computer.  Benitez Decl. ¶ 8.  On June 11, 2009, Benitez responded in an email that forwarded two documents providing Scarpelli with the requested information.  Benitez Decl. ¶ 10; Exhibit 1.  This initiated the email string that included the initial discussion of defendant's anticipated motion to suppress, an email string that also included friendly, joking banter.

1  "softening" a defendant before giving him <u>Miranda</u> warnings could

2  result in suppression of the defendant's confession, noted that

3  "[t]he [d]efense attorney is saying I compelled the defendant to

4  confess because I 'softened him' pre-Miranda," and asked

5  Scarpelli to "[g]ive me your thoughts when free."  Benitez Decl.

6  ¶ 10; Exhibit 1.[5]  On June 11, Scarpelli sent Benitez an email

7  promising to look into the <u>Miranda</u> claim and stating that "most

8  judges would frown upon 'softening up' defendants."  <u>Id.</u>  Benitez

9  responded: "One man's softening up is another man's repore [sic]

10  building."  <u>Id.</u>

11     After defendant filed his motion, but still prior to filing

12  her declaration, on July 1, 2009, Benitez sent Scarpelli an email

13  in which she forwarded the defense motion and the transcript of

14  her interview of defendant.  Exhibit 6.  In a separate email sent

15  earlier that same day, Benitez had advised Scarpelli that she

16  would be testifying at the suppression hearing, and that she was

17  shocked by the allegations in the defense's motion.  Benitez

18

19     [5] As noted in the June 11, 2009 email string, the issue had
    come up in a case against Rafael Giraldo that was handled by
20  Catherine Connelly, an AUSA in Washington, D.C.  Benitez Decl. ¶
    6; Exhibit 1.  At a suppression hearing on February 20, 2009,
21  Giraldo's attorney (Katzoff) had challenged Benitez's alleged
    "'softening' [Katzoff used the term 'building up'] of the
22  defendant pre-Miranda and the judge [threw] out the defendant's
    pre-Miranda statement."  Benitez Decl. ¶ 8; Exhibit 1.  After
23  this, from June 1 to 5, 2009, Benitez had attended an LAPD
    Homicide Investigation training during which there was a
24  discussion of pre-<u>Miranda</u> "softening up" conduct (defined by the
    instructors as physical abuse,), including a California court
25  decision where investigators used tactics to improperly "soften
    up" a defendant.  Benitez Decl. ¶ 7.  These events led Benitez to
26  pursue the legal significance of the softening/building up
    concept, to attempt to reconcile the terms in her mind, and to
27  discuss the issue with Scarpelli.  Benitez Decl. ¶ 10.

28                                  9

Decl. ¶ 15; Exhibit 5.[6]

After Benitez's declaration had been filed, on July 9, 2009, Benitez received an email from Scarpelli regarding his review of the interview transcript. Benitez Decl. ¶ 18; Exhibit 8. Scarpelli's email analyzed the legality of the interview, noting that Benitez had done a "good job" making clear that defendant was not in custody, but that even if the court found that he was in custody, the pre-Miranda interview was "not incriminating" and constituted "background information to see if defendant wanted to

---

[6] Scarpelli was not the only person from whom Benitez sought advice regarding defendant's suppression motion. On June 17, 2009, Morton-Owens had told Benitez that she was a relatively new AUSA, that she had never worked a child pornography case before, and that she would be relying on Benitez's experience. Benitez Decl. ¶ 12. Because Benitez had been promoted and transferred to Washington D.C. in December 2008, she was no longer the case agent responsible for this matter; since her replacement also had limited experience, Benitez tried to reach out to AUSAs in DC with whom she had previously worked to gather information to assist Morton-Owens. Id. On June 19, 2009, at 2:54 pm, Benitez forwarded to Morton-Owens a "recent opp to motion to suppress statements" that Benitez had received from Connelly. Benitez Decl. ¶ 13; Exhibit 2. Later that same day, at 4:39 pm, Benitez forwarded to Morton-Owens an email to which were attached "arguments that you may want to include in your response to defense counsel regarding the voluntariness of Welton's confession"; the attached document came from Benitez' own archive of suppression responses from previous cases she had worked. Benitez Decl. ¶ 13; Exhibit 3. On June 30, Benitez forwarded a copy of defendant's motion to suppress to Connelly. Benitez Decl. ¶ 14; Exhibit 4. And, on July 9, 2009, at 6:19 pm, Benitez forwarded a copy of the suppression motion to the AUSA previously assigned to this case, AUSA Joey Blanch of the Central District of California. Benitez Decl. ¶ 18; Exhibit 7. Benitez's consultations with others continued after the hearing on the suppression motion as well. On the evening of July 13, with Morton-Owens present, Benitez discussed the suppression hearing with Blanch. Benitez Decl. ¶ 20; Exhibit 9. That same day, Benitez reached out to Connelly for advice as to whether Morton-Owens should stipulate to certain matters at defendant's trial. Benitez Decl. ¶ 20; Exhibit 10.

1   talk and to make him feel comfortable." Exhibit 8.  Scarpelli

2   stated: "the prosecutor should keep in terms of just trying to

3   develop a rapport" with the defendant and "DON'T SAY IT WAS TO

4   SOFTEN HIM UP." Exhibit 8 (all caps in original).  After

5   receiving this email on July 9, Benitez checked with Scarpelli to

6   see if he had any objection to providing the email to the

7   prosecutor handling the hearing in Los Angeles.  Benitez Decl. ¶

8   18.  Scarpelli indicated that he had no objection, and, on the

9   same day, July 9, Benitez forwarded his email to the prosecutor

10  with her own email introduction that stated: "I forwarded the

11  suppression motion to a friend of mine who is a AUSA in DC and

12  has been doing sex crimes for 17 years to see if I missed

13  anything.  He had some thoughts, most of which we had already

14  discussed." Benitez Decl. ¶ 18; Morton-Owens Decl. ¶ 4; Exhibit

15  8.[7]

16  _____

17  [7]  During the July 29 hearing, there was confusion as to
    whether Benitez had provided the July 9 email to the prosecutor
18  before the suppression hearing.  Immediately prior to the July
    29, 2009 hearing, Morton-Owens asked Benitez why she had not
19  previously forwarded the July 9, 2009 email.  Morton-Owens Decl.
    ¶ 3.  Benitez responded that she had forwarded the email to the
20  AUSA on or about July 9, 2009; Morton-Owens immediately searched
    her computer for the email, but was unsuccessful in locating it.
21  Id.  Benitez also reviewed her sent emails in an attempt to
    confirm the forwarding of the July 9, 2009 email; however,
22  Benitez also could not locate the email.  Id.; Benitez Decl. ¶
    23.  FBI email boxes are subject to size limitations that, once
23  exceeded, prohibit the employee from sending outgoing emails
    until space is cleared in the email box.  Sangley Decl. ¶ 3.
24  Because Benitez was an FBIHQ Child Abduction Supervisor, she
    received daily all national Amber Alerts and a high volume of
25  other emails that caused her to regularly exceed her email box
    size limits in a very short time.  She regularly deleted the
26  contents of her "deleted" and "sent items" folders to make room
    in her email box, and this was likely the reason she could not
27  readily find the forwarded email to Morton-Owens.  Benitez Decl.

28                              11

D.  <u>Benitez's Suppression Hearing Testimony</u>

At the July 13, 2009 suppression hearing, Benitez's July 6 declaration was introduced as her direct testimony, and then she was cross-examined.  That cross-examination focused mainly on the reasons individuals look at child pornography and the details of what happened at the interview.  RT 7/13/09: 29-47, 49-50.  A total of seven leading questions elicited answers relating to why Benitez discussed defendant's childhood sexual abuse with him:

Q.  And you expressed sympathy for him; right?

A.  Empathy, yes.

---

¶ 23.  Ultimately, FBIHQ IT personnel were called on to retrieve these deleted items from the FBI servers, and they found the sent email in question.  Sangley Decl. ¶¶ 4-7; Benitez Decl. ¶ 25.

During the July 29, 2009 hearing, Benitez was asked whether she forwarded the July 9, 2009 email to Morton-Owens, to which she responded, as she had earlier told Morton-Owens, that she did on or about July 9.  RT 7/29/09: 24-25.  The court inquired of Morton-Owens whether she received the email from Benitez, and Morton-Owens responded that she did not recall receiving the email nor could she locate it, that she could not state with certainty that Benitez did not send it, but that she knew that she did not review it prior to the suppression hearing.  RT 7/29/09: 57.  After the conclusion of the trial, the USAO's technical support team conducted a complete search of the USAO's email server to determine whether there was any record of Benitez's attempt to forward the July 9, 2009 email.  The search of the USAO server revealed that Benitez had forwarded the email to Morton-Owens on July 9, 2009.  Morton-Owens Decl. ¶ 4; Exhibit 8.  In addition, as referenced above, the search of the FBI server also showed that Benitez had sent the email to Morton-Owens on July 9, 2009.  Thus, Benitez testified truthfully on July 29 when she stated that she had forwarded the Scarpelli email to Morton-Owens on July 9, 2009.  Morton-Owens still does not recall receiving or reviewing that email.  Morton-Owens Decl. ¶ 5.  The government posits that the email was accidentally deleted by Morton-Owens, though there appears to be no way to confirm this.  Morton-Owens apologizes to the court for not taking more care to ensure that the email was properly accounted for and for not recalling her receipt of the email.  <u>Id.</u>

1    Q.   And you hoped to build a rapport with him; right?

2    A.   Yes.

3    Q.   You hoped that he might think that you were on his side?

4

5    A.   Yes.

                    * * *

6

7    Q.   Now, you testified in your declaration that you were not using Mr. Welton's prior sexual abuse as an

8         interview tactic?

9    A.   That's correct.

10   Q.   But you knew that expressing sympathy for him would build rapport with him; right?

11

12   A.   Yeah. More of a -- more of being able to relate to him and let him know this was not about a witch-hunt which

13        he later also agreed with.

    Q.   And it would put him at ease?

14

15   A.   Correct.

    Q.   And that in turn would make it more likely that he

16        would be cooperative with you. Isn't that what you believed?

17

18   A.   Possibly, yes.

RT 7/13/09: 39, 43.  On redirect, the prosecutor followed up

19

20  with two questions addressing this topic:

21   Q:   Agent Benitez, when you first brought up the issue of Mr. Welton's abuse, why did you do that?

22   A:   I had told him that there was a few things that I knew about him and had read some items.  It was basically to

23        let him know, you know, what my specialty is and that I knew kind of where he was coming from.  And what I

24        meant by that is, you know, that he was a registered sex offender.

25

                    * * *

26

27

28                     13

Q:   When you ask suspects information about their
     background, are you asking them those questions because
     you are attempting to get information from them?

A:   I'm wanting to know their background.

RT 7/13/09: 47, 48).

On July 20, 2009, the court denied defendant's Motion to

Suppress and found that defendant's statements were made

voluntarily.

E.   Benitez's July 29 Testimony That the Scarpelli Email
     Did Not Affect Her Suppresson Hearing Testimony

On July 13, 2009, defense counsel requested all email

communications related to the case, and the government gathered

potentially responsive communications from all agents and experts

working on the matter, including Benitez.  On July 22, 2009,

Benitez forwarded to Morton-Owens the July 9 email from Scarpelli

to Benitez along with other responsive communications, and

Morton-Owens then provided these communications to the defense.

Benitez Decl. ¶ 22; Morton-Owens Decl. ¶ 2; Exhibit 11.[8]

On July 27, 2009, defendant filed a Motion to Dismiss the

Indictment alleging governmental misconduct, based on the July 9

Scarpelli email.  On July 29, 2009, the court held an evidentiary

hearing that included the testimony of both Benitez and

Scarpelli.  During that hearing, Benitez confirmed that she

_____

[8]   As discussed above in footnote 7, Benitez had forwarded
the July 9 email to Morton-Owens on July 9, as Benitez
subsequently testified at the July 29 hearing.  RT 7/29/09: 24-
25.  The email was not disclosed until after Benitez had again
forwarded it to Morton-Owens on July 22 because, as also
discussed above in footnote 7, Morton-Owens did not recall
receiving or reviewing it prior to the July 13 hearing.

14

sought advice from Scarpelli about the suppression motion and

that Scarpelli, among other things, had "told you that you should

not say that you were just trying to soften him up."  RT 7/29/09:

26-27.  Benitez testified, however, that Scarpelli's advice did

not "color" her testimony:

> Q.   And yet it's your testimony that notwithstanding the
>      fact that you sought AUSA Scarpelli's advice about this
>      hearing, that advice didn't color your testimony at
>      all?
>
> A.   No.

RT 7/29/09: 28-29.  Benitez explained that her and Scarpelli's

use of the term "soften up" was "the result of a joke, after all

of this discussion, and so it was used several times as a joke,

such as if we should refer to something, it would be like, well,

don't try to soften me up.  It was a joke between he and I."  RT

7/29/09: 34).  Benitez testified that neither the July 9 email

nor any of her other communications with Scarpelli "affected" her

testimony:

> Q:   And did you understand that AUSA Scarpelli's July 9th
>      e-mail, in which he says, "Don't say it was to soften
>      him up," was an instruction to you on how to testify?
>
> A:   No, when I first read it, I laughed.  I thought it was
>      him being funny and thought nothing of it.
>
> Q.   Did anything in any of AUSA Scarpelli's e-mails to you
>      affect your testimony at all?
>
> A.   No, it did not.
>
> Q:   Did anything in AUSA Scarpelli's e-mails to you or
>      anything he's ever said to you affect your testimony on
>      July 13 of 2009?
>
> A:   No, it did not.

15

* * *

> Q:   And notwithstanding all of the communication you had
>       with Mr. Scarpelli about this case, you are confident
>       that it had absolutely no effect on your testimony?
>
> A:   Absolutely 100 percent confident.

RT 7/29/09: 34, 37.

Scarpelli similarly testified that he intended the term "soften up" as a joke:

> Q: And so you saw nothing improper about instructing her to,
> quote, don't say that it was to soften him up, unquote?
>
> A: Well, in reflection, I would say that it was a poor
> decision on my part.  Because what that meant was it was a
> joke.  And it became sort of a joke after we discussed
> softening up.  And then I think if you look at the e-mails
> at one point, Special Agent Benitez says one person's
> softening up is another person's rapport buiding or
> something to that effect. [¶] There was, I remember, at
> least one other time where Special Agent Benitez and I
> kidded about that, where I think we were going to meet or
> something.  And I sort of kidded with her, and I said what
> are you trying to do?  Soften me up or something?  So it
> sort of became a joke.  And that's why it's in there.  And
> that's why it's actually in caps because of the significance
> that it was a joke.

RT 7/29/2009: 48-49.[9]

Scarpelli further testified that he did not believe that his communications would influence Benitez's testimony:

> Q: But wasn't it obvious to you at that time that your legal
> advice might affect the way she testified.
>
> A: I don't believe so.

---

[9] The prior incident to which Scarpelli was referring occurred on or about June 15, 2009, when Benitez and Scarpelli walked to get coffee.  During the walk, Benitez told Scarpelli that because she kept canceling on him, she would buy the coffee. Sarcastically referencing their previous discussions on "softening," Scarpelli joked, "Are you trying to soften me up?" Benitez Decl. ¶ 11.

16

RT 7/29/09: 51.  Finally, Scarpelli testified that he did not intend for his communication to influence Benitez:

> Q: Did you ever intend to influence Agent Benitez's testimony in any way?
>
> A: No.
>
>                              * * *
>
> Q: When you wrote your July 9th e-mail, why did you say, "Don't say it was to soften him up"?
>
> A: Again, it was a joke. And it was referring back to our, you know, sort of kidding around about the term softening up.  And again, I would refer you back to where there was the time where she and I – I'm not a hundred percent sure, but we were going to meet, and I sort of kidded around, "hey, what are you trying to do, soften me up?" So it became a joke.
>
> Q: Was it your understanding that you were telling her how to testify?
>
> A: I was not telling her how to testify.
>
> Q: Have you ever told an agent how to testify?
>
> A: No.
>
> Q: Do you believe that you were coaching Agent Benitez in the way to phrase things during her testimony?
>
> A: No.

RT 7/29/09: 53-54.

    F.    The Court's August 1 Credibility Findings Regarding
          Benitez and Scarpelli

        In its Order denying defendant's motion to dismiss the indictment, the court found Scarpelli to be not credible in testifying "that his admonition to Benitez was simply a joke" and "that he thought 'softening up' was akin to gangsters beating someone until they talked."  Order at 8 n.28; see also Order at

                                    17

20 ("Scarpelli not only advised Benitez how to present her testimony at the suppression hearing, but also took no responsibility for his actions, describing the comment as merely a joke.") and Order at 21 (reiterating that court "finds not credible Scarpelli's assertion that his advice to Benitez was simply a joke.").[10]

The court also found Benitez's July 29 testimony "not credible" in stating that Scarpelli's advice did not influence her when she testified at the suppression hearing, as the advice "undoubtedly affected Benitez's testimony regarding her state of mind during the pre-Miranda portion of her interview with Welton, whether consciously or subconsciously." Order at 21. As the court stated:

> [T]he court finds not credible Benitez's testimony that Scarpelli's advice did not influence her in any way when she testified at the suppression hearing. Even if she attempted to put it from her mind, Scarpelli's comments undoubtedly affected Benitez's testimony regarding her state of mind during the pre-Miranda portion of her interview with Welton, whether consciously or subconsciously. . . . The court therefore makes a specific finding that those portions of Benitez's testimony that were influenced by Scarpelli's advice – i.e., those relating to[] her motivation for making certain statements during the pre-Miranda portion of her interview with Welton — are not credible.

Order at 21.

Based on its findings, the court exercised its supervisory powers to strike both the portion of Benitez's testimony referenced above and statements in Benitez's July 6 declaration

---

[10]   The court made no similar finding that Benitez was not credible when she testified that she interpreted Scarpelli's comment regarding "soften up" as a joke.

about her state of mind in questioning the defendant, even though the declaration was executed "before Scarpelli offered advice on how Benitez should testify" and "contain[ed] much the same information as Benitez's testimony at the hearing," because the defendant had not had an effective opportunity to cross-examine Benitez regarding those statements.  Order at 21 n.40.  In addition, the court held that it would take its credibility finding regarding Benitez "into account in assessing Benitez's credibility as a trial witness, should she be called to testify."  Order at 24.  With respect to Scarpelli, the court exercised its supervisory power to refer "this matter to the United States Attorney for the District of Columbia and the Department of Justice's Office of Professinal Responsiblity so that they may determine whether any ethical or legal violations were commited by Scarpelli that warrant further discipline."  Order at 20-21. /

**III.**

**ARGUMENT**

A.  <u>Both Benitez and Scarpelli Understand The Seriousness of the Issues Posed By Scarpelli's Comment, Recognize That It Should Not Have Been Made, And Apologize</u>

At least in part, the court's adverse credibility findings appear to have been intended to emphasize to Benitez and Scarpelli that Scarpelli's comment was not a joking matter and posed serious issues.  <u>See</u> Order at 20 (noting that Scarpelli "took no responsibility for his actions, describing the comment as merely a joke"); Order at 19 ("declining to impose some type of litigation sanction would endorse the notion that suggesting

19

to government witnesses how they should testify at pretrial hearings is permissible"). To the extent this was a concern, the court can be assured that both Benitez and Scarpelli understand and acknowledge the seriousness of the issues.

First, Scarpelli and Benitez both wish to assure this court that they understand and acknowledge the seriousness of the issues raised by the comment in Scarpelli's email. They understand that, given the pendency of Benitez's testimony, it could have been interpreted as a suggestion as to how she should testify, or perceived as potentially influencing her testimony, even if not consciously. Both Scarpelli and Benitez apologize to the court for the communication that occasioned the court's need to address the issues raised in a hearing and subsequent order, and assure the court that they have learned from these events. Scarpelli Decl. ¶¶ 2-4; Benitez Decl. ¶¶ 3, 26. As Scarpelli states in his attached declaration:

> 2.   . . . I realize now that regardless of my motivation, and even in the context of a friendly relationship, where Special Agent Benitez's testimony was pending at a suppression hearing, such a commment could have been interpreted by others as a suggestion as to how she shoudl testify, or as potentially influencing the testimony of a less-experienced witness.

> 3.   As an Assistant United States Attorney, I am well aware of the ethical obligations attendant to my position. I take very seriously my responsibility to "seek justice, not merely to convict." Ethical Consideration (EC) 7-13 of Canon 7 of the American Bar Association (ABA) Model Code of Professional Responsibility (1982). In accordance with my professional standards, I immediately self-reported this Court's findings to the United States Attorney's Office for the District of Columbia and to the Department of Justice's Office of Professional Responsibility.

4.    I wish to apologize to the Court for my comments that caused this controversy and for any actions on my part that may have suggested to the court that I did not recognize the seriousness of the issues posed by my communication.

Scarpelli Decl. ¶¶ 2-4.  Similarly, Benitez states:

3.    I recognize the July 9, 2009, electronic mail ("email") that I received from [AUSA] Anthony Scarpelli has been extremely troubling to the court.  I understand and have taken all matters presented sincerely.  I accept my position as a Special Agent as an honor and understand the heavy responsiblity I carry to act justly, serve unfailingly, and maintain integrity in all situations.  I am distressed and I humbly apologize if the court thought I behaved otherwise.  I did not intend to give the court the impression that I took these matters lightly or that I acted independently or questionably in matters involving this case.  I apologize if I gave this impression.

* * *

26.    . . . I recognize the court's concern that given the pendency of the suppression motion, and my status as a witness in connection with that motion, the comment [in AUSA Scarpelli's July 9, 2009, email] could create the impression tha it was intended improperly to tailor my testimony.  I further recognize the court's concern that the comment may have subconsciously affected my testimony.  I want to assure the court that I take the court's concerns seriously, and that I take responsibility for the events that occasioned the court to rule as it did.  I apologize if anything I have said or done has created a different impression.

Benitez Decl. ¶¶ 3, 26.

Prior to the circumstances giving rise to this controversy, Scarpelli, a senior prosecutor in the Organized Crime and Narcotics Trafficking Section of the United States Attorney's Office for the District of Columbia, had an exemplary record. Since joining that office in 2000, he has received top evaluations, seven Department of Justice Special Achievement Awards, and a 2009 nomination for a Director's Award from the Executive Office for the United States Attorneys.  Geise Decl. ¶

21

10.  More importantly, he is well regarded by members of the federal and local benches, as well as the defense bar, in the District of Columbia, and, while a veteran of hundreds of cases and over forty jury trials, he has never previously been sanctioned for an ethical lapse.  Geise Decl. ¶ 11.  Nor was Scarpelli ever sanctioned for an ethical lapse during his prior nine-year career as a county prosecutor in Middlesex County, New Jersey.  Geise Decl. ¶ 11.  Regardless of the court's ruling on this motion to amend, Scarpelli understands the issues posed by his actions, and the impact the court's order has already had on his otherwise blemish-free record.  Scarpelli Decl. ¶ 4.  Moreover, Scarpelli self-reported this court's findings to the DC-USAO, as well as to DOJ-OPR.  Scarpelli Decl. ¶ 3; Geise Decl. ¶ 13.  Accordingly, again regardless of the court's ruling on this motion to amend, Scarpelli faces possible disciplinary action from either DOJ-OPR or the DC-USAO.  Geise Decl. ¶ 13.  The government respectfully submits that there is no need for a further sanction in the form of an adverse credibility finding against AUSA Scarpelli.

Benitez has a similarly distinguished record.  Since joining the FBI in 2002, Benitez has been the lead case agent on hundreds of criminal investigations, including cases involving take-over bank robberies, fugitives, child prostitution, child exploitation, and the possession, distribution, and production of child pornography.  Benitez Decl. ¶ 4; Smith Decl. ¶ 6.  Benitez has been the affiant on over 50 affidavits in the Central

22

District of California, has testified approximately 40-50 times in local and federal court, and has been deemed a government subject matter expert in child pornography.  Benitez Decl. ¶ 4; Smith Decl. ¶ 6.  Benitez is a certified child forensic interviewer, a credentialed instructor for the State of California, and a general police instructor for the FBI.  Benitez Decl. ¶ 4; Smith Decl. ¶ 9.  Benitez has instructed more than 1,000 law enforcement officers on the topic of child exploitation and interviewing and interrogation of sex offenders.  Benitez Decl. ¶ 4; Smith Decl. ¶ 9.  Because of her accomplishments and expertise, Benitez was honored as the Keynote Speaker by the California Sexual Assault Investigators Association in 2007. Benitez Decl. ¶ 4; Smith ¶ 9.  In 2008, Benitez was recognized by the Mayor and City Council of West Covina, California, for her work as the case agent in a high-profile child pornography case. Benitez Decl. ¶ 4; Smith Decl. ¶ 9.  Regardless of the court's ruling on this motion to amend, Benitez, who was the recipient and not the author of the primary email at issue, understands the seriousness of the issues posed by her communications with Scarpelli, and the impact the court's order has already had on her otherwise blemish-free record.  Benitez Decl. ¶¶ 3, 26.[11] Moreover, again regardless of the court's ruling on this motion to amend, Benitez is now the subject of a DOJ-OPR investigation

---

[11]    Benitez should not be punished for soliciting legal advice from several government attorneys and receiving the email communication in this matter, particularly where, as discussed below (see infra, Part B), the facts now known corroborate the witnesses' credibility.

as a result of this matter.  Smith Decl. ¶ 12.  The government respectfully submits that there is no need for a further sanction in the form of an adverse credibility finding, particularly where that finding will effectively deprive Benitez of the ability to perform key duties of FBI agents investigating cases.[12]

B.   A New Material Fact Warrants Removal of the Adverse Credibility Findings Against Both Benitez and Scarpelli

One important fact in dispute at the July 29 evidentiary hearing was whether Benitez had forwarded Scarpelli's email containing the "DON'T SAY IT WAS TO SOFTEN HIM UP" comment to Morton-Owens on July 9.  Benitez testified that she forwarded the July 9 email to Morton-Owens on or about the same day that she received it.  RT 7/29/09: 25.  However, Benitez noted that in her preparations for the evidentiary hearing, she had been unable to locate proof that she had done so in her "sent" emails.  RT 7/29/09: 24.  Morton-Owens stated to the court that while she could not state with certainty that Benitez did not forward the email, she did not recall receiving the July 9 email from Benitez and she too had not been able to locate it.  RT 7/29/09: 57.

---

[12] Testifying in court and serving as an affiant on complaints and warrants are requirements for most FBI Special Agents assigned to investigate criminal cases.  Smith Decl. ¶ 13. A court's adverse credibility finding against an FBI Special Agent may limit that agent's ability to perform these functions. Id.  Though Scarpelli does not ordinarily serve as an affiant or testify in court, an adverse credibilty finding against him would also be extremely damaging to his career – as a prosecutor, he is considered an officer of the court, and his credibilty is essential to his reputation and career.

Defense counsel argued that the lack of proof that Benitez forwarded the email cast substantial doubt on her overall credibility: "Your Honor, just on that issue, the problem that that causes – that Special Agent Benitez testified that she's confident [that she produced the email to Morton-Owens].  That doesn't mean that's true.  And Ms. Morton-Owens is confident she never received it.  So one of those statements is not true.  I don't know which one.  And it doesn't matter which one, but I do think to the extent that <u>it does undercut Agent Benitez's credibility as part of this hearing.</u>  Your Honor, I just have no way to know."  RT 7/29/09: 57-58 (emphasis added).

Unfortunately, at the July 29 hearing, there was no evidence corroborating Benitez's testimony that she had forwarded Scarpelli's email to Morton-Owens on July 9 – or at any time before the July 13, hearing – and only a negative inference that she had failed to do so in light of the inability of either Benitez or Morton-Owens to locate a copy of the email and Morton-Owens' lack of recollection of receiving it.  The mistake of fact arising from this negative inference may have cast significant doubt on Benitez's credibility, as defense counsel urged.

As we now know, however, Benitez was truthful when she testified that she had forwarded Scarpelli's email on July 9.  The new evidence establishing her truthfulness on this point corroborates her credibility generally.  It provides independent proof that she took an action that she claimed to have taken, on

the date she recalled taking it.  More importantly, it specifically corroborates her testimony on the subject matter of the July 9 email, and that testimony included her testimony that she understood Scarpelli's "DON'T SAY IT WAS TO SOFTEN HIM UP" comment as a joke.

The cover note to Morton-Owens in Benitez's email forwarding Scarpelli's email further supports this point.  As noted above in footnote 6, Benitez sought advice regarding the motion to suppress from a number of AUSAs (not just Scarpelli), based on her concern that Morton-Owens was a relatively new AUSA who had never before handled a case of this type, and Morton-Owens's indication that she would be relying on Benitez's experience. Benitez then shared Scarpelli's email with Morton-Owens, suggesting that Scarpelli "had some thoughts" that would be "worth passing [] to you."  Benitez Decl. ¶ 18; Exhibit 8.  This cover note demonstrates that Benitez thought Scarpelli's analysis would be helpful to Morton-Owens in responding to the motion to suppress, not to Benitez in shaping her own testimony.  That Benitez forwarded Scarpelli's email demonstrates that she had no concern that any inappropriate witness coaching had occurred.

The new evidence also weighs in favor of Scarpelli's credibility.  As with any witness, consistent testimony by other credible witnesses is corroborative.  <u>See, e.g.</u>, <u>United States v. Tucker</u>, 716 F.2d 576, 583 (9th Cir. 1983) (finding ineffective assistance based in part on counsel's "failure to identify or interview witnesses who might be able to corroborate

[defendant's] testimony"); <u>United States v. Casanova</u>, 642 F.2d 300, 301 (9th Cir. 1981) (sufficient evidence to sustain conviction where accomplice's testimony was corroborated by two other witnesses' testimony); <u>cf.</u> <u>United States v. Davis</u>, 548 F.2d 840, 843 (9th Cir. 1977) (affirming "two witness rule" in perjury prosecutions, which requires "that the falsity of the defendant's statements must be proved by the testimony of two witnesses or the testimony of one witness, plus corroborating evidence").  In this case, Benitez testified that she interpreted Scarpelli's "DON'T SAY IT WAS TO SOFTEN HIM UP" comment as "a joke between him and I" and "him being funny" because that phrase was a running joke between them.  RT 7/29/09: 34.  To the extent that the court now has additional cause to credit Benitez's testimony, her testimony that she understood this comment as a mutual joke corroborates Scarpelli's testimony that he intended it in that same way, and not as an improper effort to influence Benitez's testimony.

Moreover, Scarpelli testified that he was aware that his July 9 email would be shared with Morton-Owens.  RT 7/29/09: 45 ("I think that maybe Special Agent Benitez asked me to give my opinion on the motion, what I assumed was with a goal towards giving that information to the [A]ssistant handling the case."); RT 7/29/09: 47-48 ("I assumed it was going to the AUSA.  And at some point I think in the e-mails, Special Agent Benitez asked me if she could send it to the [A]ssistant handling the case, and I said sure."); RT 7/29/09: 50 ("So I assumed it was going over to

the AUSA."); RT 7/29/09: 51 ("my understanding was it was going to be turned over to the [A]ssistant handling the case")). Scarpelli's belief that his email would be shared with the assigned AUSA bolsters the conclusion that he did not believe his "DON'T SAY IT WAS TO SOFTEN HIM UP" comment constituted improper witness coaching.  This conclusion is further corroborated by Benitez's testimony that she was not seeking Scarpelli's advice on "how to testify" and that she told Scarpelli that she planned to forward his email to the assigned AUSA.  See RT 7/29/09: 23 ("I never sought advice on how to testify."); RT 7/29/09: 25 ("And actually on the e-mail, I had asked him if it was okay to forward it to the AUSA."); see also Benitez Decl. ¶ 18; Exhibit 11 (Benitez: "I hope you don't mind if I forward your email to her?"; Scarpelli: "Yes, feel free to send it to her.").  Had the court credited Benitez's testimony on these points, her testimony strongly corroborates Scarpelli's testimony that his "DON'T SAY IT WAS TO SOFTEN HIM UP" comment was intended as a joke (albeit a misguided one) and that his July 9 email was not intended to influence Benitez's testimony.  It would be extremely difficult to conclude that Scarpelli would have risked his legal career to provide inappropriate advice to a witness in a case (to which he was not even assigned) in an email that he anticipated would be shared with another AUSA.  Cf. United States v. Lentz, 383 F.3d 191, 218 (4th Cir. 2004) (reversing district court's adverse credibility finding against AUSA and holding that trial court's negative inference against AUSA was unwarranted based in part on

1   fact that alleged misconduct occurred in front of numerous

2   people, "in contravention of court orders and at risk to his

3   legal career," noting that it "straine[d] reason to find . . .

4   that an AUSA or anyone else would have even attempted to [commit

5   the misconduct at issue] in the midst of all of the people

6   present and involved in the process at the time.").

7          For all the reasons discussed above, the discovery of new

8   evidence corroborating Benitez's testimony warrants the striking

9   of the adverse credibility findings against both Benitez and

10  Scarpelli.

11         C.   The Order's Recognition That Benitez May Have Been
                Influenced Only "Subconsciously" Justifies Striking the
12              Adverse Credibility Finding Against Her

13         A separate ground to strike the credibility finding against

14  Benitez stems from the court's finding that the influence denied

15  by Benitez (that of Scarpelli's July 9 email on her testimony)

16  may have been only a subconscious influence.  The court reasoned

17  that even if Benitez had tried to disregard Scarpelli's email,

18  his comments undoubtedly affected her testimony about her state

19  of mind during the interview of defendant, "whether consciously

20  or subconsciously."

21         1.   Denial of a "subconscious" influence, even if
                incorrect, would not constitute intentional false
22              testimony

23         The government agrees that it is possible that Scarpelli's

24  statements could have subconsciously affected Benitez's testimony

25  as to her state of mind.  A person's viewpoint and choice of

26  words are influenced by an array of factors, and a person never

27

28                                  29

knows what factors have subconsciously influenced their statements.  Scarpelli stated in his email that the government should explain Benitez's comments to defendant in terms of building "rapport" and not that she was trying to "soften him up."  It may be that even if Benitez viewed Scarpelli's "soften[ing]" comment as a joke, her consideration of all of his comments could have caused her, without her being aware, to use different words than she otherwise would have, had she not had the email exchange with Scarpelli.  Or it may be that she would have expounded on her brief answers to defense counsel's questions if she had not read Scarpelli's email that underscored the importance of her word choice (even if subconsciously).

If Benitez's testimony was false only because she denied a subconscious effect resulting from her communications with Scarpelli, she certainly does not deserve an adverse credibility finding, as her misstatement would necessarily not be purposeful – by definition, a subconscious effect is one of which an individual is not aware, making denial of such an effect consistent with one's knowledge at the time of the denial.  The government therefore respectfully requests that the adverse credibility finding, which would significantly affect Benitez's career as a Special Agent with the FBI, be removed from the order.

    2.   <u>Benitez reasonably may have believed that her suppression hearing testimony was not influenced by Scarpelli's July 9 email</u>

The terms of the court's credibility finding regarding only

1   a subconscious influence on Benitez are themselves enough to

2   warrant amending the August 1 Order in the manner that the

3   government requests as to Benitez.   Additional facts and

4   circumstances, however, demonstrate that it was not unreasonable

5   for Benitez to fail to recognize the possibility of a

6   subconscious influence, and thus that it was reasonable for

7   Benitez to have testified that her suppression hearing testimony

8   was uninfluenced by Scarpelli's July 9 email, even if the

9   testimony in fact was subconsciously influenced.

10              a.   The Limited and Leading Questioning

11          At the July 13 suppression hearing, there were only seven

12  brief questions from the defense that Benitez answered concerning

13  her state of mind, see Section III.E above, and these were

14  leading questions that themselves suggested the preferred terms

15  referenced in Scarpelli's earlier email.   For example, the

16  defense's initial three questions in this area were as follows:

17          Q.   And you expressed sympathy for him; right?

18          A.   Empathy, yes.

19          Q.   And you hoped to build a rapport with him; right?

20          A.   Yes.

21          Q.   You hoped that he might think that you were on his
                side?
22
            A.   Yes.
23

24  RT 7/13/09: 39.[13]   Thus, though Scarpelli's email had stated that

25  _____

26      [13] The government does not mean to suggest that defense
    counsel bears any responsibility for Benitez's testimony.
    Indeed, had defense counsel been provided with the Scarpelli
27  email before the July 13 hearing, he likely would have altered

28                              31

the AUSA should keep it in terms of developing a "rapport" with defendant, it was defense counsel who raised that term, with which Benitez agreed.   It is very likely that Benitez would have answered these leading questions in the same way had she not received the Scarpelli email, and thus reasonable for Benitez not to recognize that her testimony may have been subconsciously influenced by Scarpelli's earlier email.

In the remaining four questions about Benitez's state of mind, defense counsel again brought up building "rapport" in leading questions:

> Q.   Now, you testified in your declaration that you were not using Mr. Welton's prior sexual abuse as an interview tactic?
>
> A.   That's correct.
>
> Q.   But you knew that expressing sympathy for him would build rapport with him; right?
>
> A.   Yeah.  More of a -- more of being able to relate to him and let him know this was not about a witch-hunt which he later also agreed with.
>
> Q.   And it would put him at ease?
>
> A.   Correct.
>
> Q.   And that in turn would make it more likely that he would be cooperative with you. Isn't that what you believed?

---

his approach to questioning at that hearing.  The fact remains, however, that the questions that were asked themselves used the preferred terms referenced in Scarpelli's earlier email, making it reasonable for Benitez not to have recognized that her testimony may have been subconsciously influenced by the email, as opposed to her simply responding to questions that were asked. In any event, it makes it difficult to determine whether the email played any role, since both the questions and the email employed the same language.

1     A.    Possibly, yes.

2  RT 7/13/09: 43.  Had Benitez herself advanced the preferred terms

3  referenced in Scarpelli's email, it might have indicated to her

4  that her testimony was influenced by that email.  But this was

5  not the case; she generally and simply gave affirmative answers

6  to leading questions.  Indeed, when asked two non-leading

7  questions in this area by the government, Benitez did not use the

8  term "rapport" suggested by Scarpelli's email:

9       Q:    Agent Benitez, when you first brought up the issue of
              Mr. Welton's abuse, why did you do that?

10

11      A:    I had told him that there was a few things that I knew
              about him and had read some items.  It was basically to
12              let him know, you know, what my specialty is and that I
              knew kind of where he was coming from.  And what I
13              meant by that is, you know, that he was a registered
              sex offender.

14                        * * *

15      Q:    When you ask suspects information about their
              background, are you asking them those questions because
16              you are attempting to get information from them?

17      A:    I'm wanting to know their background.

18  RT 7/13/09: 47, 48.  Consequently, while it is possible that

19  these answers were subconsciously influenced by Scarpelli's

20  email, there is nothing in the answers that should have made it

21  clear to Benitez that her testimony was being so influenced.

22       b.   The Prior Declaration

23     Further evidence that Benitez was not influenced by

24  Scarpelli's email is that her hearing testimony was consistent

25  with her July 6 declaration, which was filed before she received

26  the July 9 email from Scarpelli.  As this court acknowledged in

27

28                        33

its August 1 Order, the declaration "contains much of the same information as Benitez's testimony at the hearing." Order at 21 n.40.  In the declaration, Benitez testified consistently with Scarpelli's later advice.  While she did not use the term "developing rapport," which Scarpelli suggested, she testified that she did not intend to use defendant's prior sexual abuse as an interview tactic and that defendant "did not appear uncomfortable" in talking about it.  Even before Scarpelli's email, Benitez did not use the term "soften him up."  Because Benitez's declaration was, as this court noted, similar to Benitez's hearing testimony, there was reason for Benitez to think the latter was not influenced, even subconsciously, by Scarpelli's intervening email.

          c.   The FBI's Training

    Yet another reason for Benitez to reasonably conclude that her testimony was not influenced by Scarpelli's email is that the preferred terms referenced in that email were consistent with Benitez's prior training.  Building "rapport" is a common term used by law enforcement agents when interviewing subjects; indeed, Benitez herself serves as an instructor on interview and interrogation techniques, teaching a block of instruction on rapport building.  Benitez Decl. ¶ 7; Benitez 7/6/09 Decl. ¶ 3. Because Scarpelli's email referred to rapport building, it was reasonable for Benitez to think that her testimony would have been the same if it had been based only on her training and experience, and she had not received Scarpelli's email.

1

**d.    The Provision of Scarpelli's E-Mail to the
Prosecutor**

2

3       Finally, another reason for Benitez to reasonably believe

4  that her testimony was not influenced by Scarpelli's email was

5  that Benitez had provided that email to the AUSA handling the

6  prosecution after discussing this with Scarpelli and being told

7  by him that there was no problem with doing so.  RT 7/29/09: 24-

8  25.  Benitez's willingness to provide the email suggests that,

9  consistent with her subsequent testimony, she believed the email

10 was not intended to and did not improperly influence her

11 testimony.  In addition, Benitez had earlier provided the

12 prosecutor with information Benitez had gathered from other

13 sources relating to the suppression motion and could reasonably

14 have viewed Scarpelli's email as being similar information that

15 was not intended to and did not influence her testimony.

16      For all these reasons, it was reasonable for Benitez to

17 believe that her suppression hearing testimony was not

18 influenced, even subconsciously, by Scarpelli.  Even if this

19 belief was not, as the court has concluded, correct, the court's

20 recognition that the influence may have been only subconscious

21 demonstrates that Benitez's testimony that there was no influence

22 was not purposefully false – Benitez could reasonably have been

23 unaware of the subconscious influence.  A non-purposeful false

24 statement should not warrant an adverse credibility finding, and

25 the government requests that the August 1 Order be amended to

26 remove it.

27

28                                35

1

**IV.**

**RELIEF REQUESTED**

For the reasons stated, the government requests that the court amend two paragraphs of its August 1 Order to eliminate the adverse credibility finding against Benitez, and two paragraphs of the Order to eliminate the adverse credibility finding against Scarpelli.  Though there are a number of ways in which these paragraphs could be amended to eliminate the credibility finding, the government suggests the following amendments to help make its position clear:

(a)  The government suggests that the first full paragraph on page 21 be amended to read as follows:

> [T]he court finds that, contrary to Benitez's testimony on July 29, Scarpelli's comments may have influenced her when she testified at the suppression hearing.  Even if she attempted to put them from her mind, Scarpelli's comments may have affected Benitez's testimony regarding her state of mind during the pre-<u>Miranda</u> portion of her interview with Welton, whether consciously or subconsciously. . . .  The court therefore exercises its discretion to strike those portions of Benitez's testimony that could have been influenced by Scarpelli's comments – <u>i.e.</u>, those relating to[] her motivation for making certain statements during the pre-<u>Miranda</u> portion of her interview with Welton.

(b)  The government suggests that the portion of the paragraph on page 24 be struck in its entirety, as it states that Benitez was found not credible and that this adverse credibility finding will be taken into account by the court at trial.

(c)  The government suggests that footnote 28 be amended by deleting the last three sentences and citation.

(d)  The government suggests that the third full paragraph on page 20 be amended to read as follows:

36

As noted, a troubling aspect of these proceedings is that AUSA Scarpelli's comments may have influenced Benitez how to present her testimony at the suppressing hearing.  As an initial remedy, therefore, the court refers this matter to the United States Attorney's Office for the District of Columbia and the Department of Justice's Office of Professional Responsibility, so that they may determine whether any ethical or legal violations were committed by Scarpelli that warrant further discipline.

**V.**

**CONCLUSION**

For the reasons stated, the government respectfully requests that the court amend its August 1, 2009 Order to eliminate the adverse credibility findings against FBI Special Agent Benitez and Assistant United States Attorney Scarpelli.

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF
# FBI SUPERVISORY SPECIAL AGENT
# STEPHANIE D. BENITEZ

1                 DECLARATION OF SSA Stephanie D. Benitez

2      I, Stephanie Benitez, hereby declare and state:

3      1.   I currently am a Supervisory Special Agent ("SSA") with

4 the Federal Bureau of Investigation ("FBI"); prior to my

5 promotion to SSA in December 2008, I had served as a Special

6 Agent ("SA") with the FBI since 2002.  I am currently assigned

7 temporarily to the Los Angeles Homicide Task Force working with

8 the Los Angeles Police Department in investigating unsolved

9 homicide cases.

10      2.   In August 2007 I was assigned as the case agent to work

11 a child pornography investigation that ultimately led to the

12 criminal charges against Richard Michael Welton.  I served as the

13 case agent on this matter until December 2008 when I was

14 transferred to my temporary assignment in Washington, D.C.  I

15 have personal knowledge of the facts set forth in this

16 declaration, and I make this declaration in support of the

17 government's motion to amend the Court's August 1, 2009, order in

18 United States v. Welton, CR 09-153-MMM.

19      3.   I recognize that the July 9, 2009 electronic mail

20 ("email") that I received from Assistant United States Attorney

21 ("AUSA") Anthony Scarpelli has been extremely troubling to the

22 court.  I understand and have taken all matters presented

23 sincerely.  I accept my position as a Special Agent as an honor

24 and understand the heavy responsibility I carry to act justly,

25 serve unfailingly, and maintain integrity in all situations.  I

26 am distressed and I humbly apologize if the court thought I

27 behaved otherwise.  I did not intend to give the court the

28 impression that I took these matters lightly or that I acted

1 independently or questionably in matters involving this case.  I
2 apologize if I gave this impression.

3     4.   I have been an FBI Special Agent since 2002.  During
4 that time I have been the lead case agent on hundreds of criminal
5 investigations, including cases involving take-over bank
6 robberies, fugitives, child prostitution, child exploitation, and
7 the possession, distribution, and production of child
8 pornography.  I have been the affiant on over 50 affidavits in
9 the Central District of California, and have testified
10 approximately 40-50 times in local and federal court.  I was
11 deemed a government subject matter expert in child pornography
12 matters in 2008.  Prior to becoming an FBI Agent, I was a Los
13 Angeles County Public High School teacher for eight years. I am a
14 certified child forensic interviewer, a credentialed instructor
15 for the State of California, and a general police instructor for
16 the FBI.  I have instructed more than 1,000 law enforcement
17 officers on child exploitation and methods for interviewing and
18 interrogating sex offenders.  I was honored as the Keynote
19 Speaker of the California Sexual Assault Investigators
20 Association in 2007.  In 2008, I was recognized by the Mayor and
21 City Council of West Covina, California, for my work as the case
22 agent and my testimony at trial in a high-profile child
23 pornography case.  During the eight years of my tenure as an FBI
24 SA I have maintained a blemish free record and have received no
25 disciplinary actions against me.

26     5.   On December 8, 2008, I was promoted to FBI Headquarters
27 ("FBIHQ") in Washington, D.C., to serve as an SSA in the Crimes
28 Against Children Unit.  All of my Los Angeles cases were

1 reassigned at that time.

2     6.   On February 20, 2009, I testified at a hearing on a
3 suppression motion pertaining to Raphael Giraldo in the District
4 of Columbia.[1] During the hearing, Giraldo's attorney cross-
5 examined me and charged that, during the interview, I spent
6 excessive time prior to giving <u>Miranda</u> warnings "building up"
7 Giraldo. On the same date, the district court, while denying the
8 bulk of the suppression motion, agreed to suppress the pre-
9 <u>Miranda</u> portion of the interview. The court ruled that Giraldo's
10 home address, which was a relevant portion of the evidence,
11 should have been asked post-<u>Miranda</u>.[2] This case was prosecuted
12 by District of Columbia AUSA Catherine Connelly, and the
13 defendant pled guilty shortly after this hearing.

14     7.   From June 1 through 5, 2009, I attended a Los Angeles
15 Police Department Homicide Investigation training. In this
16 training, the instructor, Lieutenant Gary Yacoubian, discussed
17 pre-<u>Miranda</u> conduct and referenced a court decision where
18 investigators used tactics to inappropriately "soften up" a
19 defendant. After class, I pursued this issue with Lt. Yacoubian
20 because prior to the training and with the Giraldo hearing
21 freshly in my mind, I had believed "softening up," "building up,"
22 and "rapport building" were one and the same. Lt. Yacoubian

23

24     [1] On December 15, 2007, I interviewed Rafael Giraldo in Los
25 Angeles, California. While I was not the lead investigator on
this case, I was asked by the Case Agent to interview Giraldo
26 based on my experience.

27     [2] The only portion of this interview that was suppressed was
the pre-<u>Miranda</u> section, which did not contain the defendant's
28 confession.

1   informed me that he used the term "soften up" to refer to wearing
2   down a person's resistance by various improper physical means
3   such as depriving them of water for long periods of time and not
4   to refer to rapport building.  I thanked Lt. Yacoubian and told
5   him I wanted to understand the term to improve myself as an
6   investigator and instructor.  I further asked him if I could have
7   a copy of his presentation as I teach a block of instruction on
8   rapport building.  Lt. Yacoubian agreed and gave me a digital
9   copy of his presentation.

10       8.   On June 4, 2009, I received a call from AUSA Scarpelli,
11   whom I had dated briefly from January through March 2009, asking
12   my opinion about what kinds of digital evidence should be
13   requested when reviewing a computer on a child pornography case.

14       9.   On June 8, 2009, I received a call from FBI SA Minh
15   Tran, who was assigned as the new case agent for the Welton case.
16   SA Tran asked me several questions about the case and informed me
17   that a new AUSA had been assigned to the case and was preparing
18   for trial.

19       10.  On June 11, 2009, I sent AUSA Scarpelli an email with
20   an attached document that I had prepared several years prior for
21   law enforcement personnel and prosecutors that contained
22   suggestions about examining digital evidence.  In this same email
23   exchange, we discussed social issues and I referenced my
24   discussion with Lt. Yacoubian on the "softening" issue and the
25   prior Giraldo hearing.  I further informed AUSA Scarpelli that I
26   had a current case in Los Angeles where the defense attorney was
27   claiming I was being too nice.  I informed AUSA Scarpelli I was
28   not worried about this claim, but was still curious as to why the

4

1  term "softening up" kept being brought up.  It appeared to me
2  that the term "softening" was being used as synonymous with
3  "rapport building," and I did not understand why, when used in
4  this way, it would be considered something that might justify
5  suppression by the courts.  In the email I wrote, "This keeps
6  coming up!" referring to the reference to the term "soften up." I
7  additionally wrote "the defense attorney is saying I compelled
8  the defendant to confess because I 'softened' him pre-Miranda"
9  and asked him to "give me your thoughts when free."  I brought
10 these matters up with AUSA Scarpelli because I was interested in
11 any court decisions or definition that mentioned the term in the
12 federal system, similar to the California state system cases Lt.
13 Yacoubian had discussed. Because I had a personal relationship
14 with AUSA Scarpelli, I knew him to be an experienced,
15 intelligent, practiced, and meticulously detailed prosecutor who
16 would research the term thoroughly and whose advice I could rely
17 on.  On the same date, AUSA Scarpelli responded that he would
18 look into the Miranda issue, but that "most judges would frown
19 upon 'softening up' defendants."  It was here that I returned the
20 banter and first used the term "softening up" in a joking manner
21 when I responded, "One man's softening up is another man's repore
22 [sic] building."[3]

23

24    [3] On July 29, 2009, this email was presented to the court as
25 an exhibit.  The exhibits, however, were not presented in
   chronological order, thus potentially making it appear,
26 incorrectly, that the June 11, 2009, email came after the July 9,
   2009, email.  When read in chronological order, the email chain
27 demonstrates that I was the first to use the terms "rapport
   building" and "soften up," before these terms were used by
28 AUSA Scarpelli, thus demonstrating that I did not "tailor my

1    11.  On or about June 15, 2009, I went to coffee in
2  Washington, D.C. with AUSA Scarpelli.  During the walk, I told
3  AUSA Scarpelli that because I kept canceling meeting him for
4  coffee, I would buy the coffee.  Sarcastically referencing our
5  previous discussions on "softening," AUSA Scarpelli replied, "Are
6  you trying to soften me up?"  When I received the July 9, 2009,
7  email, at issue with this court, a few weeks later, I understood
8  it to be an extension of the humorous reference to this line of
9  discussion.

10    12.  On or about June 17, 2009, I spoke telephonically with
11  Central District of California AUSA Lana Morton-Owens about the
12  Welton case.  She told me about the pending suppression motion by
13  the defense and wanted me to testify as an expert regarding the
14  child pornography images.  AUSA Morton-Owens informed me that she
15  had been an AUSA for a relatively short time and had never worked
16  a child pornography case.  She told me that she would be relying
17  on my experience for the Welton case and asked for my assistance
18  since the current case agent was also inexperienced.  She
19  explained she was waiting for a suppression motion from the
20  defense attorney based on my interview with Welton.  I assured
21  her I would assist her on anything that she would need to respond
22  to the motion to suppress filed by the defense attorney.  I
23  informed her I would be forwarding some ideas regarding answering
24  the suppression motion from prior suppression motions after I
25  listened to Welton's interview again.  I also told her I was

26

27

testimony" based on my communications with AUSA Scarpelli, as the
28  defense claimed.

6

recently part of a child pornography case in D.C. (I was referring to the Giraldo matter) and would talk to the AUSAs in D.C. about forwarding her examples to help address the suppression motion.  AUSA Morton-Owens thanked me and told me she would forward the suppression motion when it was filed.

13.  On June 19, 2009, I forwarded (via email) to AUSA Morton-Owens an opposition to a suppression motion filed by AUSA Connelly in the Giraldo case.  The email read, "attached is a recent opp to motion to suppress statements.  Unfortunately, it is not as similar to our case as I first thought, however, it may help."  I also wrote, "I will send you the other list of points regarding why Welton's confession was voluntary soon."  On the same date, I sent AUSA Morton-Owens a document that outlined the points I felt she should make in response to the suppression motion.  This document came from my own archive of suppression responses from previous cases that I worked.

14.  On June 29, 2009, AUSA Morton-Owens sent me the Welton suppression motion, interview transcripts, and an exhibit.  I forwarded those documents to AUSA Connelly, who was at the time on temporary duty assignment from the D.C. United States Attorney's Office to the FBI.  AUSA Connelly offered to pull together some case law on the matter, but I never followed through with her on that offer. On or about the same day I spoke with AUSA Morton-Owens regarding the motion.  I told her I was surprised at some of the defense attorney's arguments, especially the accusation that I lied during the interview regarding the fingerprints being on the evidence when the defense attorney knew this to be a correct fact.  AUSA Morton-Owens agreed with me and

7

stated she had spoken to the defense attorney about it and he had
downplayed the fact.

15. On July 1, 2009, I responded to a social banter email
from AUSA Scarpelli about ice hockey. I also brought up the
Welton motion and my frustration at the defense inaccuracies
because I wanted his professional opinion regarding the defense
attorney's statements. Furthermore, I wanted his legal insight
into how this motion could be addressed by AUSA Morton-Owens.
(In a previous discussion, I had informed AUSA Scarpelli that the
prosecuting AUSA on this case was a new AUSA.)

16. On July 2, 2009, I discussed telephonically my
declaration for the government's opposition with AUSA Morton-
Owens. Pursuant to her request, I also sent her a copy of the
arrest warrant containing charging language. AUSA Morton-Owens
sent me via email the declaration to review.

17. On July 5 & 6, 2009 I contacted AUSA Morton-Owens and
informed her I made changes to the declaration and would fax her
my finalized declaration.

18. On July 9, 2009, I received the email from AUSA
Scarpelli that contained the statement currently at issue. Prior
to forwarding it, I checked with him to obtain permission to send
it to others as I believed it would be more information to assist
AUSA Morton-Owens. After he assented, I forwarded it to AUSA
Morton-Owens with the comment, "I forwarded the suppression
motion to a friend of mine who is a [sic] AUSA in DC and has been
doing sex crimes for 17 years to see if I missed anything. He
had some thoughts, most of which we had already discussed.
Anyway, thought they would be worth passing them to you. Talk to

8

you soon."  Also on that date, I sent the suppression motion to
AUSA Joey Blanch in the Central District of California.  AUSA
Blanch was the AUSA assigned to the Welton case prior to AUSA
Morton-Owens.[4]

19.  On July 13, 2009, I met AUSA Morton-Owens in person for
the first time.  The meeting was in AUSA Morton-Owens's office
and FBI SA Minh Tran was also present.  During the meeting, I
asked AUSA Morton-Owens if she had gotten my emails, and she said
that she had.

20.  On July 13, 2009, I testified at the first hearing on
the suppression motion.  After the hearing, AUSA Morton-Owens
asked my opinion whether the United States Attorney's Office
should stipulate to not showing the jury certain of the child
pornography images if the defense stipulated that the children in
the images were in fact under 18.  I told AUSA Morton-Owens that
I did not think it was a good idea but that I would call AUSA
Connelly on the issue.  I sent AUSA Connelly a text to call me,
which she did.  We discussed the issue and her advice was to not
agree to the proposed stipulation.  I relayed this information to
AUSA Morton-Owens and then sent a text message to AUSA Connelly
stating, "Thanks Kate. We will not stipulate".  On the same
date, AUSA Morton-Owens asked my advice about another issue
regarding the original filing of the case.  I knew AUSA Joey
Blanch, another experienced AUSA, would know the answer so I

---

[4] I did not recall I forwarded this email to AUSA Blanch,
the former AUSA on this case, until it was restored on or about
September 2, 2009.  This is an example of a forwarded email that
had been deleted to make more room on my computer.

9

1  walked to her office and sought her opinion.  After our
2  discussion, AUSA Blanch came to AUSA Morton-Owens's office and
3  discussed the case further with AUSA Morton-Owens, FBI SA Tran,
4  and myself.  Before leaving the office, AUSA Morton-Owens asked
5  me to listen in on a conference call between her and the defense
6  attorney the following day.  I informed her that if I was not on
7  the airplane, I would, but regardless, I would arrange for
8  another Agent to assist her if needed.

9      21.  On July 14, 2009, AUSA Morton-Owens sent me an email
10 thanking me for all my hard work and the moral support.  She also
11 informed me she would not need me for the call because she had
12 chosen to send the defense attorney a letter.  On the same date,
13 AUSA Connelly sent me an email regarding the Welton matter
14 stating, "the AUSA should order the transcript of the D's
15 testimony of the hearing, so she can use it to cross examine him
16 if he goes to trial . . . "  On or about the same day I called
17 AUSA Morton-Owens and informed her what AUSA Connelly advised.

18     22.  On July 22, 2009, at her request, I emailed AUSA
19 Morton-Owens all emails that I had in my email account with any
20 reference to the Welton case.  The first email I sent contained
21 the statement currently at issue.  The text accompanying the
22 forwarded email stated, "Here is the chain and talk between me
23 and AUSA Scarpelli."  The text accompanying the forwarded email
24 had no additional information as to who AUSA Scarpelli was and no
25 further explanation because this was the second time I had
26 forwarded the email to AUSA Morton-Owens.

27     23.  Prior to the July 29, 2009, suppression hearing, in
28 response to an inquiry from AUSA Morton-Owens, I told her that I

                                10

had forwarded AUSA Scarpelli's July 9, 2009, email to her on July 9, 2009. At the request of AUSA Morton-Owens, I then looked for the record that I had forwarded the July 9, 2009, email to AUSA Morton-Owens, but could not locate it. As an FBIHQ SSA responsible for child abduction violations, I receive every national Amber Alert and missing child report from the National Center for Missing and Exploited Children, which culminates in a high daily volume of emails. The FBI email system will not allow a user to send outgoing emails when the mailbox exceeds a certain size limit, so I regularly delete my "deleted items" and "sent items" folders to make room. This is why I could not locate the sent email in question nor did I feel at the time it was a relevant issue as I had the original email in my inbox.

24. On July 29, 2009, I testified before the court regarding the suppression motion. At some point before entering the courtroom, AUSA Morton-Owens informed me that the defense might ask me why I did not forward AUSA Scarpelli's July 9, 2009 email to her. I responded that I had forwarded that email to her prior to the first suppression hearing.

25. On or about September 2, 2009, I received the court transcripts from the July 29, 2009, hearing and learned some of the issues that were discussed in the motion hearing. After this, I contacted the FBIHQ Information Technology section and asked for a search of my deleted email to include all forwarded emails. Ultimately IT Specialist Anthony Sangley stated he found on the FBI servers the email I had sent to AUSA Morton-Owens along with other emails mentioned in this declaration that I had deleted.

11

26.  I fear that at the July 29, 2009, hearing the court was led to believe I had been acting on my own in ways that could affect my testimony without consulting with AUSA Morton-Owens.  I fear that my credibility was further put in question based on the mistaken belief that I had never forwarded the July 9, 2009, email to AUSA Morton-Owens as I testified I had.  If I had realized that my forwarding of this email to AUSA Morton-Owens would become a significant issue relating to my credibility, I would have made certain that it was found and produced at the time of the hearing.  I apologize for any confusion resulting from this email.  It was simply part of my efforts to consult with a number of AUSAs to ensure that the government was able to present the best opposition it could to defendant's suppression motion.  I make this declaration so the court may have additional details regarding the events that led up to my testimony on July 29, 2009.  I told the complete truth about the conversations I had with the defendant, and I did not view any of the emails I received, including the July 9, 2009, email from AUSA Scarpelli, as attempting improperly to cause me to testify in a particular way.  To the contrary, based on my previous interactions with AUSA Scarpelli, I viewed his comment, "DON'T SAY IT WAS TO SOFTEN HIM UP," as a joke, and, for this reason, I do not believe this comment affected my testimony.  Nevertheless, I recognize the court's concern that given the pendency of the suppression motion, and my status as a witness in connection with that motion, the comment could create the impression that it was intended improperly to tailor my testimony.  I further recognize the court's concern that the comment may have subconsciously

12

1  affected my testimony.  I want to assure the court that I take
2  the court's concerns seriously, and that I take responsiblity for
3  the events that occasioned the court to rule as it did.  I
4  apologize if anything I have said or done has created a different
5  impression.  If the court should request additional information,
6  I willingly make myself available to the court.

7      I declare under penalty of perjury that the foregoing is
8  true and correct to the best of my knowledge and belief.
9  Executed this ___ day of July, 2010.

11

12                          Stephanie Benitez
13                          STEPHANIE BENITEZ

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              13

1
2
3
4
5
6
7
8
9
10
11
12
13

# DECLARATION OF ASSISTANT UNITED STATES ATTORNEY ANTHONY SCARPELLI

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUPPLEMENTAL DECLARATION OF ANTHONY SCARPELLI

I, ANTHONY SCARPELLI, declare and state as follows:

1.   I am an Assistant United States Attorney for the District of Columbia.  I have been so employed since August 2000. I hereby incorporate by reference my previous declaration filed in this matter signed and dated July 28, 2009.

2.   As I truthfully testified to the Court and swore in my earlier declaration dated July 28, 2009, the comment I made to Special Agent Benitez regarding "softening" a defendant was intended to be humorous, in the context of a social relationship I had with Special Agent Benitez, in which we had previously joked with each other using this language.  I realize now that regardless of my motivation, and even in the context of a friendly relationship, where Special Agent Benitez's testimony was pending at a suppression hearing, such a comment could have been interpreted by others as a suggestion as to how she should testify, or as potentially influencing the testimony of a less-experienced witness.

3.   As an Assistant United States Attorney, I am well aware of the ethical obligations attendant to my position.  I take very seriously my responsibility to "seek justice, not merely to convict."  Ethical Consideration (EC) 7-13 of Canon 7 of the American Bar Association (ABA) Model Code of Professional Responsibility (1982).  In accordance with my professional standards, I immediately self-reported this Court's findings to the United States Attorney's Office for the District of Columbia and to the Department of Justice's Office of Professional Responsibility.

4.    I wish to apologize to the Court for my comments that caused this controversy and for any actions on my part that may have suggested to the court that I did not recognize the seriousness of the issues posed by my communication.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Washington D.C., this 6th day of July , 2010.

ANTHONY SCARPELLI

2

1
2
3
4
5
6
7
8
9
10
11
12
13

# DECLARATION OF
# ASSISTANT UNITED STATES ATTORNEY
# J. LANA MORTON-OWENS

16
17
18
19
20
21
22
23
24
25
26
27
28

1               **DECLARATION OF J. LANA MORTON-OWENS**

2      I, J. Lana Morton-Owens, declare and state:

3      1.   I am an Assistant United States Attorney ("AUSA") at

4 the United States Attorney's Office for the Central District of

5 California.  I am responsible for the prosecution of <u>United</u>

6 <u>States v. Richard Michael Welton</u>, CR09-153-MMM.  I make this

7 declaration in support of the government's motion to amend the

8 court's August 1, 2009, order in the <u>Welton</u> case.

9      2.   On July 22, 2009, in response to my request, FBI

10 Special Agent ("SA") Benitez forwarded to me a series of email

11 communications relating to the <u>Welton</u> case, including a July 9,

12 2009 email she had received from District of Columbia AUSA

13 Anthony Scarpelli.  I provided these email communications,

14 including the July 9, 2009, email from AUSA Scarpelli, to the

15 defense.

16      3.   On July 29, 2009, immediately prior to the hearing on

17 Defendant's Motion Regarding Government Outrageous Misconduct, I

18 asked SA Benitez why she had not previously forwarded the July 9,

19 2009, email from AUSA Scarpelli to me as the email chain she had

20 provided to me on July 22, 2009 indicated she had intended to.

21 SA Benitez told me that she had in fact forwarded AUSA

22 Scarpelli's July 9, 2009, email to me on July 9, 2009.  Based on

23 this information, I immediately searched my computer for the

24 email, including all sent, deleted and case file emails, but

25 could not locate it.  I then aked SA Benitez to attempt to locate

26 the email in her sent emails (remotely from the U.S. Attorney's

27 Office) in an attempt to confirm the forwarding of AUSA

28 Scarpelli's July 9, 2009 email.  SA Benitez also could not locate

1 │ the email.   There was insufficient time to conduct a search of my

2 │ office's computer servers for the email prior to the hearing.

3 │        4.    After the conclusion of the trial, I contacted my

4 │ office's technical support staff to conduct a complete search of

5 │ my office's computer servers to determine whether there was any

6 │ record of SA Benitez's attempt to forward AUSA Scarpelli's July

7 │ 9, 2009 email.   This search revealed that SA Benitez had indeed

8 │ forwarded AUSA Scarpelli's July 9, 2009, email to me on July 9,

9 │ 2009, precisely as she had stated and testified that she had.   A

10 │ copy of the July 9, 2009 email from SA Benitez recovered from my

11 │ office's computer servers is attached in Exhibit 8.

12 │        5.    I have no specific recollection of receiving the July

13 │ 9, 2009 email from SA Benitez, or of deleting that email.   I

14 │ sincerely apologize to the Court and all parties for my failure

15 │ to properly account for my email communications, and for not

16 │ recalling that I received the July 9, 2009, email from SA

17 │ Benitez.

18 │        6.    I believe that SA Benitez conducted herself during the

19 │ entire case with the utmost professionalism.   To the extent

20 │ anything I said or did during the case in any way contributed to

21 │ the Court making the adverse credibility finding against SA

22 │ Bentiez, I ask that the Court reconsider.

23 │        7.    On June 30, 2010, at the request of Deputy Federal

24 │ Public Defender ("DFPD") John Littrell, the attorney for

25 │ defendant Welton, I provided DFPD Littrell with a copy of the

26 │ government's motion to amend the August 1, 2009, order to strike

27 │

28 │                                    2

the credibility findings against FBI SA Benitez and AUSA
Scarpelli in the <u>Welton</u> case.  On July 8, 2010, I received from
DFPD James Locklin an email (copied to DFPD John Littrell)
advising me that the Federal Public Defender's Office would take
no position on the government's motion so long as it continued to
include the paragraph stating: "By this motion the government
does not seek to alter the remedies imposed by the court as a
means of avoiding prejudice to defendant in the underlying
criminal case.  In particular, the government is not asking the
court to reconsider its decision to strike a portion of Benitez's
testimony.  And, though the government does seek withdrawal of
the adverse credibility finding against Benitez (for reasons
discussed below), the government agrees not to call Benitez as a
witness should this case return for retrial for any reason, so
defendant would not be harmed by losing the opportunity to employ
an adverse credibility finding in cross-examining Benitez at any
such retrial."  The government's motion includes this paragraph.

I declare under penalty of perjury under the laws of the
United States that the foregoing is true and correct to the best
of my knowledge and belief.  Executed this 7 day of July,
2010, at Los Angeles California.


J. LANA MORTON-OWENS

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF
# ASSISTANT UNITED STATES ATTORNEY
# JOHN V. GEISE

DECLARATION OF JOHN V. GEISE

I, John V. Geise, declare and state as follows:

1. I am an Assistant United States Attorney for the District of Columbia. I have held that position since September of 2005. I am presently the Acting Chief of the Organized Crime and Narcotics Trafficking Section of the Criminal Division of that Office.

2. I am a 1980 graduate of the Harvard Law School. As a law student, I served as a Note Editor of the Harvard Law Review.

3. From 1980-1981, I was a law clerk to Justice Benjamin Kaplan of the Supreme Judicial Court of Massachusetts.

4. From 1981-1984, I was an associate at the law firm of Hughes Hubbard & Reed.

5. From 1984-1987, I was a trial attorney at the Narcotics and Dangerous Drug Section of the Criminal Division of the Department of Justice.

6. From 1987-1999, I was an Assistant United States Attorney for the District of Maryland. During that period I held various positions including Mid-Atlantic Regional OCDETF Coordinator, Appellate Chief, Southern Division, and Deputy Chief, Southern Division.

7. From 1999-2005, I was Senior Counsel and then Principal Associate Director for Policy at the Office of Enforcement Operations of the Criminal Division of the Department of Justice. During that time I was a recipient of the John Marshall Award for Support of Litigation and the Attorney General's Award for Exceptional Service.

8.   Since  1996,  I  have  been  an  Adjunct  Professor  at  the University  of  Maryland  Law  School  and  have  taught  "Advanced Criminal  Procedure"  and  am  presently  teaching  "The  Role  of  the Federal  Prosecutor."

9.  In  my  position  as  Acting  Chief  of  the  Organized  Crime  and Narcotics  Trafficking  Section  of  the  Criminal  Division  in  the Office  of  the  United  States  Attorney  for  the  District  of  Columbia, I  am  the  direct  supervisor  of  Assistant  United  States  Attorney Anthony  Scarpelli.

10.   Mr.  Scarpelli  joined  the  Office  of  the  United  States Attorney  for  the  District  of  Columbia  in  2000.   In  that  time  he  has had  an  outstanding  record  and  receives  exemplary  performance evaluations.   In  addition,  he  has  been  the  recipient  of  seven Department  of  Justice  Special  Achievement  Awards,  and,  in  2009,  was nominated  for  a  Director's  Award  from  the  Executive  Office  for United  States  Attorneys.

11.  Mr.  Scarpelli  is  well  regarded  by  the  judges  of  both  the federal  and  local  bench,  as  well  as  the  defense  bar.   He  has handled  hundreds  of  cases  in  the  Federal  District  Court  for  the District  of  Columbia  and  the  Superior  Court  for  the  District  of Columbia.   He  has  never  been  sanctioned  in  either  of  these  courts for  any  ethical  lapse.   I  have  spoken  to  Mr.  Scarpelli's  former supervisor  from  his  prior  nine-year  career  as  a  county  prosecutor in  Middlesex  County,  New  Jersey,  and  understand  that  his  reputation for  professional  ethics  was  unblemished.

2

12. As Mr. Scarpelli's supervisor, I have always found that Mr. Scarpelli exercises excellent judgment and acts in an entirely professional and, indeed, admirable fashion.

13. Based on this Court's order of August 1, 2009 in <u>United States v. Welton</u>, Mr. Scarpelli has been referred to the Office of Professional Responsibility of the Criminal Division of the Department of Justice for possible disciplinary action. The Office of the United States Attorney for the District of Columbia is also considering internal disciplinary sanctions in light of this Court's opinion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Washington, D.C., this 2nd day of July, 2010.

JOHN V. GEISE

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF ANTHONY SANGLEY

DECLARATION OF ANTHONY SANGLEY

I, Anthony Sangley, declare and state as follows:

1.  I am a RSA (Rivest, Shamir, Adleman) Two Factor Authentication Team Operations and Maintenance Administrator.  At the time of the request by SSA Stephanie Benitez, I was a UNET (Unclassified Network) Systems Administrator.  I have been employed with the FBI as a contractor for approximately two years.  Prior to my work with the FBI I was an IT Manager for Triumph Technologies Incorporated.

2.  As a UNET Systems Administrator my job was to maintain the services and functionality of the FBI information technology systems or assets.  This includes but is not limited to installing security updates, security patches, and proprietary software and hardware updates applied to servers and applications.

3.  The email system utilized by the FBI is Microsoft Exchange 2007 and the mail interface used to browse and draft emails is Microsoft Outlook.  The FBI IT policy imposes a limit on mailbox sizes for all FBI employees not to exceed 150 MB.  The reason for this is to keep the server storage space at an operational state.

4.  On September 3, 2009, I received a request from SSA Benitez to recover a specific email that was deleted.  I requested from SSA Benitez the date she sent or received the email, the sender, and the recipients of the email.  I also requested the date the email was originally sent to SSA Benitez. I also requested the name of the original sender of the email and

1  performed key word searches pertaining to the sender and
2  recipient of the email. I recall two of the key word searches
3  being "Scarpelli" and "Morton".

4     5.  On September 3, 2009, I selected the date range from
5  July 1, 2009, to August 2, 2009, to restore potentially lost or
6  deleted emails from the exchange server, which holds user emails
7  indefinitely.

8     6.  On September 4, 2009, I restored the emails which fell
9  between July 1, 2009 to August 2, 2009 and placed them in a
10 folder I created called "RECOVERED_3SEPT09". From this folder I
11 subsequently performed key word searches. Once I found the
12 possible email candidates, I restored them into SSA Benitez's
13 inbox for her to review and verify. For security purposes and
14 network requirements, I am not permitted to open or review any
15 FBI user's email.

16    7.  On September 4, 2009, SSA Benitez called me and verified
17 the deleted email she was seeking was recovered. I closed the
18 ticket on her request once I received this confirmation.

19    I declare under penalty of perjury that the foregoiong is
20 true and correct to the best of my knowledge and belief.

21    Executed in Washington, D.C, this 30 day of June, 2010.

22
23                                    _____
24                                    Anthony Bangley
25
26
27
28                              2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF
# FBI SUPERVISORY
# SENIOR RESIDENT AGENT
# KERRY P. SMITH

DECLARATION OF KERRY P. SMITH

I, Kerry P. Smith, declare and state as follows:

1. I am a Supervisory Senior Resident Agent (SSRA) for the Federal Bureau of Investigation (FBI) assigned to the Los Angeles Field Office, West Covina Resident Agency Squad 3 (WCRA Squad 3). I have served in this position since May 1997. I entered on duty as a Special Agent with the FBI on March 31, 1985. During my tenure as supervisor over WCRA Squad 3, I have been responsible for managing Special Agents who conduct investigations of Asian organized crime, violent gangs, violent crime, and the Innocent Images National Initiative that targets child pornography.

2. I am a 1980 graduate of California State University Fullerton earning a Bachelor of Arts degree in Criminal Justice.

3. From 1980-1985, I was employed as a police officer for the City of Stanton, located in Orange County, California.

4. During my career with the FBI, I have earned the following distinctions: Director's Award for Special Achievement (related to successful resolution of an international kidnaping investigation); FBI Quality Step Increases (QSI) incentive awards for exceptional performance of duties; Lifetime Achievement Award for Excellence in Law Enforcement presented in 2009 by the International Organization of Asian Crime Investigators and Specialists.

5. In my position as Supervisory Senior Resident Agent (SSRA) over West Covina Resident Agency (WCRA) Squad 3, of the Los Angeles Field Office of the FBI, I was the direct supervisor of Special Agent (SA) Stephanie Benitez from February 21, 2003, upon her graduation from the FBI New Agents Training Academy, until her promotion to a Term Supervisory Special Agent position in the

1  Crimes Against Children Unit (CACU) at FBIHQ, effective December 7,
2  2008.   In the time that I supervised SA Benitez, she had an
3  outstanding record as one of the most productive agents on the
4  squad and received exemplary performance evaluations.

5       6.   While under my supervision, SA Benitez was the primary
6  case agent on hundreds of criminal investigations, including cases
7  involving take-over bank robberies, fugitives, child prostitution,
8  child exploitation, and the possession, distribution, and
9  production of child pornography.  SA Benitez was the affiant on
10 over 50 arrest and search warrant affidavits in the Central
11 District of California; testified approximately 40-50 times in
12 local and federal court, and has been deemed a government subject
13 matter expert on child pornography.

14      7. During SA Benitez's assignment to WCRA Squad 3, she
15 distinguished herself as an exceptional investigator, consistently
16 demonstrating strong initiative, tenacity, and a tireless work
17 ethic.  She was knowledgeable of FBI policy, procedures, and
18 applicable laws, and could always be relied upon to make sound
19 decisions in carrying out her assignments.

20      8.  SA Benitez was assigned initially to the investigation of
21 violent crime matters handling a large case load of bank robberies.
22 Working with limited FBI violent crime resources due to the FBI's
23 realignment of manpower to combat terrorism, SA Benitez teamed up
24 with local law enforcement in successfully identifying, gathering
25 evidence, and obtaining prosecution against many gang-related
26 violent takeover bank robbery groups.  SA Benitez was responsible
27

28                              2

1   for creating a computer website for law enforcement agencies to
2   share information on bank robbery matters throughout the greater
3   Los Angeles area which greatly enhanced communication and
4   information sharing amongst local, state, and federal agencies.

5       9. Following her assignment to violent crime matters, SA
6   Benitez's efforts were redirected to the investigation of crimes
7   against children, focusing primarily on child internet pornography
8   cases under the FBI's Innocent Images National Initiative. SA
9   Benitez was the only agent on WCRA Squad 3 assigned full time to
10   these matters. Once again, she established productive working
11   relationships with other local, state, and federal investigators
12   resulting in many successful joint investigations and prosecutions
13   of child sexual offenders. She was a member of the Los Angeles FBI
14   SAFE Team (Sexual Apprehension Felony Enforcement Team) where she
15   was extremely well respected among her colleagues. Without
16   prompting, she organized a multi-day training course on the
17   investigation of crimes against children that was extremely well
18   received by local, state, and federal officers. She brought in
19   instructors with expertise on a variety of topics, while
20   instructing herself on several areas. Again, SA Benitez showed
21   tremendous initiative and dedication in organizing this training
22   course that benefitted many other law enforcement officers by
23   enhancing their knowledge, skills, and abilities in conducting
24   investigations involving crimes against children.

25      10. SA Benitez is a certified child forensic interviewer, a
26   credentialed instructor for the State of California, and a general
27

28                                3

police instructor for the FBI.  She has instructed more than 1,000 law enforcement officers on the topic of child exploitation and interviewing and interrogation of sex offenders.  Because of her accomplishments and expertise, Benitez was honored as the Keynote Speaker by the California Sexual Assault Investigators Association in 2007.  In 2008, Benitez was recognized by the Mayor and City Council of West Covina, California, for her work as the case agent in apprehending the subject, a convicted sex offender from West Covina, who had relocated to Russia in violation of California law, and had taken up residence next to a school.

11.  In sum, as SA Benitez's former supervisor, I have found her to be of the utmost integrity, fully dedicated to the mission of the FBI, and loyal to the United State of America.  She always performed her duties and responsibilities professionally, and to the best of her abilities.

12.  SA Benitez is currently the subject of a pending DOJ OPR investigation for her role in the matter currently before this court.  The FBI has also opened an OPR investigation on Benitez and is deferring action on it pending the results of the DOJ OPR.

13.  Testifying in court and serving as an affiant on complaints and warrants are requirements for most FBI Special Agents assigned to investigate criminal cases. My understanding is that a court's adverse credibility finding against an agent will result in the agent having Henthorn/Giglio issues.  DOJ policy requires that Henthorn/Giglio issues be divulged to the appropriate United States Attorney's Offices.   These offices then turn

4

1    information relating to the Henthorn/Giglio issues over to defense

2    attorneys in cases being prosecuted in which the agent is

3    significantly involved. FBI agents with these issues are typically

4    subject to impeachment by defense attorneys based on the

5    information relating to the Henthorn/Giglio issues for the balance

6    of their careers each time they testify. Prosecutors typically try

7    to build their cases without agents with these issues and will

8    avoid using them whenever possible. Consequently, agents with

9    these issues are often transferred to programs where these issues

10    do not impact their ability to fully do their jobs. This restricts

11    career development and advancement opportunities for these agents.

12      I declare under penalty of perjury that the foregoing is true

13    and correct to the best of my knowledge and belief.

14      Executed in West Covina, California, this $\underline{30^{TH}}$ day of $\underline{JuNe}$,

15    2010.

16

17

Kerry P. Smith

18                   Kerry P. Smith

19

20

21

22

23

24

25

26

27

28                             5

# Exhibit 1

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 07/27/2009 01:02:55 |
|---|---|---|---|
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | |
| Folder: | | | |
| Subject: | FW: | | |
| Attachments: | | | |

🖨 Print the page

SSA Stephanie D. Benitez
Federal Bureau of Investigation
Violent Crimes/Crimes Against Children Unit, Rm. 3999
Tel:    202-324-6364
Cell:   626-523-4272
_____

From: Benitez, Stephanie D.
Sent: Thursday, June 11, 2009 4:47 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:

Enough surface area that will fit your ass.

-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 4:50 PM
To: Benitez, Stephanie D.
Subject: RE:

Don't get carried away, I only own 13% of the white elephant.

From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 4:38 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:

One man's softening up is another man's repore building.

Kate's case – defendant was Rafael Gilberto Giraldo.


Regarding the North Carolina property.  Ugh... purchasing that thing was like purchasing a white elephant.

-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 4:25 PM
To: Benitez, Stephanie D.
Subject: RE:

I will look up the Miranda issue.  My first thought is that most judges would frown upon "softening up" defendants.
I will read over Honeycutt and see what else I can come up with.  In the case you did with Kate, do you recall the
defendant's name and possibly the criminal case number?  I could look and see if Judge Urbina prepared a written
opinion.  If I don't get back to you next week please remind me.  At my age and with all the chemicals in my hair,
the brain is slowing.

How about insult to injury – the IRS has audited me because they don't believe I have a stake in the NC property.
Maybe the government will bail me out too.

From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 2:14 PM
To: Scarpelli, Anthony (USADC)
Subject: RE:

Helloooo – Clydes – Yeah - the last time I went there my credit card was stolen.

I am not sure. I just returned from homicide school so am pretty busy myself. I also told a colleague I would take him out to celebrate his passing of his ASAC exam which I will be taking in the next few weeks. Maybe we will swing by.

Charlie is good. He was pretending like he was afraid of the storm last night and barked until I let him in my room. Faker.

When you have a chance, give me your thoughts regarding a Miranda question. In this last case, Katzoff questioned my "softening" of the defendant pre-Miranda and the judge through out the defendant's pre-Miranda statement. (But Kate never told me why). I did not think this was a problem. However, last week at school I was told "softening" could get your confession thrown out (Case law – Honeycutt). So… LA USAO called me yesterday to inform they were not going to offer another one of my sex offenders any type of plea because he is so dangerous, thus he will go to trial July 21. The Defense attorney is saying I compelled the defendant to confess because I "softened him" pre-Miranda.

This keeps coming up! While I don't think this is going to be an issue in this case (the defendant was out of custody during the interview and prior to interviewing him I told him he was not in-custody and he was free to leave) I Mirandized him bc his parole Agent was onsite and I told him, I did not want him to feel like he had to talk to me because he was here, so, out of an abundance of caution, I was going to Mirandize him. To which he waived.

Give me your thoughts when free...


-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, June 11, 2009 1:40 PM
To: Benitez, Stephanie D.
Subject: RE:

Hi Ms. Benitez,

Thank you for the documents. I will look them over.

Are you going to meet at Clyde's later? I was going to try but have too much to do. I am traveling to Florida for work Saturday morning and won't be back until Wednesday. So, I have a bunch of things I need to get done.

Anyway, thanks again, hope you are well

Anthony

P.S. How is Charlie?


From: Benitez, Stephanie D. (FBI)
Sent: Thursday, June 11, 2009 12:13 PM
To: Scarpelli, Anthony (USADC)
Subject:

Hi Anthony,

I hope you are well. The attached word document is a doc. I created a few years ago for the local police regarding what they should do when seizing computer evidence and subsequently asking for a review. It might answer some of the questions you had asked about last week. The attached word perfect document is a basic guide CART gives Agents who ask for a computer review. While some of it may be over your head, you may be able to glean some pointers from it as well.

Good Luck,


SSA Stephanie D. Benitez

Violent Crimes/Crimes Against Children Unit,3999

Washington D.C.

Tel: 202-324-6364

Cell: 626-523-4272

# Exhibit 2

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 06/19/2009 14:54:15 |
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | Tran, Minh D. (FBI) <Minh.Tran@ic.fbi.gov> |
| Folder: | | | |
| Subject: | FW: | | |
| Attachments: | Opp to motion to supp stmts.wpd  Opp to motion to supp stmts.pdf | | |

🖶 Print the page

Hi Lana,

Attached is a recent opp to motion to suppress statements.  Unfortunately, it is not a similar to our case as I first thought, however, it may help.

For the website information I would contact the following two people:

1)  Chris Christopherson FBI Agent San Diego– 858.499.7753
2)  Justin Kempf – FBI Agent Los Angeles – 951.248.6616

I will send you the other list of points regarding why Welton's confession was voluntary soon.

-----Original Message-----
**From:** Connelly, Catherine
**Sent:** Thursday, June 11, 2009 4:57 PM
**To:** Benitez, Stephanie D.
**Subject:**

## Benitez, Stephanie D.

| | |
|---|---|
| **From:** | Benitez, Stephanie D. |
| **Sent:** | Friday, June 19, 2009 2:54 PM |
| **To:** | Morton-Owens, Lana (USACAC) |
| **Cc:** | Tran, Minh D. |
| **Subject:** | FW: |
| **Attachments:** | Opp to motion to supp stmts.wpd; Opp to motion to supp stmts.pdf |

Hi Lana,

Attached is a recent opp to motion to suppress statements.  Unfortunately, it is not a similar to our case as I first thought, however, it may help.

For the website information I would contact the following two people:

1) Chris Christopherson FBI Agent San Diego– 858.499.7753
2) Justin Kempf – FBI Agent Los Angeles – 951.248.6616

I will send you the other list of points regarding why Welton's confession was voluntary soon.

-----Original Message-----
**From:** Connelly, Catherine
**Sent:** Thursday, June 11, 2009 4:57 PM
**To:** Benitez, Stephanie D.
**Subject:**

9/28/2009

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 08-14 (RMU) |
| | : | |
| v. | : | |
| | : | |
| RAFAEL GILBERTO GIRALDO | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, hereby files this opposition to defendant's motion to suppress statements. In support of this opposition, the government relies upon the points and authorities set out in this memorandum and at any hearing on this matter.

### Background

On Friday, August 31, 2007, Metropolitan Police Department Detective Timothy R. Palchak, of the Federal Bureau of Investigation's ("FBI") Innocent Images Task Force, was acting in an undercover capacity in a child pornography picture chat room posing as an adult male using the screen name, "daughterlover_maryland". Using a secure computer in the District of Columbia, Detective Palchak posted a message in the public chat room asking if anyone had access to a child. An individual using the screen name "pued" responded back stating, "not in the US". Detective Palchak provided this individual an MSN screen name and email address and then began a private online conversation with this individual. During this private online conversation, the individual was using the MSN screen name "hu" and an email address of wngmn2007@hotmail.com.

The individual using screen name "hu" and an email address of wngmn2007@hotmail.com stated that he was a thirty year-old male residing in California but originally from Columbia, South America. This individual informed Detective Palchak that he had connections with a madam in

# Exhibit 3

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 06/19/2009 16:39:27 |
|---|---|---|---|
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | Tran, Minh D. (FBI) <Minh.Tran@ic.fbi.gov>, Macfarlane, Douglas (LA) (IC) (FBI) <Douglas.Ma ... |
| Folder: | | | |
| Subject: | More on Welton | | |
| Attachments: | Welton's confession.wpd | | |

🖶 Print the page

Hi Lana,

Attached are arguments that you may want to include in your response to defense counsel regarding the voluntariness of Welton's confession.

In addition, I was talking to FBI SA Doug MacFarlane (310.996.3845) who is an Agent in Westwood, and who has gone to trial on several of these cases. He brought up a good idea regarding the interstate nexus issue. The victims pictured in the cp most definitely are not from California, nor were the images produced in California. Whomever we have testify regarding the children, we can ask whether those children live in California or if those images were produced in California – which will be no.

Have a great weekend,

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit,3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

## Benitez, Stephanie D.

| | |
|---|---|
| **From:** | Benitez, Stephanie D. |
| **Sent:** | Friday, June 19, 2009 4:39 PM |
| **To:** | Morton-Owens, Lana (USACAC) |
| **Cc:** | Tran, Minh D.; Macfarlane, Douglas (LA) (IC) |
| **Subject:** | More on Welton |
| **Attachments:** | Welton's confession.wpd |

Hi Lana,

Attached are arguments that you may want to include in your response to defense counsel regarding the voluntariness of Welton's confession.

In addition, I was talking to FBI SA Doug MacFarlane (310.996.3645) who is an Agent in Westwood, and who has gone to trial on several of these cases. He brought up a good idea regarding the interstate nexus issue. The victims pictured in the cp most definitely are not from California, nor were the images produced in California. Whomever we have testify regarding the children, we can ask whether those children live in California or if those images were produced in California – which will be no.

Have a great weekend,

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

9/28/2009

Reasons why Welton's confession was voluntary:

We: Refers to FBI SA Stephanie D. Benitez, and FBI Task Force Officer Detective Bernie Trapp.

-Welton was intervied by the investigators in an office and the interview was audiotaped.
-We identified ourselves and advised we were not part of the parole search.
-We talked to him away from his parole officer, away from the search area.
-We did not have our guns showing.
-We did not show up in raid jackets.
-We advised Welton within the first two minutes of the interview he was not in custody and he was free to leave.
-Prior to Welton having his <u>Miranda Rights</u> read to him, and 13 minutes into the interview it was explained to him that he did not have to talk with us.
**-While he was not in custody, he was told by SA Benitez she was going to advise of him of his <u>Miranda Rights</u> because she wanted him to make sure he that he understood he did not have to talk to the investigators.**
-Prior to Miranda and 16 minutes into the interview, Welton was told again he was not in custody and SA Benitez did not want him to feel like he was compelled to talk.
- Welton's <u>Miranda Rights</u> were read to him and he indicated he wanted to talk with the investigators
- Welton signed the waiver portion of the <u>Miranda</u> form.
- Toward the end of the interview Welton had the presence of mind to ask if he should get a lawyer. - - SA Benitez advised he was free to get a lawyer if he wanted.
- Welton voluntarily gave consent to search his computer at his house.
- Welton was interviewed for approximately one hour, thirty minutes.
- SA Benitez and Detective Trapp did not arrest Welton that day.

Exhibit 4

Benitez, Stephanie D.

| | |
|---|---|
| ɔm: | Connelly, Catherine |
| ɪt: | Friday, September 04, 2009 11:33 AM |
| : | Benitez, Stephanie D. |
| _ubject: | FW: Welton Motion to Suppress |


-----Original Message-----
From: Connelly, Catherine
Sent: Tuesday, June 30, 2009 8:21 AM
To: Benitez, Stephanie D.
Subject: RE: Welton Motion to Suppress

Thanks.  I have a few mtgs this morning, so will probably hit you up this p.m.

-----Original Message-----
From: Benitez, Stephanie D.
Sent: Tuesday, June 30, 2009 8:19 AM
To: Connelly, Catherine
Subject: Re: Welton Motion to Suppress

:). Ok let me know when ur free today. I'm 30 min from O now, but have all day open.
SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272

----- Original Message -----
From: Connelly, Catherine
: Benitez, Stephanie D.
ɪt; Tue Jun 30 08:17:59 2009
ɔject: RE: Welton Motion to Suppress

No problem at all.  I'll take a look at it this week.  (I skimmed the facts, but didn't
read the whole legal argument.) I've got your back girl!

-----Original Message-----
From: Benitez, Stephanie D.
Sent: Tuesday, June 30, 2009 8:14 AM
To: Connelly, Catherine
Subject: Re: Welton Motion to Suppress

You are hilarious!!  I am sure she would not mind bc she has not done a case like this
before. I don't want you going out of your way on this.  I know she is working on this
soon.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272

----- Original Message -----
From: Connelly, Catherine
To: Benitez, Stephanie D.
Sent: Tue Jun 30 08:10:55 2009
Subject: RE: Welton Motion to Suppress

Seriously?  Give me a break.  This is just evidence of how good you are at your job!

s the AUSA feel comfortable responding to these?  Do you want me to pull together some
ɔlaw?

1

From: Benitez, Stephanie D.
Sent: Monday, June 29, 2009 8:56 PM
To: Connelly, Catherine
Subject: Fw: Welton Motion to Suppress

here we go again..


SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272


From: Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov>
To: Benitez, Stephanie D.
Sent: Mon Jun 29 20:48:11 2009
Subject: Welton Motion to Suppress


Stephanie,

Please see the motion and transcript attached.

<<Motion to Suppress.pdf>> <<weltontranscripts.pdf>> <<Suppress Exh. A-d.pdf>>

Lana Morton-Owens

Assistant United States Attorney

United States Attorney's Office

2 North Spring Street

Los Angeles, California  90012

Telephone:  (213) 894-3547

Facsimile:      (213) 894-0141

2

# Exhibit 5



**"Morton-Owens, Lana (USACAC)"**
**<Lana.Morton-Owens@usdoj.gov>**

07/28/2009 03:48 PM

To  "John Littrell" <John_Littrell@fd.org>

cc

bcc

Subject  Additional Emails from Scarpelli/Benitez

John:

I am forwarding these to you without Bates numbers to save time. I will create Bates versions as soon as I can. Please call me if you have any questions.

<<FW: Still like Brashear??>> <<FW: >>
----- Message from "Scarpelli, Anthony (USADC)" <AScarpelli@usa.doj.gov> on Tue, 28 Jul 2009 17:38:56 -0400 -----

To:  "Morton-Owens, Lana (USACAC)"
     <lmorton-owens@usa.doj.gov>

Subject:  FW: Still like Brashear??

-----Original Message-----
From: Benitez, Stephanie D. (FBI)
Sent: Wednesday, July 01, 2009 4:06 PM
To: Scarpelli, Anthony (USADC)
Subject: RE: Still like Brashear??

Thx

-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Wednesday, July 01, 2009 4:05 PM
To: Benitez, Stephanie D.
Subject: RE: Still like Brashear??

If I don't get back to you on the review of the documents by early next week, contact me and we can talk about it.

-----Original Message-----
From: Benitez, Stephanie D. (FBI)
Sent: Wednesday, July 01, 2009 3:49 PM
To: Scarpelli, Anthony (USADC)
Subject: RE: Still like Brashear??

You are so wishy-washy.

The interview transcript is also included. I thought I did a great job
on this one. He was on probation and at work. Because I feared he
would use the excuse that he "had to talk" because his probation officer
was onsite, I interviewed him away from his parole officer AND
Mirandized him after I told him he did not have to talk to me. I should
be good.

Congrats on the sex cases. You seem to have difficulty getting one of
these things to go to trial. Which is a good thing...frees you up for
more bad guys.

-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Wednesday, July 01, 2009 3:45 PM
To: Benitez, Stephanie D.
Subject: RE: Still like Brashear??

Today is the first day of free agency. Brashear signed with the
Rangers, ha ha. Now I love him!

I will read it and give you any thoughts.

Both of the sex cases I have are pleading tomorrow. Oh well, I will
have find something else to do.

-----Original Message-----
From: Benitez, Stephanie D. (FBI)
Sent: Wednesday, July 01, 2009 3:41 PM
To: Scarpelli, Anthony (USADC)
Subject: RE: Still like Brashear??

I was just thinking about you the other day, thinking it was about that
time you send me a random email mocking my beloved CAPS. I can't open
the article but will when I get home. I can only assume he kicked some
puppies or sponsored some dog fights.

I leave at the end of next week for yet another suppression hearing on
another case. I will forward you the suppression motion by the defense
attorney. I am honestly shocked by what he says about me and find it
hard to believe that can get away with this. An Agent I work with said
if a Defense Attorney was going to be that over the top in his town
(Indiana), he would get a tongue lashing from the judge. What he says

about me in the motion is complete crap and untrue. I really hope
others do not have access to this and can use it against me in another
trial. For shame.


-----Original Message-----
From: Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
Sent: Wednesday, July 01, 2009 3:33 PM
To: Benitez, Stephanie D.
Subject: Still like Brashear??

 <<story.url>>
The message is ready to be sent with the following file or link
attachments:

Shortcut to: http://www.tsn.ca/nhl/story/?id=283433


Note: To protect against computer viruses, e-mail programs may prevent
sending or receiving certain types of file attachments. Check your
e-mail security settings to determine how attachments are handled.
----- Message from "Scarpelli, Anthony (USADC)" <AScarpelli@usa.doj.gov> on Tue, 28 Jul 2009
17:38:24 -0400 -----
  **To:** "Morton-Owens, Lana (USACAC)"
    <lmorton-owens@usa.doj.gov>
**Subject**
**:** FW:


**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, June 11, 2009 6:26 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** Re:

Kate called to see if I was going to HH and I told her I had to work late. On the way down, I ran into her on
the elevator and she said, "Work late huh?". I am on her crap list now. Ugh.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272


**From:** Scarpelli, Anthony (USADC) <Anthony.Scarpelli@usdoj.gov>
**To:** Benitez, Stephanie D.
**Sent:** Thu Jun 11 18:03:16 2009
**Subject:** RE:

I tried to send you this case. Although your technique is efficient and productive, 5 of the 9 supreme court justices didn't like it. I will try and scan the opinion and email it to you. Based on what a defendant says, it may make the entire confession inadmissible.

Supreme Court of the United States
MISSOURI, Petitioner,
v.
Patrice SEIBERT.
No. 02-1371.
Argued Dec. 9, 2003.
Decided June 28, 2004.

**Background:** Defendant was convicted in the Circuit Court, Pulaski County, Douglas E. Long, Jr., J., of second-degree murder. Defendant appealed, and the Missouri Supreme Court, 93 S.W.3d 700, reversed and remanded. Certiorari was granted.

**Holding:** The Supreme Court, Justice Souter, held that *Miranda* warnings given mid-interrogation, after defendant gave unwarned confession, were ineffective, and thus confession repeated after warnings were given was inadmissible at trial, abrogating *United States v. Orso*, 266 F.3d 1030, and *United States v. Esquilin*, 208 F.3d 315.

Affirmed.


**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, June 11, 2009 5:42 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** RE:

OK. I will just wait for the Scarpelli opinion.

-----Original Message-----
**From:** Scarpelli, Anthony (USADC) [mailto:Anthony.Scarpelli@usdoj.gov]
**Sent:** Thursday, June 11, 2009 5:28 PM
**To:** Benitez, Stephanie D.
**Subject:** RE:

No written opinion by judge.

**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, June 11, 2009 5:02 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** FW:

Possibly February 20th...

-----Original Message-----
**From:** Connelly, Catherine
**Sent:** Thursday, June 11, 2009 4:57 PM
**To:** Benitez, Stephanie D.
**Subject:**

# Exhibit 6

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 07/22/2009 10:46:14 |
|---|---|---|---|
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | Tran, Minh D. (FBI) <Minh.Tran@ic.fbi.gov> |
| Folder: | | | |
| Subject: | FW: Welton Motion to Suppress | | |
| Attachments: | Motion to Suppress.pdf  weltontranscripts.pdf  Suppress Exh. A-d.pdf | | |

🖨 Print the page

Hi Lana,

This is the first of several emails I will be sending you that may be jinx material.

The only people I ever email regarding this case is AUSA Scarpelli and you. I will have to see if I email Minh, but I am not sure.

-----Original Message-----
**From:** Benitez, Stephanie D.
**Sent:** Wednesday, July 01, 2009 3:41 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** FW: Welton Motion to Suppress

Here it is... ridiculous.

-----Original Message-----
**From:** Morton-Owens, Lana (USACAC) [mailto:Lana.Morton-Owens@usdoj.gov]
**Sent:** Monday, June 29, 2009 8:48 PM
**To:** Benitez, Stephanie D.
**Subject:** Welton Motion to Suppress


Stephanie,

Please see the motion and transcript attached.

<<Motion to Suppress.pdf>> <<weltontranscripts.pdf>> <<Suppress Exh. A-d.pdf>>

Lana Morton-Owens

Assistant United States Attorney

United States Attorney's Office

312 North Spring Street

Los Angeles, California  90012

Telephone: (213) 894-3547

Facsimile:    (213) 894-0141

Exhibit 7

**Cardona, George S. (USACAC)**

| | |
|---|---|
| **From:** | Angelini, Peter M. Jr. (FBI) |
| **Sent:** | Wednesday, November 25, 2009 3:26 PM |
| **To:** | Cardona, George S. (USACAC) |
| **Subject:** | Fw: remind me? |

```
----- Original Message -----
From: Benitez, Stephanie D.
To: Angelini, Peter M. Jr.
Sent: Wed Nov 25 18:20:09 2009
Subject: FW: remind me?
```

This email preceeds the one I just you. Joey was the original AUSA on the case.

```
From: Blanch, Joey (USACAC) [Joey.Blanch@usdoj.gov]
Sent: Thursday, July 09, 2009 6:16 PM
To: Benitez, Stephanie D.
Subject: RE: remind me?
```

When is the hearing?  I may come lurk in the back.

```
From: Benitez, Stephanie D. (FBI)
Sent: Thursday, July 09, 2009 3:14 PM
To: Blanch, Joey (USACAC)
Subject: Re: remind me?
```

Bernie Trapp. 3106282245

I will be in the office on Monday to testify in Welton's suppression hearing. I will try and stop by to say hi.


SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

```
From: Blanch, Joey (USACAC) <Joey.Blanch@usdoj.gov>
To: Benitez, Stephanie D.
Sent: Thu Jul 09 18:03:50 2009
Subject: remind me?
```

Remind me who was assigned the Serrano case?  He was just sentenced state-side to 17 years. I need to touch base w/ them to get him over here.

**Cardona, George S. (USACAC)**

| | |
|---|---|
| **From:** | Angelini, Peter M. Jr. (FBI) |
| **Sent:** | Wednesday, November 25, 2009 3:25 PM |
| **To:** | Cardona, George S. (USACAC) |
| **Subject:** | Fw: Welton Motion to Suppress |
| **Attachments:** | Motion to Suppress.pdf; weltontranscripts.pdf; Suppress Exh. A-d.pdf |

```
----- Original Message -----
From: Benitez, Stephanie D.
To: Angelini, Peter M. Jr.
Sent: Wed Nov 25 18:19:00 2009
Subject: FW: Welton Motion to Suppress
```

```
From: Benitez, Stephanie D.
Sent: Thursday, July 09, 2009 6:19 PM
To: Blanch, Joey (USACAC)
Subject: Fw: Welton Motion to Suppress
```

1:15 pm.

Never have I been accused of being "too nice" or acting like a priest. This should be fun.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

```
From: Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov>
To: Benitez, Stephanie D.
Sent: Mon Jun 29 20:48:11 2009
Subject: Welton Motion to Suppress
```

Stephanie,

Please see the motion and transcript attached.

<<Motion to Suppress.pdf>> <<weltontranscripts.pdf>> <<Suppress Exh. A-d.pdf>>

Lana Morton-Owens

Assistant United States Attorney

United States Attorney's Office

312 North Spring Street

Los Angeles, California  90012

1

Telephone:  (213) 894-3547

Facsimile:     (213) 894-0141

Exhibit 8

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 07/09/2009 18:48:12 |
|---|---|---|---|
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | |
| Folder: | | | |
| Subject: | FW: Welton | | |
| Attachments: | | | |

🖶 Print the page

Hi Lana,

I forwarded the suppression motion to a friend of mine who is a AUSA in DC and has been doing sex crimes for 17 years to see if I missed anything. He had some thoughts, most of what we had already discussed.

Anyway, thought they would be worth passing them to you.

Talk to you soon,

SSA Stephanie D. Benitez
Federal Bureau of Investigation
Violent Crimes/Crimes Against Children Unit, Rm. 3999
Tel:    202-324-6364
Cell:   626-523-4272
_____
From: Scarpelli, Anthony (USADC) [Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, July 09, 2009 4:39 PM
To: Benitez, Stephanie D.
Subject:

Hey Benitez,

I have been reading you interview, piece-by-piece, so I may have missed a point or two. But here are my thoughts.

First, I didn't think the defense attorney said anything so shocking about you. It is the usual nonsense they spew out. I have seen much worse, and directed at me, too.

That said, first, I think there is a good argument that he was not in custody. I have not researched it, but your best line is at p. 3, " . . . if you want to leave and go that's fine too."

Also, at p. 16 " . . . you don't have to talk to us today." I think these are more detailed and clear that he was free to leave. It's much more pointed than the usual you're not in custody. Good job.

Even if the judge determines the D was in custody, the per-Miranda conversations were not incriminating. The conversation was background information to see if D wanted to talk, and to make him feel comfortable with you. DON'T SAY IT WAS TO SOFTEN HIM UP. Even if the court decides that parts were incriminating, the prosecutor can request to merely redact those parts.

If the court concludes that the pre-Miranda were statements made while in custody, and likely to elicit an incriminating response, no big deal. After he was Mirandized, he gave you the juicy stuff, right?

The argument that you lied to him, and you preyed on his prior victimization will not fly. Lying to D's is permissible, as long as it does not go so far to violate Due Process rights. Case law establishes that much worse things have been told to D's and to not invalidate the statement. Finally, preying on his victimization (as the defense attorney will claim), is a loser too. The prosecutor should keep it in terms of just trying develop a rapport with D.

Some other quick thoughts. He appeared to understand legal concepts – he understood parole issues. He had been arrested before, so he has experience with the criminal justice system, he had some further education, and was a Marine. This all is good to establish he was not the innocent fawn that the D will paint him out to be.

Also, the defense attorney said in his motion that Welton didn't understand his rights because you read them too fast. P. 5, L19-21.
At transcript p. 85 he said he may want a lawyer now. Obviously, he understood his rights, as read by you.

Bottom line, he will take a plea because he is cooked.

Does that make sense?  Let me know if there is anything else.

Good luck,

AS

**Benitez, Stephanie D.**

| | |
|---|---|
| **From:** | Benitez, Stephanie D. |
| **Sent:** | Thursday, July 09, 2009 6:48 PM |
| **To:** | Morton-Owens, Lana (USACAC) |
| **Subject:** | FW: Welton |

Hi Lana,

I forwarded the suppression motion to a friend of mine who is a AUSA in DC and has been doing sex crimes for 17 years to see if I missed anything. He had some thoughts, most of what we had already discussed.

Anyway, thought they would be worth passing them to you.

Talk to you soon,

SSA Stephanie D. Benitez
Federal Bureau of Investigation
Violent Crimes/Crimes Against Children Unit, Rm. 3999
Tel: 202-324-6364
Cell: 626-523-4272

From: Scarpelli, Anthony (USADC) [Anthony.Scarpelli@usdoj.gov]
Sent: Thursday, July 09, 2009 4:39 PM
To: Benitez, Stephanie D.
Subject:

Hey Benitez,

have been reading you interview, piece-by-piece, so I may have missed a point or two. t here are my thoughts.

First, I didn't think the defense attorney said anything so shocking about you. It is the usual nonsense they spew out. I have seen much worse, and directed at me, too.

That said, first, I think there is a good argument that he was not in custody. I have not researched it, but your best line is at p. 3, " . . . if you want to leave and go that's fine too."

Also, at p. 16 " . . . you don't have to talk to us today." I think these are more detailed and clear that he was free to leave. It's much more pointed than the usual you're not in custody. Good job.

Even if the judge determines the D was in custody, the per-Miranda conversations were not incriminating. The conversation was background information to see if D wanted to talk, and to make him feel comfortable with you. DON'T SAY IT WAS TO SOFTEN HIM UP. Even if the court decides that parts were incriminating, the prosecutor can request to merely redact those parts.

If the court concludes that the pre-Miranda were statements made while in custody, and likely to elicit an incriminating response, no big deal. After he was Mirandized, he gave you the juicy stuff, right?

The argument that you lied to him, and you preyed on his prior victimization will not fly. Lying to D's is permissible, as long as it does not go so far to violate Due Process rights. Case law establishes that much worse things have been told to D's and to not invalidate the statement. Finally, preying on his victimization (as the defense attorney will claim), is a loser too. The prosecutor should keep it in terms of just trying evelop a rapport with D.

e other quick thoughts. He appeared to understand legal concepts — he understood role issues. He had been arrested before, so he has experience with the criminal justice system, he had some further education, and was a Marine. This all is good to

1

establish he was not the innocent fawn that the D will paint him out to be.

Also, the defense attorney said in his motion that Welton didn't understand his rights because you read them too fast.  P. 5, L19-21.

transcript p. 85 he said he may want a lawyer now. Obviously, he understood his rights, read by you.

Bottom line, he will take a plea because he is cooked.

Does that make sense?  Let me know if there is anything else.

Good luck,

AS

# Exhibit 9

**Cardona, George S. (USACAC)**

| | |
|---|---|
| **From:** | Angelini, Peter M. Jr. (FBI) |
| **Sent:** | Wednesday, November 25, 2009 3:27 PM |
| **To:** | Cardona, George S. (USACAC) |
| **Subject:** | Fw: Hi |

----- Original Message -----
From: Benitez, Stephanie D.
To: Angelini, Peter M. Jr.
Sent: Wed Nov 25 18:24:08 2009
Subject: FW: Hi


From: Benitez, Stephanie D.
Sent: Monday, July 13, 2009 7:50 PM
To: Blanch, Joey (USACAC)
Subject: Re: Hi

Be right there
SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272

----- Original Message -----
From: Blanch, Joey (USACAC) <Joey.Blanch@usdoj.gov>
To: Benitez, Stephanie D.
Sent: Mon Jul 13 19:47:03 2009
Subject: RE: Hi

Am at my desk.  Extension 3315.  Room number?  No clue.  15th floor, go right at the
reception desk.  How did the hearing go??

-----Original Message-----
From: Benitez, Stephanie D. (FBI)
Sent: Monday, July 13, 2009 4:46 PM
To: Blanch, Joey (USACAC)
Subject: Hi

You at your desk?  What room number?

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272

1

# Exhibit 10

**Cardona, George S. (USACAC)**

| | |
|---|---|
| **From:** | Angelini, Peter M. Jr. (FBI) |
| **Sent:** | Wednesday, November 25, 2009 3:33 PM |
| **To:** | Cardona, George S. (USACAC) |
| **Subject:** | Fw: Hi |

----- Original Message -----
From: Benitez, Stephanie D.
To: Angelini, Peter M. Jr.
Sent: Wed Nov 25 18:28:27 2009
Subject: FW: Hi

This was sent after the first hearing. Lana did not know if she should stipulate to having
the child pornography shown so I called Kate and told Lana her suggestions.

From: Benitez, Stephanie D.
Sent: Tuesday, July 14, 2009 6:18 PM
To: Connelly, Catherine
Subject: Re: Hi

Hi!
Just landed back in DC. I will try and find you tomorrow. Pretrial was crazy.  Defendant took
the stand too. They was some good times there.

Have a good night!

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272

----- Original Message -----
From: Connelly, Catherine
To: Benitez, Stephanie D.
Sent: Tue Jul 14 08:08:21 2009
Subject: RE: Hi

Good.  I think that is the way to go.
When are you coming back?

Also - the AUSA should order the transcript of the D's testimony at the hearing, so she can
use it to cross examine him if he testifies at trial...

-----Original Message-----
From: Benitez, Stephanie D.
Sent: Monday, July 13, 2009 7:14 PM
To: Connelly, Catherine
Subject: Re: Hi

Thanks Kate. We will not stipulate.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.

1

```
Tel:   202-324-6364
Cell:  626-523-4272

----- Original Message -----
From: Benitez, Stephanie D.
To: Connelly, Catherine
Sent: Mon Jul 13 18:42:18 2009
Subject: Hi

Can u call me?

626.523.4272
SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999 Washington D.C.
Tel:   202-324-6364
Cell:  626-523-4272
```

Exhibit 11

| From: | Benitez, Stephanie D. (FBI) <Stephanie.Benitez@ic.fbi.gov> | Date: | 07/22/2009 11:08:15 |
|---|---|---|---|
| To: | Morton-Owens, Lana (USACAC) <Lana.Morton-Owens@usdoj.gov> | Cc: | Tran, Minh D. (FBI) <Minh.Tran@ic.fbi.gov> |
| Folder: | | | |
| Subject: | FW: | | |
| Attachments: | | | |

🖶 Print the page

Here is the chain and talk between me and AUSA Scarpelli.

-----Original Message-----
**From:** Benitez, Stephanie D.
**Sent:** Thursday, July 09, 2009 5:50 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** Re:

That time already? Have fun.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

**From:** Scarpelli, Anthony (USADC) <Anthony.Scarpelli@usdoj.gov>
**To:** Benitez, Stephanie D.
**Sent:** Thu Jul 09 17:48:35 2009
**Subject:** RE:

He's screwed.

Well, good luck. I am off to play hockey.

**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, July 09, 2009 5:44 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** Re:

I am always gentle.

We were at his place of work, in the privacy of his boss' office. He has been mirandized at least 15 time prior and per his case file, has invoke a majority of the time, thus this was not new to him.

Not cuffed.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

Case 2:03-cr-00153-MMM Document 128 Filed 12/02/09 Page 115 of 117 Page ID #:2024

**From:** Scarpelli, Anthony (USADC) <Anthony.Scarpelli@usdoj.gov>
**To:** Benitez, Stephanie D.
**Sent:** Thu Jul 09 17:38:28 2009
**Subject:** RE:

Well, that helps, too (that he wasn't in custody).

In the end for in custody purposes, the test is would a reasonable person in his position feel free to leave and not answer questions. You told him he could leave, and left, he knew the criminal system, was smart enough, did not appear to be under the influence of drugs, alcohol, etc., the statement wasn't long, it was at his place, not police station (right?), you were not aggressive with him.

Not cuffed, right? Offered him drink, bathroom?

**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, July 09, 2009 5:29 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** Re:

Yes...but then was arrested by parole (not me) for having a scooby-doo alarm clock. (His 19th arrest by the way).

She will appreciate it. Thank You.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

**From:** Scarpelli, Anthony (USADC) <Anthony.Scarpelli@usdoj.gov>
**To:** Benitez, Stephanie D.
**Sent:** Thu Jul 09 17:25:17 2009
**Subject:** RE:

Did he leave after the statement?

Yes, feel free to send it to her.

**From:** Benitez, Stephanie D. (FBI)
**Sent:** Thursday, July 09, 2009 5:15 PM
**To:** Scarpelli, Anthony (USADC)
**Subject:** Re:

Thank You. Yes, makes lots of sense. Thanks for looking this over. I testify on Monday so we will see what happens. The AUSA is awesome on this case, but she has about four months on only so I wrote most of my declaration for her (scary).

I hope you don't mind if I forward your email to her???

Hope you are well.

SSA Stephanie D. Benitez
Violent Crimes/Crimes Against Children Unit, 3999
Washington D.C.
Tel: 202-324-6364
Cell: 626-523-4272

---

**From:** Scarpelli, Anthony (USADC) <Anthony.Scarpelli@usdoj.gov>
**To:** Benitez, Stephanie D.
**Sent:** Thu Jul 09 16:39:52 2009
**Subject:**

Hey Benitez,

I have been reading you interview, piece-by-piece, so I may have missed a point or two. But here are my thoughts.

First, I didn't think the defense attorney said anything so shocking about you. It is the usual nonsense they spew out. I have seen much worse, and directed at me, too.

That said, first, I think there is a good argument that he was not in custody. I have not researched it, but your best line is at p. 3, " . . . if you want to leave and go that's fine too."

Also, at p. 16 " . . . you don't have to talk to us today." I think these are more detailed and clear that he was free to leave. It's much more pointed than the usual you're in custody. Good job.

Even if the judge determines the D was in custody, the per-Miranda conversations were not incriminating. The conversation was background information to see if D wanted to talk, and to make him feel comfortable with you. DON'T SAY IT WAS TO SOFTEN HIM UP. Even if the court decides that parts were incriminating, the prosecutor can request to merely redact those parts.

If the court concludes that the pre-Miranda were statements made while in custody, and likely to elicit an incriminating response, no big deal. After he was Mirandized, he gave you the juicy stuff, right?

The argument that you lied to him, and you preyed on his prior victimization will not fly. Lying to D's is permissible, as long as it does not go so far to violate Due Process rights. Case law establishes that much worse things have been told to D's and to not invalidate the statement. Finally, preying on his victimization (as the defense attorney will claim), is a loser too. The prosecutor should keep it in terms of just trying develop a rapport with D.

Some other quick thoughts. He appeared to understand legal concepts – he understood parole issues. He had been arrested before, so he has experience with the criminal justice system, he had some further education, and was a Marine. This all is good to establish he was not the innocent fawn that the D will paint him out to be.

Bottom line, he will take a plea because he is cooked.

Does that make sense? Let me know if there is anything else.

Good luck,

AS